1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF GEORGIA

3       MACON DIVISION

4     ————————————

5

6 PAUL WINDOM,  PLAINTIFF,   :
             : Case No. 5:10-CV-407(MTT)
7 v.         :
             :  July 30, 2012
8           :  Macon, Georgia
 NORFOLK SOUTHERN RAILWAY  :
9 COMPANY,        :
      DEFENDANT.  : Volume I of IV
10 ————————————————

11

12       CIVIL JURY TRIAL

13   BEFORE THE HONORABLE MARC T. TREADWELL,
   UNITED STATES DISTRICT JUDGE, PRESIDING

14 <u>APPEARANCES</u>:

15 FOR THE PLAINTIFF:   PETER ANDREW LAMPROS
          PATRICK JOSEPH HANNON
16         COOK, HALL, AND LAMPROS, LLP
          1230 PEACHTREE ST NE STE 3700
17         ATLANTA, GA 30309

18 FOR THE DEFENDANT:   MARK EDWARD TOTH
          AMANDA M. MORRIS
19         HALL, BLOCH, GARLAND, & MEYER
          P.O. BOX 5088
20         MACON, GA 31201

21

22

23 ———————————————————————————

24     *SALLY L. GRAY, CCR, RPR, USCR*
       *P.O. BOX 875*
      *MACON, GA 31202-0875*
25

       *(478-752-3497)*

1                    INDEX TO PROCEEDINGS

2                      July 30, 2012

3                      Volume I of IV

4      PRELIMINARY

5      OPENING STATEMENTS

6

7    PAUL TIMOTHY WINDOM

8          DIRECT EXAMINATION BY MR. LAMPROS          43

9          CROSS EXAMINATION BY MR. TOTH              96

10

11

12    CERTIFICATE OF COURT REPORTER                    165

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**JULY 30, 2012**

**THE COURT:**  Let's talk just a moment about scheduling this morning first, let me see if I can get some idea.  I don't think -- some idea of what your preferences are with regard to one question.  I do not think that I'm going to move into opening statements.  That is where the lawyers have the opportunity to tell you what they believe the evidence will show that you will hear in this case.  We're too close to lunchtime to do that.

It seems to me that it would be the best use of our time though for me to take a few minutes and give you some preliminary instructions and then release you for lunch.  That will probably take ten minutes, plus or minus.  I'm ready to move directly into that, but do any of you want to take a short break before we do that, knowing that we'll only be going for another ten minutes?

Okay.  Hearing no objections to that, let me give you some preliminary instructions.  The first thing I'm going to do is to ask Ms. Hatcher to administer to you another oath.

*(Clerk Swears Jury)*

**THE COURT:**  Thank you.  Ladies and gentlemen, you have now been sworn as the jury that will try this case, and I want to give you some preliminary instructions to give you some idea about what we're going to be doing or our procedure.  As

1    jurors, by your verdict you will decide the disputed issues of

2    fact in this case.  I will decide the legal issues, and at the

3    conclusion of the trial I will instruct you with regard to the

4    law that governs the fact.  But you decide the facts.  You are

5    the judges of the facts that you will hear during the course

6    of this trial.

7         Obviously, it should come as no surprise to you, but

8    because you are the judges of the facts you need to give

9    careful attention to the testimony and evidence presented for

10   your consideration during the course of the trial.

11        You should keep an open mind.  You should not form or

12   state any opinion about the case one way or other until you

13   have heard all of the evidence and have the benefit of the

14   closing arguments of the lawyers, which they will do after you

15   have heard the evidence.

16        In order for your verdict to be fair, you must not be

17   exposed to any other information about the case, the law, or

18   any issues or any people involved in this case during the

19   course of your trial duty.

20        This is very important, and I'm going to take a few

21   minutes to talk about it because we have found through

22   experience, courts across the country, that in our day of

23   instant access to information, whether or not it's true or

24   accurate information or not, but instant access to information

25   has sometimes presented a problem.

1       Our system in this country is based on many things, but

2   one thing it's based on when it comes to a jury trial is that

3   the 12 of you or any juror base your verdicts on what comes

4   out in the courtroom.  The lawyers have the opportunity to

5   test that evidence through cross examination.  The exhibits,

6   they can cross examine about the exhibits.  Both sides are

7   fighting on the same field, so to speak.

8       So any information that you have that comes -- that I

9   admit into evidence you can rest assured that both sides have

10  had a fair opportunity to test that information on behalf of

11  their clients.

12      It's an important to the case, to all the parties.  And

13  they're entitled to have the opportunity to test the evidence

14  that comes in, the evidence upon which you will base your

15  verdict.

16      Now, we used to just worry about newspapers and the

17  impact that newspapers might have or radio might have when

18  jurors could be exposed to information about a case other than

19  the information that comes into evidence.  Of course, we live

20  in a different world now.  Whether it's through the Internet,

21  you name it.  I'm sure I don't have to tell you how easily it

22  is for to you access information.  You cannot do that.

23      You cannot go home at night and say well, I'll just look

24  at Google and see what I can find out.  You can't Twitter and

25  Tweet and e-mail and text to try to find out information or to

1    tell somebody about what's going on in this case.  I won't

2    tell you the severe sanctions, I won't tell you in detail the

3    severe sanctions that some courts have had to impose in order

4    to, first, to stop that kind of conduct misconduct by jurors,

5    and, two, to punish jurors for that misconduct.

6        Here in this court we haven't had a significant problem.

7    But I recognize the potential for that, and that why I'm

8    taking the time to speak to you directly about this very

9    serious potential problem.  Don't Tweet, don't Google, don't

10   look at your computer.

11       And this includes, too, more traditional means of

12   communication.  Don't go home and talk to your spouse about,

13   well, this is what we did today, what do you think, or what

14   can you tell me about this.

15       After the trial is over you can Tweet, Google, text, talk

16   to your spouse to your heart's content.  That's fine.  But

17   during the trial we will not have a fair trial if you allow

18   yourself to access or to be exposed to any information about

19   the case, the parties to the case, what happened, anything at

20   all like that.  Anybody have any questions at all about the

21   problem I am addressing and how serious I am about it?

22       Okay.  I will check with you during the course of the

23   trial to make sure we're not having any problems.  Typically

24   when you come back in the morning I will make sure that

25   nothing happened overnight that may have been a breach of what

1    I'm instructing you just now.

2        Of course, if any of you should learn that that type of

3    conduct has gone on, that a juror has done this or done that

4    or if anybody should try and contact you, which I don't think

5    for a moment will happen in this case, but if anybody should

6    try and contact you about your jury service, let us know and

7    we'll deal with that promptly.

8        We're careful about this because it's now not just what's

9    fair to the parties, although that's very, very important,

10   it's also a matter if there should be a breach of these rules

11   there's always the potential for a mistrial, meaning that --

12   the parties are here ready to go, the Court is ready to go,

13   they spent a lot of time, they've work hard to bring this case

14   to you, and if something -- you were to be exposed to

15   something that you're not supposed to be exposed to, there

16   would be the possibility of a mistrial, meaning all of our

17   time, at least this morning and to whatever point in the trial

18   we are at would be wasted as well as your time would be

19   wasted, and I know -- and not to mention the expense to the

20   court of having to reconvene again with another jury.

21       Enough of that.  Let me give you some preliminary

22   instructions on the law.  As I said, at the end of the trial I

23   will give you detailed instructions on the law but there are

24   some principles that you need to understand as we move forward

25   with the evidence.

1     First, the burden of proof.  This is a civil case as

2  opposed to a criminal case, and in a civil case the plaintiff

3  generally has the burden of proving his case beyond -- or by a

4  preponderance of the evidence.  If you've watched any kind of

5  TV, courtroom dramas, or if you've served on criminal juries,

6  you've heard the phrase beyond a reasonable doubt.

7     That is not the burden of proof in a civil case.  That is

8  the burden of proof in a criminal case.  In a civil case,

9  again, the burden is to prove -- whoever has the burden of

10  proof has to prove their case by a preponderance of the

11  evidence.  And I will talk to you more about that at the end

12  of the trial.

13     A quick example of that is a set of scales that we see in

14  the seals of courts, the scales of justice.  If whoever has

15  the burden of proof, say it's the plaintiff on a particular

16  issue, if his evidence or her evidence tilts the scales ever

17  so slightly in his or her favor, then that party has met their

18  burden of proof.

19     The defendant may have some defenses, and I will charge

20  you about this at the end of trial if that's the case, but the

21  defendant may have some defenses upon which it has the burden

22  of proof.  And if so, then the defendant too would have the

23  burden of proving its -- meeting its burden by a preponderance

24  of the evidence, again, tipping the scales however slightly in

25  its favor, and it would have carried its burden of proof on

1    that particular issue.

2         Evidence.  There are two kinds of evidence:  Direct and

3    circumstantial.  Direct evidence is direct proof of a fact,

4    such as testimony of an eye witness.  Circumstantial evidence

5    is proof of facts from which you may infer or conclude that

6    other facts exist.  I will talk to you more about direct

7    evidence and circumstantial evidence at the end of the trial.

8    You may take notes.  And are the pads in the jury box?

9         **COURTROOM DEPUTY:**  Yes.

10        **THE COURT:**  We have provided you with pencil and paper

11   so that you can take notes if you wish.  It is entirely up to

12   you.  If you do decide to take notes, don't get so caught up

13   in your notes that you're not paying attention to what's going

14   on here in the courtroom.  Sometimes it's easy to do that.  So

15   notes are there to aid your memory.

16        But what you really need to rely on is what you recall

17   from the testimony, from the evidence.  If you do not take

18   notes, and, again, that's fine, you should rely upon your

19   independent recollection or memory of what the testimony was,

20   and you should not be unduly influenced by your fellow jurors

21   who may have taken notes.

22        Ms. Sally Gray here, I'll go ahead and introduce her now,

23   is our court reporter.  She's going to be taking down and has

24   taken down everything -- what we call taking down --

25   everything that goes on in this courtroom, and it may be that

1    at some point a transcript will be prepared of the testimony.

2    But a transcript will not be available to you as jurors.

3    That's the reason it's so important that you listen carefully

4    to the testimony.

5        On the other hand, and another form of evidence that you

6    will have are the exhibits, not just the testimony of parties

7    and witnesses which is evidence, but the exhibits that I admit

8    are also evidence, and they will go back to you when you begin

9    your deliberations so -- and some exhibits may be passed to

10   you, some will be shown to you on the screen.  Don't worry

11   about trying to write down whatever you may see on an exhibit

12   because it will be available to you when you go back to begin

13   your deliberations.

14       As you listen to the testimony, you should remember that

15   you will be the sole judges of the credibility or the

16   believability of each witness and the weight to given to his

17   or her testimony.  What I might think about a witness -- and I

18   won't expressing any of opinion one way or the other.  But

19   what a judge might think of a witness's credibility doesn't

20   make any difference.  It's what you think of a witness's

21   credibility or believability.

22       You should consider in making a decision about a

23   witness's credibility his or her relationship to the plaintiff

24   or to the defendant, his or her interest, if any, in the

25   outcome of the case, his or her manner of testifying, his or

1    her opportunity to observe or see the things that he or she is

2    talking about, his or her candor, fairness, intelligence, and

3    to the extent to which his or her testimony has been supported

4    or contradicted.

5        You may hear the word impeach.  You can consider the

6    extent to which one witness's testimony has been supported or

7    contradicted by other evidence.  As I said, we are not going

8    to move into opening statements this morning.  We'll do that

9    right after lunch.  I'll have a couple more comments to say to

10   you about that.

11       Let me make one other ruling, and I will now invoke the

12   rule of sequestration.  What that means, ladies and gentlemen,

13   is that until a witness has testified, that witness cannot be

14   in the courtroom.  That witness cannot discuss his or her

15   testimony with any other witnesses.

16       The reason for that goal, I think you understand, we want

17   a witness to testify based upon their own knowledge without

18   being influenced by what they may have heard another witness

19   say or what they heard another witness say in the hall or on

20   the stand.  So the witnesses will be sequestered or remain

21   apart and outside of the courtroom until they have testified.

22       Have we fixed our clock?  We have.  Okay.  The clock on

23   the wall is right.  Sometimes it's right, sometimes it's not.

24   It appears to be generally correct.  It's 20 of 12:00.

25   Typically we will take about hour and 15 minutes for lunches.

1    I will always have at least one midmorning break, one

2    midafternoon break.

3        We will not go beyond 5 o'clock unless there's something

4    really important that we need to get done.  I understand that

5    sitting there listening intently is hard work and after you've

6    been doing it for five or six hours during the course of the

7    day, you wear down.  So it's not a marathon.

8        We want things to move as quickly as possible so that you

9    can get back to your lives, but at the same time we want to

10   proceed at a pace that would allow you to give maximum

11   attention to what's going on here in the courtroom.

12       For today, let's be back in the jury room -- and

13   Ms. Hatcher is going to take you back in a moment and

14   introduce you to our nice jury room.  But today be back in the

15   jury room at 1:15.  That will give you a little over an hour

16   and a half for lunch which is, as I said, is longer than we

17   normally take, but I've got several matters I have to deal

18   with here in the courtroom during the lunch hour.  So we'll

19   remain seated while you retire to the jury room.  Ms. Hatcher.

20   *(Jury Excused, 11:43 a.m.)*

21       **THE COURT:**  All right.  For the lawyers, make sure your

22   clients understand that the rule has been invoked.

23   Mr. Lampros, anything we need to consider before we take a

24   lunch break?

25       **MR. LAMPROS:**  No, Your Honor.  The only other thing, if

1    Your Honor may want to remind them if we pass in the hall and

2    we don't speak, we're not being unfriendly, it's just that

3    we're not permitted to.

4         THE COURT:  I was thinking of that just now as I

5    thought y'all would be leaving about the time they're leaving.

6    I will remind them of that.

7         MR. LAMPROS:  Otherwise, we'll get things out of the

8    way so you can take your pleas and we'll be back at 1 o'clock?

9         THE COURT:  You can stack it at one end.  They take the

10   pleas up front.  By the way opening, that mike at the -- on

11   the rail is pretty good.  You need to stay, though, use this

12   small podium.

13        MR. LAMPROS:  I was going to use the Elmo in my

14   opening.

15        THE COURT:  That's fine too, it's got a mike there.

16   But if you want to stand in front of the jury, just do it

17   there at the small podium.

18        MR. TOTH:  We haven't discussed any demonstrative

19   exhibits and whether or not we have agreement on that.

20        THE COURT:  About what?

21        MR. TOTH:  Any demonstrative exhibits he wants to use

22   in his opening.  I haven't seen anything.

23        THE COURT:  Do you intend to use any exhibits?

24        MR. LAMPROS:  Just some of the pictures that -- one of

25   the exhibits the --

1      **THE COURT:**  Well, discuss that during lunch.  It's

2   usually not a problem.  But y'all talk about it during lunch

3   and if there's something I need to rule on, we will.  Anything

4   further?

5      **MR. TOTH:**  Your Honor.  Mr. Birmingham -- if we're

6   invoking the rule, Mr. Birmingham is in the courtroom right

7   now, along with another witness I have and along with

8   certainly Mr. Bobbitt.  So the Court's ruling on whether or

9   not he's going to be call as a witness is certainly going to

10   impact whether he goes back to work or whether he has to hang

11   out in the hall.

12      **MR. LAMPROS:**  He's under subpoena, Your Honor.

13      **THE COURT:**  Let me say this first with regard to the

14   plaintiff's questions of Mr. Birmingham.  I discussed that ex

15   parte with the plaintiff's lawyers so that they would not to

16   reveal, appropriately so, trial strategy.  As outlined to me,

17   there is nothing in that examination that will require Mr.

18   Birmingham to discuss the plaintiff at all.  The plaintiff's

19   name.  There's no reason why it should come up during that

20   examination.  So that should give Mr. Birmingham some -- you

21   can talk with him about keeping his testimony to -- don't open

22   the door, in other words.  He's not going to be asked about

23   Mr. Windom, and I'm sure on your direct you won't get into it.

24   All right.  Anything else?

25      **MR. LAMPROS:**  Nothing from the plaintiff at this time,

1   Your Honor.

2       **THE COURT:**  All right.  Be back in the courtroom about

3   ten minutes after one.  Thank you.

4   *(RECONVENED; ALL PARTIES PRESENT)*

5       **THE COURT:**  Anything we need to talk about before we

6   bring the jury in?

7       **MR. LAMPROS:**  Yes, Your Honor, I'd like to use some

8   exhibits in opening, and I understand Mr. Toth objected until

9   they're ruled into evidence.  My view of opening is it's an

10  overview of the evidence to show them what we're talking

11  about, where we're talking about.  I was going to talk a

12  little bit about the knee and what I think the evidence is

13  going to show.

14      **THE COURT:**  Well, the knee model that I'm looking at is

15  demonstrative.  You're not going to tender that into evidence?

16      **MR. LAMPROS:**  No.

17      **THE COURT:**  I know of no reason why he can't use it.

18  Does the doctor use it?

19      **MR. LAMPROS:**  The doctor uses it.

20      **THE COURT:**  You could use that.  Now, generally the

21  rule is different with regard to exhibits themselves.  But

22  have there been any objections to the exhibits?

23      **MR. TOTH:**  Your Honor, what I anticipate at least in

24  part was that, you know, as Your Honor's figured out long ago

25  what the jury decides about the step, which step is involved,

1    I mean, that's highly disputed as to, you know, which step is

2    involved.  The step from the fuel tank or the step they

3    contend is the middle step that's closest to the ground.

4    Mr. Lampros gets up there, puts picture up there, and he

5    explains to the jury, you know, essentially testifies as to,

6    not necessarily what the evidence is, about what his

7    contentions are, before any witness has had the opportunity to

8    take the stand, authentic a photo, say this is the welding

9    truck, say this is what it looked like on a certain day, say

10   this is the platform, the step in the fuel tank, whatever

11   their explanation is going to be.  I think it should come from

12   the witnesses.  It certainly would be appropriate for argument

13   by counsel in closing arguments and certainly could be the

14   subject of direct and cross exam, but I don't think it's --

15   you know, the knee diagram, the doctor does use it, I

16   understand that, I could live with that.  But, you know,

17   putting photos up here, I mean, we're essentially up here

18   making a closing argument in an opening statement as to, you

19   know, that the evidence is.

20       **MR. LAMPROS:**  Your Honor, I will not make -- I'm not

21   going to be argumentative.  I'm going to show them what we're

22   talking about.  I think it's perfectly appropriate.  I'm sure

23   the Court is going to instruct them that our opening

24   statements are not evidence, that they are just simply what

25   our view of what the evidence is going to be.  I think I'm

1    entitled to talk to them about, these are documents from

2    Norfolk Southern, this is what they show, this is the truck,

3    this is what it shows.  This is the knee.  This is what it

4    shows.  This is the parking lot at the Pilot Station in

5    Vienna.  This is where it happened.  I won't be argumentative.

6    I'm going to say, this is what it is, and this is what we're

7    here about and what we're going to talk about.

8         THE COURT:  Well, the general rule is that absent

9    agreement between the parties exhibits can't be shown to the

10   jury.  Insistence upon that is sometimes silly, quite frankly,

11   because it is helpful in some cases for the jury to be able to

12   see but, you know, they're not in evidence and if the railroad

13   is gong to insist on that objection, they can't be used in

14   opening.

15        MR. LAMPROS:  Some of them are their own exhibits, Your

16   Honor.

17        THE COURT:  Well, that may be.

18        MR. LAMPROS:  Do you object to your own exhibits?

19        THE COURT:  Mr. Lampros, address the Court.

20        MR. LAMPROS:  I'm sorry.

21        THE COURT:  And no, that's my ruling on that.

22        MR. LAMPROS:  Well, can we try to work something out

23   very quickly?

24        THE COURT:  You may do that while we are bringing the

25   jury in.  By the way, it's my rule that we do not stand when

1    the jury comes and leaves.  That turns into kind of a comical

2    thing sometimes as each side tries to out jump the other to

3    stand up.  So we keep seated for the jury.  We may bring the

4    jury in.

5          MR. LAMPROS:  Your Honor, we've reached an agreement

6    that I can use Defendant's 3 and 4 in opening.

7          THE COURT:  Three and four?

8          MR. LAMPROS:  Yes, sir.

9    (Jury In, 1:20 p.m.)

10          THE COURT:  Welcome back, ladies and gentlemen.  Before

11   I tell you a little bit about what's going to happen during

12   opening statements, there was one thing I neglected to mention

13   before lunch before I dismissed you.  You probably know this.

14   The lawyers are not going to be speaking to you except here in

15   the courtroom during the course of opening and closing

16   arguments.  So that if they see you in the courthouse or in

17   the elevator, and this includes the clients as well, they're

18   not going to be speaking to you.  They're not being rude, but

19   they just understand that it's not appropriate for them to be

20   speaking to you.  They may nod their heads, but other than

21   that, they will not be communicating with you, and, of course,

22   you should not try and communicate with them.

23          Now, as I said our next step is for the lawyers to give

24   you their opening statements.  The plaintiff will go first,

25   his lawyers will go first.  Are you doing to be the opening

1    alone, Mr. Lampros?

2         **MR. LAMPROS:**  Yes, Your Honor.

3         **THE COURT:**  And Mr. Toth?

4         **MR. TOTH:**  Yes, Your Honor.

5         **THE COURT:**  Okay.  Mr. Lampros will give the opening

6    statement for the plaintiff.  Mr. Toth will give the opening

7    statement for the defendant.  In opening -- and this is to be

8    contrasted with the closing arguments, that's the reason

9    they're called opening statement and closing arguments.

10        Opening statements are not arguments.  It's not a debate.

11   They won't be arguing to you what they think the evidence has

12   shown and what you should conclude from that evidence.

13   They're simply telling you what they think the evidence will

14   be.

15        The statements of the lawyers are not themselves

16   evidence.  That doesn't mean they're not important.  They are

17   very important.  The lawyers will be telling you what they

18   believe to be the important facts of the case to be.  So it is

19   important, but nevertheless, what the lawyers say is not

20   evidence.

21        Before they begin their opening statements, I'm going to

22   give you some facts that the parties have agreed are not in

23   dispute.  These are stipulated facts, or the facts that I'm

24   about to tell you have been established.

25        First:  The Defendant, Norfolk Southern Railway Company

is a duly authorized foreign railroad corporation, organized

and existing under the laws of the Commonwealth of Virginia.

Second:  The Defendant conducts business within the

jurisdiction of this court as a common carrier of intrastate

and interstate commerce.

Third:  Jurisdiction and venue are proper in this court.

Fourth:  On August 6, 2010, Paul Windom was an employee

of Defendant, Norfolk Southern Railway Company.

Fifth:  On August 6, 2010, plaintiff was working as a

member of Defendant's Maintenance of Way Department as a track

repairman.

Sixth:  At the time of the incident alleged in the

complaint the plaintiff was engaged in work duties in the

course of his employment with defendant.

Seven:  Plaintiff's work duties on August 6, 2010, were

conducted in furtherance of interstate commerce.

Eight:  At the time of the incident alleged in the

complaint, the incident of August 6, 2010, plaintiff was

engaged in work which directly, closely, and substantially

affected interstate commerce.

And finally:  Norfolk Southern vehicle 200622, a 2000

Chevrolet C-7500 electric welder's truck was assigned to

plaintiff for his use as a track repairman.

As I said, those facts have been established.

Mr. Lampros, you may give your opening statement.

1    MR. LAMPROS:  May it please the Court, counsel, ladies

2  and gentlemen of the jury.  Andrew Lampros, along with Patrick

3  Hannon, we're representing Paul Windom.  The first thing I

4  want to let you know right up front is we're not here to tell

5  you that Paul is incapable of working in some job at some time

6  in the future.  He is going to be able to go back to work, and

7  he is going to be able to hopefully earn a living for his

8  family.

9    But what we're going to tell you is the job that he did

10  before and the nature and extent of his injuries he can't

11  perform the same type of job duties.  What we're going to ask

12  you to do is to make him whole, to compensate him for the

13  effect those injuries have on him and to put in the same

14  position he would have been in had this injury not occurred.

15    Now, you've heard and you've probably surmised by now

16  that Mr. Windom worked for Norfolk Southern as a track

17  repairman, and at Norfolk Southern he had a good job and he

18  earned a good living.

19    Right here were his earnings for 2005, and in 2005 he

20  earned a little over $35,000.  And in 2006 he earned almost

21  40,000.  And in 2007 he earned 52,599.  In 2008, he earned

22  almost $67,000.  In 2009, which is the last full year he

23  worked before he was injured, he earned $78,000.  And then the

24  year that was injured, 2010, he earned $55,000.

25    So he earned a good living.  In addition to these wages,

1    he also had benefits, and we'll talk about those benefits as

2    well.  And you can see also that the wages for his craft, they

3    call it a craft, his job, the job that he performed had gone

4    up historically over time in '96, 14.46 an hour, to July 9 --

5    July of 2009, the last time we have a date for up to $22,

6    almost $23, and that's straight time.

7        So here -- and we will have an economist come in here who

8    will project those earnings out over what would have been the

9    course of his career, and he will tell you how much Paul would

10   have earned had he continued to do work in the job that he had

11   at the time of this incident.

12       And what we're going to ask you to do is to make Paul

13   whole, to compensate him for what -- the difference between

14   what he would have earned and what he's capable of earning now

15   given his condition.

16       Now, he was hurt on August 6, 2010 when he was getting

17   out of the welding truck, and you're going to see pictures of

18   the welding truck, and we're going to talk a lot about that.

19   It was at a Pilot Station in Vienna, Georgia.  He would stop

20   there to fuel up the truck before heading on to the Cordele

21   office to drop it off.

22       And he was getting -- and as he was getting out, he

23   slipped and he fell.  He didn't fall all the way to the

24   ground.  He caught himself, and I think his language was he

25   tweaked his knee, and he went on and completed that task and

1   fueled the truck and took it to Cordele, and as he left it at

2   the office and was heading towards his vehicle, one of the

3   railroad supervisors saw him, saw him walking with a limp and

4   asked him what happened, and he told him.  And they went in

5   and started the paperwork.

6        And you'll see the paperwork that Mr. Windom filled out

7   that talks about what happened.  Now, there's going to be some

8   dispute amongst the parties as to which step Mr. Windom

9   slipped off of the truck and which step means what.  You'll

10  see a picture of the truck.  It's big truck.  It's got a

11  platform outside of it, and it's got a step in the fuel tank

12  and then it's got a step below that.  There's only two steps

13  on that truck.

14       Mr. Windom called it the middle step that he slipped off

15  of.  And you'll see and he's been consistent through his

16  testimony as to what he meant by the middle step, and he will

17  be here to explain that for you.

18       In any event that was a Friday, August 6th, 2010 was

19  Friday when he got hurt.  He goes in, he fills out the

20  paperwork, heads home, and spends the weekend at home.

21  There's going to be testimony that he iced his leg and rested,

22  went back to work on Monday, and was doing better.  He tried

23  to work.

24       He worked Monday, Tuesday, and then it got to the point

25  where he could not work any longer, and one of his railroad

1    managers took him to the doctor.  He -- I believe the

2    testimony will be that he went initially to a doctor, he

3    couldn't get in, and so he went to an ER, and they performed

4    routine medical treatment.  Eventually you'll find out that he

5    underwent an MRI and that MRI showed that he had suffered --

6    and this is a right knee, Dr. Slappey will use this in his

7    testimony.

8         But this is the right knee, and Mr. Windom hurt his left

9    knee -- that he tore his meniscus and the meniscus, the whole

10   meniscus is this part right here, and it's the cushioning

11   between the bottom bone of your leg and the top bone, and he

12   tore in the back part his meniscus.

13        And what Dr. Slappey did and what he'll tell you about is

14   he went in there and just cut out that torn part, and it

15   leaves a gap in the meniscus, and there is no way to close

16   that gap, and it's there from now on.

17        After that surgery, Paul followed up with Dr. Slappey.

18   He's seen him several times.  He has continued to have some

19   recurrent pain.  He continues to be under a doctor's care

20   today.  Dr. Slappey gave him injections and prescription

21   medication.

22        Dr. Slappey, feeing that he could no longer do

23   anything for Mr. Windom, told him, advised him to seek a

24   second opinion, which Mr. Windom has done.  And he -- as I

25   said he continues under a doctor's care today receiving

1    injections and that type of treatment.

2         We're going to have an expert, a vocational expert who's

3    going to come in and tell you what the job prospects are for

4    Mr. Windom given his condition, and he will be here hopefully

5    tomorrow and can tell you what his opinions are based upon the

6    information he reviewed and his meeting with Mr. Windom.  His

7    name is Vincent Hecker.

8         We'll also have an economist in here who, like I said,

9    will take those earnings, project them out, and bring them

10   back to the present value.  And all he's going to tell you is

11   what Mr. Windom would have earned in wages and benefits had he

12   continued to work that job, and then it will be your job to

13   determine out of that amount if damages are appropriate how

14   much.

15        At the end we are going to ask you for a verdict in Mr.

16   Windom's favor, and we're going to ask you to make him whole.

17   Like I said, we're not going to stand here and tell you that

18   he's never going to work again in any other job because he

19   will.  He's too young, and he's too otherwise healthy.

20        But we will ask you to put him in the position he would

21   have been financially had this not occurred.  And also the

22   Judge will instruct you in closing we'll also ask for other

23   damages, but I appreciate your attention, and we look forward

24   to presenting this case to you.

25             **THE COURT:**  Mr. Toth?

1     MR. TOTH:  May it please the Court, counsel, ladies and

2  gentlemen.  Again, my name is Mark Toth.  I work for a firm

3  here in Macon, and we've represented Norfolk Southern Railway

4  Company for a number of years.  And we're happy to be here

5  today and want to thank you first for your jury service here

6  today.  We know it's inconvenient.

7     But we've been looking forward to this day for a long

8  time to have an opportunity to have our day in court just like

9  Mr. Windom is entitled to have his day, and there's going to

10  be evidence in dispute, and this is my opportunity to bring to

11  your attention some of the evidence that I think is going to

12  be very important for you to consider and listen to when

13  witnesses take the stand and talk about this event that

14  occurred almost two years ago.

15     I talked a lot, you may remember, in voir dire about

16  safety programs at the various companies that you worked, and

17  you're going to hear a great deal of evidence from railroad

18  employees and even Mr. Windom himself about the steps that

19  Norfolk Southern takes in -- and the focus they put on safety

20  in the work environment.

21     MR. LAMPROS:  Your Honor --

22     MR. TOTH:  Some of the evidence you're --

23     MR. LAMPROS:  May we approach?

24     THE COURT:  No, we don't need to approach.  Mr. Toth,

25  you know his point.

1    **MR. TOTH:**  Yes, Your Honor.  You're going to hear

2    evidence from Mr. Windom himself that he was on a safety

3    committee at Norfolk Southern Railway Company.  You're going

4    to hear evidence --

5        **THE COURT:**  Mr. Toth, maybe we do need approach.

6    *(AT SIDEBAR)*

7        **THE COURT:**  It sure sounds like you're talking about

8    general safety -- generally a safe company.  We talked about

9    that.

10       **MR. TOTH:**  I'll be more specific to the bulletin and

11   what will be in evidence.

12       **THE COURT:**  Okay.

13       **MR. LAMPROS:**  Well, and, Your Honor, saying that he's

14   on the safety committee -- violated the motion in limine in

15   terms of character evidence --

16       **THE COURT:**  Well, we talked about it, and, you know,

17   both of you had points you wanted to make on this, but what's

18   relevant is the safety rule in question, not how safe Norfolk

19   Southern is, not how safe they want their employees to be, but

20   what's relevant to him.

21       **MR. TOTH:**  I'll stick to the two.

22   *(BENCH CONFERENCE CONCLUDED)*

23       **MR. TOTH:**  My apologies to the Court and counsel and

24   certainly you for taking up additional time.  I want to be

25   very specific on the safety rule that there will be evidence

1    that Mr. Windom violated on August 6th of 2010 that you will

2    hear evidence about, and specifically it's called Rule J that

3    requires in the rule book all employees to do their job in a

4    manner that will not jeopardize their own safety.

5         In addition there is a bulletin that has been published

6    that discusses in detail -- and you'll have this, I suspect

7    that you will hear evidence from Mr. Windom himself about when

8    you dismount equipment at the railroad -- and equipment is a

9    very broad term because the railroad uses many types of

10   equipment -- that when dismounting this rule requires you to

11   maintain three points of contact.

12        And Mr. Windom, himself will explain to you and other

13   railroad employees that three points of contact means just

14   that.  When dismounting, you always maintain three points of

15   contact.  And the evidence will be three points of contact can

16   be two hands securing yourself and one foot on a step or three

17   points of contact in accordance with this rule or bulletin can

18   be one hand and two feet.

19        So there will be evidence presented about a rule that

20   there will be contentions made about whether Mr. Windom

21   violated that rule or not, and you're going to hear evidence

22   about that.

23        Now, you're also going to hear evidence about a hi-rail

24   vehicle, and both Mr. Lampros and I talked about hi-rail

25   vehicles, and many of you on the panel indicated you had some

1   knowledge of hi-rail vehicles.  But the evidence that you'll

2   hear from Mr. Windom, I expect, and certainly witnesses I

3   call, that when a vehicle is -- a hi-rail vehicle, the

4   evidence will be, is capable of being driven right down I-75

5   or 41 or 49.  It's capable of that, but also a hi-rail

6   vehicle, the evidence will show, is capable of being operated

7   on the rail, and it can move down the railroad track just like

8   a locomotive could pulling freight.

9       And that's very important evidence because when a vehicle

10  is in the hi-rail operation mode, the evidence will be that it

11  elevates the truck so the step down that Mr. Windom would take

12  if he was in -- if his welding truck was on the railroad track

13  would require a bigger step to the ground.

14      So listen to the evidence that will be presented about

15  hi-rail operation because it's important to understand what

16  the welding truck looks like and what the evidence will be on

17  the steps that were taken by Mr. Windom when he was exiting

18  the vehicle.

19      And the testimony is going to be from Mr. Windom, and

20  from employees that you'll hear from today that talked to Mr.

21  Windom the same day it occurred, that he was getting out of

22  the hi-rail truck, the welding truck, not when it was on the

23  railroad track, but when it was at the Pilot Gas Station in

24  Vienna that you've heard, too, several times.

25      And you'll hear evidence.  And I'll just take you through

1    what the evidence is -- I think will be, on August 6th of 2010

2    what he was doing.  Mr. Windom will testify that normally this

3    welding truck had been assigned to him for about two years and

4    he was primarily operator of the welding truck, of course,

5    unless he was taking vacation or sick or something like that.

6        And he will testify that on the day that this event

7    occurred his truck was in the shop.  So his supervisor who

8    will be here to testify, Tommy Thornhill, will tell you that

9    he assigned Mr. Windom and another employee and actually a

10   contractor that does some work for the railroad to do work

11   around the yard in Cordele.

12       Now, the Norfolk Southern yard in Cordele is not a huge

13   yard by railroad yards standards.  But one of the things Mr.

14   Windom will tell you that he was doing on August 6th was

15   assisting in moving some concrete steps up to some storage

16   trailers.

17       And I think the evidence that you will hear will be since

18   he couldn't be out assisting crews doing welding work because

19   the truck, the welding truck, the evidence will be, was in the

20   shop for repairs actually on the hi-rail components, the

21   components that go down the flanged wheels that allow it to

22   operate on the rail.

23       So he was assigned a job that day to work around the yard

24   in Cordele.  And that's what he was doing.  I think they made

25   a -- the evidence will be they went to Tifton, got the

1   concrete steps, came back, did some more work, and the

2   evidence will be Mr. Thornhill his supervisor then called him

3   and said, your truck is ready, I'm going to have somebody

4   drive you up to Macon to pick up your truck so you can bring

5   it back.

6       And there won't be any dispute that the day this occurred

7   was a Friday.  And the evidence will be that Mr. Windom

8   stopped on the way back.  He's by himself now because he's

9   been dropped off by the person that drove him up there.  This

10  particular person went on back to Cordele, and Mr. Windom

11  stopped to get gas at the Pilot Station.  And Mr. Windom will

12  tell you that he has a gas card and that's nothing out of the

13  ordinary for him to stop and fuel the truck that's assigned to

14  him.

15      And the evidence will be that when he was descending the

16  truck -- the very first time he pulls up, he will tell you, he

17  was descending the truck when he slipped, and the evidence

18  will be from Mr. Windom that he did not fall all the way to

19  the ground.  The evidence will be he simply landed on the left

20  leg.  And I believe he said it was awkward, and he felt a

21  twist.

22      And, of course, that takes us back to what Mr. Lampros

23  already told you that Mr. Thornhill, his supervisor, saw him

24  when he got in the shop, and he was limping.  And

25  Mr. Thornhill, his immediate supervisor, that you'll hear

1  from, had a conversation with him.  And the evidence that

2  you'll hear from Mr. Thornhill is he inquired, what's going

3  on, why are you limping?  And he explained that when he was at

4  the Pilot Gas Station in Vienna he slipped.

5      And they actually -- the evidence will be that they

6  actually went over to the truck, and Mr. Windom indicated that

7  the truck -- or the step on the truck that he slipped from was

8  a step we refer to as inset in the fuel tank.  And you'll have

9  evidence in this case that will show you photographs of the

10  steps on the welding truck that he was operating that day and

11  that he was descending in the Pilot gas station.

12      But there'll be -- the evidence will be at least from the

13  defendant that it was the step inset in the fuel tank that he

14  slipped from.  He talked about -- Mr. Lampros -- procedures

15  that take place, and I agree with him when someone reports

16  they've had an event or an incident that may have caused them

17  an injury -- and you'll get to see what's referred to commonly

18  as a Form 22.  I'm sure Mr. Lampros will show it to you and

19  I'll show it to you, and you'll have the benefit of that I

20  believe in evidence to read the information completed on the

21  Form 22 by his supervisor.

22      But you'll also hear evidence from Mr. Windom about the

23  part that he handwrote in about what occurred that day, and

24  the evidence you'll hear will be that he contends he slipped

25  from a step he described as the middle step.  And the evidence

1    will be that the middle step per the railroad's contentions

2    would have been the fuel tank step.

3         Now, that will be an issue that will be for everyone on

4    the jury to decide as to which step was involved based upon

5    the evidence that you hear from Mr. Windom, the evidence you

6    hear from Mr. Thornhill, the supervisor, and the evidence that

7    you hear from Mr. Lucius Bobbitt, who will tell you he was the

8    division engineer of maintenance of way division of the

9    Georgia division at the time.

10        So those are kind of the factual issues that you're going

11   to have to deal with, and we submit you'll hear evidence from

12   both Mr. Thornhill and Mr. Bobbitt that he indicated he failed

13   to maintain three points of contact and that is why he

14   slipped.

15        And the evidence will be, the defendant submits, that he

16   admitted it was his fault, and there will be other witnesses

17   that we will produce that will also testify about what was

18   said by Mr. Windom about the event on August 6th.

19        As Mr. Lampros I think alluded to, Mr. -- this was

20   Friday, and Mr. Windom returned to work on Monday, and he had

21   an additional conversation with his supervisor.  And his

22   supervisor will testify as to what took place on Monday.

23        His supervisor will also tell you about the two of them

24   going out there and actually looking at the welding truck

25   again on Monday.  There will be evidence from some of the

1    co-employees, fellow union brothers of Mr. Windom, about what

2    they heard from Mr. Windom that Monday morning about the event

3    that took place on Friday.

4        The evidence will be he worked all day Monday.  No one

5    saw him limping.  That he worked all day Tuesday, no one saw

6    him limping, and somewhere right before lunch, I believe on

7    Wednesday, he reported that he needed medical attention.

8        And when he requested that medical attention, he was

9    taken, as Mr. Lampros has told you, to South Georgia Medical

10   Center down in Valdosta, where he was examined down there.

11       There will be evidence that he had a follow-up exam after

12   the hospital at the Valdosta Orthopedic Clinic.  There'll be

13   evidence that he had an additional exam from a Dr. Mann that I

14   believe is in Fitzgerald.

15       And there'll be evidence, as Mr. Lampros alluded to,

16   after being under the care of Dr. Slappey, that he was

17   referred up to a physician in Atlanta, a Dr. Howard, where the

18   evidence will be that he conducted a functional capacity

19   examination.

20       And there will be -- Dr. Slappey and others are able to

21   address a functional capacity examination, as did one of the

22   expert witnesses that Mr. Lampros referred to in this case, a

23   Dr. Vincent Hecker, a gentleman that is a vocational

24   rehabilitation expert that is from Greenville, South Carolina

25   that is a retained paid expert that will be here to offer

1   testimony about his opinions in regard to employment

2   opportunities for this gentleman based upon his limitations

3   that are imposed per the functional capacity examination.

4        You'll also hear evidence that he saw an additional

5   physician in Columbus at the Hughston Clinic, a physician over

6   there.  And I think the only evidence that you will hear -- as

7   you might expect doctors are very busy and very rarely come to

8   court anymore.  But the evidence on the medical issues in this

9   case will come from Dr. Slappey who was kind enough to make

10  time for us last week for a videotaped deposition.

11       So you'll get to see Dr. Slappey in his coat, and you'll

12  get to hear what Dr. Slappey has to say about this injury.

13  And I would submit that since I already know what the

14  deposition testimony is that the evidence on this is Dr.

15  Slappey will say that he deemed the surgery a success, that he

16  went in and did two little portals that are centi -- not

17  inches, but centimeters -- I think he estimated about a

18  quarter-inch incision, two different places on his knee, that

19  he inserted an arthroscope.

20       The evidence will be from Dr. Slappey that he went in,

21  identified the meniscus tear, that he identified it as a

22  partial tear, and that he repaired it, and 60 to 70 percent of

23  the meniscus remained intact.  Dr. Slappey will also offer

24  evidence that the majority of patients that undergo this

25  procedure -- and it's called a partial medial meniscectomy --

1    and the majority of the people that have this surgery return

2    to heavy labor and their recreational activities in the three

3    to six weeks.

4        And obviously the evidence in this case will be that is

5    not the case with Mr. Windom, who underwent that surgical

6    procedure in October of 2010.  But the evidence is as of today

7    he is still not returned -- he has still not been able to work

8    in any capacity.

9        Mr. Lampros talked about certain expert witnesses.  He

10   talked about an economist.  And the evidence will be that this

11   economist -- and let me just back up a little bit and say, I

12   can say with a great degree of confidence what I feel like the

13   expert witnesses are going to say as under our rules of

14   procedure I'm allowed to take depositions under certain

15   circumstances.

16       And the evidence will be that I not only have a report

17   from Dr. Hecker, the voc-rehab expert, I have a report from

18   the economist who details his methodology for arriving at his

19   calculations as to future lost earnings, and he will opine

20   initially that if he had worked 30 years up until -- let's

21   see, if he had worked until age 63, averaging -- I know

22   Mr. Lampros showed you some earnings information.

23       But the evidence will be that Dr. Thompson essentially

24   takes a 2007, 2008, and 2009 annual certain earnings, averages

25   them, and then his methodology allows him to average those

1   numbers and come up with a number that he then projects into

2   the future as to what those earnings would be.  And the

3   evidence will be from this Thompson report that his earnings

4   would have been $3,021,781.

5        The evidence will be that, from Dr. Thompson when he

6   explains his methodology to you, that the law requires him in

7   his mind, Dr. Thompson's mind, to take out state taxes and

8   federal taxes, and that he reduced this number by about

9   9.5 percent to reduce his economic analysis number to

10  $2,724,438.

11       And Dr. Thompson will also testify, consistent with his

12  deposition testimony, that he then reduces that number to a

13  present day number.  Because -- and reduces it to what dollars

14  would be the equivalent of today.  And that reduced that

15  number to $1,485,105.

16       Now, the evidence will also be, and you'll hear this from

17  Dr. Thompson, he freely acknowledges and admits this, that he

18  must deduct also the business expenses from his economic

19  calculations, and he indicates that he reduced this by two

20  percent, which the evidence will be is his contention as to

21  the maximum amount of business deductions that you're allowed

22  to take under the law.  And that's actually how he arrived at

23  the last number I gave you, the 1,485,000.

24       But there'll be evidence, and I think this is very

25  important evidence for you to consider from Dr. Thompson

1    because Dr. Thompson opines that despite significant business

2    expenses anywhere from 6 thousand to 10 thousand dollars a

3    year, that in his mind he does not have to reduce those

4    business expenses.

5        And that evidence you'll hear directly from Dr. Thompson.

6    And I say this with a great degree of confidence as he's been

7    deposed and questioned about these items and his methodology.

8    So you'll get to hear from him during this case.

9        Another expert that you're going to hear from in this

10    case that I've also deposed, he's going to offer opinions in

11    this case.  And the evidence he's going to provide is he feels

12    like based upon his experience and his expertise that this

13    gentleman is certainly not capable of making -- excuse me,

14    this gentleman is certainly not capable of going back to what

15    he described as moderate to moderate-plus job classifications.

16        And Dr. Hecker will provide evidence of what the

17    Department of Labor provides in regard to what job

18    classifications are, and I think the evidence is pretty -- in

19    my mind I can get it in the sense of sedentary, light duty,

20    medium duty, heavy, and very heavy.

21        And you'll hear evidence from Dr. Hecker that he was in

22    possession of this functional capacity examination and that

23    provided to him what the limitations on lifting, what the

24    limitations were as to how much he should walk, stand.

25        And Dr. Hecker's opinion will be that, despite this

1    physician who offered these opinions about what his capacities

2    were, he disagrees that he should not go back to a job in the

3    moderate to moderate-plus or medium level job classification.

4    And evidence will be that 50 to 55 percent, if not more, of

5    the jobs that are available to all of us fall within that

6    medium category.

7         The evidence will be from him that the Department of

8    Labor has job classifications of 12,300 jobs, but Dr. Hecker

9    will tell you in his exam that he does not feel like he's

10   capable of any of those 50 to 55 percent of the jobs that fall

11   in the medium level.  And his evidence will be he feels like

12   that would put him back to work above his potential capacities

13   to work a full life expectancy, and you'll get to hear from

14   him and make your own decisions on that.

15        Dr. Slappey, we talked about briefly, and you'll hear

16   from him, and you'll see his video.  And I would submit to you

17   that the evidence that he's going to provide to you is that a

18   person can tear their meniscus by mowing grass and stepping in

19   a hole, and that can cause a tear in the meniscus.

20        Dr. Slappey will tell you can also step off the curb,

21   leaving Kroger, I believe is the example, and that can cause a

22   torn meniscus.  He'll tell you that if you were playing

23   basketball and came down with rebound, those are the type

24   things that can tear a meniscus.  And he'll tell also that

25   stepping off, slipping off a step on a welding truck could

1    also cause this type injury.

2         But the importance of Dr. Slappey's testimony will be the

3    evidence that he could find -- after the first three months

4    post-surgery, the evidence will be, he could find no objective

5    findings to support the subjective complaints of pain that Mr.

6    Windom kept reporting every time that he came to the doctor.

7         And the evidence will be because of frustration over

8    trying to figure out what was causing this pain, that he

9    ordered additional x-rays on three separate times.  The

10   evidence will be on two occasion he recommended that he get a

11   second opinion, and eventually he did.

12        And that's important testimony for you to keep in mind

13   when you hear what Dr. Slappey has to say about this course of

14   treatment that he went through.  Repeatedly during Dr.

15   Slappey's deposition he testified and he will offer this

16   evidence that he had full range of motion, he found no

17   swelling, and he found no diffusion or fluid on the knee.

18        Now, I'll tell you also, and I know Mr. Lampros will tell

19   you later on, and you'll get to hear the video, that he

20   believes Mr. Windom remains in pain, but he indicates that I

21   can't measure pain.  I have no testing tool for pain.  And

22   he'll indicate to you that he believes his patient remains in

23   pain.

24        There's going to be evidence about, that I think is

25   important about what Mr. Windom has been doing since

1    August 6th of 2010.  And there will be evidence that he goes

2    to the gym in Fitzgerald.  I believe it's called American Body

3    Works or American Fitness.  And you'll hear that he's going

4    sometimes six times a week, sometimes three times a week,

5    sometimes no times a week.  And the evidence will be from Mr.

6    Windom, because, again, I had the opportunity to take his

7    deposition, that he was doing this to rehab his knee at the

8    direction of Dr. Slappey who performed his surgery.

9        Yet the evidence will be, I would submit to you that if

10   you listen to Dr. Slappey's testimony, that the evidence will

11   be he told him that walking on a treadmill, which is what he

12   indicated he was doing at the gym, was not something he would

13   want him to do.  And there'll be evidence from Mr. Windom

14   himself, I expect that he's not just walking on the treadmill

15   for 30 to 35 minutes, that he's also at times doing dumbbell

16   curls, doing some military press and doing some ab work.

17       So these are things that are really important for you to

18   consider when you hear Mr. Windom testify and you hear these

19   experts testify.  And I'll tell you, you will hear no evidence

20   from any expert witnesses on behalf of Norfolk Southern.

21       You're going to hear evidence from the witnesses I'm

22   going to present are going to be from Mr. Bobbitt, who is the

23   gentleman that's worked for Norfolk Southern for over

24   30 years.  And Mr. Bobbitt is going to testify that he talked

25   to him on August 6th, and Mr. Bobbitt is going to say, I knew

1  Paul Windom, I had known Paul Windom.

2      The one thing about Mr. Bobbitt, he doesn't stay in an

3  office in Atlanta.  He'll tell you about what he does as a

4  division engineer when he was here in Atlanta or in the --

5  supervising the Atlanta territory.

6      And he will tell you he talked to Paul on August 6th, and

7  the evidence that he will tell you is that Paul said,

8  Mr. Bobbitt, it's Friday, I guess I got in a hurry, I didn't

9  maintain my three points of contact.

10      You're also going to hear from Tommy Thornhill, the

11  immediate supervisor that saw him limping, and he's going to

12  tell you, just like Mr. Bobbitt is going to tell you, that the

13  step identified that he slipped on was the step that was in

14  the fuel tank.  And that's what you need to pay attention to

15  when you hear this evidence is focusing on what people say

16  about the step.

17      And I would submit to you the evidence in this case was

18  always that the fuel tank step was the one he slipped from

19  until five to six weeks later when counsel got involved in the

20  case.

21      That's what the evidence will be.  And I appreciate your

22  attention, and I hope you'll remember that our rules of

23  procedures allow the plaintiff to go first, and he gets to put

24  up his evidence first, and just keep your mind open until you

25  get an opportunity to hear from the witnesses that Norfolk

1    Southern Railway Company is bringing forward in this case.

2    Thank you.

3         THE COURT:  Mr. Lampros, you may call your first

4    witness.

5         MR. LAMPROS:  Yes, Your Honor.  The plaintiff calls

6    Paul Windom.

7         THE COURT:  Mr. Windom.

8         COURTROOM DEPUTY:  Do you solemnly swear that the

9    testimony you are about to give in this case shall be the truth,

10   the whole truth, and nothing but the truth, so help you God?

11        THE WITNESS:  Yes, ma'am.

12        COURTROOM DEPUTY:  Please state and spell your name for

13   record.

14        THE WITNESS:  Paul Timothy Windom.  P-A-U-L.  Timothy,

15   T-I-M-O-T-H-Y.  Windom, W-I-N-D-O-M.

16                      **PAUL TIMOTHY WINDOM**

17      **Witness, having first been duly sworn, testified on**

18                      **DIRECT EXAMINATION**

19   BY MR. LAMPROS:

20   Q.   Mr. Windom, good afternoon.  Please introduce yourself to

21   the jury.

22   **A.**   Paul Timothy Windom.

23   Q.   Are you nervous?

24   **A.**   Yes.

25   Q.   Tell us a little bit about yourself.  Where were you

1    born?

2    **A.**    Well, I was born in Cartersville, Georgia.

3    **Q.**    How many children in your family growing up?

4    **A.**    I have two children.

5    **Q.**    How many children were in your family growing up?

6    **A.**    Oh, in my family.  15.

7    **Q.**    15?

8    **A.**    Yes.

9    **Q.**    Where do you fall?

10   **A.**    I fall at number 11.

11   **Q.**    How old are you?

12   **A.**    42 years old -- 41, I'm sorry.  I'm nervous.

13   **Q.**    Where did you grow up?

14   **A.**    I grew up in Centre *(phonetic),* Alabama, Fort Payne,

15   Alabama, and Columbia, Mississippi.

16   **Q.**    Where do you live now?

17   **A.**    I live in Abbeville, Georgia.

18   **Q.**    How far is that from there to Macon?

19   **A.**    Probably 75 miles.

20   **Q.**    Who lives there with you?

21   **A.**    My wife and children.

22   **Q.**    Where you live now in Abbeville, how long have you lived

23   there?

24   **A.**    Anywhere between 10 and 15 years.

25   **Q.**    Do you have other family who lives in the area?

1   **A.**    Yes.  My mother-in-law, my brother-in-law, and my

2   brother, he lives about a mile away.

3   **Q.**    Tell us about your education.  Where did you go to high

4   school?

5   **A.**    I went to high school in Fort Payne, Alabama at Fort

6   Payne High School.

7   **Q.**    Did you graduate?

8   **A.**    No, sir.

9   **Q.**    What did you do?

10  **A.**    I eventually dropped out.  I got my GED, and I went to a

11  few -- a technical college.

12  **Q.**    What technical college?

13  **A.**    I started out at Irwin Tech in Fitzgerald.

14  **Q.**    And I take it you're married?

15  **A.**    Yes.

16  **Q.**    Who is your wife, and tell us about your wife and your

17  children?

18  **A.**    Dina Windom.

19  **Q.**    How long have y'all been married?

20  **A.**    November 3rd will be 16 years.

21  **Q.**    Do y'all have any children?

22  **A.**    Yes.  We have two boys.

23  **Q.**    How old are they?

24  **A.**    Tyler will be 12 tomorrow, and Trenton is seven years

25  old.

1    Q.   You told us you went to high school in Fort Payne, you

2    dropped out, then you got a GED, then Irwin Tech; is that

3    right?

4    A.   Yes, yes.

5    Q.   What did you study there at Irwin Tech?

6    A.   I studied industrial maintenance.

7    Q.   Did you get a certificate or a diploma or something like

8    that?

9    A.   I got a diploma.

10   Q.   And did you go to work after that?

11   A.   Yes, I did.

12   Q.   I want you to start and just kind of progress us through

13   the jobs you had after you finished at Ben Irwin Tech until

14   you started at the railroad?

15   A.   Okay.  Well, I started at Presta Light Wire.  We made

16   spark plug wires for GM products, Ford products, and Nissan.

17   Q.   Where is that?

18   A.   That's in Tifton, Georgia.

19   Q.   Okay.

20   A.   My second job I started at Irby Construction.  They did

21   overhead -- I was the overhead lineman apprentice, and I

22   started that job, it was in -- when I found it, it was in

23   Albany, Georgia.

24   Q.   What job after that?

25   A.   Third job, I was at Tacompsi Products.  They made lawn

1    mowers.  That was locate in Douglas, Georgia, and I was a

2    maintenance man there.

3    Q.   Other than your degree in industrial maintenance, have

4    you had any other education or training?

5    A.   Yes.  I also went to Middle Georgia Technical College.  I

6    trained to be a truck driver.  I also went to Pearson Tech.  I

7    was -- I learned fibra optics.

8    Q.   Did you get a diploma or a certificate or something from

9    Middle Georgia Tech?

10   A.   Yes, I got a certificate.

11   Q.   Did you also obtain a commercial driver's license?

12   A.   Yes, also.

13   Q.   Do you still maintain that today?

14   A.   Yes, sir.

15   Q.   Pearson Tech, you said you studied fibra optics?

16   A.   Yes.

17   Q.   Did you get a diploma or a certificate from there?

18   A.   I got a certification in that.

19   Q.   When did you go to Middle Georgia Tech?

20   A.   Probably early 2000.

21   Q.   How about Pearson Tech?

22   A.   I think in the 90s, late 90s.

23   Q.   Do you use either one of those programs of training and

24   education in any of the jobs you told us about?

25   A.   No, sir.

1    **Q.**   And the last job you talked about was Tacompsi Products,

2    what did you do after that?

3    **A.**   I joint IBEW.

4    **Q.**   Tell us what IBEW is?

5    **A.**   It's an electrical journeyman -- electrical outfit.

6    They're union, and we did -- went very different places doing

7    electrical work.

8    **Q.**   When did you become an electrician?

9    **A.**   I think 2000, I believe.

10   **Q.**   Did you go to another school for that?

11   **A.**   No.  We had to take a test.  I already graduated, you

12   know, I already had that electrical ability under my belt and

13   been trained, so when I went to IBEW, all I had to do was take

14   a test.

15   **Q.**   Did you pass that test?

16   **A.**   Yes, I passed it.

17   **Q.**   What did you do as an electrical journeyman?

18   **A.**   We went from company to company doing electrical work.

19   **Q.**   Was it steady work?

20   **A.**   No.

21   **Q.**   And after the IBEW what was the next job you had?

22   **A.**   With Norfolk Southern.

23   **Q.**   Why would you leave the IBEW and go to work for Norfolk

24   Southern?

25   **A.**   Well, IBEW, they're a good job, but they -- I'd be -- I

continued to get laid off every three months, so my wife, you

know, she was a person that she always believed in her husband

being on a steady job, so she always -- every time I get laid

off, she would -- you know, it would kind of irritate her.

**Q.**   Did you get a job with Norfolk Southern?

**A.**   Yes, I did.

**Q.**   And what was that job?

**A.**   I started out as a laborer.

**Q.**   I'm sorry?

**A.**   A laborer.

**Q.**   What did you do as a laborer?

**A.**   We processed rail, we spiked tires, we replaced cross

ties.

**Q.**   And how long did you have that job?

**A.**   Probably about almost two years.

**Q.**   When did you hire on with Norfolk Southern?

**A.**   January 10, 2005.

**Q.**   So you held that job until January of 2007?

**A.**   Yes.

**Q.**   I want to back up a little bit.  When you hired on with

the railroad, did you have to take and pass a physical?

**A.**   Yes, I did.

**Q.**   Did you have to get cleared medically?

**A.**   Yes.

**Q.**   Did anyone from the railroad when you hired on tell you

1    weren't capable of working there physically?

2    **A.**    No, sir.

3    **Q.**    All right.  After that laborer job for two years, what

4    did you do next?

5    **A.**    I bidded on over to Cordele, and I was a hi-rail man for

6    about a year and a half, maybe two.

7    **Q.**    Tell us what a hi-rail man is.

8    **A.**    He rides with the assistant supervisor.  He's inspecting

9    track along with the assistant supervisor.

10   **Q.**    What did you do after that?

11   **A.**    I eventually bidded on the track repairman's job.

12   **Q.**    Now, tell us, as you moved from a laborer to hi-rail man

13   to track inspector to track repairman, are you moving up?

14   **A.**    Yes, sir.

15   **Q.**    Is that an increase in pay?

16   **A.**    Yes.

17   **Q.**    Tell us a little bit about how the railroad works in

18   terms of how you work your way up?

19   **A.**    Well, it's a seniority base, whenever someone moves up in

20   a position, you have an opportunity to bid on that position

21   that the person left.

22   **Q.**    Now, the track repair job, is that the job you were

23   working the day you got hurt?

24   **A.**    Yes.

25   **Q.**    I think you said you the hired on January '05, and I

1  think we're all in agreement that this incident happened on

2  August 6th of 2010.

3  **A.**   Yes.

4  **Q.**   So about how long were you working for the railroad when

5  you got hurt?

6  **A.**   Probably about a little over five years.

7  **Q.**   And how long did you plan to work for the railroad?

8  **A.**   I planned on working 30 years, full retirement require

9  30 years, so I was planning on working 30 years.

10  **Q.**   Now, each year that you worked with the railroad did you

11  make more money than you did the year before?

12  **A.**   Yes, sir.

13  **Q.**   Why is that?

14  **A.**   Increase -- the more you're out there, the more contracts

15  you get.  And we -- more overtime and all that played a part

16  into it.

17  **Q.**   The last full year -- what was the last full year you

18  worked for the railroad?

19  **A.**   2009.

20  **Q.**   And approximately how much did you earn that year?

21  **A.**   I think I made 78, a little over $78,000.

22  **Q.**   Now, we talked about what you earned.  Did you also

23  receive benefits at Norfolk Southern?

24  **A.**   Yes.

25  **Q.**   What are those benefits?

1   **A.**   The benefits was dental, vision, healthcare, retirement,

2   and 401 savings.

3   **Q.**   Now, let's talk a little bit about the job you do as

4   track repairman.  Tell us what a track repairman does.

5   **A.**   The track repairman, he does a lot of welding, he does a

6   lot of grinding, he does a lot of -- you're in one area for

7   probably hours, you're doing a lot of kneeling, you're doing a

8   lot of welding, sitting down.  Sitting across a -- what they

9   call frogs.

10   **Q.**   What is frog?

11   **A.**   Well, that's a -- has a point on it where the trains -- a

12   train threads through, and the points, a lot of times the

13   points break off, and our job was to weld the points back up.

14   **Q.**   Was it labor intensive?

15   **A.**   Yes, it was.

16   **Q.**   Did you have to lift heavy things?

17   **A.**   Yes.

18   **Q.**   Did you have to lift and carry heavy things?

19   **A.**   Yes.

20   **Q.**   Would you have to walk in -- work in areas that had

21   uneven footing, or would it be nice and smooth like the

22   courtroom here?

23   **A.**   Uneven footing.

24   **Q.**   What else would you have to do?

25   **A.**   Whenever we were not working with the -- as a track

1    repairman, we were assigned to work with the laborers.

2    **Q.**    Okay.   And what are some of the things you'd have to do

3    with the laborers?

4    **A.**    Well, process rail, work behind changing out rail

5    constantly, changing out cross ties, doing whatever needed to

6    be done.

7    **Q.**    Is that physical labor?

8    **A.**    Yes.

9    **Q.**    How heavy are some of the things you'd have carry?

10   **A.**    Anywhere between five and 60 to 65 pounds to 70.

11   **Q.**    Would you work inside or outside?

12   **A.**    Outside.

13   **Q.**    Did y'all stop if it rained?

14   **A.**    No.

15   **Q.**    Did you stop if it got up to be 95 or 100 degrees like

16   we've had here lately?

17   **A.**    No.

18   **Q.**    Did you ever have to climb up and down equipment?

19   **A.**    Yes.

20   **Q.**    The job that you talked about, the track repairman and

21   other jobs you had at Norfolk Southern, do any of those jobs

22   -- especially the track repair job -- does it entail any

23   inside work?

24   **A.**    No.

25   **Q.**    Did you do any office work?

1    **A.**   No.

2    **Q.**   Did you do any paperwork?

3    **A.**   No.

4    **Q.**   All right, let's shift our focus a little bit and talk

5    about the day you got hurt.  Do you remember that?

6    **A.**   Can you repeat that?

7    **Q.**   I want to shift our focus a little bit and talk about the

8    day you got hurt, okay?

9    **A.**   Yes.

10   **Q.**   Do you remember the day you got hurt?

11   **A.**   Yes.

12   **Q.**   What day was that?

13   **A.**   August 6th, 2010.

14   **Q.**   What did you hurt?

15   **A.**   I hurt my knee.

16   **Q.**   Which knee?

17   **A.**   My left.

18   **Q.**   Had you ever hurt that knee before?

19   **A.**   No, sir.

20   **Q.**   Had you ever hurt that knee stepping off a curb at

21   Kroger?

22   **A.**   No, sir.

23   **Q.**   Have you ever hurt that knee before cutting grass or

24   stepping into a hole?

25   **A.**   No, sir.

1    **Q.**   Had you ever hurt your knee before playing basketball and

2    coming down hard?

3    **A.**   No, sir.

4    **Q.**   Where were you when you got hurt?

5    **A.**   I was at -- in Vienna, Georgia at the Pilot Gas Station.

6    **Q.**   How had you gotten to the Vienna Pilot Station?

7    **A.**   After the truck be repaired, I was in Macon, and we was

8    low on fuel, so I stopped to refuel.

9    **Q.**   What had you been doing that day before you got your

10   truck?

11   **A.**   The day before?

12   **Q.**   During the day you got hurt, what had you been doing

13   earlier that day?

14   **A.**   Oh.  We was loading cement steps.  We was transporting

15   them from Tifton to Cordele.

16   **Q.**   And tell us about loaded cement steps.  What do you do

17   there?

18   **A.**   Well, they was replaced -- I think they decided to

19   replace the steps in Cordele, so they found some steps in

20   Tifton, and relocated -- and bought and relocated them to the

21   Cordele yard.

22   **Q.**   Any problems doing that job task?

23   **A.**   No, sir.

24   **Q.**   Did you get hurt doing that job?

25   **A.**   No, sir.

1    **Q.**   All right.  So you got to the Pilot Station in Vienna to

2    fill up -- what kind of truck is it?  Is it gas or diesel?

3    **A.**   Diesel.

4    **Q.**   And I want to show you -- before I get there, did you

5    have a truck -- when you were a track repairman, did you have

6    a truck that was regularly assigned to you?

7    **A.**   Yes.

8    **Q.**   And you were here when the Judge read the stipulation.

9    It was truck 200622.  Is that right?

10   **A.**   Yes.  Yes, sir.

11   **Q.**   Is that the truck you picked up that had been getting

12   repaired?

13   **A.**   Yes.

14   **Q.**   Is that the truck that you took to the Pilot Station in

15   Vienna?

16   **A.**   Yes, sir.

17   **Q.**   Is that the truck that was involved in this incident?

18   **A.**   Yes, sir.

19   **Q.**   Let me show you what I've marked as Plaintiff's

20   Exhibit 19.

21        **THE COURT:**  Let me talk a little bit about procedure.

22   It saves times -- and I saw you conferring -- for you to

23   simply ask each other, can we go ahead and display this, but

24   if there's any question, don't put it on the Elmo until after

25   we've addressed whatever issue that we have to address.  I

1    assume there's no objection to this particular photograph?

2         **MR. TOTH:**  Not at this time, Your Honor.

3         **THE COURT:**  Okay.  But you understand my point.  I

4    don't want somebody putting something on the Elmo that there's

5    an issue about until after resolve the issue.

6         **MR. TOTH:**  Yes, Your Honor.

7    **BY MR. LAMPROS:**

8    **Q.**   What's that a picture of?

9    **A.**   That was -- the picture of the truck I slipped off of.

10   **Q.**   Now, when was this picture made?

11   **A.**   Some time after my injury.

12   **Q.**   Does this picture that we've marked as Exhibit 19 -- on

13   here on the side it says Windom Photo 45 -- does that truly

14   and accurately depict the condition of the truck 200622?

15   **A.**   Yes.

16   **Q.**   On August 6, 2010?

17   **A.**   Yes.

18   **Q.**   Was it in that condition when you picked it up from the

19   repair facility?

20   **A.**   Yes.

21   **Q.**   How long had it been in that position?

22   **A.**   Ever since I had it.

23   **Q.**   How long have you been assigned that truck?

24   **A.**   Two -- maybe two and a-half years.

25   **Q.**   And what are we looking at there?  What do we see in this

1    picture?

2    **A.**    I see a bent step.

3    **Q.**    And is it the driver's side?

4    **A.**    Yes.

5    **Q.**    Is this the side that you would have gotten off of?

6    **A.**    Yes.

7    **Q.**    And I want you to take me through and explain to the

8    folks here what the parts are -- and it's kind of hard to see.

9    Is this the door that I'm marking there?

10   **A.**    Yes.

11   **Q.**    What is this right here?

12   **A.**    That's the grab bar.

13   **Q.**    That's the grab bar right there?

14   **A.**    Yes.

15   **Q.**    What is it for?

16   **A.**    It's a mounting upon on -- getting in the truck.

17   **Q.**    Getting in and out of the truck?

18   **A.**    Yes.

19   **Q.**    What is this area right here?

20   **A.**    That's the fuel tank.

21   **Q.**    And is that right there, does that show where the fuel --

22   where you put the fuel in the tank?

23   **A.**    Yes.

24   **Q.**    What is this right here?

25   **A.**    I think that's where the battery is located at.

1    Q.   How many steps are on that truck on the driver's side?

2    A.   There's two steps.

3    Q.   Okay.  I think if you touch your screen you should be

4    able to mark on it?

5    A.   Oh, okay.

6    Q.   Show us where step number one is?

7    A.   Step number one, right there.

8    Q.   Rights there?

9    A.   Uh-huh.

10   Q.   Where's the second step?

11   A.   Right here.

12   Q.   Okay.  Is this the step right there that I just marked?

13   A.   No.

14   Q.   What is that?

15   A.   That that's the platform.

16   Q.   Okay.  Let me show you what we've marked as Plaintiff's

17   Exhibit 20, which is marked Windom 57?

18   A.   Okay.

19   Q.   What is that?

20   A.   It's a picture of the truck.

21   Q.   Just a different shot, a different angle?

22   A.   Yes, could be.

23   Q.   Was it taken the same day that you took the other

24   picture?

25   A.   Yes.

1    **Q.**   Does it truly and accurately depict the condition of the

2    truck on the driver's side on August 6, 2010?

3    **A.**   Yes.

4    **Q.**   Let me show you what we've marked as Plaintiff

5    Exhibit 21?

6    **A.**   Uh-huh.

7    **Q.**   Is that also your truck?

8    **A.**   Yes, it is.

9    **Q.**   Just two different shots from it?

10   **A.**   Yes.

11   **Q.**   Does it also truly and accurately depict the truck on

12   August 6, 2010?

13   **A.**   Yes.

14   **Q.**   Before the time you slipped off of it?

15   **A.**   Yes.

16   **Q.**   Tell us what's going on with this step right here?

17   **A.**   That's the step I slipped off of.  That's the bent --

18   it's bent.

19   **Q.**   Is it supposed to be like in the condition that you see

20   it in?

21   **A.**   No, sir.

22   **Q.**   Is it supposed to have one side tilted up?

23   **A.**   No, sir.

24   **Q.**   And one side tilted down?

25   **A.**   No, sir.

1    **Q.**   All right.  I want you to take us through and tell us

2    what you were doing and how you went about getting out of that

3    truck and how you slipped.

4    **A.**   As I was getting out, I had my left hand on the door

5    handle of the truck.  I had my right hand on the seat of the

6    truck.  I made my way onto the platform.  I placed my right

7    foot onto the middle -- onto the top step, and then I placed

8    my left foot on the middle step which is that bent one down

9    there.

10   **Q.**   This one is the middle step, that's you call --

11   **A.**   Yes.

12   **Q.**   -- the middle step?

13   **A.**   Yes.

14   **Q.**   Why do you call that the middle step?

15   **A.**   Because there's only two steps.

16   **Q.**   Why would you call that one the middle one instead of

17   calling this one the top and this one the bottom?

18   **A.**   I mean, that's the only two steps.

19   **Q.**   How many steps does it take you to get from the top of

20   the truck to the ground?

21   **A.**   It would take me three steps.

22   **Q.**   All right.  So you were getting out?

23   **A.**   Yes.

24   **Q.**   Which foot did you put where first?

25   **A.**   I placed my right foot on the step inside the gas tank.

1    **Q.**   Okay.  Mark -- let me clear this up.  Mark where you

2    placed -- the step on which you placed your first step.

3    **A.**   I placed -- well, after I come onto the platform, right,

4    I played my right foot right there inside the tank.  That's

5    the top step.  And I placed my left foot right there on the

6    middle step, and that's where I slipped.

7    **Q.**   Okay.  And when you slipped what happened with your left

8    foot?

9    **A.**   It slipped off, and I come crashing to the ground.

10   **Q.**   And where was your right foot when that happened?

11   **A.**   It eventually came down.  It was on -- right there on the

12   top -- top step.

13   **Q.**   And if you hadn't slipped, what would have been your

14   movement getting out of that truck?

15   **A.**   I would place my right foot on the ground.

16   **Q.**   So if I follow you right, there's three steps to get out

17   of the truck.  This one is one?

18   **A.**   Uh-huh.

19   **Q.**   This one is two?

20   **A.**   Uh-huh.

21   **Q.**   And then three, you're on the ground; is that right?

22   **A.**   Yes, yes.

23   **Q.**   Now, the condition that we see the truck in on

24   Plaintiff's Exhibit 19, had it been like that the entire time

25   you'd driven it?

**A.**   The entire time I drove it, yes, it was like that.

**Q.**   Had you ever told anyone at Norfolk Southern about the condition of the truck?

**A.**   Yes.  I told my supervisor that.

**Q.**   Who's your supervisor?

**A.**   Tommy Thornhill.

**Q.**   What did you tell him?

**A.**   I told him that we needed to get these steps fixed.  This step and the step on the other side was the same way.

**Q.**   What did he tell you?

**A.**   He told me whenever we find time we'll be able to get it.

**Q.**   Now, when you get in and out, is there a rule that says you're supposed to maintain three points of contact?

**A.**   Yes, it is.

**Q.**   Tell us about that rule.

**A.**   It's a rule we go over in our safety meeting.  It's a -- let's see, we almost -- always maintain three points of contact getting up and down any piece of equipment.  That's two hands and one foot or two feet and one hand.

**Q.**   And as you got out of this truck on the day that you slipped and got hurt, where were your hands?

**A.**   My right hand was on the seat, and my left hand was on the door handle.

**Q.**   And were they there in the entire time?

**A.**   Yes.

**Q.**   Did you ever let go?

**A.**   No, sir.

**Q.**   It was there ever a time when you didn't have at least three points of contact?

**A.**   No, sir.

**Q.**   Let me ask you this.  Why don't you just step in the fuel tank step and then step onto the ground?

**A.**   I think I would have been in violation.

**Q.**   What do you mean you think you would have been in violation?

**A.**   Well, I just -- that's the way -- I mean, that's the way I always came down on every step.

**Q.**   Okay.  What caused you to slip?

**A.**   That bent step.

**Q.**   Did you fall?

**A.**   I fell, but I didn't fall all the way down.  I caught myself.

**Q.**   What happened?  What did you feel?

**A.**   I felt a sharp pain in my knee and my toe -- my toes became real numb.

**Q.**   What did you do?

**A.**   Well, I tried to walk it off for a minute, and then I eventually went ahead and started filling the truck up, fueling the truck.

**Q.**   Had you ever felt any pain like that in your knee before?

1   **A.**   No, sir.

2   **Q.**   Which knee was it?

3   **A.**   My left.

4   **Q.**   Were you able to finish fueling the truck?

5   **A.**   Yes, I eventually was able to finish fueling the truck.

6   **Q.**   What did you do then?

7   **A.**   I got in and I made my way to Cordele.

8   **Q.**   How far as it from Vienna to Cordele?

9   **A.**   Probably about 20 -- 15 or 20 minutes.  I'd say about 15

10   miles.

11   **Q.**   What time was it when you got there?

12   **A.**   Right at 4 o'clock.

13   **Q.**   What happened then?

14   **A.**   I parked the truck, and I got out, and I was on my way to

15   my truck and Tommy Thornhill pulled up.

16   **Q.**   What did Mr. Thornhill say?

17   **A.**   He questioned me why was I limping.  I told him I slipped

18   off the truck.  I told him, you know, where I was at when I

19   slipped off the truck.

20   **Q.**   When you said you told him where you were when you

21   slipped off the truck, you mean you told him you were in

22   Vienna --

23   **A.**   Yes.

24   **Q.**   -- or you told him where you were on the truck?

25   **A.**   I told him that I slipped off the truck in Vienna.

1    **Q.**   What did he do?

2    **A.**   He looked at me, he asked me did I need medication, and I

3    said him, I said, well, I'll try to get by the weekend.

4    **Q.**   What did y'all do next?

5    **A.**   He got out.  He saw me -- he walked over to the truck,

6    and I pointed at which step that I slipped off of.

7    **Q.**   Which -- clear this off of here.  Which step did you

8    point at?

9    **A.**   I pointed at the middle step, the middle step, the bent

10   one.

11   **Q.**   This one?

12   **A.**   Yes.

13   **Q.**   And how far were you from -- how far were you and

14   Mr. Thornhill from the truck when you pointed?

15   **A.**   We was probably about 10, maybe 10, maybe 15 yards away.

16   **Q.**   In the Cordele -- at the Cordele yard?

17   **A.**   Yes.

18   **Q.**   What did Mr. Thornhill say?

19   **A.**   He got on the phone -- well, he asked me did I want to

20   fill out a report.  I said, well, I guess I will.

21   **Q.**   Did y'all go back inside, I take it?

22   **A.**   Yes.

23   **Q.**   Okay.  And you say you filled out a report?

24   **A.**   Yes.

25   **Q.**   Do you know what that report is called?

1   **A.**   Form 22.

2   **Q.**   Did you fill one out?

3   **A.**   Yes, sir.

4   **Q.**   Let me show you what we've marked as Plaintiff's 30.

5   **A.**   Uh-huh.

6   **Q.**   Is that a Form 22?

7   **A.**   Yes, sir.

8   **Q.**   Is that the Form 22 that you filled out?

9   **A.**   Yes, sir.

10  **Q.**   And was anyone there with you when you filled it out?

11  **A.**   No one but Tommy Thornhill, my supervisor.

12  **Q.**   Did you fill out the entire thing?

13  **A.**   No, I didn't.

14  **Q.**   Did he fill out part of it?

15  **A.**   Yes.  He filled out the first half, and he started

16  filling out my part.

17  **Q.**   When you say my part, what do you mean is my part?

18  **A.**   Well, when you get down here "when employee was

19  dismounting" I think he wrote that part.

20  **Q.**   This part right here?

21  **A.**   Yes.

22  **Q.**   Okay.  Did you -- can you read that?  Can you see it well

23  enough to read it?  Or, Your Honor, if I can approach I have

24  an extra copy.

25       **THE COURT:**  That's fine.

1    **BY MR. LAMPROS:**

2    **Q.**   *(Handing to witness).*   All right.   What did you write

3    down as to what happened?

4    **A.**   Do you want me to read it?

5    **Q.**   Yes, sir.

6    **A.**   Okay.   "Employee was dismounting the welding truck.   I

7    had one hand on the middle -- one hand on the handle of the

8    door and the other on the seat of the truck.   I placed my left

9    foot onto the middle step.   As I began to exit the truck, my

10   left foot slipped, and I caught myself with the same left

11   foot, with all of my weight shifted on the foot, causing me to

12   tweak my left knee."

13   **Q.**   And when you said you had one hand on the handle of the

14   door, what are you talking about?   Which hand did you have on

15   the handle of the door?

16   **A.**   My left hand.

17   **Q.**   And the other on the seat of the truck?

18   **A.**   Yes.

19   **Q.**   "I place my left foot on the middle step as I began to

20   exit the truck."   What did you mean by that?

21   **A.**   Well, as I -- after I come off the platform, I placed my

22   -- you say my -- say that -- can you repeat that?

23   **Q.**   What did you mean by "I placed my left foot on the middle

24   step as I began to exit the truck?"

25   **A.**   Oh.   I placed my left foot on the bent step of the truck

1    of the step.

2    **Q.**   As you began to exit the truck --

3    **A.**   Yes.

4    **Q.**   -- let's see if we got this right -- was your first step?

5    **A.**   Yes.

6    **Q.**   -- as you began to exit the truck?

7    **A.**   Yes.

8    **Q.**   -- onto this step --

9    **A.**   No.  I began to exit --

10   **Q.**   -- or this step?

11   **A.**   I began to exit the truck, after I come off the platform,

12   I placed my right foot right there on the top step, which is

13   in the middle of the fuel tank.  My left foot was on the

14   middle step right there.  That's the bent one.

15   **Q.**   So you didn't try to step from here -- from the inside of

16   the truck, all the way down to here, did you?

17   **A.**   No, sir.

18   **Q.**   Did you try to step from the truck all the way down to

19   this step?

20   **A.**   Yes.

21   **Q.**   Did you first stop on the platform?

22   **A.**   Yes.

23   **Q.**   And it says "I fell with all my weight, slipped on that

24   foot, causing me to --"  what is that word?

25   **A.**   Tweak.

**Q.**   -- tweak my left knee."

**A.**   I have some bad handwriting.

**Q.**   What did you mean by tweak?

**A.**   Twist it, kind of twist it like --

**Q.**   Did you turn this form into Mr. Thornhill?

**A.**   Yes.

**Q.**   Did he say anything to you about it?

**A.**   I asked him was it -- was that accurate, and he said --
he looked at it, and he said, yes.

**Q.**   Did he say anything about, well, Paul, you slipped on the
step in the fuel tank?

**A.**   No.

**Q.**   Did he ask you to clarify that?

**A.**   No.

**Q.**   Did he ask you what you meant by the middle step?

**A.**   No.

**Q.**   How far were you and Mr. Thornhill from this truck when
this form was filled out?

**A.**   We was inside the office.

**Q.**   How far was that from the truck?

**A.**   Probably 25, 30 feet.

**Q.**   Could y'all have gone out there and looked at the truck
at that time?

**A.**   Yes.  Yes.

**Q.**   Could y'all have gone out there and you stood there while

1    Mr. Thornhill took pictures of it?

2    **A.**   He didn't take any pictures.

3    **Q.**   I understand that, but what I'm asking is could y'all

4    gone out there that day and taken pictures of the truck with

5    you standing by it?

6    **A.**   Yes.

7    **Q.**   He didn't ask you to do that?

8    **A.**   No, sir.

9    **Q.**   What was Mr. Thornhill doing while you were filling out

10   those forms?

11   **A.**   He might have been -- he was talking on the phone.

12   **Q.**   Do you have any idea who he was talking to?

13   **A.**   I think he talked to Mr. Gerhardt, and I think he talked

14   to Mr. Bobbitt.

15   **Q.**   Did you hear what they were talking about?

16   **A.**   Well, he was -- I think he was reporting to them that I

17   was filing out a form, that I had been injured.

18   **Q.**   After you filled out this form what did you do next?

19   **A.**   I went home.

20   **Q.**   Excuse me?

21   **A.**   I went home.

22   **Q.**   Did you need medical attention at this time?

23   **A.**   Well, I told Mr. Thornhill that I was going to try to

24   wait because it was a weekend, and I was going to see how it

25   played out over the weekend.

1    **Q.**   Did you go home?

2    **A.**   Yes.

3    **Q.**   And how did you do?

4    **A.**   Not very well.  I elevated -- I went home, I elevated it.

5    I put ice on it, and my wife, she kept ice on it all through

6    the night because I was in a cold sweat, and she gave me

7    Advil.  She -- constantly.

8    **Q.**   Did you go to the doctor?

9    **A.**   No, sir.

10   **Q.**   Why not?

11   **A.**   Well, in the morning time, I felt better the next

12   morning.  I -- kind of moving around the next morning, so I

13   felt that I was on my way to recovery.

14   **Q.**   Did you do anything over the weekend that would have hurt

15   your knee?

16   **A.**   No, sir.

17   **Q.**   Did you play basketball with your children?

18   **A.**   No.

19   **Q.**   Did you go shopping at Kroger?

20   **A.**   No, sir.

21   **Q.**   Did you cut grass?

22   **A.**   No, sir.

23   **Q.**   Did you go back to work on Monday?

24   **A.**   Yes, I did.

25   **Q.**   How did you do?

1  **A.**   I think I did pretty good.  I had somewhat of a little

2  small limp, but I was sore, it was tender, but I still had

3  motion in my knee.

4  **Q.**   Were you able the work all day?

5  **A.**   Yes, sir.

6  **Q.**   Did you have any pain?

7  **A.**   I had some pain, but I worked through it.

8  **Q.**   What did you do Monday night?

9  **A.**   Monday night, my wife, she put ice packs on it.  She was

10  trying to get me back to -- nurse me back to health.

11  **Q.**   What did you do on Tuesday?

12  **A.**   Tuesday, I think I went back to work, and I think we were

13  tearing out a crossing that day, I think, right outside of

14  Tifton.

15  **Q.**   Okay.  Were you able to work all day?

16  **A.**   Yes, I was.

17  **Q.**   Did you have any pain?

18  **A.**   Yes.  I told -- I reported it on my way -- it was myself

19  and Matt Coleman, he was the foreman on that gang, and on my

20  way home I told him, I said, I'm experiencing some -- my knee

21  pain, I don't think is -- I don't think it's -- I think

22  something is wrong.  I just told him, I said, I don't know how

23  long I'm going to be able to keep this up.

24  **Q.**   Did you do anything Monday or Tuesday either at work or

25  at home to hurt your knee?

1    **A.**    No, sir.

2    **Q.**    Did you go back to work on Wednesday?

3    **A.**    Yes, I went back to work Wednesday.

4    **Q.**    What time did you show up?

5    **A.**    I showed up on time, 7 o'clock.

6    **Q.**    What did you do?

7    **A.**    We was getting -- they had a spray truck on the district,

8    and they picked me to run through the switches at every

9    switch.

10   **Q.**    Okay.  And how long did you work on Wednesday?

11   **A.**    Until about -- probably about 2 o'clock.  Maybe in

12   between one and 3 o'clock.

13   **Q.**    And did you end up going to the doctor that day?

14   **A.**    Yes.  I called Tommy Thornhill.  I told him, I say, I've

15   gone as far as I could go, I said, I think I need some medical

16   attention.

17   **Q.**    What did he say?

18   **A.**    He came around -- he came and he pulled up, and he called

19   Lucius Bobbitt again.  We was in Tifton, Georgia.

20   **Q.**    And what did y'all do?

21   **A.**    Well, after they sit in the truck for about 30 minutes

22   trying to decide were they going to -- what doctor that I was

23   going to be going to, they decided to take me to Valdosta.

24         **MR. TOTH:**  Objection, Your Honor.  I don't know that

25   there's any evidence that he was party to that conversation.

1    He's speculating as to that conversation.  I don't think he

2    can speculate unless he has some personal knowledge of being

3    part of that conversation.

4        **THE COURT:**  So your objection is to them deciding that

5    he was going to Valdosta?

6        **MR. TOTH:**  Well, the form of question was in my mind

7    asking him to comment on what two people were talking about on

8    a phone conversation that he was not even a part of.

9        **THE COURT:**  Right.  When he said they decided to take

10   me to Valdosta.  Did they take you to Valdosta?

11       **THE WITNESS:**  Yes.

12       **THE COURT:**  Okay.

13       **THE WITNESS:**  We was sitting in Tifton and we had a

14   hospital right across the street.

15       **THE COURT:**  Well, I think he can testify -- I get your

16   point, but they ended up taking him to Valdosta.  It doesn't

17   make much difference.

18       **MR. TOTH:**  Thank you, Your Honor.

19   **BY MR. LAMPROS:**

20   **Q.**   Where were when you told Mr. Thornhill that you needed

21   help?

22   **A.**   We was in Tifton, Georgia.

23   **Q.**   And where was Mr. Bobbitt, to your knowledge?

24   **A.**   I guess he was in his office in Atlanta.

25   **Q.**   But he wasn't there present?

1    **A.**   No, sir.

2    **Q.**   Did y'all wait for Mr. Bobbitt to show up?

3    **A.**   No, sir.  He never showed up.

4    **Q.**   So who took you to the doctor?

5    **A.**   My supervisor, Tommy Thornhill.

6    **Q.**   And where did he take you?

7    **A.**   He took me to Valdosta.

8    **Q.**   Was there a hospital in Tifton?

9    **A.**   Yes.  There's a big hospital, Tift Regional.

10   **Q.**   How long did it take you to go from Tifton to Valdosta?

11   **A.**   Probably about 30 minutes.

12   **Q.**   Did you tell them you wanted to be taken to Valdosta?

13   **A.**   No, sir.

14   **Q.**   What's closer to your home, Tifton or Valdosta?

15   **A.**   Tifton.

16   **Q.**   When you got to Valdosta did you see the doctor?

17   **A.**   I saw the emergency doctor.

18   **Q.**   Were you initially going to Valdosta to go to the

19   emergency room?

20   **A.**   No, sir.

21   **Q.**   Where are you initially going to go see?

22   **A.**   I was initially going to see the doctor that they decided

23   on I believe.

24   **Q.**   Did Mr. Thornhill tell you what doctor you were going to

25   see in Valdosta?

1    **A.**    He called -- he was calling on the way.

2    **Q.**    But you didn't go see that doctor?

3    **A.**    No, sir.

4    **Q.**    You went to the ER?

5    **A.**    Yes.  They plans changed all the sudden.

6    **Q.**    And Mr. Thornhill took you to the ER, right?

7    **A.**    Yes.

8    **Q.**    What time of day is it when you get to the ER?

9    **A.**    It was about 6 o'clock maybe, 5:30 or 6 o'clock.

10   **Q.**    On Wednesday evening?

11   **A.**    Yes, sir.

12   **Q.**    And what did they do for you there at the ER?

13   **A.**    The prescribed -- well, they x-rays, and they prescribed

14   me a prescription, and they put me in a long knee -- I had a

15   -- they prescribed a long knee brace, and they prescribed me

16   crutches.

17   **Q.**    Did you walk out of there with a knee brace and crutches?

18   **A.**    Yes, sir.

19   **Q.**    Had you done anything either at home or at work on

20   Monday, Tuesday, or Wednesday to hurt your knee?

21   **A.**    No, sir.

22   **Q.**    All right.  After you left the ER in Valdosta, did you go

23   back to work?

24   **A.**    No, sir.

25   **Q.**    How long did you wait before you went to the doctor after

1    that?

2    A.    My doctor at the ER, she prescribed -- she recommended me

3    to go see an orthopedic physician.

4    Q.    Did you go see an orthopedic physician?

5    A.    Yes.

6    Q.    Who did you see?

7    A.    A guy by the name of Dr. Eric Gee.

8    Q.    Where is Dr. Gee?

9    A.    He's in Valdosta.

10   Q.    How many times did you see Dr. Gee?

11   A.    Once.

12   Q.    Why did you switch from him?

13   A.    Well, I didn't switch with him.  I was scheduled to come

14   to him, but his assistant was there.

15   Q.    And who was his assistant?

16   A.    Dr. Landis Coffee.

17   Q.    Landis -- I'm sorry?

18   A.    Dr. Landis Coffee.

19   Q.    And how many times did you see Dr. Coffee?

20   A.    Probably about three times.

21   Q.    Why did you switch from Dr. Coffee?

22   A.    Sir?

23   Q.    Why did switch from Dr. Coffee?

24   A.    Well, I lost contact with her.

25   Q.    How far was it for you to go from your home down to

1    Valdosta to see these doctors?

2    **A.**    It's about -- anywhere between 85 and 90 miles.

3    **Q.**    Who did you see after Dr. Coffee?

4    **A.**    I saw my family doctor, Dr. Mann.

5    **Q.**    Is he an orthopedic surgeon?

6    **A.**    No, sir.

7    **Q.**    What did Dr. Mann do for you?

8    **A.**    He prescribed me some pain pills -- some medication.

9    **Q.**    Had any of these doctors told you to go back to work?

10   **A.**    Yes.  Dr. Mann.  Dr. Mann, he --

11   **Q.**    Why didn't you go back to work?

12   **A.**    Because I went back -- I went back to him, but I was

13   still having pain so he recommended me to see an orthopedic

14   surgeon, too.

15   **Q.**    Did you do that?

16   **A.**    Yes.

17   **Q.**    Who was that orthopedic surgeon?

18   **A.**    Dr. James Barbara in Douglas, Georgia.

19   **Q.**    At some point did you see any other doctors before Dr.

20   Barbara?

21   **A.**    No, sir.  No, sir.

22   **Q.**    What did Dr. Barbara do for you?

23   **A.**    He read my MRI out to me.

24   **Q.**    Did you continue to treat with Dr. Barbara?

25   **A.**    No, sir.

1   **Q.**   Why not?

2   **A.**   Well, I felt that I didn't have too much confidence in

3   him.

4   **Q.**   At some point did you see a Dr. Samuel?

5   **A.**   Yes, I seen Dr. Samuel.  He was down in the Valdosta --

6   after Dr. Landis Coffee prescribed me a MRI, after my MRI she

7   had told me what my diagnosis was, and she told me that Dr.

8   Rick Sandler would be the person that she would recommend to

9   perform the surgery.

10   **Q.**   Was it convenient for you and your family for you to go

11   see the doctor in Valdosta?

12   **A.**   It wasn't, but I was willing to go.  I mean, I was

13   wanting to take care of this problem.

14   **Q.**   And Dr. Barbara we talked about, and you didn't go back

15   to see him?

16   **A.**   No, I just went to him for a second opinion.

17   **Q.**   And then who did you see?

18   **A.**   I saw Dr. Slappey.

19   **Q.**   And who is Dr. Slappey?

20   **A.**   He's my orthopedic surgeon.

21   **Q.**   How did you get to Dr. Slappey?

22   **A.**   I looked online, Googled -- looked on line and decided to

23   go with him.

24   **Q.**   Did you decide to go with him -- did you come see him

25   first?

1   **A.**   Yes, yes.

2   **Q.**   Why did you decide to make another change?

3   **A.**   Well, by him being in Macon I thought that he had more

4   experience in doing a lot of, you know, surgery.  So that's

5   why I --

6   **Q.**   How long had it been from the time you were injured on

7   August 6th, 2010 until the time you got to see Dr. Slappey?

8   **A.**   Like I say, I got hurt August 6th, 2010.  I saw Dr.

9   Slappey in October of 2010.

10  **Q.**   So about two months?

11  **A.**   Yes.

12  **Q.**   What did Dr. Slappey do for you?

13  **A.**   He ran x-rays, and he gathered my MRIs together, and he

14  recommended surgery.

15  **Q.**   Did you have surgery done?

16  **A.**   Yes.

17  **Q.**   Where?

18  **A.**   Forsyth Street Orthopedic in Macon, Georgia.

19  **Q.**   Right around the corner here?

20  **A.**   Yes.

21  **Q.**   And when did you have that surgery done?

22  **A.**   I had it done October 20, 2010.

23  **Q.**   From the time you first saw Dr. Slappey until the time

24  you had surgery, how long was that?

25  **A.**   Say that again, sir?

1   Q.   From the time you first saw Dr. Slappey until the time

2   that he operated on you, how long was that?

3   A.   It was probably about a week and a half.

4   Q.   Did anyone come up with you for the surgery?

5   A.   Yes.  My wife.

6   Q.   Did they put you to sleep?

7   A.   Yes.

8   Q.   What do you recall that they did to you?

9   A.   Well, I recall when I woke up -- they put me to sleep and

10  when I woke up I was still out of it, my knee was in a lot of

11  pain so --

12  Q.   What did you do the day after that -- the same day that

13  you had the surgery later in the day, what time of day did

14  they operate on you?

15  A.   They operated me about 6:00 in the morning like that.  It

16  was really early, so got home probably about 10:00, I'd say

17  9:00 or 10:00, and I was sedated, and I was recommended to

18  relax and elevate my knee -- my leg.

19  Q.   Did you have to take any medications?

20  A.   Yes.

21  Q.   Is that the first time you've had any surgery?

22  A.   Yes.

23  Q.   Is that the only time you've ever had any surgery?

24  A.   Yes.

25  Q.   Let me show you -- let me show you what we've marked as

1   Plaintiff 53.  Who's that in the picture?

2   **A.**   That's me.

3   **Q.**   Down here on the date it says January 14, 2005.  Is that

4   right?

5   **A.**   No, sir.

6   **Q.**   Why does it say that?

7   **A.**   We got a digital camera.  I don't -- we don't -- neither

8   one, me or my wife how to update it.

9   **Q.**   Set your date?

10   **A.**   Yes.

11   **Q.**   Was this taken -- where was this taken?

12   **A.**   Probably at a family reunion or family gathering.

13   **Q.**   Was this after your surgery?

14   **A.**   Yes.

15   **Q.**   And are you on crutches?

16   **A.**   Yes.

17   **Q.**   Let me show you part B in Exhibit 53.

18   **A.**   Okay.

19   **Q.**   Can you tell us what that is?

20   **A.**   That's after Dr. Slappey took the wrap off.

21   **Q.**   Is that your left knee?

22   **A.**   Yes, sir.

23   **Q.**   And, again, the date on that is January 1, 2005.  Is that

24   right?

25   **A.**   Yes.

1    Q.    That's date that picture was taken?

2    A.    No, sir.  Like I say, we don't know how to reset the time

3    on it.

4    Q.    You think that picture was taken some time in October of

5    2010?

6    A.    Probably January.  I think some time around January 2011.

7    Q.    How long did he keep the wrap on your knee?

8    A.    Probably about -- I'd say probably about two months.

9    Q.    Okay.  And then I'm going to show you part C of Exhibit

10   53.  Is that just another view of your knee?

11   A.    Yes.

12   Q.    And again it's got the date but --

13   A.    Yes.

14   Q.    -- that's just the digital camera malfunction?

15   A.    Yes.

16   Q.    How did you do after the surgery?

17   A.    I think I did fine.  I just had pain, a few pains.

18   Q.    Did you follow up with Dr. Slappey?

19   A.    Yes, I did.

20   Q.    Did you follow his instructions?

21   A.    Yes, I did.

22   Q.    Did you have physical therapy?

23   A.    Yes, I did.

24   Q.    Did you go to physical therapy?

25   A.    Yes.

1    **Q.**    Tell us about that.

2    **A.**    Well, he had us doing -- he started me out light.   He

3    stated me out with just walking, and, you know, trying to

4    maintain my balance, and then eventually as my leg got

5    stronger, we started doing leg exercises as far as leg raises,

6    and we started doing step raises.

7    **Q.**    Okay.   How long did you go through physical therapy?

8    **A.**    Probably about -- probably from two to four months.

9    **Q.**    Did you do any home exercises?

10   **A.**    Yes.

11   **Q.**    Tell us about that?

12   **A.**    I did walks, I did knee bends, I continued my therapy

13   that I learned from my therapy.

14   **Q.**    Did you continue to follow up with Dr. Slappey?

15   **A.**    Yes.

16   **Q.**    Did you continue to follow his instructions?

17   **A.**    Yes.

18   **Q.**    What other treatment was he providing you during this

19   recovery period?

20   **A.**    Well, injections.   And he told me to continue to

21   exercise.

22   **Q.**    Did he give you any prescription medication?

23   **A.**    Yes.

24   **Q.**    Did you take those as you were supposed to?

25   **A.**    Yes.

1    **Q.**    How often did you see Dr. Slappey?

2    **A.**    Probably about once a month, I believe, about once a

3    month.

4    **Q.**    Did you continue to have pain?

5    **A.**    Yes.

6    **Q.**    Describe the pain that you were having and let's talk

7    about the first six months after the surgery.

8    **A.**    The first six months I was in enormous pain, and then it

9    gradually, probably after that third or fourth month, it

10   started getting better.  He had to change my pain medicine a

11   few times in between that.

12   **Q.**    And at what point did you join a gym and start working

13   out at a gym?

14   **A.**    When my therapy was over with, I was recommended to go

15   ahead and, you know, try to join a fitness, at least try to

16   get my strength back in other ways.

17   **Q.**    Let's talk about what you do in the gym.  What are some

18   of the exercises you do?

19   **A.**    Well, I did -- I walked on the treadmill.  I did --

20   worked with dumb bells, and I did sit ups and things of that

21   nature.

22   **Q.**    When you were working with dumb bells, how much are you

23   working with?

24   **A.**    Anywhere from 10 -- 15 to 20 pounds.

25   **Q.**    And when you're doing -- what did you say, sit ups?

1    **A.**    Yes.

2    **Q.**    Are you doing it with any weight resistance?

3    **A.**    No, sir, no, sir.

4    **Q.**    How long do you do, if you're doing dumb bell exercises

5    how often -- or how long do you do those for?

6    **A.**    Not long.  I just probably do about three sets of ten,

7    something like that.

8    **Q.**    How about the sit ups?

9    **A.**    I probably do about the same, three sets of 20.

10   **Q.**    When you walk on the treadmill, how far do you walk?

11   **A.**    About a mile, mile and a half.

12   **Q.**    For how long?

13   **A.**    Probably about I think 30, 35 minutes.

14   **Q.**    What's your average speed?

15   **A.**    Anywhere from 2.8 to, like, 3.0.

16   **Q.**    And why do you walk on a treadmill?

17   **A.**    Because I was strengthen -- I was trying to strengthen my

18   knee.  I was trying to do something to strengthen my knee.

19   **Q.**    Had anybody ever told you not to walk on a treadmill?

20   **A.**    No, sir.

21   **Q.**    Other than the treadmill and the dumb bells and the sit

22   ups, did you do any other exercises or do you do any other

23   exercises at the gym?

24   **A.**    Yeah.  I did a little stationary -- a little stationary

25   -- they had a little stationary, like leg lifts -- I mean, arm

1    lifts, curls, they had on the stationary, things like that.

2    **Q.**   Other than your knee, do you have any other health

3    issues?

4    **A.**   Yes, I became a Type II diabetic.  I was controlling with

5    diet and exercises, but now I'm beginning to take some

6    medications.

7    **Q.**   Is part of your gym routine to help with your diabetes?

8    **A.**   Yes.

9    **Q.**   Did you continue to see Dr. Slappey through this time?

10   **A.**   Yes.

11   **Q.**   What did he continue to do for you?

12   **A.**   Well, he gave -- he started giving me cortisone shots,

13   and he reached the point that there was nothing he could do he

14   said.

15   **Q.**   Did he refer you out?

16   **A.**   Yes.

17   **Q.**   Who did he refer you to?

18   **A.**   He referred me to Dr. Jacobson in the Hughston Clinic in

19   Columbus, Georgia.

20   **Q.**   Do you treat with Dr. Jacobson now?

21   **A.**   Yes.

22   **Q.**   When was the last time you saw him?

23   **A.**   Last week -- yeah, last Monday.

24   **Q.**   Do you have any appointments with him scheduled now?

25   **A.**   Yes.

1   **Q.**   What are they for -- I'm sorry, when is that appointment

2   scheduled?

3   **A.**   I have one Wednesday.

4   **Q.**   You might have to skip that one.

5   **A.**   Yes, sir.

6   **Q.**   What have they done for you there at the Hughston Clinic?

7   **A.**   Well, he ordered me therapy, more therapy, and he gave me

8   injections.

9   **Q.**   When you say he ordered more therapy, what type of

10   therapy?

11   **A.**   He wanted me -- more strength.  He wants some more

12   strength in my leg.

13   **Q.**   You talking about physical therapy?

14   **A.**   Yes.

15   **Q.**   And is he actually giving you injections?

16   **A.**   Yes.

17   **Q.**   When he gives you an injection, does he take actually

18   take a needle and syringe and stick it into your knee?

19   **A.**   Yes.

20   **Q.**   How does that feel?

21   **A.**   Not very good.

22   **Q.**   Let's talk about how you're doing now.  How are you

23   doing?

24       **THE COURT:**  This will be a good time to take a break,

25   Mr. Lampros.  I assume you intend to tender the exhibits that

1    you've identified.

2        **MR. LAMPROS:**  Yes, Your Honor.

3        **THE COURT:**  And there's no objection to those exhibits,

4    Mr. Toth?

5        **MR. TOTH:**  None, Your Honor.

6        **THE COURT:**  So Plaintiff's 19, 20, 21, 22, 30, and 53

7    are admitted without objection.  Ladies and gentlemen, we'll

8    take our afternoon break.  We will take about 15 minutes.

9    Before I let you go, there's one person I haven't introduced

10    you to yet, and that's my law clerk, Brooke Walker sitting

11    over here next to Ms. Hatcher.  I'm sorry about that, Ms.

12    Walker.  All right, we'll remain seated while you go to the

13    jury room for your afternoon break.

14    *(Jury excused, 3:00 p.m.)*

15        **THE COURT:**  We'll be in recess 10 minutes.

16    *(RECONVENED; ALL PARTIES PRESENT)*

17        **THE COURT:**  Bring the jury in.

18    *(Jury In)*

19        **THE COURT:**  All right, Mr. Lampros?

20        **MR. LAMPROS:**  Thank you, Your Honor.

21    BY MR. LAMPROS:

22    Q.  Before the break we were talking about -- and we've been

23    through your treatment and all -- let me ask you this.  Today

24    now, do you have constant, chronic, excruciating pain in your

25    knee?

1    **A.**    No.

2    **Q.**    So how are you doing?

3    **A.**    I have good days, and I have bad days.

4    **Q.**    On your bad days, how bad is it?

5    **A.**    It can be tough.

6    **Q.**    Are you telling this jury that because of the knee injury

7    you can't work in any job of any sort ever again?

8    **A.**    No, I'm not saying that.  I just -- the way my education

9    is is that it was all geared to labor, labor working, and now

10   I got to make that transition to find something else.

11   **Q.**    When's the last time you were physically able to work at

12   the railroad in your job as a track worker?

13   **A.**    Say that again, sir?

14   **Q.**    When's the last time you were able to physically work in

15   your job as a track welder at the railroad?

16   **A.**    August 11, 2010.

17   **Q.**    Is that the day that Mr. Thornhill took you to Valdosta

18   to the doctor?

19   **A.**    Yes.

20   **Q.**    Since that time, do you think there's been a time when

21   you could have consistently held that job -- physically able

22   to consistently hold that job as a track welder and perform

23   those duties?

24   **A.**    No, sir, I don't think so.

25   **Q.**    Why not?

**A.**    It requires a lot of manual labor.  It requires a lot of

walking on uneven surfaces.  It requires a lot of lifting.  It

requires a lot bending and a lot of squatting.

**Q.**    Have you looked for any jobs since August 11 --

**A.**    Yes.

**Q.**    -- of 2010?

**A.**    Yes.

**Q.**    How have you gone about looking for those jobs?

**A.**    I've gone -- well, actually I drove some places.  I went

to the labor department and places, and I went to the Internet

online.

**Q.**    Have you had any success?

**A.**    No, sir.

**Q.**    You have training as a truck driver.  Do you think you

could go back to driving a truck?

**A.**    I believe I -- I mean, I hadn't tried it, but I -- that

calls a lot double braking -- double clutching, I mean, on

that, and that clutching is with my left foot, so I don't -- I

really don't know yet.

**Q.**    How about the fibra optics training?  Do you think you

could do anything with that?

**A.**    If I can get my certifications I hope -- I would try -- I

would like to do that.  That also calls -- fibra optic, it

also requires a lot of underground work, and you have to do a

lot of walking on uneven surfaces too.

1    Q.   Have you tried to get your job at -- is it Presto Light

2    Wire?

3    A.   Yes -- well, I went out there but they moved overseas,

4    Mexico -- I think they moved to Mexico.

5    Q.   And how about Irby Construction?

6    A.   Irby Construction, they was -- they move around a lot.  I

7    don't know where they're at now.

8    Q.   How about Tacompsi Products, have you tried to get your

9    job back there?

10   A.   Tacompsi Products, they moved overseas too.

11   Q.   Have you tried to go back to being an electrician?

12   A.   Yes.  I want to the union hall, and they are not doing

13   any hiring at the time.

14   Q.   Since August 11, 2010, tell us what Norfolk Southern has

15   done to try to help you get back to work?

16   A.   Absolutely nothing.

17   Q.   Has Norfolk Southern offered you a light duty job?

18   A.   No, sir.

19   Q.   To your knowledge is there a light duty job at the

20   railroad?

21   A.   I was told there no light duty on the railroad.

22   Q.   Has Norfolk Southern offered you a desk job?

23   A.   No, sir.

24   Q.   Has Norfolk Southern offered you a office job?

25   A.   No, sir.

1   **Q.**   Has Norfolk Southern said we're going to send you to

2   school for retraining so you can do another job here in the

3   company?

4   **A.**   No, sir.

5        **MR. TOTH:**  Objection, leading, Your Honor.

6        **THE COURT:**  I'll allow that.  That wasn't leading.

7   **BY THE WITNESS:**

8   **A.**   No, sir, they haven't.

9   **Q.**   Has Norfolk Southern done anything since August 11, 2010,

10   to help you find a way to work for a living?

11   **A.**   No, sir.

12   **Q.**   Have you suffered lost damages -- or, excuse me, have you

13   suffered lost wages as a result of this knee injury?

14   **A.**   Yes, sir.

15   **Q.**   Have you lost some of the benefits?

16   **A.**   Yes.

17   **Q.**   -- that came with your job?

18   **A.**   Yes, sir.

19   **Q.**   What are your plans for the future?

20   **A.**   I plan on getting back to work, hopefully getting better,

21   and getting back to work and hopefully just moving on with my

22   life.

23   **Q.**   Are you doing all you can to do that?

24   **A.**   Yes, sir.

25   **Q.**   Mr. Windom, do you think that you would have slipped and

1    fell and tweaked your knee and hurt it on August 6, 2010 if

2    that step right there hadn't been bent?

3    **A.**   No, sir, I don't think I would.

4    **Q.**   Do you think the condition of that step, you think the

5    condition, it's bent condition there, do you think that caused

6    or contributed to cause you to slip?

7    **A.**   Yes.

8         **MR. TOTH:**   Objection, Your Honor.  He's asking the

9    witness to answer the ultimate issue that's going to be

10   resolved by the jury in this case based upon people that are

11   qualified to offer opinions on medical diagnoses and

12   causation.

13        **THE COURT:**   What was the question?

14        **MR. LAMPROS:**   Your Honor, the question was did the

15   condition of the step cause or contribute to cause him to

16   slip.

17        **THE COURT:**   I think he already answered that.

18        **MR. LAMPROS:**   The first question was if he thought he

19   would have slipped if the step hadn't been bent.  The second

20   it's a little -- it's a distinct question with a difference,

21   Your Honor.

22        **THE COURT:**   I'll overrule that objection.  You can ask

23   it.

24   **BY MR. LAMPROS:**

25   **Q.**   The question, Mr. Windom, is did the condition of the

1  step, the bent condition of the step, did that cause or

2  contribute to cause you to slip?

3  **A.**   Yes.

4  **Q.**   And when you slipped, did you hurt your knee?

5  **A.**   Yes.

6       **MR. LAMPROS:**  One moment, Your Honor.  That's all I

7  have at this time, Your Honor.

8       **THE COURT:**  Cross examination?

9       **MR. TOTH:**  Yes, Your Honor.

10                    **CROSS EXAMINATION**

11  BY MR. TOTH:

12  **Q.**   Good afternoon, Mr. Windom.

13  **A.**   Good afternoon.

14  **Q.**   We're going to plow some ground you've already plowed,

15  but I have some follow up on various things that you commented

16  up in response to questions presented to you from your

17  counsel.  On the day that you reported this slip incident at

18  the Pilot Gas Station, did that day, August 6th, 2010, start

19  like any other day?

20  **A.**   Yes, yes.

21  **Q.**   And tell me what took place that morning.

22  **A.**   That morning we did our safety meeting, then we did our

23  exercises, and then we went to do our work.

24  **Q.**   And in the morning safety meeting were three points of

25  contact when mounting and dismounting equipment discussed

1   during that safety meeting?

2   **A.**   Yes, that's something we --a routine thing we do.

3   **Q.**   So that's something that in your mind is discussed not

4   just on August 6th, but on a regular basis?

5   **A.**   Yes, sir.

6   **Q.**   And I believe you said your job that day was not to

7   operate the welding truck, but it was to assist a contractor

8   and another railroad employee move concrete steps from Tifton

9   to Cordele?

10  **A.**   Yes.

11  **Q.**   And do you recall the name of that contractor?

12  **A.**   I think it was JT Industrial.

13  **Q.**   And would that gentleman have been Alex Warner who was

14  working with you on that day?

15  **A.**   I have no idea.  I don't know his name.  I mean, they

16  send a lot of new guys up.  So I don't -- I don't know.

17  **Q.**   You would not recognize him?

18  **A.**   I probably would recognize him if I saw him.

19  **Q.**   And is it your testimony that prior to the event at Pilot

20  Gas Station on the afternoon of August 6th, 2010 that you were

21  not limping at any point in time during the day?

22  **A.**   No, sir.

23  **Q.**   And the onset of the pain -- just so I'm clear -- was at

24  the Pilot Gas Station in Vienna?

25  **A.**   Yes, sir.

1    **Q.**    Now, I believe you said this welding truck, you had been

2    the operator of it for, what, two to two and a-half years?

3    **A.**    Yes, in that range, yes, sir.

4    **Q.**    And you're the one that's responsible for reporting any

5    problems, maintenance problems with the truck, correct?

6    **A.**    Yes.  Most of time, yes, I --

7    **Q.**    And I believe you, in fact, had made reports of problems

8    with the truck that required medical -- excuse me, mechanical

9    attention?

10   **A.**    Yes.

11   **Q.**    And were you the one that reported the problems, I guess

12   some time prior to August 6th about the flange wheels that go

13   down and the problems with the brakes on it?

14   **A.**    Yes.

15   **Q.**    And was the response of Mr. Thornhill to direct you to

16   take it up to -- and I don't think I'm making this up -- Mad

17   Dog Trucking?

18   **A.**    Yes.

19   **Q.**    And that's here in Macon, sir?

20   **A.**    Yes.

21   **Q.**    And do you recall how long the welding truck was at Mad

22   Dog Trucking?

23   **A.**    A couple days, I believe.

24   **Q.**    And, of course, on -- at the time you reported the

25   problems two or three days, I guess, beforehand about the

1    brakes with the hi-rail components on the truck, you didn't

2    make any complaint about the steps on the driver's side in

3    conjunction with taking it to Mad Dog immediately preceding

4    your incident, did you, sir?

5    **A.**    No, sir, not that day.  That day, actually I reported it

6    to Tommy a couple weeks before and then when I talked to

7    Lucius Bobbitt and I told him about it, he told me again to

8    tell Tommy that he said send -- take the truck up there.

9    **Q.**    But it's not your testimony to this jury that the reason

10   for the trip to Mad Dog on August -- you said it had been up

11   there two or three days, so I guess this would have been the

12   4th or 5th of August --

13   **A.**    Uh-huh.

14   **Q.**    -- it wasn't for step repairs; it was for repairs on

15   brakes --

16   **A.**    Yes.

17   **Q.**    -- on the hi-rail.  All right, sir.  And you had operated

18   this truck or been the primary operator for two and a-half

19   years --

20   **A.**    Yes.

21   **Q.**    -- and it's my understanding you had never had an event

22   where you slipped on the step closest to the ground or bottom

23   step before this incident on August 6th of 2010, correct?

24   **A.**    No, sir, no, sir.

25   **Q.**    So the one time you did slip, it caused you this onset of

1    knee pain, correct?

2    **A.**    Yes, yes.

3    **Q.**    And you don't feel like the topography at the Pilot Gas

4    Station played any role in causing your knee to twist when you

5    descended the welding truck?

6    **A.**    I'm not sure what that word means you just said.

7    **Q.**    Well, I had asked you if you could describe what the

8    surface was at the Pilot Gas Station in Vienna.  Do you

9    recall?

10   **A.**    Yes.

11   **Q.**    And I believe you said you do not know what the surface

12   was like at the Pilot Station whether it was flat, whether it

13   was concrete, whether it was asphalt?

14   **A.**    Right.

15   **Q.**    I'm going to show you here on the Elmo, if I can work out

16   the technology here, Mr. Windom, a document that we've marked

17   as Defendant's Exhibit 9.  And it's titled Getting On and Off

18   Moving Equipment.  Do you agree with that, sir?

19   **A.**    I can -- that's a little better.  Yes, sir.

20   **Q.**    Tell me, I'll be happy to try to help, I can't promise

21   anything.

22   **A.**    That's -- that's probably about the best you going to

23   probably be able to get it.

24   **Q.**    And the date on this is July 16th of 2010?  Would you

25   agree?

**A.**    Sir?

**Q.**    The date on this is July 10th of 2010 -- July 16th, I'm sorry?

**A.**    July 16th, yes, sir.

**Q.**    My apologies.  Do you agree with me, sir?

**A.**    Yes.

**Q.**    And there's reference there to safety in general conduct rule 1070 in the very first paragraph?

**A.**    Uh-huh.

**Q.**    And would you agree with me, sir, that this would have been just a few weeks before the incident on August 6th, 2010, the railroad had a rule in place about maintaining three points of contact before July 16th of 2010, correct?

**A.**    I believe so.

**Q.**    And I believe you indicated throughout your employment with Norfolk Southern in the maintenance and way department maintaining three points of contact, getting on and off equipment was something that was routinely talked about at the morning safety meetings?

**A.**    Yes.

**Q.**    And, of course, number five there, would you agree with me it says maintain three points of contact, and that's two hands and one foot and one hand and two feet when getting on or off equipment?  Did I read that correctly?

**A.**    Yes.

1    **Q.**   I want to show you a document that's marked Defendant's

2    Exhibit 7-C, and I represent to you it's a document -- or a

3    photograph taken by Mr. Thornhill on August 6th, 2010.  Would

4    you agree with me, sir, that this would be a fair and accurate

5    representation of what the truck looked like on August 6th of

6    2010?

7    **A.**   It looked a little different right there, I mean, it

8    looks like it could be, I mean, I don't know whether the

9    shades are on it or -- I mean, it's shady or what.

10   **Q.**   Does that help any, sir?

11   **A.**   Yes.

12   **Q.**   And I'm going to do my best here, just so everybody's

13   clear, this was -- you slipped getting out of the truck, not

14   getting in?

15   **A.**   Yes.

16   **Q.**   Okay.  And so if you were -- and I'm looking at your --

17   your Form 22 here --

18   **A.**   Uh-huh.

19   **Q.**   -- that you were previously asked about by your attorney?

20   **A.**   Uh-huh.

21   **Q.**   I think it was Plaintiff's Exhibit 30.  And you recall

22   exactly filling that document out in the presence of

23   Mr. Thornhill, correct?

24   **A.**   Yes.

25   **Q.**   But the only thing that you would have completed was --

1    and let me just show you the same document, but -- it's marked

2    Defendant's Exhibit 1.  Just so the jury is clear and the part

3    that you filled out is highlighted in yellow?

4    **A.**    Yes.

5    **Q.**    And just so I'm clear, if you're sitting in the driver's

6    seat, the first thing you do on exiting is come from where I

7    marked in blue there, that would be the cab of the truck,

8    correct?  There in blue?

9    **A.**    Yes.

10   **Q.**    With the floorboard -- whatever term you're more

11   comfortable with -- the floorboard of the cab of the truck?

12   **A.**    Uh-huh.

13   **Q.**    And so your first step is down here to the platform step,

14   correct?

15   **A.**    Yes, I come onto the platform.

16   **Q.**    You agree with me -- I'm going to go a little further

17   here -- that actually that platform step has actually got a

18   raised surface for tread connection or raised surface to

19   assist with grip?

20   **A.**    Yes.  Yes, sir.

21   **Q.**    So the second step down would be -- excuse me -- yeah,

22   the second step down would be right here where I've marked

23   with three little lines.  That's correct?

24   **A.**    That would be my first step.

25   **Q.**    And that step is in the fuel tank, correct?

**A.**    Yes.

**Q.**    So we've got step one, and then we got step two.  And then your last step when you descended was step three, correct?

**A.**    No, sir.

**Q.**    Well, let me see if I can be clear.  All right, you're -- we'll go over this again.  You're sitting in the welding truck at the Pilot Station, correct?

**A.**    Yes.

**Q.**    You open the door?

**A.**    Uh-huh.

**Q.**    Your first step is down to the platform where you've got -- where you put the diesel fuel in over here, if you look at the far right here?

**A.**    Uh-huh.

**Q.**    And so that's your first step down to the fuel tank, correct?  On the top, the platform I believe is what you referred to it as?

**A.**    Yes, but that's not considered a step.  That's considered a platform.

**Q.**    Okay.  But you have to step out of the truck to get to the platform?

**A.**    Yes, yes.

**Q.**    Okay.  So -- just so I'm clear, that's your first step down anyway, correct?

1    **A.**   Yes, yes.

2    **Q.**   All right.  Your next step down is into the fuel tank?

3    **A.**   Yes.

4    **Q.**   Step in the fuel tank.  So that's step number two, right?

5    **A.**   That's step number one.

6    **Q.**   Well, let me go back.  If you're in the cab and you get

7    out of the cab, your first step down is to the platform,

8    correct?

9    **A.**   Yes.  But that's not considered -- yes, yes, you're

10    right.

11    **Q.**   That's the platform, and the platform is serving as a

12    step for you right there, correct?

13    **A.**   Yes, but -- yes, it could be.

14    **Q.**   Okay.  So, all right, that's your first --

15    **THE COURT:**  Let him finish.  Go ahead.

16    **MR. TOTH:**  I'm sorry, Your Honor.

17    **THE COURT:**  Was there something else you want to say?

18    **BY THE WITNESS:**

19    **A.**   Well, I mean, that's not considered a step, though.  I

20    mean, that's --

21    **Q.**   Would you agree with this, Mr. Windom, it involves the

22    physical mechanism of a step in a downward direction, six to

23    eight inches, to get down to what you're calling the platform?

24    **A.**   You step over.

25    **Q.**   You step down.

1    **A.**   To me, it's a step over.

2    **Q.**   And then eventually down after you step over?

3    **A.**   Yes.

4    **Q.**   So you step down and over to the platform that's on top

5    of the fuel tank, correct?

6    **A.**   I stepped over to the platform.

7    **Q.**   But you're still right here where I've got this X right

8    over here, correct?  That's your --

9    **A.**   Yes, I stepped over.

10   **Q.**   Okay.  So that's your first step down toward getting out

11   of the cab?

12   **A.**   That's my first step over.

13       **THE COURT:**  Y'all are quibbling.  I understand your

14   point, Mr. Toth, and I understand your point, Mr. Windom.  He

15   calls it a platform.  You call it a step.  I don't know how

16   many more times you need to correct each other about what it

17   is.  I think everybody is clear where he put his foot he's not

18   going to call it a step.  He wants to call it a platform and

19   quibbling over it is not going to get us anywhere.

20       **MR. TOTH:**  Well, Your Honor, let me see if I can

21   rephrase it.

22   **BY MR. TOTH:**

23   **Q.**   To get to what you call the platform, does that require

24   you to make a downward movement with your body to reach that

25   position?

**A.**    It -- I step over.

**Q.**    So the number one movement getting out of the cab is stepping over?

**A.**    Step over, yes.

**Q.**    Okay.  Well, call it number one, step over.  And number two is step down.  Can we agree step down into the fuel tank step?

**A.**    Yes.  That should be my first step.

**Q.**    First step or second movement, is what -- correct?  To get out of the cab?

**A.**    Well, you say first move -- first move would be down though.

**Q.**    First step --

**A.**    The first -- my first move would be over.  My second move would be down.

**Q.**    That's -- all right.  And your third step is to the step that's closest to the ground, correct?

**A.**    No.  That would be my second step.

**Q.**    But your third downward movement, correct?

**A.**    That would be my second downward movement.

**Q.**    So let me just -- number one is step over, then you make your first step down?

**A.**    Yes.

**Q.**    Then you make your second --

**A.**    -- my second step down.

1    Q.    -- step down to what is the step closest to the ground?

2    A.    Yes.

3    Q.    And then you make your final step which puts you on the

4    ground?

5    A.    On the ground, yes.

6    Q.    And in the process of the final step that's when you

7    slipped?

8    A.    On the second step is where I slipped.

9    Q.    But your final movement?

10   A.    My final movement was on the ground.

11   Q.    Let me ask you this, Mr. Windom, I just drew a blue line

12   which I would say refects the very bottom of the cab, would

13   you agree with that?

14   A.    Yes.

15   Q.    Is that a yes?

16   A.    Yes, I think that's -- that should be the bottom, yes.

17   Q.    And I believe what you called the platform, you don't

18   want to refer to it as a step, but I'm using your term

19   platform?

20   A.    Yes.

21   Q.    In inches would you give me the distance from the blue

22   line on 7-C to the platform which is the bottom blue line?

23   A.    I'm not good with math.  Probably --

24   Q.    I'm just asking you for an estimate.

25   A.    I'd say probably two or three inches.

1   **Q.**   You've never measured it?

2   **A.**   No, sir.

3   **Q.**   And the step in the fuel tank, what is the distance from

4   the platform which was the middle blue line here on 7-C right

5   now and the step inset in the fuel tank?  I guess we're

6   talking about here.  What would the distance be in inches?

7   **A.**   I have no idea.  Probably eight inches.  I'm not sure.

8   I'm not good with distance.

9   **Q.**   Eight inches is your estimates?

10  **A.**   Eight to ten -- it's probably ten, probably.

11  **Q.**   And one more time, I'm going to see what I can do, the

12  distance between the step in the fuel tank and the step

13  closest to the ground, what would you estimate that distance

14  to be?

15  **A.**   Can you repeat that?

16  **Q.**   Yes, sir.  I'll be happy to.  On 7-C, and let me just see

17  if I can make it a little easier for you.  What is the

18  distance in between the two blue lines, which I would just

19  represent on the record here on 7-C is the step inset in the

20  fuel tanks, versus the step that's closest to the ground?

21  **A.**    I'd say six to eight inches.  I'm not sure.

22  **Q.**   And in terms of going from the step closest to the

23  ground, to the actual ground, what would you have estimated

24  that to be on August 6th, 2010 when you had your slip incident

25  from that step closest to the ground?

**A.**   Probably -- probably eight inches, eight to 10 inches.
I'm not sure.

**Q.**   On August 6th of 2010 what was your height and weight,
sir?

**A.**   2010.  I would say probably about 240 - 245, probably six
foot, maybe six foot one and a half, 6 foot and a half, I
mean.

**Q.**   I'm sorry, sir?

**A.**   Probably six foot, six and a half.

**Q.**   And you -- we defer testify to your medical records for
whatever they said as to your height?

**A.**   Yes.

**Q.**   And once again another distance for you, and I understand
this is not what you explained to the jury you did on
August 6th.  But the step inset in the diesel fuel tank down
to the ground, what would you estimate that distance to be?

**A.**   Probably I'd say maybe -- maybe 18 to 20 inches.  I'm not
sure.

**Q.**   Mr. Windom, I'm going to hand you what I marked as
Defendant's Exhibit B that I just showed Mr. Lampros.

         **THE COURT:**  What was that number?  Seven?

         **MR. TOTH:**  I'm sorry, 7-B, as in boy.  I went
backwards, Your Honor.  I apologize.  The one I had up there
was 7-C, but I'm now on 7-B as in boy.

**BY MR. TOTH:**

1  Q.   Have you had a chance to look at that?

2  A.   Yes.

3  Q.   And you recognize that as your welding truck?

4  A.   Yes.

5  Q.   And the step closest to the ground, is it secured by two

6  cables on both the left and right side?

7       **THE COURT:**  By two what?

8       **MR. TOTH:**  Cables.

9  **BY THE WITNESS:**

10 A.   Yes.

11 Q.   And the date, August 6, 2010, when you slipped off the

12 step closest to the ground, it was secured by four cables on

13 that day, wasn't it?

14 A.   I believe so.  It was just out of proportion.

15 Q.   When you mean -- let me ask the question to you this way.

16 On August 6th of 2010 your contention is there's something

17 wrong with the step closest to the ground because you feel it

18 is crooked and it's parallel and it was bent?

19 A.   It's crooked.  It's not horizontal.  And it appeared to

20 be bent.

21 Q.   So those are your issues, it's the manner in which it is

22 secured below that step inset in the fuel tank.  Let me see if

23 I can read from you said here.  It's crooked, and it's not

24 parallel, and I think you corrected to say it's not

25 horizontal?

1    **A.**    Right.

2    **Q.**    And by horizontal you mean perfectly in line with the

3    step?

4    **A.**    Yes.

5    **Q.**    We could say parallel I guess if we were looking at it

6    that way, but I understand your point.  It's bent?

7    **A.**    Yes.

8         **MR. TOTH:**  Your Honor, this is Defendant's Exhibit 7.

9    **BY MR. TOTH:**

10   **Q.**    I'm going to show you what I've marked as Defendant's

11   Exhibit 7.  And do you recognize this photograph as being of

12   your welding truck?

13   **A.**    Yes.

14   **Q.**    And I understand it's not the best quality of photo.  But

15   the step inset in the diesel fuel tank, do you take any

16   exception to the design of it on the day that you had your

17   slip incident from what you described as the step below it?

18   **A.**    What are you -- I mean, what are you talking about here?

19   **Q.**    Well, on August 6th, of 2010, did you report any defect

20   or problem in regard to what I've circled here in blue, the

21   step in the inset fuel tank?  Do you see any problem with it

22   in Defendant's Exhibit 7?

23   **A.**    I didn't report an incident on that step, no, sir.

24   **Q.**    I understand, but I'm just asking you.

25   **A.**    No, sir.

1    **Q.**   Do you see any problem with it?

2    **A.**   No, sir.

3    **Q.**   And if we look up here to the platform, as you've

4    described it, you do you have any problems with the condition

5    of it, take any exception to it?

6    **A.**   No, sir.

7    **Q.**   And just so I'm clear, I want to make sure that you feel

8    like the slip that you had allowed all of your weight to land

9    on, your left foot, was due to the condition of the step

10   that's closest to the ground, correct?

11   **A.**   Yes, the middle step.

12   **Q.**   And, for example, the -- I'm going to move back to

13   another picture we've looked at here.  I'm sorry, Mr. Windom.

14        **THE COURT:**  And that is?

15        **MR. TOTH:**  I'm back to 7-B, Your Honor, which we've

16   already discussed, I'm sorry, I should have told the Court.

17   **BY MR. TOTH:**

18   **Q.**   A railroad man like yourself, do you call these grab

19   irons that -- or handholds?  How would you refer to that for

20   the people that aren't railroad men like yourself?

21   **A.**   Handholds or something like that.

22   **Q.**   And it's my understanding that you did not use, at least

23   according to your Form 22 that you completed in your own

24   handwriting, the handholds when you were getting out the

25   truck?

1  **A.**   Yes, sir.

2  **Q.**   And was that your practice when you were in highway mode

3  operation to not use the handholds when you were getting out

4  of the welding truck?

5  **A.**   I normally -- I normally grabbed the door and the

6  steering wheel and the seat.  I used the handholds when I'm

7  getting into the truck.

8  **Q.**   So just to make sure I understand, you do not use the

9  grab irons or handholds when you're exiting or descending out

10  of the step -- or out of the truck, I'm sorry?

11  **A.**   I use the steering wheel or the seat.

12  **Q.**   And so we're clear, you don't feel like the seat or the

13  steering wheel or the door handle played any role in your slip

14  event; it was the step closest to the ground?

15  **A.**   Yes.

16  **Q.**   And you heard Mr. Lampros talking, you heard me talk, we

17  both have talked a lot about operating the welding truck on

18  the rail.  You're familiar with that, aren't you, sir?

19  **A.**   Yes.

20  **Q.**   And that's not something you would do necessarily daily,

21  but you did have a lot of experience hi-railing during your

22  time at Norfolk Southern?

23  **A.**   Yes.

24  **Q.**   And did you have the ability, sir, to place your welding

25  truck on the hi-rail or on the railroad tracks without any

1    assistance, or was that a two-man job?

2    A.    That was a two-man job.

3    Q.    And was that in accordance with the railroad rules or

4    that's just the way it always worked?

5    A.    I think it's in accord with the railroad rules.

6    Q.    So at no point in time were you responsible for getting

7    it on the rail by yourself?

8    A.    No, sir.

9    Q.    And would you agree with me, sir, that when the welding

10   truck is in hi-rail mode operation where it moved up and down

11   the railroad tracks to get to an area where you were going to

12   do maintenance work, the front tires are elevated off the

13   ground, correct?

14   A.    Yes.

15   Q.    And can you tell the jury whether in hi-rail mode

16   operations the distance of the bottom of the tire to the

17   ground?

18   A.    Probably -- probably another eight inches.  I'm sorry,

19   I'm not sure.

20        MR. TOTH:  I'm sorry, Mr. Windom, Your Honor, members

21   of the jury, counsel I just needed to mark this.  Your Honor,

22   Mr. Lampros says we need to talk about 45, so I don't need to

23   publish it yet.

24        THE COURT:  What's the number?  45?

25        MR. LAMPROS:  45?  No, that one is okay, I'm sorry.  No

1    problem.

2         THE COURT:  No problem?

3         MR. TOTH:  May I publish, Your Honor?

4         THE COURT:  If there's no objection you may.

5         MR. LAMPROS:  No objection.

6         MR. TOTH:  Thank you, Mr. Lampros.  Thank you, Your

7    Honor.

8    BY MR. TOTH:

9    Q.    I think you estimated eight inches.  Let me show you what

10   I've marked as Defendant's Exhibit 45-A, and I'll just

11   represent to you that this is the welding truck on the

12   hi-rail.  And it looks like your estimate as to how high it

13   would be elevated would be fairly close.  Would you agree?

14   It's looking like 11 inches versus eight inches?

15   A.    It don't look like that tape measure is on the tie.

16   Q.    Let me see if I have another one.

17        MR. LAMPROS:  Your Honor, may we approach for a moment,

18   please?

19        THE COURT:  Well, I'm not so sure that there's much

20   point in examining Mr. Windom about his estimates about

21   distance which he says he doesn't consider to be very

22   reliable.  Surely this is something that y'all can figure out.

23        MR. TOTH:  I'll move on, Your Honor.  I'll withdraw the

24   question.

25        MR. LAMPROS:  We need to approach anyway.

1     **THE COURT:**  All right.

2     *(AT SIDEBAR)*

3     **MR. LAMPROS:**  This is defendant's exhibit list from

4     pretrial order entered.  This photograph 45 is photograph of

5     the Pilot Gas Station and that's clearly not the photograph

6     when it was at the Pilot Gas Station, and I don't see the

7     photograph listed on pretrial.

8     **THE COURT:**  It wasn't in the books I have.  There was

9     nothing marked for Exhibit 45.

10    **MR. LAMPROS:**  We objected to these, some of them are

11    not relevant, but others they were not produced until we

12    finalized the pretrial order, but that's not the same exhibit.

13    **MR. TOTH:**  That's me misspeaking, and I will withdraw

14    the question and won't go -- I must have labeled it wrong, I

15    apologize.

16    **THE COURT:**  Just remember, as you have been doing,

17    don't put anything on the Elmo without the other side saying

18    it's okay.

19    **MR. TOTH:**  Yes.

20    **THE COURT:**  And then I'll rule if I need to.  If there

21    is any issue about exhibits not produced, we'll deal with

22    that.

23    **MR. LAMPROS:**  I can tell you, on these taken in Cordele

24    -- welding at the top rail, the videos -- I have a really real

25    issue with those because they weren't produced until the

1    pretrial order was finalized.

2         **THE COURT:**  Have they been introduced?

3         **LAW CLERK:**  His objection are in here if you want to

4    look at them, they should be --

5         **THE COURT:**  If we need to deal with that, we will.

6    *(BENCH CONFERENCE CONCLUDED)*

7    **BY MR. TOTH:**

8    **Q.**   I show you again Form 22 that Mr. Lampros has already

9    seen and Defendant's 1.  It's also a plaintiff exhibit.  It's

10   my understanding from reading your Form 22 that when you were

11   dismounting I understand what I'm -- your handwriting here,

12   sir, you had one hand on the door handle.  That would be your

13   left hand?

14   **A.**   Yes.

15   **Q.**   And the other on the seat of the truck, but not the grab

16   iron is your practice in descending?

17   **A.**   Yes.

18   **Q.**   And you then placed your left foot on the middle step to

19   begin the exit of the truck, and as I understand your

20   testimony, and I'll refer to the 7-B just to be clear, your

21   left hand is on the door handle, your right hand is on the

22   seat, and then you move your left foot -- "I placed my left

23   foot on the middle step as I begin to exit."  And per what

24   you're saying, the middle step is all the way down here?

25   **A.**   Yes.

1   **Q.**   So that's the movement you made?

2   **A.**   No.   That's not the movement I made.

3   **Q.**   Well, am I reading your Form 22 -- let me put it back up

4   here?

5   **A.**   Yes.

6   **Q.**   "I had one hand on the handle of the door and the other

7   on the seat of the truck, and I placed my left foot on the

8   middle step, and as I begin to exit the truck, my left foot

9   slipped, and I caught myself with the same left foot with all

10   my weight.."  Can't quite get the last of it.  But the middle

11   step is here?

12   **A.**   Yes.

13   **Q.**   Per your testimony, correct?

14   **A.**   Yes.

15   **Q.**   And nowhere in your Form 22 do you indicate that you put

16   your foot in the inset step in the fuel tank?

17   **A.**   I thought we cleared that up in the deposition, that I

18   placed my right foot on the top step.

19   **Q.**   I'm just referring to your Form 22, and I don't see

20   anywhere in your description in your own handwriting where

21   you're saying you put any foot in the inset step in the fuel

22   tank.

23   **A.**   Yes.  But we had two depositions, and we talked about

24   that.  You was okay with it.

25   **Q.**   You were asked by your attorney, Mr. Lampros, about

1    photographs and whether they were a fair and accurate

2    representation of what the truck looked like on August 6th.

3    I'll just put Plaintiff's 19 back up there for you.  And when

4    did you take these pictures, sir?

5    **A.**   After my injury, sometimes in 2011, the first part of

6    2011.

7    **Q.**   Would it be like January, February of 2011?

8    **A.**   Somewhere around in that range, I believe.

9    **Q.**   And as I recall from that second deposition, you went

10   down to the Albany yard, and I believe you said you were on

11   Second Street when you took these photographs?

12   **A.**   Yes.

13   **Q.**   So you did so for purposes of this litigation?

14   **A.**   Yes.

15   **Q.**   And your testimony is this photograph here, Plaintiff's

16   19, is substantially similar to what the welding truck steps

17   on the driver's side look like on August 10th of --

18   **A.**   August 6th.

19   **Q.**   -- or excuse me, August 6th of 2010, I'm sorry?

20   **A.**   Yes.

21   **Q.**   Is that correct?

22   **A.**   Yes.

23   **Q.**   Mr. Windom, looking back at Defendant's Exhibit 7-B,

24   would you agree with me that the vertical -- I'm sorry,

25   Mr. Windom, that the vertical handhold provides you with a

1    more secure grip for maintaining your three points of contact

2    than the seat right here?

3    **A.**    It probably -- it probably would.

4    **Q.**    And just -- I think you're better at this than me, can

5    you pop on there where you had your right hand at the time

6    that you slipped where your right hand would have been on the

7    seat?

8    **A.**    Say that again?

9    **Q.**    Can you just take your finger like you did for

10   Mr. Lampros and just, you know, put it -- you know, an X or

11   whatever you want to do, where your right hand was when you

12   were descending?

13   **A.**    Right in there.

14   **Q.**    So it would have been on the back of the seat?  That's

15   what I was trying to --

16   **A.**    No.  It was on the inside of the front seat.

17   **Q.**    But on the -- like the backrest right here, sir?

18   **A.**    Yes.

19   **Q.**    And if you could show me where you would have had your

20   left hand when going down?

21   **A.**    The left hand would be on the door handle.

22   **Q.**    Right here on the door handle?

23   **A.**    Yes.

24   **Q.**    And I believe you said before that they played no role in

25   your slip --

**A.**    No, sir.

**Q.**    -- it was the step closest to the ground?

**A.**    No, sir.

**Q.**    And you indicated to Mr. Lampros on direct examination that it was always your practice to -- when you exited to use all of the steps available to you when dismounting?

**A.**    Yes.

**Q.**    And I believe you estimated -- and I've see an estimate 18 to 20 inches to go from here to the ground?

**A.**    I believe so, yes, sir.

**Q.**    And would that have been at the Pilot Station?  I just want to be sure.  We're not talking about on the hi-rail?

**A.**    I would think, yeah -- I think so.

**Q.**    And do you agree with me, sir, if this truck, welding truck had been in hi-rail mode operation, the step down or the distance from the bottom step to the ground would have been a greater distance in terms of inches?

**A.**    I agree.

**Q.**    And can you give me your estimate, per your experience of having this truck two and a-half years and having it on the hi-rail significant periods of time, what the distance would be from the bottom step in hi-rail mode to the ground?

**A.**    I'd say about, probably -- from the bottom step to the ground?

**Q.**    Yes, when it's in hi-rail mode on the rail.

**A.**    Probably 15 inches, probably 14 -- 12, probably 12

inches.  I'm not sure.  I mean, I'm not good with inches.

**Q.**    Can you tell the jury, sir, what the difference in inches

would be in terms of on August 6th, of 2010 the distance from

the bottom step to the ground at the Pilot Station versus the

distance from the bottom step down to the ballast if you were

in hi-rail mode on a railroad track?

        **THE COURT:**  By ballast, you mean the rocks on the

railroad tracks?

        **MR. TOTH:**  Yes, Your Honor.  Thank you.

**BY THE WITNESS:**

**A.**    I -- I couldn't say.

**Q.**    All you can say is from the bottom step down to the

ground, if it was on the rail it would be more in inches as

opposed to less, correct?

**A.**    It would be more, but --

**Q.**    Mr. Windom, have you ever seen any of your co-workers

exit the welding truck face forward?  Do you understand what I

mean?

**A.**    Are you talking about facing the truck?

**Q.**    Well, instead of backing down and maintaining three

points of contact, going down forward?

**A.**    No.

**Q.**    And I understand your practice was to always use the

close -- the step closest to the ground when getting out of

1    the truck whether you were on hi-rail or whether you were

2    getting gas at the Pilot Station?

3    **A.**    Yes.

4    **Q.**    But can you point me to any particular rule that requires

5    you to use each step, specifically the close -- the step

6    closest to the ground, when exiting the truck?

7    **A.**    There's a rule that says employee must mount -- must not

8    exit a truck unless it's still and in place, and it says side

9    ladders, sill steps, and grab irons are required for mounting

10   and dismounting.

11   **Q.**    Do you have a rule number or a place in the rule book you

12   could refer me to?

13   **A.**    I think it's rule 1071.

14   **Q.**    And is that something you investigated and become aware

15   of recently?

16   **A.**    I always -- it come, you know, in our safety meetings

17   from time to time it come and we read it.  We go through our

18   whole book.

19   **Q.**    Have you seen your co-employees exit the truck when it's

20   not in hi-rail mode of operation and not use the bottom step?

21   **A.**    Yes, I've seen some.

22   **Q.**    And can you point to anyone who ever was ever disciplined

23   or received a reprimand, hey, you're not working safely by,

24   you know, not using that bottom step when you're in the Pilot

25   Gas Station?

**A.**    No.  But, like I say, I read -- it's in the rule book,
I'm going to try to follow it.

**Q.**    Do you recall your conversation with Mr. Bobbitt on
August 6th, of 2010?

**A.**    Yes, sir.

**Q.**    Did you have good relationship with him as a supervisor?

**A.**    As a division engineer?

**Q.**    Yes, sir.

**A.**    At times.

**Q.**    And can you remember anything -- well, let me ask the
question this way.  It's my understanding that although you
recall a conversation with Mr. Bobbitt you can't remember
anything -- well, let me say this -- you can't remember the
substance of the conversation with Mr. Bobbitt because you
said you'd had all this stuff flying around in your head so
fast.

**A.**    Yes.

**Q.**    So if Mr. Bobbitt does have a recollection of his phone
conversation with you on August 6th of 2010, I assume you
don't have the ability to disagree with his recollection of
events from that conversation, do you?

**A.**    Well, if I could remember, I agree; if I don't, I won't
agree.

**Q.**    Well, we can agree on March 30th of 2012 you didn't have
the ability to agree or disagree what his recollection may or

1   may not be?

2   **A.**   Right.

3   **Q.**   Now, you talked about being taken -- on this Wednesday

4   you said the pain increased.  It happened on the 6th, and you

5   were off the 7th and 8th.  The 9th was a Monday you worked,

6   the 10th, Tuesday you worked.  You weren't limping on Monday

7   and Tuesday, but on Wednesday --

8   **A.**   I was -- I was sore, but I had somewhat of a limp, but I

9   was -- my knee was sore.

10   **Q.**   Well, just to clarify, you were, in fact, limping some on

11   Monday or Tuesday?  I may have misunderstood you.

12   **A.**   Very little, but on Tuesday it became -- I became -- it

13   became more noticeable.

14   **Q.**   And then on Wednesday, I guess, you clearly remember

15   limping and having pain?

16   **A.**   Yes.  Because I was running up and down the tracks and

17   throwing switches.

18   **Q.**   And just to be fair to the jury, you say running --

19   **A.**   When I was --

20   **Q.**   You don't physically --

21   **A.**   I was in a --

22   **Q.**   -- run?

23   **A.**   I was in a faster pace than -- because the spray truck

24   was coming, and I had to, you know, kind of walk in a fast

25   pace to throw the switch in time for him to go into the side

track.

Q.   I'm not being critical at all, Mr. Windom, but it's easy for you to go to railroad, you know, terminology and maybe the jury is not as familiar with you.  You say the spray truck and you were trying to stay ahead of that.  Was that to spray vegetation that may be accumulating along the road?

A.   Yes.

Q.   And that's a safety measure the railroad takes to keep the sight lines clear?

A.   Yes, yes.

Q.   And so the spray truck when it's going down the track sort of the switches maybe need to be aligned based on that?

A.   Yes.

Q.   So it's -- what you're telling the jury is to stay ahead of the spray truck and however fast it was going, you had to walk, would it be fair to say a brisk pace, to stay ahead of it?

A.   Yes.

Q.   And can you recall how many switches you had to throw?

A.   I think we got about 70 switches on -- probably more than that on just one end, so I had to prove pretty -- we was coming up in town so most of the switches are pretty close distance, so I had to throw this switch and get ready to throw the next switch.

Q.   And do you have the ability -- 70 switches.  Do you have

1    any ability to tell us in terms of distance or the jury in

2    terms of distance how long you may have walked that day?

3    **A.**   All together?

4    **Q.**   To the extent you can give us just an estimate.

5    **A.**   It was a good distance.  I'm not -- I mean, I had to walk

6    a long way.

7    **Q.**   More or less than two miles?

8    **A.**   All together?

9    **Q.**   Yes, sir.

10   **A.**   Probably, I guess about probably -- probably about a --

11   it might have been two miles.  I had to walk on the rocks and

12   on uneven surfaces that day.

13   **Q.**   And as the day wore on, your pain levels increased in

14   your leg?

15   **A.**   Yes.

16   **Q.**   And at some point in time you went to a co-worker named

17   Matt Coleman and said, I can't keep it up, or we need to get

18   me medical attention?

19   **A.**   Well, I told -- now, I told him that on the Tuesday.  I

20   said that -- I told him, I said my knee still bothers, I said

21   I don't know how long I'm going to be able to hold up.

22   **Q.**   And Mr. Coleman was not your supervisor, was he?

23   **A.**   He's the foreman.

24   **Q.**   And is he a fellow member of the Brotherhood of

25   Maintenance of Way Workers?

**A.**    Yes.

**Q.**    And is Derrick Boone also a fellow member of the Brotherhood of Maintenance and Way Workers?

**A.**    Yes.

**Q.**    Would you agree with me that the surgery performed by Dr. Slappey was a success?

**A.**    I believe it was.  I believe it was, yes.

**Q.**    And if the operative note of Dr. Slappey indicated that your surgery took 35 minutes, you wouldn't disagree with it, would you, sir?

**A.**    Would you --

**Q.**    I said, would you disagree with Dr. Slappey if his testimony in this trial is that the procedure took 35 minutes, you don't take issue with that, do you, sir?

**A.**    If he said it, I wouldn't.

**Q.**    And we can agree you weren't in the hospital overnight?

**A.**    No, sir.

**Q.**    And if I understood you correctly, it sounds like he started very early and -- started around six, and you were headed home by 10:00 a.m.?

**A.**    Something like -- I believe so, yes, sir.

**Q.**    And was your wife with you?

**A.**    Yes.

**Q.**    And was she your caregiver during your recuperation period?

1   **A.**   Yes.

2   **Q.**   And when you reported this, and they said, we're going to

3   take you down to South Georgia Medical Center, did you

4   indicate at that time, I don't want to go to South Georgia

5   Medical Center, I want to go to this hospital in Tifton,

6   Georgia?

7   **A.**   No, I assumed they knew where to take me.

8   **Q.**   And at least initially were you satisfied with the care

9   and treatment that you received at South Georgia Medical

10  Center?

11  **A.**   Yes.

12  **Q.**   And Mr. Lampros went through with you on your direct

13  examination all of the different doctors that you've seen, and

14  I just want to make sure I got all of them.  Who was the first

15  doctor you saw in Valdosta?

16  **A.**   The first doctor I saw was a Dr. Nicole Jasper.  She was

17  in the emergency room.  She's an emergency doctor.

18  **Q.**   She wasn't an orthopedic surgeon?

19  **A.**   Sir?

20  **Q.**   She wasn't an orthopedic surgeon?

21  **A.**   No, sir.  No, sir.  The second doctor I saw was Dr. Eric

22  Gee.  He was an orthopedic doctor.

23  **Q.**   Did you have a good doctor-patient relationship with Dr.

24  Gee?

25  **A.**   Well, I only met him one time.  He scheduled me to come

1   back, and when I came back, he was gone.

2   **Q.**   No longer with the practice?

3   **A.**   Well, the assistant -- his assistant said he was on

4   military duty.

5   **Q.**   And after Dr. Gee, who was the next physician?

6   **A.**   Doctor Landis Coffee.

7   **Q.**   I'm sorry, sir, I didn't catch it?

8   **A.**   Landis Coffee.  It's a woman.

9   **Q.**   Coffee?

10   **A.**   Sir?

11   **Q.**   Dr. Coffee, like we drink coffee?

12   **A.**   Yes, sir.

13   **Q.**   And where's Dr. Coffee at?

14   **A.**   She was down there at South Georgia Orthopedics.

15   **Q.**   And this was another orthopedist?

16   **A.**   Yes, sir.

17   **Q.**   And you're -- at this time you're still on crutches in a

18   knee brace?

19   **A.**   No, sir.  I had the knee brace, but no crutches.

20   **Q.**   And I see in your medical records that -- I'm just --

21   refer to a record from January 13th, of 2011, Dr. Slappey,

22   that you were continuing to ambulate with a cane or using a

23   cane for ambulatory aid; is that true?

24   **A.**   Yes, yes.

25   **Q.**   We talked about your pain levels a great deal today.  How

1    long did you stay on crutches after the event, the first

2    medical care, I guess, was that Wednesday?

3    **A.**    Yes, sir.

4    **Q.**    So you were on crutches then until when, sir?

5    **A.**    Until -- I'm not sure.  One of the doctors down in

6    Augusta told me to start trying to walk on my own a little

7    bit.  I done forgot whether -- it might have been Coffee, I'm

8    not sure.

9    **Q.**    Can you recall the last time you used a cane for

10   ambulation?

11   **A.**    Dr. Slappey.  Probably couple months after my surgery.

12   **Q.**    And your surgery was, I guess, October 20th, I believe?

13   **A.**    Yes.

14   **Q.**    When did you stop using a cane to get around to assist

15   you with your ambulation?

16   **A.**    Well, I went to crutches, so I don't -- I done forgot how

17   long I was on crutches, and after I got the cane, I probably

18   was on the cane about a month or so.

19   **Q.**    And I believe you indicated that prior to your surgery

20   your pain was five on a scale of one to ten.  Do you recall

21   that?

22   **A.**    It could have been.

23   **Q.**    And although I believe you said the surgery was a success

24   you still rated your pain at least on March 30th, of 2012, as

25   five on a scale of one to 10?

**A.**   Yes.

**Q.**   So I guess I'm a little confused.  The surgery was a success, but it did not reduce your pain levels?

**A.**   It reduced it, but it just come back from time -- you know, it comes back -- it comes and go off different days of the week.

**Q.**   It appears you're seeing Dr. Slappey for once every six weeks?

**A.**   Say that again?

**Q.**   How often do you see Dr. Slappey since your initial visit?

**A.**   I think my last visit was maybe in March, I believe somewhere around in that area.

**Q.**   And it appears by at least three months after the surgery or early 2010 --

**A.**   Uh-huh.

**Q.**   -- he's reporting that you have full range of motion?

**A.**   Yes.

**Q.**   And the records that been provided to me indicate that you had no swelling in that knee anymore, correct?

**A.**   I have -- here lately I have swelling in it.

**Q.**   Well, on February 23rd, of 2012 there was no swelling in your knee during your exam with Dr. Slappey on that day, was there?

**A.**   Probably not at the time, probably not.

1   **Q.**   And the medications he's prescribing are antiinflammatory

2   medications?

3   **A.**   Yes.

4   **Q.**   And to the best of your recollection you described these

5   injections, which, is it your understanding those are like a

6   steroid injection?

7   **A.**   What I understand it to be, it supposed to be -- he told

8   me that they're -- you know, they could work or they could not

9   work.  They could last.  The pain should be -- should subside

10   for three months, or it could last a year, you know, when you

11   take these shots.

12   **Q.**   Do you recall Dr. Slappey having x-rays done on three

13   different occasions following your surgery?

14   **A.**   Yes.

15   **Q.**   And did he discuss those findings with you and indicate

16   he saw no abnormalities per the x-rays?

17   **A.**   Yes.  But I would tell him about the pain, and he was

18   saying that -- he was saying that he wanted to refer me to

19   another doctor because I was -- I told him how my pain, you

20   know, comes and goes.

21   **Q.**   And we heard from the jury today, all the jury, about

22   people that have some experience with arthroscopic procedures.

23   And just so the jury is clear, the incisions that were made

24   for your surgery were two on -- one on each side of your

25   kneecap, just below your kneecap?

**A.**   Yes.

**Q.**   And I think the doctor in his deposition gave us an estimate in centimeters like physicians will often to.  Can you tell me what your estimate would be in terms of the incision, the length of the incision?  Something less than a quarter-inch?  Half-inch?

**A.**   I'm not sure.  I mean, I really don't know about all that.  Probably.

**Q.**   Were there some small stitches put in those --

**A.**   Yes, there were stiches.

**Q.**   -- in those little portals as they call them?

**A.**   Yes.

**Q.**   And was it, what, three or four stitches in each incision?

**A.**   Something of that nature, yes.

**Q.**   And do you have scaring from this surgery that was --

**A.**   They went away.  No, sir.

**Q.**   So I'm not asking you to do it, of course, but if we pulled your pant leg up, would we even be able to see where the incisions were made?

**A.**   I don't think you could.  I don't believe so.

**Q.**   And I got off track, I apologize to the Court and our jury and Mr. Lampros, but the last physician -- I was taking you through Dr. Jasper, Dr. Gee, Dr. Coffee.  Those were the -- appears to be Valdosta physicians.  Who did you then go

1    see?

2    **A.**    I saw my family doctor, Dr. Mann.

3    **Q.**    And he's who you go to if you had the flu or --

4    **A.**    Yes.

5    **Q.**    -- needed a Z pack or whatever?

6    **A.**    Yes, uh-huh.

7    **Q.**    Does he see your wife and children?

8    **A.**    Yes.

9    **Q.**    And where's he located?

10   **A.**    He's located in Fitzgerald, Georgia.

11   **Q.**    Okay.  And who was the next physician you saw?

12   **A.**    The next physician was Dr. Barber.  James Barber.  Dr.

13   Mann referred me to him because he said he wasn't an

14   orthopedic person, so he referred me to Dr. James Barber.

15   **Q.**    And you said Dr. Barber referred you to Dr. Walker?

16   **A.**    Sir?

17   **Q.**    Who did Dr. Barber refer you to?

18   **A.**    Dr. Mann referred me to Dr. Barber.

19   **Q.**    I'm sorry.  And, of course, he was not an orthopedic

20   surgeon and so you got referred once again?

21   **A.**    Yes, sir.  To Dr. Barber.

22   **Q.**    And what type of care and treatment did he provide?

23   **A.**    Well, actually they sent me back to Fitzgerald to get an

24   MRI done, and Dr. Barber was the one who was supposed to read

25   it for me.

1   **Q.**   Okay.  And you then took that MRI to go see Dr. Slappey?

2   **A.**   Say it again?

3   **Q.**   You had the MRI done at the direction of this physician

4   and then took that MRI to see the orthopedic surgeon in Macon?

5   **A.**   Well, after he -- after Dr. Barber confirmed that I had a

6   tear --

7   **Q.**   Well, I don't want to know -- I don't want medical

8   diagnoses.

9   **A.**   Okay.

10   **Q.**   I just want to know did you take the MRI and go to

11   another physician?

12   **A.**   Yes.

13   **Q.**   And who was that?

14   **A.**   That was Dr. Slappey.

15   **Q.**   Shifting gears again a little bit.  How old were you

16   whether you started at the railroad?

17   **A.**   I was 33 years old.

18   **Q.**   And we talked a little bit about your work experiences

19   before you came to the railroad, and I want to follow up on

20   some of that.  Do you recall completing an employment

21   application with Norfolk Southern?

22   **A.**   Yes.

23   **Q.**   Did you complete that in your own handwriting?

24   **A.**   Yes.

25   **Q.**   And from the time you completed it, do you recall how

1    long it was before you actually received a job offer?

2    **A.**    Let's see.  I believe I filled it out around November,

3    maybe October, a couple of months before I actually got the

4    job.

5    **Q.**    And did you ever get furloughed or from the time you

6    started, you've been able to -- you know, you never got laid

7    off for any period of time?

8    **A.**    No, sir.

9    **Q.**    And we discussed certain jobs on the railroad are

10   seniority based?

11   **A.**    Yes.

12   **Q.**    And what type of machines were you qualified to operate

13   before you got hurt?

14   **A.**    Nothing but the tractor repairman position.  That was my

15   first qualification.

16   **Q.**    Let me show you this document we've marked as Defendant's

17   20 and ask you if you can -- this was an exhibit to your

18   deposition that you've referred to.  Do you recognize this as

19   your handwriting?

20   **A.**    Yes, sir.

21   **Q.**    And it looks like you had experience -- I'll just move it

22   up here a little bit.  The first thing I want to talk to you

23   about is you had school activities listed as football and

24   basketball?

25   **A.**    Yes.

1   Q.   And I believe we covered in your deposition that you had

2   a football injury your -- what, junior year of high school?

3   A.   Yes, I believe -- yeah, my junior year.

4   Q.   And that injury was to your leg?

5   A.   It was to my ankle.

6   Q.   On which leg?

7   A.   My left leg.

8   Q.   And you actually went to Hughston Clinic to see Dr. James

9   Andrews?

10  A.   No, sir.  I went to UAB Medical Clinic to see Dr. James

11  Andrews.

12  Q.   Dr. James who?

13  A.   Andrews.  In Birmingham, Alabama.

14  Q.   And I believe we discussed, this is the surgeon that

15  operates on many professional athletes?

16  A.   Yes.

17  Q.   And were you recruited in high school for a college

18  football scholarship?

19  A.   Well, I was -- we moved so many different places.  When

20  my parents divorced, we moved from Centre *(phonetic),* Alabama

21  to Fort Payne, Alabama to Columbia, Mississippi, and I never

22  did get a chance to graduate because I was so -- I had got

23  done behind on my --

24  Q.   So academic problems --

25  A.   Yes.

**Q.**   -- you felt may have impeded your athletic career with all these moves?

**A.**   Yes, sir.

**Q.**   But you do list on your resume here that you have a -- you came out of high school with 3.2 GPA?

**A.**   2.9 --

**Q.**   Is that correct?

**A.**   2.8, 2.9, something like that.

**Q.**   But you listed here 3.2, and you filled it out, correct?

**A.**   Yes, sir, I filled it out.

**Q.**   And certainly here you've got under education you attended Middle Georgia Technical College?

**A.**   Yes.

**Q.**   And how long were you in school there?

**A.**   Probably -- I was there long enough to receive my truck driving CDL.

**Q.**   And have you let that lapse?  Is that what I understood you to say earlier that you no longer have your commercial driver's license?

**A.**   Yes, I have my commercial driver's license.

**Q.**   Is it current, sir?

**A.**   Sir?

**Q.**   It's current?

**A.**   Yes, sir.

**Q.**   And what is it about a truck driver's job, a commercial

1  truck driver's job that you feel like you would not be able to

2  physically perform?

3  **A.**   I'm not saying I can't perform it, but I'm aware that you

4  have to do a lot of climbing up in the cab and you got to also

5  operate the brakes -- I mean, the clutches.

6  **Q.**   Have you submitted a resume to any company that works in

7  the transportation industry?

8  **A.**   No, sir.

9  **Q.**   Have you looked at the Tifton newspaper, the Macon

10  newspaper, to see if there's any job advertisements for

11  commercial truck drivers?

12  **A.**   I've looked, but I just -- I would have to go back to

13  school because I haven't drove CDL -- a commercial truck -- I

14  think after a year or so, you would have to go back to school

15  in order to drive a commercial truck for a company.

16  **Q.**   But if I understand you, it's something you're willing to

17  give a try if somebody is willing to give you a try?

18  **A.**   I would -- yes, I would try it.

19  **Q.**   And I believe there is some testimony on direct

20  examination that when you were -- in 2010 your hourly salary

21  was 22.84 an hour?

22  **A.**   Yes.

23  **Q.**   And you left a job to come to the railroad and you were

24  employed by?

25  **A.**   IBEW.

**Q.**   Right.  And just -- can you tell the jury what that
stands for, that acronym?

**A.**   International Electrical Brotherhood of America --
International Brotherhood of Electrical Workers, I'm sorry.

**Q.**   And when you were employed with the IBEW you were also a
member of a union, correct?

**A.**   Yes, sir.

**Q.**   And your starting salary was 18.50 and your most recent
salary was 19.55?

**A.**   Yes.  They -- when they have agreements, you know, how
the union they have collective bargaining agreements.

**Q.**   So just to be sure, the salary when you left the IBEW was
19.25?

**A.**   Yes, sir.

**Q.**   And in 2010 at the railroad your salary was 22.84?

**A.**   Yes.

**Q.**   So it was less than a $3 an hour raise, correct?

**A.**   Yes.

**Q.**   Tell the jury some of the things that you were able to do
when working for the IBEW, what kind of skills you developed.

**A.**   I developed -- well, I -- I got better as a electrician.
We had to run conduit.  We had to pull wire.  We had to
terminate, you know, wiring.  And we had to do a lot.
Sometimes we used cherry pickers, which is actually a boon
that goes way up into the ceiling and get up there and work.

1    Lifts, sometimes we use those to get up, you know, high

2    elevations to work.

3    Q.    And have you applied for any job, maybe not at the IBEW,

4    but jobs with any companies where you could utilize the skills

5    that you developed in, I guess, nearly six years that you were

6    with the IBEW?

7    A.    Yes.

8    Q.    And do you have a resume, sir?

9    A.    No, sir, I don't.  I have no resume.

10   Q.    Do you retain copies of any job applications that you

11   complete?

12   A.    I've had some.

13   Q.    Did you bring it with you to court today?

14   A.    No, sir.

15   Q.    How many job applications do you feel like you have that

16   you have retained?

17   A.    Probably -- probably about eight, but I also went online

18   and tried and filled out applications online too.

19   Q.    Did you print a copy?

20   A.    No, sir.

21   Q.    -- online to save for your records?

22   A.    No, sir.

23   Q.    And has anybody with any of these job applications that

24   you submitted, has anybody followed up with you to call you in

25   for an interview?

1   **A.**   No, sir.

2   **Q.**   And you can remember eight and then others that you did

3   online?

4   **A.**   Yes.  I even went to a temp service, a temp service in

5   Cordele and --

6   **Q.**   Which temp service?

7   **A.**   I don't know the name of it but --

8   **Q.**   Do you remember who you talked to there?

9   **A.**   Some woman.  I forgot.  She took my application and she

10  said that, you know, she'd try find somebody who would --

11  **Q.**   At some point in time Dr. Slappey recommended that you

12  seek another opinion, correct?

13  **A.**   Yes.

14  **Q.**   In fact, he recommended that on two separate visits to

15  him, right?

16  **A.**   Yes, yes.

17  **Q.**   And eventually you actually followed his recommendation

18  and went over to the Hughston Clinic and saw a Dr. Jacobson,

19  correct?

20  **A.**   Yes.  Yes, sir.

21  **Q.**   And that was not the person he actually referred you to

22  but who you ended up seeing?

23  **A.**   No.  That was the doctor he referred me to.

24  **Q.**   Also, Dr. Slappey recommended that you get a functional

25  capacity examination, correct?

**A.**   Yes.

**Q.**   And you made a personal decision to seek out that examination in Atlanta, correct?

**A.**   Yes.

**Q.**   So if Dr. Slappey just said you needed one, and you decide to pick where to go on your own, or did you do this with the advice of someone else?

**A.**   Well, my sister, she was in a car accident, she broke her hip, and when she did a functional capacity test, she told me there was a place.

**Q.**   Did she also have a lawsuit?

**A.**   No, sir.

**Q.**   Are you familiar -- or can you recall the FC?  It looks like it was done February 4th of 2011?

**A.**   Yes, sir.

**Q.**   How long were you there with him?

**A.**   Probably about two hours, two or three hours.

**Q.**   And it looks like he determined you were capable of a moderate to moderate plus job.  Would you agree?

**A.**   Yes.

       **MR. TOTH:**  Your Honor, may we approach?

       **THE COURT:**  I tell you what, we're going to stop.  It's almost 5 o'clock.  We are obviously not going to finish with Mr. Windom's testimony today.  So, ladies and gentlemen, I'm going to excuse the 12 of you for the day.  Some of you have

1    some distance to travel, I know.  Would starting at 9 o'clock

2    and say be here five or 10 minutes before nine, does that

3    present any difficulty for any of you?  Okay, well, let's plan

4    on that.  Just be back in the jury room about 10 of 9:00 or

5    five of 9:00 and we'll make every effort to get started right

6    at 9:00.

7         Now, I told you at the end of every day, and I don't

8    think it will be too many days, but at the end of every day I

9    was going to give you additional -- well, the same

10   precautionary instructions.  And that's what I'm about to do,

11   the same thing I told you this morning.

12        It is imperative and extremely important that you not be

13   exposed or allow yourselves to be exposed to any information

14   about this case, anything involved in this case or any person

15   involved in this case.  That means you can't do your

16   independent research by getting on the Internet or talking to

17   friends or anything like that.

18        So don't allow yourselves to either be exposed to

19   information or certainly on your own try and find out that

20   information.  You'll have some questions more than likely by

21   family members, and it's fine to tell them what you're doing,

22   you're on federal jury duty here in Macon, but don't get into

23   the specifics of the case.  You don't need to know the opinion

24   of your husband or wife, son or daughter, mother or father,

25   whatever the case may be.  You're the ones that are listening

1    to the evidence.  You are the ones who have to make a decision

2    about the factual issues in the case.

3         So I'm going to excuse you now.  Ms. Hatcher will check

4    on you just to make sure you have everything you need, but

5    other than that, you're free to go to the jury room to gather

6    whatever you may have and then you can be excused.  We'll

7    remain seated while you leave.

8    *(Jury Excused)*

9         **THE COURT:**  Mr. Windom, let me ask you a few things and

10   then you can step down.  You said that the hi-rail vehicle was

11   being taken to Mad Dog because there was an issue with the

12   brakes?

13        **THE WITNESS:**  Yes, sir.

14        **THE COURT:**  And that's the brakes for the --

15        **THE WITNESS:**  The hi-rail part of the rail -- the rail.

16        **THE COURT:**  The flange rails?

17        **THE WITNESS:**  Yes.

18        **THE COURT:**  Very generally how do those brakes work?

19   Is it the same pedal as on the vehicle?

20        **THE WITNESS:**  Yes, sir.  But we have to engage in -- I

21   think they work off air.  We have to -- when we put the rails

22   on the -- when we put the wheels on the rail, we engage air

23   brakes and those same air brakes we can stop, you know, use

24   the regular brakes to stop.

25        **THE COURT:**  You mentioned that this bottom most step

1    was attached on either end with cables?

2         THE WITNESS:  Yes.

3         THE COURT:  What type of cables?

4         THE WITNESS:  I don't know exactly what type of cables.

5         THE COURT:  Metal cables?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Was there any degree of flexibility in the

8    step as it was attached?

9         THE WITNESS:  It was supposed to be, but it wasn't.

10   They was fixed -- I mean, they needed to be replaced.

11        THE COURT:  You say it was supposed to be, what do you

12   mean?

13        THE WITNESS:  They -- on -- if you look at all the

14   other trucks, the bottom, you know, could sway, it would give

15   back and forth, it was flexible, but these were just fixed

16   they had been rusted, and they had been bent.  It caused the

17   step to -- the step part of the truck to bend up, and, like,

18   it wasn't horizontal.

19        THE COURT:  Do you know why they're supposed to be to

20   some degree flexible?

21        THE WITNESS:  No, sir.

22        THE COURT:  And when they were replaced were they

23   replaced -- as far as how they were attached, was something

24   other that cables?

25        THE WITNESS:  Yes.  It was something other than cables,

1     some kind of rubber form that they got.  Now, it don't -- it

2     don't sway like it -- you know, like it is, but now it's -- it

3     may give a little bit, but it's a rubbery form on each end.

4          **THE COURT:**  Hard rubber?

5          **THE WITNESS:**  Well, it's a tough-like rubber.  Like

6     something -- looks like something they make out of tires or

7     something.

8          **THE COURT:**  Okay.  You can step down.  Thank you.  All

9     right, what's the issue we have?

10          **MR. LAMPROS:**  Your Honor, this is the document, the

11     FCE, they fought so hard to keep anyone else from testifying

12     about and now they want to introduce it to the jury, and I

13     just want to make sure that we're all clear and in agreement,

14     if they do that, they open the door.

15          **THE COURT:**  Mr. Toth?

16          **MR. TOTH:**  I don't understand how crossing him, Your

17     Honor, about an FCE introduces the door.  It's a 50-pound

18     weight restriction, and that's not going to allow him to

19     return to work in the maintenance and way department if he's

20     got a 50-pound weight limit.

21          **THE COURT:**  Well, number one, the document is not in

22     evidence, and it's not going to be shown to the jury until it

23     gets into evidence.  That applies to any exhibit except a

24     demonstrative exhibit.  So given -- now, I say that, there are

25     obviously circumstances where a witness's recollection can be

1  refreshed by some document, but I don't think that's what

2  you're talking about doing at this time.  So what are you --

3  knowing that you can't show the jury the report, unless you

4  can get it admitted into evidence, what do you want to do with

5  this?

6        MR. TOTH:  I think I can address that, Your Honor.  I'm

7  not trying to open the door on anything.  What I am tying to

8  do is -- the Court ruled in regard to our motion on their

9  vocational rehabilitation expert that he could rely on records

10  in formulating his opinions, but he could not give the medical

11  diagnoses, that as an expert, if these are the routine type

12  things he relies upon and reaches certain opinions based on

13  those, then, you know, it's going to be in the record from Dr.

14  Hecker, because Dr. Hecker will say, you know, these are the

15  materials provided to me, these were the restrictions imposed

16  by the FCE.

17        I will say that Dr. Hecker goes on to say that even

18  though it's a moderate to moderate plus, which Dr. Hecker

19  relies upon the Department of Labor guidelines to deem that a

20  medium to medium plus, which constitutes 50 to 55 percent of

21  the job -- of the 12,300 job categories in the United States

22  per the Department of Labor, yet he says, still, even though

23  that shows on the day of his exam on that slice of time what

24  he's capable of doing, and he agrees with that that says per

25  his experience if you put somebody back to work, just because

1   they can do it on the day of the exam doesn't mean they're

2   going to be able to do it in the last two or three years of

3   their work life expectancy.  So he then thinks he should only

4   go to work at sedentary or light duty jobs.

5       And I think by letting the jury know Dr. Slappey thinks

6   he needs an FCE to determine what he's able to return to do.

7   I am not going to argue through my witnesses -- if anything my

8   witness would say right back here, Mr. Bobbitt, that a 50

9   pound weight restrictions is going to keep him from coming

10  back to work at -- in the maintenance and way department

11  because as he would testify, and I think he did in part today,

12  he requires to lift, I can't remember the exact testimony,

13  but, you know, more than 50-pounds.

14      So I don't see how -- and I certainly like clarification

15  from Your Honor if you disagree that the jury ought to be able

16  to hear about that FCE and because the FCE doesn't say

17  sedentary and light; it says moderate to moderate plus, which

18  the voc-rehab expert he's going to bring is going to say that

19  means medium job, but we don't want to push it.  He may not

20  work his full life expectancy to push it.

21      And I understand that document is not going to go out

22  with the jury, but they can hear what, you know, you know, to

23  the extent he knows what the FCE shows and, you know, and I

24  hand him a document and say, do you agree these were the

25  limitations imposed.

1      **THE COURT:**  Well, number one, with regard to the FCE in

2   particular, I have not made any ruling about even whether or

3   not the vocational expert can rely on that.  What I said

4   generally was that experts can rely on what might otherwise be

5   hearsay, but they can't simply be a means to get into evidence

6   some other expert's opinion.

7      I don't know exactly how this FCE comes into play yet

8   with regard to the vocational expert, but I still don't

9   understand what you're trying to do with it with Mr. Windom.

10   Are you simply trying to establish that he understands he has

11   a 50-pound weight limitation?

12      **MR. TOTH:**  I'm trying to establish that the FCE does

13   not limit him to sedentary and light duty jobs.  I think

14   according to Dr. Slappey what his testimony was, as long as he

15   says he's still in pain -- it was really testimony from Dr.

16   Slappey -- as long as he continues to complain of pain in that

17   left knee, I believe him, I can't find anything objective to

18   support his subjective complaints of pain, and that's why I

19   did three x-rays, that's why I recommended he see other -- you

20   know, someone else, you know, I think just reading through the

21   lines he was frustrated and he was still complaining of pain

22   and so -- but Dr. Slappey says as long as he's in pain, you

23   know, he doesn't need to have job to bend, stoop --

24      **THE COURT:**  Okay, but what do you want to do with the

25   FCE and Mr. Windom?  That's what I'm getting at.

1      **MR. TOTH:**  Well, establish if he even knows what the

2      limitations were that were imposed by Dr. Howard that he went

3      to in Atlanta.

4      **MR. LAMPROS:**  Your Honor, he's calling for hearsay.

5      He's opening the door to this.  He is asking for hearsay.

6      This is the document that he filed a motion in limine to which

7      I had to file a response, and we came down here and we argued

8      20 minutes over it at the pretrial conference, and now he's

9      wanting to elicit from the plaintiff the exact testimony that

10     he want to exclude.  And if he wants to do that, fine.  But

11     he's not going to be able to say the only person who gets to

12     talk about this hearsay evidence is Mr. Windom.  I don't think

13     that would be fair.

14     **THE COURT:**  Well, what does your vocational expert

15     intend to do with the FCE?

16     **MR. LAMPROS:**  My vocational expert intends to say that

17     he looked at the FCE and that based upon the doctor's

18     recommendations that his opinion is that Mr. Windom is capable

19     of doing this, that, and the other.  He is going to say that

20     if you push it, if you make him into the highest level he's

21     capable of now, that in his opinion it will shorten his work

22     life expectancy.

23     **THE COURT:**  And then you would agree that the defendant

24     can cross examination the vocational expert about the FCE?

25     **MR. LAMPROS:**  That's right, but the expert gets to talk

1    about the FCE too.

2        THE COURT:  Well --

3        MR. LAMPROS:  I don't think he can have it both ways.

4    I don't think he can ask Mr. Windom about the FCE and elicit

5    hearsay testimony or ask him back door, you didn't know that

6    your FCE said that you sit for eight hours out of an eight

7    hour day and then not let me get into what the FCE -- the

8    other parts of FCE with other witnesses.  If he wants to get

9    into the FCE, then let's get into the FCE, but it's not going

10   to be cherry picked by Mr. Toth and the defendant.

11       THE COURT:  Well, that's one issue, and, Mr. Toth, you

12   can address that.  But the first issue that I'm trying to get

13   clear in my head is what difference does it make what Mr.

14   Windom knows or doesn't know about the FCE?

15       MR. LAMPROS:  I agree with that, with all the medical

16   records.  I think it's not appropriate to cross examine a

17   plaintiff about medical records that he probably has never

18   seen.

19       THE COURT:  Well, you know, it could be, particularly

20   -- and there's been a little bit of that about, you know, if

21   the doctor puts something in his records that the plaintiff

22   told him or something like that, there has been testimony by

23   Mr. Windom about the extent to which he's looked for work.

24   And a part of that would likely include what he thinks his

25   capabilities.  I just don't know though that I see the value

1  of asking him if he knows what -- whoever the person was who

2  did this FCE did or didn't do, or concluded or didn't

3  conclude.

4      MR. TOTH:  And, Your Honor, I think that -- I'm not

5  sure, I'd have to look back at his deposition -- his answer

6  may have been I don't know what he said.  I know Dr. Slappey

7  said he never got the results of the FCE, although they were

8  in his file, and Your Honor has ruled, you know, they're not

9  admissible.  I guess my primary concern, Your Honor, I

10  understand what you're saying, and I think the Court made a

11  very good point, I don't want to waste the Court's time or the

12  jury's time, but, you know, Mr. Lampros is eliciting testimony

13  do you know of any light jobs at the railroad?  You know, do

14  you know of any desk jobs at the railroad?

15      Well, that seems to imply there's -- that he could only

16  do a light duty job, sedentary job at the railroad, yet the

17  voc rehab person is relying upon an FCE that says moderate,

18  moderate plus.

19      If the Court will let me establish that, you know, if all

20  the -- you know, I don't know how the voc rehab expert can

21  provide an opinion based on an interview in medical records

22  that don't indicate what his physical capabilities are in

23  terms of how the Department of Labor defines things.

24      And so that's what I would like to be able to do is

25  certainly cross his voc rehab person, saying, you know, that,

1   all right, you have an FCE and it says A, B, and C and those

2   are his limitations.  Which effectively disqualifies him from,

3   you know, absent the labor issues from, you know, going back

4   to work in heavy labor.  But it does open up any number of

5   jobs in the medium or moderate category which, you know,

6   physically the person that performed the FCE says he's able to

7   do.

8       **THE COURT:**  Well, it sounds to me like at least at this

9   point, you've got the cart before the horse.  After the

10   vocational rehab expert testifies it may be that you'll have

11   some questions of Mr. Windom about what he can do or cannot do

12   or what he understands he can do or not do based upon what the

13   vocational expert has said including the extent to which his

14   testimony the expert's testimony is based on the FCE.  I'm not

15   so sure how -- from what both of y'all are saying how either

16   of you is going to examine the vocational expert without

17   getting into the FCE.  It sounds like you're both relying on

18   parts of it.

19       **MR. LAMPROS:**  Your Honor, I was under the impression

20   that we weren't supposed to.

21       **THE COURT:**  Well, but you just told me that you were

22   going to establish that this was -- with your expert that this

23   was something that he relied n.

24       **MR. LAMPROS:**  He relied on.  We're going to talk about

25   what he reviewed and what he relied upon, but my understanding

1  of Your Honor's ruling from last week was that we weren't

2  going to be able to get into the specifics of what the FCE

3  said, that he reviewed it and he relied upon it only, and that

4  was true of all the medical records.  And what I'm saying, my

5  whole problem -- if he wants to go into this, then he's

6  opening the door, and I just want to make sure that we're

7  clear about that.  And that's my whole point.  If he wants to

8  go into it with Mr. Windom, have it.

9      **THE COURT:**  Well, to the extent that you elicit

10 testimony that your expert relied on something, on cross

11 examination, that's likely going to open up questions about

12 what he relied on.  And that's really the point I'm making.

13 It sounds to me like both of you are going to end up talking

14 about this FCE.

15     **MR. LAMPROS:**  And I don't disagree, Your Honor.  And

16 I'm not the one who tried to keep it out.  The defendants --

17 the defendant filed a motion in limine to keep us from talking

18 about the FCE with any detail, and now it seems like they want

19 to go back on their motion in limine and talk about it with at

20 least Mr. Windom in some detail.  And as I say, if that's what

21 they want to do, I'm okay with that, but I just want to make

22 sure that we know that if they do that, then I'm going to be

23 able to talk about it with other -- not with just Mr. Windom

24 but with some other people too.

25     **THE COURT:**  Well, all we can do now is -- I'm not going

1     to let you cross examine Mr. Windom about the FCE.

2          **MR. TOTH:**  I understand that, Your Honor.

3          **THE COURT:**  And it wouldn't be the first time,

4     Mr. Lampros, that somebody has taken one position in a trial

5     and then realize they want to take another position.

6          **MR. LAMPROS:**  I understand and I may do it myself.

7          **THE COURT:**  The point of what we established earlier

8     was you couldn't put your expert on the stand and say here's

9     this FCE, Your Honor, I tender the FCE, he's identified it.

10    That's what we established earlier.  But it's a -- you know,

11    when you get into what an expert relied on, exactly where that

12    line gets drawn is really going to depend.

13         **MR. LAMPROS:**  And I don't disagree.

14         **MR. TOTH:**  I guess that's my, you know, my question,

15    Your Honor.  And why, you know, I may need -- I'll look back

16    Your Honor's order and the arguments, but if he's going to

17    rely upon this FCE that, you know, in Dr. Hecker, in his

18    report lays out right in the report all of the restrictions in

19    the FCE.  That's the first -- that's when I found out about

20    the FCE.

21         **THE COURT:**  All right, then tell me why you don't want

22    to cross examine the vocational expert using the FCE?

23         **MR. TOTH:**  Well, I would assuming that Mr. Lampros is

24    taking the position that I'm opening the door for him to then

25    come in and prove that he forfeited his seniority and there's

1    no job for him to go back to at the railroad, but I'm not

2    trying to argue there's a railroad job, Your Honor, I'm just

3    trying to establish that 50 to 55 --

4         THE COURT:  Well, you lost me there.  What's forfeiting

5    seniority got to do with FCE?

6         MR. LAMPROS:  That's not the door I'm saying they're

7    opening, Your Honor.

8         THE COURT:  What I'm hearing is that if you start cross

9    examining the vocational expert about the FCE, yes, that's

10   likely going to lead Mr. Lampros on redirect to try and repair

11   whatever damage you've done on cross, and it may be at the end

12   of the day everything but the paper report itself is

13   effectively before the jury.  What is it, Exhibit 24?

14        MR. LAMPROS:  Yes, Your Honor.

15        THE COURT:  Well, if your point, Mr. Toth, is that your

16   cross examination of the vocational expert with information

17   contained in the FCE after he's testified on direct that he

18   relied on the FCE that that doesn't open the door to an issue

19   such as his seniority with the railroad, and I have no idea

20   what that issue is, you probably right, but Mr. Lampros after

21   you cross examine the expert with the FCE can stand up and

22   stay, well, doctor, whatever questions arising out of the FCE

23   that he wants to ask, assuming they're reasonable to

24   rehabilitate him within the confines what you've done on

25   cross, that's typically how it works.

1    **MR. TOTH:**  Well, I don't see how -- if Mr. Lampros's

2    position is that by me, his -- Dr. Hecker talks about the FCE

3    and talks about, you know, the conclusions of the FCE, then I,

4    you know --

5        **MR. LAMPROS:**  Your Honor, that was my understanding of

6    what I couldn't do.

7        **THE COURT:**  Yeah, I --

8        **MR. LAMPROS:**  And now he's wanting -- that's the door

9    I'm talking about opening.  He said I couldn't do that and

10   Your Honor agreed with him, and I've carefully counseled him

11   not to get in to that, and now he's going to come in here and

12   cross examine him with the very document he told me I couldn't

13   use.

14       **THE COURT:**  That's kind of what it sounds like, Mr.

15   Toth.  It does sound to me like other, at most, having his

16   vocational expert testify that this was one -- it's in his

17   file, it's one of many things upon which he relied, and then

18   not unreasonably, you want to come back and take some of these

19   documents that he relied on and cherry pick out of there

20   information that you think will help your client.  That's how

21   it's done.  But when you do that, I mean, that doesn't mean

22   that it's off limits to your opponent to come back and try and

23   repair that damage.

24       **MR. TOTH:**  Well, if Dr. Hecker testifies that based on

25   all the materials in my file, you know, he goes through, he

1   had medical records from, you know, A through M, and he

2   doesn't say what the diagnoses are, and he said he's got an

3   FCE and he says the FCE indicates he can work a moderate -- or

4   excuse me, a moderate to moderate plus job, I'm fine with

5   that.  I won't get into the 50 --

6       **THE COURT:**  Well, then we don't have a problem.  But if

7   you pull out the FCE, whether or not it's -- I mean, how I

8   anticipate it goes, how it usually goes, is, well, Doctor, you

9   told us one of the documents you relied upon was this FCE;

10  isn't that true -- can you pull that out and take a look at

11  it?  Isn't it true that in the FCE it says this?  And that's

12  inconsistent with what you told Mr. Lampros on direct, well,

13  yeah, you got me, Mr. Toth.  And, you know, that's great, you

14  feel pretty good.  But Mr. Lampros is going to stand back up

15  and redirect and try and repair the damage.  I mean, but when

16  you go down that road and -- that doesn't mean that

17  Mr. Lampros can't travel on the same road.  Now, to the extent

18  to which it opens up questions on redirect about the FCE, I

19  can't say right now.

20      **MR. TOTH:**  Really it's not the minutiae of what is in

21  the FCE as to, you know, pounds, and bending, stooping, it's

22  not the minutiae, it's the opinion of the person that did the

23  functional capacity examination, this physician, that he can

24  do moderate to moderate plus.  That's all I want to establish,

25  yet Dr. Hecker renders an opinion that he should only go to

1    work doing sedentary or light duty.  And I don't see how I'm

2    opening the door on anything other than, you know, that's in

3    his report, those were his opinions and --

4        **THE COURT:**  Well, but, you know, you know how it goes,

5    there's always a yes, but, if he's a halfway decent expert,

6    he's going to say without Mr. Lampros getting back up on

7    redirect, well, yeah, that's true, Mr. Toth, but you have to

8    understand that this -- it says this or that I relied on this.

9    Once again, I can't remember what the other issue that we

10   talked around, without really having -- not being in a context

11   that we could resolve, how it was going to be handled, but

12   there's nothing to decide right now.  If you start cross

13   examining any expert about something that's in his file,

14   there's a chance that you're opening yourself up to the other

15   side or the physician or the expert elaborating about that

16   particular document.  It doesn't mean the document is

17   admissible, but that's just the way things go.  And as I said,

18   at the beginning, if after all that you think you've made a

19   point that you can now cross examine Mr. Windom further about,

20   then that may be something that you'll want to consider doing

21   and I might let you do it, but I'll just have to see how

22   things unfold at this point.

23       **MR. TOTH:**  That's very fair, Your Honor.

24       **THE COURT:**  All right.  Look for your e-mail.  We'll be

25   sending out a rough draft of the charges.  I probably won't

1    even have had an opportunity to look at them carefully, so

2    don't panic when you see that -- it's something we obviously

3    we've got to talk about, but we'll want to start thinking

4    about that.  All right, Mr. Lampros, scheduling.  How much --

5    I'm not going to hold you to anything so you don't have to

6    qualify it, but tell me what you think your time frame is

7    going to be.

8         MR. LAMPROS:  Well, Your Honor, I was hoping we were

9    going to get through Mr. Windom today and at least a couple of

10   other witnesses who I have here under subpoena who desperately

11   need to get back to work, but that's obviously not going to

12   happen.  I would request, Your Honor, that perhaps we can take

13   them out of turn first thing in the morning and send them on

14   their way.

15        THE COURT:  Unless there's a very strong reason not to

16   do that, I'll allow that.

17        MR. LAMPROS:  And then he can begin again with the

18   cross examination of Mr. Windom.

19        MR. TOTH:  I don't know who he's talking about, Your

20   Honor.

21        THE COURT:  Who are you talking about?

22        MR. LAMPROS:  Mr. Boon and Mr. Joseph, and they will

23   not be very long witnesses.

24        MR. TOTH:  Mr. who?

25        MR. LAMPROS:  Boon.

1      **MR. TOTH:**  I know Mr. Boone.

2      **MR. LAMPROS:**  And Mr. Joseph Windom.

3      **MR. TOTH:**  Oh, the brother?

4      **MR. LAMPROS:**  Yes.

5      **MR. TOTH:**  I didn't know.  I'm just asking.

6      **THE COURT:**  But you don't have any objection to the

7   plaintiff taking them out of order?

8      **MR. TOTH:**  Certainly not Mr. Boon, no.

9      **THE COURT:**  What about the other one?

10      **MR. TOTH:**  If -- his representation he needs to get

11   back to work, that's fine, Your Honor.

12      **THE COURT:**  Okay.  Well, we'll do that and then put Mr.

13   Windom back on the stand and then move into your experts?

14      **MR. LAMPROS:**  My experts, I was hoping we could get

15   them done before lunch tomorrow, but it looks like it'll be

16   tomorrow afternoon and then I'll have Dr. Slappey, and then

17   I'll have a couple of their people to cross examine, and

18   depending upon how long, you know, I can speak for myself is

19   all I can speak for.

20      **THE COURT:**  Okay.  All right.  Be back in the morning

21   about 8:45 so that we can talk about anything we need to talk

22   about and get started right at 9 o'clock.

23      **MR. TOTH:**  Thank you, Your Honor.

24      **THE COURT:**  Thank you all.

25               *(JURY TRIAL ADJOURNED, JULY 30, 2012)*

1  _____

2       *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
   *TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE*

3  *ABOVE-ENTITLED MATTER THIS 5th DAY OF NOVEMBER, 2012.*

4       *s/SALLY L. GRAY, USCR,*
   *U.S. DISTRICT COURT-MIDDLE DISTRICT OF GEORGIA*

5       *E-mail: Sally_Gray@gamd.uscourts.gov*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25