```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF GEORGIA

 3                        MACON DIVISION

 4                 _____

 5

 6   PAUL WINDOM,    PLAINTIFF,     :
                                    : Case No. 5:10-CV-407(MTT)
 7   v.                             :
                                    :    July 31, 2012
 8                                  :    Macon, Georgia
     NORFOLK SOUTHERN RAILWAY       :
 9   COMPANY,                       :
                  DEFENDANT.        :    Volume II of IV
10   _____

11
                        CIVIL JURY TRIAL
12
              BEFORE THE HONORABLE MARC T. TREADWELL,
13           UNITED STATES DISTRICT JUDGE, PRESIDING

14   APPEARANCES:

15   FOR THE PLAINTIFF:      PETER ANDREW LAMPROS
                             PATRICK JOSEPH HANNON
16                           COOK, HALL, AND LAMPROS, LLP
                             1230 PEACHTREE ST NE STE 3700
17                           ATLANTA, GA 30309

18   FOR THE DEFENDANT:      MARK EDWARD TOTH
                             AMANDA M. MORRIS
19                           HALL, BLOCH, GARLAND, & MEYER
                             P.O. BOX 5088
20                           MACON, GA 31201

21

22

23   _____
                SALLY L. GRAY, CCR, RPR, USCR
24                   P.O. BOX 875
                 MACON, GA 31202-0875
25
                    (478-752-3497)
```

1              INDEX TO PROCEEDINGS

2                  JULY 31, 2012

3                 VOLUME II of IV

4

5

DERRICK BOONE
6         DIRECT EXAMINATION BY MR. LAMPROS          4
          CROSS EXAMINATION BY MR. TOTH             8
7         REDIRECT EXAMINATION BY MR. LAMPROS       17

8

JOSEPH WINDOM
9         DIRECT EXAMINATION BY MR. LAMPROS         19
          CROSS EXAMINATION BY MS. MORRIS           22
10        REDIRECT EXAMINATION BY MR. LAMPROS       26

11   PAUL WINDOM
          CROSS EXAMINATION BY MR. TOTH             27
12        REDIRECT EXAMINATION BY MR. LAMPROS       48

13   THOMAS JAMES BIRMINGHAM
          CROSS EXAMINATION BY MR. LAMPROS
14
     BENSON HECKER
15        DIRECT EXAMINATION BY MR. HANNON          62
          CROSS EXAMINATION BY MR. TOTH             78
16        REDIRECT EXAMINATION BY MR. HANNON        107
          RECROSS EXAMINATION BY MR. TOTH           111
17

18   RICHARD THOMPSON
          DIRECT EXAMINATION BY MR. LAMPROS         114
19        CROSS EXAMINATION BY MR. TOTH             133
          REDIRECT EXAMINATION BY MR. LAMPROS       158
20
     CERTIFICATE OF REPORTER                        169
21

22

23

24

25

1          **P R O C E E D I N G S**

2    July 31, 2012

3          **THE COURT:**  Good morning.  Anything we need to discuss

4    before we bring the jury in?

5          **MR. LAMPROS:**  Nothing from the plaintiff, Your Honor.

6          **MR. TOTH:**  None from the defendant.

7          **THE COURT:**  All right.  So you're still going to call

8    these two witnesses?

9          **MR. LAMPROS:**  Yes.  I'm going to start with Mr. Boone.

10   Okay.  You can go ahead and bring him in, and we can bring the

11   jury in.

12   *(Jury In)*

13         **THE COURT:**  Good morning, ladies and gentlemen.  I

14   appreciate you being back on time a few minutes early which

15   allows us to get started right on time.  Quick question first

16   with regard to my cautionary instructions yesterday about not

17   allowing yourselves to be exposed to any information about the

18   case.  Anybody run into any difficult in that regard?  I

19   didn't expect you would.

20         All right, Mr. Lampros, you may call your -- let me

21   explain something, ladies and gentlemen.  Of course, Mr.

22   Windom was on the stand yesterday and the defendant was not

23   yet through cross examining him.  We're going to take a couple

24   of witnesses out of the order, couple of plaintiff witnesses

25   so they can get back to things they need to get back to.  So

1    that's what we're doing this morning.  Mr. Lampros?

2         **MR. LAMPROS:**  I call Derrick Boone, Your Honor.

3         **COURTROOM DEPUTY:**  Do you solemnly swear that the

4    testimony you are about to give in this case shall be the truth,

5    the whole truth, and nothing but the truth, so help you God?

6         **THE WITNESS:**  Yes, ma'am.

7         **COURTROOM DEPUTY:**  Please state and spell your name for

8    the record.

9         **THE WITNESS:**  My name is Derrick Boone.  It's spelled

10   D-E-R-R-I-C-K, last name, B-O-O-N-E.

11                        **DERRICK BOONE**

12     **Witness, having first been duly sworn, testified on**

13                     **DIRECT EXAMINATION**

14   BY MR. LAMPROS:

15   Q.   Mr. Boone, good morning.

16   A.   Good morning.

17   Q.   You just told us your name.  Please, if you would, just

18   introduce yourself to the jury.

19   A.   Excuse me?

20   Q.   Just introduce yourself to the jury.

21   A.   I'm Derrick Boone.

22   Q.   Mr. Boone, who's your employer?

23   A.   Norfolk Southern.

24   Q.   What job do you have?

25   A.   Welder.

**Q.**    Is that the same job that Mr. Windom used -- or Mr. Windom had?

**A.**    Yes, sir.

**Q.**    The same job Mr. Windom worked at the railroad?

**A.**    Yes, sir.

**Q.**    Do you know Mr. Windom?

**A.**    Yes, sir.

**Q.**    How long have you known him?

**A.**    Probably -- I met him when I first -- when I first got over -- well, when I first started, I started on the T&S gang, and I got a chance to get back close to home.  I met him at a derailment in Clinchville, and afterward which I got a chance to work with him in Cordele as his helper on the job.

**Q.**    So you worked with Mr. Windom on a regular basis?

**A.**    Yes, sir.

**Q.**    Are you familiar with the truck that he drove as his job as a welder?

**A.**    Yes, sir.

**Q.**    Do you know that to be Norfolk Southern truck 200622?

**A.**    That's exact.

**Q.**    Do you work on that truck yourself?

**A.**    Yes, sir.  I'm working on that truck as we speak now.

        **MR. LAMPROS:**  Ms. Hatcher --

**BY MR. LAMPROS:**

**Q.**    Are you familiar with the way that truck looked back in

1    the August 2010 time frame?

2    **A.**   Yes, sir.

3    **Q.**   I'm going to show you what's been admitted into evidence

4    as Plaintiff's Exhibit 21.  Do you recognize that vehicle?

5    **A.**   Yes, sir.

6    **Q.**   Is that the welding truck that you and Mr. Windom used?

7    **A.**   Yes, sir.

8    **Q.**   And do those pictures fairly and accurately depict the

9    condition of the truck in August 2010?

10   **A.**   Yes, sir.

11   **Q.**   Was it in that condition for a time frame before August

12   of 2010?

13   **A.**   Yes, sir.

14   **Q.**   Had you ever reported the condition of the truck or have

15   you ever been present when any other employee reported the

16   condition of the truck -- in particular what we're talking

17   about are the steps -- to any Norfolk Southern manager?

18   **A.**   Yes, sir.  Mr Windom, he would go to the supervisor,

19   Mr. Thornhill, and talk to him about it.

20   **Q.**   And he would talk to Mr. Thornhill specifically about the

21   steps?

22   **A.**   Well, anything, you know what I'm saying, involving the

23   truck, anything that he feel that needed work.

24   **Q.**   Was any effort -- before August of 2010, was any effort

25   made that you know of to repair those steps?

1    **A.**    No, sir.

2    **Q.**    I'm going to show you what's been marked and admitted

3    into evidence as Plaintiff's Exhibit 19, and just ask you the

4    same question:  Does that photograph fairly and accurately

5    depict the condition of the truck prior to August 2010?

6    **A.**    Excuse me?

7    **Q.**    Does that photograph fairly and accurately depict the

8    condition of the truck that Mr. Windom used, the condition it

9    was in prior to August of 2010?

10   **A.**    Yes, sir.

11   **Q.**    Let me show you Plaintiff's 20.  Does it also fairly and

12   accurately depict the condition of the truck prior to August

13   of 2010?

14   **A.**    Yes, sir.

15   **Q.**    Now, during the times that you worked with Mr Windom

16   before August 2010, did you ever know him to have a hurt knee?

17   **A.**    No, sir.

18   **Q.**    Were you working with him on August 6, 2010?

19   **A.**    August 6th, 2010.

20   **Q.**    It's almost two years ago.  I know I'm asking a lot.

21   **A.**    I'm trying to see when -- I bidded off that job and bid

22   on another job.  I'm trying to see -- hmm, I think I left

23   there -- yeah, I don't know the exact date, sir.

24   **Q.**    Before -- in the times that you worked with Mr. Windom

25   before August had you ever seen him limping in any manner?

1   **A.**   No.

2   **Q.**   Mr. Boone, I appreciate your time.

3          **THE COURT:**  Any cross examination?

4          **MR. TOTH:**  Yes, Your Honor.

5                    **CROSS EXAMINATION**

6   **BY MR. TOTH:**

7   **Q.**   Mr. Boone, good morning.

8   **A.**   Good morning.

9   **Q.**   I know you're busy, and I appreciate you being here

10  today.  I understand you're under subpoena, and so I just want

11  to ask you a few follow-up questions.  There had been some

12  testimony by -- I want you to assume there had been some

13  testimony by Mr. Windom in his deposition that you, yourself

14  actually slipped on the step closest to the ground on the

15  driver's side and injured yourself.  Do you recall any slip

16  incident yourself, sir, on the driver's side of the welding

17  truck?

18  **A.**   No.  No, sir.  I slipped on the back.  The back step, but

19  it wasn't -- it wasn't that step, the side step or whatever

20  you was saying.  I slipped on the back step.

21  **Q.**   And just so the jury is clear, there's also a step if you

22  need to climb into the bed of the truck --

23  **A.**   Yeah.

24  **Q.**   -- to get in there, right?

25  **A.**   Yeah.

1   **Q.**   And so the slip you had was at the back when you were

2   getting on or getting off, one or the other?

3   **A.**   Yeah.  Well, I was actually getting off the bed, stepping

4   down, and I slipped.

5   **Q.**   And you didn't miss any work because of that, did you,

6   sir?

7   **A.**   No, sir.

8   **Q.**   Didn't fill out a Form 22?

9   **A.**   No, sir.

10   **Q.**   Didn't report it to Mr. Thornhill?

11   **A.**   No, sir.  It wasn't that serious, you know what I'm

12   saying, with the job we got, you know what I'm saying, stuff

13   like that happens.

14   **Q.**   Bumps and bruises, things like that?

15   **A.**   Yeah.

16   **Q.**   Is that a yes, just for the court reporter?

17   **A.**   Yes, sir.  Yes, sir.

18   **Q.**   Thank you.  I'm going to show you what was an exhibit

19   that we talked about yesterday, and I'll represent to you that

20   it is Defendant's Exhibit 7 and ask you to look at the screen

21   like you just did for Mr. Lampros.  And if you look at your

22   screen, would you agree as to what I've just marked here in

23   blue that that's the step called the fuel tank step?

24   **A.**   I just -- actually I just call it the middle step.

25   **Q.**   The middle step?

1    **A.**   *(Nods).*

2    **Q.**   Okay.  And right here, sir, where I just marked, that

3    would be, what, the floorboard to the cab?

4    **A.**   Yeah.  Yes, sir.

5    **Q.**   Would you describe it any other way?

6    **A.**   Yeah -- yes, sir.

7    **Q.**   And so if you're descending -- well, let me back up.  Are

8    you familiar with the rule about maintaining three points of

9    contact when you dismount or mount equipment?

10    **A.**   Yes.

11    **Q.**   And is that something that if not talked about on a daily

12    basis at safety meetings, it's talked about on at least a

13    weekly basis?

14    **A.**   Every morning, sir.

15    **Q.**   And the point being, maintain three points of contact so

16    you don't slip when you're getting on or off various types of

17    equipment, not just welding trucks, but any type equipment?

18    **A.**   Yes.

19    **Q.**   And just you, Mr. Boone, if you were dismounting would

20    your first step be down here where I just marked, here where

21    the platform step?

22    **A.**   Yes, sir.  That -- that'd be my first step.

23    **Q.**   And I want to you assume for purposes of this example I'm

24    giving you, that you're at the Pilot Gas Station in Vienna,

25    Georgia --

1    **THE COURT:**  No, that's not necessary to make the point

2    that you're making.

3    **MR. TOTH:**  I'm sorry, Your Honor.  Let me withdraw that

4    question.

5    **THE COURT:**  I mean, we're not recreating what happened

6    at the Pilot Gas Station.

7    **BY MR. TOTH:**

8    **Q.**   Okay.  So just to back up based on Judge Treadwell's

9    comments, your next step as you said would be to the middle

10   step, right?

11   **A.**   Yes.

12   **Q.**   And if you were not on hi-rail, in the hi-rail mode

13   operation, would your next step be down here to the ground?

14   **A.**   Yeah -- yes, sir -- yes, sir -- yes.  I got a long reach

15   so, you know what I'm saying, most of the time I just -- you

16   know what I'm saying, I use the platform and then I use the

17   middle step, and then I use the ground.  But I always have my

18   hand on the grab iron.  That's to keep me from slipping or

19   falling.

20   **Q.**   And the grab iron is over here, correct?

21   **A.**   Yeah.

22   **Q.**   So just to -- you would have, let's see, that's step one

23   and then step two, and then step three *(indicating)?*

24   **A.**   I say step two and -- okay --

25   **Q.**   Let me just clear it off for you.

1   **A.**   Where you got step two at, that's my first objective

2   right there.  I touch right there, and then I touch the middle

3   step, and then I hit the ground.

4   **Q.**   So you go here?

5   **A.**   Yes.

6   **Q.**   Here?

7   **A.**   Uh-huh.

8   **Q.**   And then ground?

9   **A.**   Yes.

10  **Q.**   All right.  And you said you had a long reach.  I'm

11  assuming you're talk at your height?  What's your height, sir?

12  **A.**   Six three and a half.

13  **Q.**   And let me ask you this -- let me just take it off.  If

14  you were on the hi-rail, is the welding truck elevated?

15  **A.**   Yes, sir.

16  **Q.**   And would there be times when you're dismounting the

17  welding truck where because of the elevation on the hi-rail

18  that you would use this step that closest to the ground?

19  **A.**   Yes, sir.  It depends on -- it depends on like where you

20  working, like the ballast, sometimes it's steep and then

21  sometimes it's not.  So it all depends.

22  **Q.**   So if it was flat, like the Pilot Gas Station, you'd go

23  straight to the group even if you were on the hi-rail?

24       **THE COURT:**  No, Mr. Toth, don't go there again.  I

25  don't even know if he knows what the Pilot Gas Station is, and

1    it's not material to the question anyway.

2    **BY MR. TOTH:**

3    **Q.**   If you were in the hi-rail mode operation, the truck is

4    elevated, correct?

5    **A.**   Yes.

6    **Q.**   And whether or not you use the close step -- the step

7    closest to the ground would be just dependent upon the ballast

8    conditions underneath where the cross ties were located?

9    **A.**   Yes.

10   **Q.**   And so if there was a slope down, you may use that last

11   step closest to the ground?

12   **A.**   Yes, sir.  But just like I say, with my reach, I very

13   seldom use it, but I have used it before.

14   **Q.**   And is that step closest to the ground for use when the

15   vehicle in hi-rail operation and elevated?

16   **A.**   Well, it all -- I guess it depends on the person.

17   **Q.**   And you mentioned ballast.  Can you explain to the jury

18   what ballast is and how that would play a role in whether or

19   not you use the bottom step or did not use the bottom step in

20   dismounting in hi-rail mode?

21   **A.**   The ballast, that's the rock that's on the ground, and it

22   depends on -- like, say, for instance -- well, y'all don't

23   work out there.  But anyway, for example, if you working in a

24   crossing, most of the time that's flat, but if you working

25   out, outside the crossing, you know what I'm saying, the

1    further you get out, you know what I'm saying out, out like on

2    the track or whatever, the steep, sometimes it gets -- how can

3    I put this.  I'm a little nervous.  But it gets steep in

4    different areas so therefore sometimes you have to use that

5    step and sometimes you don't.  But the majority of the time I

6    don't have to because I gotta long reach just like I say.

7    Q.    Let me show you what I -- we used yesterday.  We've

8    marked it as Defendant's Exhibit 7-B, and I'm just going to

9    put a line here which I would represent is the -- I guess the

10   floor of the cab.  How would you describe that?  The cab

11   floor?

12   A.    Actually, sir, I -- this my first -- you know what I'm

13   saying, I never really looked at it like that.  Just like I

14   say, I always used that middle -- that middle platform --

15   yeah, that.  I never -- I very seldom step off of that.  I go

16   straight to that platform, and then I, you know, grab -- first

17   of all, I grab the grab iron, and then I step -- I used that

18   platform, and then I use that middle step to get down.

19   Q.    And this is my fault.  I'm not articulating my question

20   well.  What is the distance in inches for that first step that

21   you make down that you just described?

22   A.    Probably, what, maybe -- I'd say, what, maybe 3 or 4

23   inches.

24          THE COURT:  Mr. Toth, don't you have measurements of

25   that?  I mean, the witnesses can speculate as much as they

1   want, but if you have measurements, that's probably the best

2   way to prove that.

3        **MR. TOTH:**  Your Honor, if you'd just indulge me a few

4   minutes, I think I'll be through.  I just want to get this

5   estimate.

6        **THE COURT:**  Okay.

7   **BY MR. TOTH:**

8   **Q.**   The middle step that you described, can you give the

9   estimate of it to the ground when you're in highway mode

10  operation?

11  **A.**   Well, actually -- actuality, no, sir I can't.  No, I

12  can't.

13  **Q.**   Mr. Windom testified 18 to 20 inches.  Would you disagree

14  with what Mr. Windom said?

15  **A.**   Well, just like I said, that's Mr. Windom and I'm

16  Derrick.  So I can't -- I can only speak for me.

17  **Q.**   Fair enough, sir.  Fair enough, I agree.  And if you're

18  in highway mode, how many steps do you have to make to reach

19  the ground?

20  **A.**   I don't make -- actually I don't make but two.

21  **Q.**   So can you describe the steps that you make?  Can you

22  indicate --

23        **THE COURT:**  You're asking him to do it again?

24        **MR. LAMPROS:**  I'm going to object.  It's asked and

25  answered.

1    **THE COURT:**  Yeah, we've been -- he said it at least

2    twice.

3    **MR. TOTH:**  I just want to make sure -- I thought he

4    indicated three steps, and he just said two steps.

5    **THE COURT:**  Well, yeah, if you think he's testifying a

6    little differently, then, yes, you can clear that up.

7    **BY MR. TOTH:**

8    Q.   Stepping out is your first step right there to the

9    platform and you grab your grab iron, correct?

10   A.   Yeah.

11   Q.   And then your next step is to the middle step?

12   A.   Well, excuse me, I grab my grab iron first, and then I

13   make that step.

14   Q.   Okay.  So that's step one?

15   A.   Yeah.

16   Q.   Then you got the grab iron --

17   A.   Yeah.

18   Q.   -- and you got three points of contact, correct?  And

19   then you go to the middle step.  So that's step two?

20   A.   Yeah.

21   Q.   And then you go to the ground.  That's step three?

22   A.   Yeah.  Okay, I made a mistake.

23   Q.   That's all I have.  Thank you, Mr. Boone, I appreciate

24   your time here today.

25   **MR. LAMPROS:**  I just have a brief follow up.

**REDIRECT EXAMINATION**

**BY MR. LAMPROS:**

**Q.**   When you get out of the truck -- when you get out of the truck when you were talking about it, do you first stand up inside the truck, or the first thing you do is you put your foot on that platform right there?

**A.**   Just like I said, I grab the grab iron, and then I use the platform and I use that second step, and then, just like I say, I -- the third step's the ground.  That's how I do it.

**Q.**   But you don't ever step from here to here?  The first place you put your foot is right there; is that correct?

**A.**   I don't -- I don't -- I put my foot -- just like I say, I grab the grab iron and put my foot right there on that platform -- right there, yeah.

**Q.**   Okay.  So you don't actually step down off anything onto the platform, you step out onto it?

**A.**   Yes, sir.

**Q.**   Is anything wrong, are there any rules against -- any railroad rules against using that step right there when you're on the highway?

**A.**   I haven't seen any.  You know what I'm saying, I think it's a rule -- I think you got to use the grab iron and use steps, but just like I -- the way I do it, you know what I'm saying -- I'm -- once you do it for so long, you gotta certain -- you know, you got your own little -- everybody got their

1    own little routine of doing stuff -- doing certain things, and

2    that's how I did it.  You know what I'm saying, I thought as

3    long as you stayed safe or whatever it was all right.

4    **Q.**    And you don't know how Mr Windom did it, did you?

5    **A.**    Excuse me?

6    **Q.**    You don't know how Mr. Windom got on or off, do you?

7    **A.**    No, sir.

8    **Q.**    That's all I have.

9    **A.**    Everybody's got their own concept of doing stuff.

10   **Q.**    I understand, Mr. Boone.  Thank you.

11        **THE COURT:**  Mr. Lampros, leave Plaintiff's 19 up for

12   just a minute please, the one that was just there.  Mr. Boone,

13   let me ask you a couple of questions.  Looking at Plaintiff's

14   Exhibit 19 and this step that is the closest to the ground.

15   As you said, this is how it looked back in August of 2010.

16   Can you tell me how that step is attached to the truck back

17   then as we look at it in the picture?

18        **THE WITNESS:**  It was attached to the bottom of the tank

19   we had, like -- just like I say, it was attached to the bottom

20   of the tank and it had like a little -- the little metal

21   ropes.

22        **THE COURT:**  Cables?

23        **THE WITNESS:**  Cables holding it.

24        **THE COURT:**  Okay.  All right, thank you.  You may step

25   down.  May he be excused?

1        **MR. LAMPROS:**  I would ask that he be excused.

2        **THE COURT:**  Mr. Toth?

3        **MR. TOTH:**  No, it's his subpoena, no.

4        **THE COURT:**  All right, Mr. Boone, you are excused.

5    Thank you again.

6        **MR. LAMPROS:**  Let me make sure my next witness is here,

7    Your Honor, and I'll call him.  The plaintiff calls Joseph

8    Windom, Your Honor.

9        **THE COURT:**  Joseph Windom?

10        **MR. LAMPROS:**  Yes, sir.

11        **COURTROOM DEPUTY:**  Do you solemnly swear that the

12    testimony you are about to give in this case shall be the truth,

13    the whole truth, and nothing but the truth, so help you God?

14        **THE WITNESS:**  Yes.

15        **COURTROOM DEPUTY:**  Will you please state and spell your

16    name for the record.

17        **THE WITNESS:**  My name is Joseph Windom.  J-O-S-E-P-H,

18    W-I-N-D-O-M.

19                        **JOSEPH WINDOM**

20      **Witness, having first been duly sworn, testified on**

21                       **DIRECT EXAMINATION**

22    **BY MR. LAMPROS:**

23    **Q.**   Mr. Windom, good morning.

24    **A.**   Good morning.

25    **Q.**   You've told us and spelled your name for us.  Please tell

1   us what your relationship is to Mr. Paul Windom?

2   **A.**   He's my brother.

3   **Q.**   And Mr Windom testified, Mr. Paul Windom testified

4   yesterday where he ranked in birth order out of the 15.  Where

5   do you rank?

6   **A.**   13th.

7   **Q.**   So you're younger than he is?

8   **A.**   Yes.

9   **Q.**   And I take it you've known him all your life?

10  **A.**   Yes, sir.

11  **Q.**   Are y'all close?

12  **A.**   Yes.

13  **Q.**   Do you spend time together?

14  **A.**   Yes, we do.

15  **Q.**   Do y'all see each other on a regular basis?

16  **A.**   Pretty much, yes.

17  **Q.**   And have you seen each other on a regular basis for a

18  number of years?

19  **A.**   Yes.

20  **Q.**   I want you to think back to August 2010, August 6th,

21  2010, okay?  Almost two years ago?

22  **A.**   Right.

23  **Q.**   Before then did you ever know Mr. Paul Windom to have any

24  type of knee injury?

25  **A.**   No, no.

1  **Q.**   Did you ever see him limp?

2  **A.**   No, I didn't.

3  **Q.**   Do you know now if he's hurt?

4  **A.**   Yes.

5  **Q.**   And what's your understanding of what his injury is?

6  **A.**   He has a knee injury now and it's limited him from, you

7  know, doing a lot of things that I have to do for him.

8  **Q.**   What are some of the things that you've had to do for

9  him?

10 **A.**   I had to cut his grass, haul off trash and stuff like

11 that, things that he normally would do but could not.

12 **Q.**   And how long did you do that for him?

13 **A.**   I did it for pretty much a year -- over a year.

14 **Q.**   Have you stopped doing that now?

15 **A.**   Yes, because of work.

16 **Q.**   Because of your work?

17 **A.**   Yes.

18 **Q.**   And before the August 2010 time period, was there any

19 time when Mr. Paul Windom was capable of doing those tasks

20 that you had to do for him?

21 **A.**   Before?

22 **Q.**   Before.

23 **A.**   No.

24    **MR. LAMPROS:**  That's all I have, Your Honor.

25    **THE COURT:**  Any cross examination?

1       **MS. MORRIS:**  Yes, Your Honor just briefly.

2                   **CROSS EXAMINATION**

3     BY MS. MORRIS:

4     **Q.**   Good morning, Mr. Windom.  My name is Amanda Morris.

5     **A.**   Good morning.

6     **Q.**   I represent Norfolk Southern here today.  And I just

7     wanted to follow up with you on a couple of things.  You said

8     that you and your brother, Mr. Paul Windom, are very close and

9     you spend time together?

10    **A.**   Yes.

11    **Q.**   How often do you see Mr Windom?

12    **A.**   Pretty much once or twice a week.

13    **Q.**   And is that because you also live in Abbeville?

14    **A.**   I live in Fitzgerald.

15    **Q.**   And what sort of things do you and Mr. Windom like to do

16    together?

17    **A.**   Well, pretty much if it's not just riding and just

18    sitting at the house talking.  Basically that's what all we

19    do.

20    **Q.**   I'm sorry, you said riding?

21    **A.**   Yes.

22    **Q.**   Could you explain what you mean by riding?

23    **A.**   Well, he needed me to take him different places and stuff

24    like that.  I have to take him to appointments.  I had to take

25    him to -- up here to Atlanta and everything like that.  That's

1    the type of riding we do.

2    **Q.**   Is it your testimony that you were required to drive Mr

3    Windom because he was not capable of doing that?

4    **A.**   I would just -- that was just part of my -- you know, he

5    would ask me would I mind riding with him.  That was all it

6    was.  It was not required for me to do that.

7    **Q.**   Do you and Mr. Windom do things together like take your

8    nephews fishing and play baseball with your nephews?

9    **A.**   No.  I played basketball sometimes with his sons, but

10   he's not able to do that, that of type of activity.  That's

11   it.

12   **Q.**   Have you had the opportunity to observe Mr Windom attempt

13   to play basketball since August of 2010 with your nephews?

14   **A.**   No, I have not.

15   **Q.**   Do you and Mr. Windom work out together?

16   **A.**   Hmm, we have went to gym together before.

17   **Q.**   And that was since August 2010?

18   **A.**   Yes.

19   **Q.**   And did you work out together before August 2010?

20   **A.**   Before.  No, I joined the gym last year I think it was.

21   **Q.**   And is that also in Fitzgerald?

22   **A.**   Yes.

23   **Q.**   When was the last time you had to do any yard work for Mr

24   Windom?

25   **A.**   Last summer.

**Q.**   I'm sorry?

**A.**   Last summer.

**Q.**   That was the summer of 2011?

**A.**   Yes.

**Q.**   Are you aware that your brother Mr. Paul Windom is using the treadmill at the gym?

**A.**   He tries to get on it -- I am aware of it, yes.

**Q.**   But have you been there with him when he was on the treadmill?

**A.**   Probably once or twice, yes.

**Q.**   Have you observed him lifting dumb bells in the gym?

**A.**   No, I haven't.

**Q.**   You haven't seen him working on any machines in the gym or doing any ab work?

**A.**   Hmm, I haven't -- I can't recall.

**Q.**   Do you recall when the last time the two of you were there together?

**A.**   It's been a while.  He had to stop going to the gym.

**Q.**   When did he stop going to the gym?

**A.**   Well, I noticed -- well, my time schedule because of my work, we were not able to go to the gym, so he just kind of slacked off going because I know the last time we were there he had to leave early because he couldn't, you know, deal with the pain.  The last time I was there with him.

**Q.**   But you don't recall when that was?

**A.**   It had to be -- no, I can't recall.

**Q.**   And you haven't seen your brother walking with a limp, have you, in the past few months?

**A.**   I've seen him walk with a limp.

**Q.**   When was the last time you were -- when was the last time you drove him to a doctor's appointment?

**A.**   The last time.  The last time.  It was an appointment here in Macon.  I can remember driving him.  I can't remember the exact place, but it was here in Macon.

**Q.**   Have you seen your brother use a cane?

**A.**   Yes.

**Q.**   When was the last time he used a cane?

**A.**   Hmm, I'm thinking it was before -- before the new year somewhere around that time.

**Q.**   The beginning of 2012?

**A.**   Yes.

**Q.**   Did Mr Windom pay you to do his yard work?

**A.**   Sometimes he did pay me to do it.

**Q.**   And you don't have any knowledge of how Mr Windom hurt his knee other than what he's told you?

**A.**   That's the only explanation I got.  I never really asked a lot.

**Q.**   Thank you, Mr Windom.

     **MR. LAMPROS:**  One brief follow up, Your Honor?

     **THE COURT:**  Okay.

**REDIRECT EXAMINATION**

**BY MR. LAMPROS:**

**Q.**   Are the activities that you and Mr. Paul Windom do now different from the activities that y'all did together before August of 2010?

**A.**   Yes.

**Q.**   How is that?

**A.**   Well, there's a lot of things that I probably could do now that I know he can't do.  I don't even ask, you know. It's just because of -- you know, there have been times I've called him and asked him how you doing and stuff like that, he talked about the pain and stuff like that.  So there was a lot of things that I know that as far as even riding off, he can't even stand to do that for a long distance.  So there's a lot of trips that -- going to see my family -- that he's not able to be in it, you know, because of the pain or doctor's appointment or something like that.

**Q.**   And when you drove him to doctor's appointments, did you drive him to keep him company -- did you go with him to keep him company, or did you drive him because he needed to drive?

**A.**   It depended on different -- it depended on my schedule was, if I was off that particular day, and he was like, well, you know, I might need you to take me up there to the doctor or, you know, he would just ask me to ride with him sometimes because of the pain he couldn't.

1  **Q.**   Is he doing better now than he was say a year and a half

2  ago?

3  **A.**   Yes, he's doing a little better.

4       **MR. LAMPROS:**  That all I have.

5       **THE COURT:**  Thank you, Mr Windom.  You may step down.

6  May he be excused?

7       **MR. LAMPROS:**  We would request that he be excused.

8       **THE COURT:**  Any objection?

9       **MS. MORRIS:**  No, Your Honor.

10      **THE COURT:**  You are excused, Mr Windom.  You may remain

11  in the courtroom or leave as you prefer.  All right.  Are we

12  ready to continue Mr. Windom's cross examination?  Those are

13  the only two witnesses you want to take out of turn?

14      **MR. LAMPROS:**  Yes, Your Honor.

15      **THE COURT:**  All right, Mr Windom, you may return to the

16  stand, please.

17                    **PAUL WINDOM**

18        **Witness, previously sworn, testified on**

19                **CROSS EXAMINATION**

20  **BY MR. TOTH:**

21  **Q.**   Good morning, Mr Windom.

22  **A.**   Good morning.

23  **Q.**   I'm going to skip around here just a little bit to try to

24  finish up.  I'm going to start with your gym membership at

25  American Body Fitness.  I know you were asked on direct

1   examination about that?

2   **A.**   Yes.

3   **Q.**   And can you tell me when you became a member there, sir?

4   **A.**   It had to be, let's see, I think around March or April of

5   2011.

6   **Q.**   And can you tell me that frequency is since -- let's just

7   say March or April of 2011, until, let's say August -- or

8   July 31st of 2010, what would be your frequency?  I assume you

9   don't go -- you know, it changes from week to week.  But if

10  you could just give me your estimate of how often you're there

11  on a weekly basis of this time period I just described?

12  **A.**   Probably about three to four times a week.

13  **Q.**   Is there a period of time that you like to go?

14  **A.**   Well, whenever convenient for me.  Sometimes I go --

15  sometime I go in the morning.  Sometimes I go in the

16  afternoon.

17  **Q.**   And what's the duration of the time that you're there

18  doing whatever exercise that it is you may be doing?

19  **A.**   I don't stay -- probably about an hour.

20  **Q.**   And how long does it take you to drive from Abbeville to

21  Fitzgerald?

22  **A.**   Probably about 25, 25 minutes -- 30, maybe 25-30.

23  **Q.**   So is if it's -- if this is an hour, or close to an hour

24  commitment of at the gym and with the commute time, this is

25  about a two-hour commitment each day to go get your exercise

1    in, correct?

2    **A.**    Yes.

3    **Q.**    And I believe you indicated that a doctor recommended

4    that you do this?

5    **A.**    Yes.

6    **Q.**    And I believe you're not able to run on the treadmill,

7    you're able to walk at -- what?  I guess a brisk pace?

8    **A.**    Walk at a moderate pace.

9    **Q.**    And I believe you said, what is that, 2.9 or 3.0 on the

10   machine whatever that means to us?

11   **A.**    Anywhere between 2.8 to 3.0.

12   **Q.**    And do you have to scan a card to get entry into the gym?

13   **A.**    Yes.

14   **Q.**    And has there ever been a time when you went to the gym,

15   scanned your card, and then turned right back around and

16   walked out?

17   **A.**    Not unless got a phone call or something.  Probably once.

18   **Q.**    Do you know Lee Yarborough, the manager of that gym?

19   **A.**    I believe I saw her before.  I think I know her.  I mean,

20   I'm not sure.

21   **Q.**    And you indicated that you lift weights occasionally.  On

22   the three times a week that you go, do you lift weights

23   one day, two days, two out of three, or how does that work?

24   **A.**    I probably lift one day.

25   **Q.**    Just back up just a little bit, it was Dr. Slappey that

1    recommended that you go and walk on the treadmill, correct?

2    **A.**    No, he recommended exercise.

3    **Q.**    Do you recall your deposition in my office on March 30th

4    of this year?

5    **A.**    Yes.

6    **Q.**    And you recall we spent several hours together discussing

7    this event?

8    **A.**    Yes.

9    **Q.**    And do you recall us discussing your exercise at the gym?

10   **A.**    Yes, yes.

11   **Q.**    Do you recall being under oath on that particular day?

12   **A.**    Yes.

13   **Q.**    I'm just going to -- with Your Honor's permission --

14   direct you to page 39 of your deposition transcript from that

15   day.

16        **MR. TOTH:**   Is that okay, Your Honor?

17   **BY MR. TOTH:**

18   **Q.**    And I'll just read to you my question on line 4:  Mr.

19   Windom, before we move on I just wanted to wrap up a couple of

20   things on this American Body.  Which doctor recommended that

21   you go and walk on the treadmill?  And would you read your

22   answer line eight?

23   **A.**    On line eight:  Dr. Slappey.  That's my orthopedic

24   surgeon.

25   **Q.**    And so exercise in your mind means walking on the

1    treadmill?

2    **A.**   Well, he -- I assume, he told me to -- he --

3        **MR. LAMPROS:**   Your Honor, I think in the interest of

4    fairness and completeness he needs to read the second -- the

5    next question and answer.

6        **THE COURT:**   Mr. Toth, can you put that back up.

7    **BY MR. TOTH:**

8    **Q.**   I'll read the next question:   In addition to walking,

9    what else did he recommend that you do in the gym to

10   rehabilitate your knee?   And do you want to read your answer

11   there, sir, on 11?

12   **A.**   I said:  Well, he said that's about -- you keep moving.

13   You keep moving it.

14       **THE COURT:**   Yes.   It never stayed still long enough for

15   him to read it.

16       **MR. TOTH:**   I'm sorry, I thought he was through.

17   **BY MR. TOTH:**

18   **Q.**   Are you through, sir?

19   **A.**   You keep moving it.   I really can't -- okay, that's it.

20   Well, that's about it with the walking part, and I had some

21   home exercises, stretches exercises he recommended *(reading)*.

22   **Q.**   You indicated you also worked out on ab machine.   Can you

23   describe how that exercise is done?

24   **A.**   You lay down on the -- on the piece of equipment and you

25   take both your hands, and you just move the upper part of your

1    body.

2    **Q.**   And that particular exercise is not designed to

3    rehabilitate your knee, is it, sir?

4    **A.**   No, sir.  I'm a diabetic.  So I'm trying to get, you

5    know, exercise.  I'm actually trying to exercise.

6    **Q.**   And, of course, you also do the military press, and can

7    you describe the movement of the military press?

8    **A.**   Well, you sit on a bench and I took probably 20, 25

9    pounds and just --

10   **Q.**   How many sets do you do?

11   **A.**   Probably about three sets of eight.

12   **Q.**   And you also do dumb bell curls.  Can you demonstrate

13   that?

14   **A.**   Yes.  I sit down on the bench, and I just -- with about

15   10 maybe 15 pounds.

16   **Q.**   Mr Windom, when you were looking for a doctor on the

17   Internet I believe you said you found Forsyth Street

18   Orthopedics and Dr. Slappey online?

19   **A.**   Yes.

20   **Q.**   Did you read any of the material on the website about Dr.

21   Slappey and perhaps his profile?

22   **A.**   I read it in part, yes.

23   **Q.**   And did you go to any of the educational links that

24   talked about the particular surgery that had been recommended

25   for you, the partial medial menisectomy and the normal times

1    for recovery to heavy labor and recreational activities

2    published on that website of Dr. Slappey?

3    **A.**   No.

4    **Q.**   Just in following up here, you were shown -- this is

5    plaintiff's exhibit.  It's a photograph.  It's not marked.

6    It's 53, but I'm not sure exactly what Mr. Lampros identified

7    it as.  But it is in the record, and I just want to ask you

8    quickly here --

9         **THE COURT:**  I don't think it's in the record.

10        **MR. LAMPROS:**  Your Honor, I believe it's 53-C.

11        **THE COURT:**  Okay.  53-C.

12        **MR. TOTH:**  Thank you, Mr. Lampros.

13   **BY MR. TOTH:**

14   **Q.**   I see the tape there on your knee, but the line that's

15   drawn out there, here and here?

16   **A.**   Uh-huh.

17   **Q.**   That's not a scar; that's the purple ink they draw on

18   your knee in preparation for the surgery, isn't it?

19   **A.**   Yes.

20   **Q.**   That's not -- I don't want anyone to believe that's an

21   incision or a scar?

22   **A.**   No, sir.

23        **MR. TOTH:**  If I can consult with co-counsel, Your

24   Honor.

25   **BY MR. TOTH:**

1   Q.   Did you file tax returns in 2006 and in 2007, 2008, 2009

2   and 2010?

3   A.   Yes, sir.

4   Q.   And did you deduct business expenses on your tax returns?

5   A.   Yes.

6        MR. LAMPROS:  Your Honor --

7   BY MR. TOTH:

8   Q.   Your attorney has been kind enough to give me back tax

9   returns that don't have information about your wife and

10  children on here.  And I just want to ask you certain

11  questions from the documents that he's given me.

12  A.   Yes, sir.

13  Q.   Do you review your tax returns, sir, before you sign

14  them?

15  A.   Yes, sir.

16  Q.   And I don't think you use a CPA; you use a tax preparer

17  in McRae?

18  A.   Yes, sir.

19  Q.   What, James King?

20  A.   Yes, sir.

21  Q.   And you provide the information to him for him to use in

22  determining what your deductions will be?

23  A.   Yes.

24  Q.   And did you do that in 2006?

25  A.   Yes.

1   **Q.**   Does this appear to be your W-2 statement from Norfolk

2   Southern in 2006?

3   **A.**   Yes.

4   **Q.**   And, I'm sorry, Mr Windom, I'm trying to get -- there we

5   go -- for the jury and you can see it.  That's your income

6   from 2006?

7   **A.**   Yes.

8   **Q.**   And just for the record, this is Plaintiff's Exhibit 46.

9        **THE COURT:**  Are they going to be tendered?

10        **MR. LAMPROS:**  Your Honor, if he wants --

11        **THE COURT:**  They're not in evidence yet.

12        **MR. LAMPROS:**  Right.  I don't object to him putting the

13   W-2s on the Elmo and the schedules.

14        **THE COURT:**  How do you want to handle this, Mr. Toth?

15        **MR. TOTH:**  I'm sorry, Your Honor?

16        **THE COURT:**  How do you want to handle this?  I mean, if

17   they're going to be shown, they need to be put into evidence

18   unless--

19        **MR. TOTH:**  I'd like him to identify them and I'd like

20   to be able to ask him certain questions on it.  I could call

21   him for cross examination to put them in in my part of the

22   trial.

23        **THE COURT:**  Well, you can put them in right now if you

24   want.

25        **MR. LAMPROS:**  Yeah, I don't mind.

1    BY MR. TOTH:

2    Q.   And what I'd like to do is show you from your 2006

3    return --

4         MR. TOTH:   Your Honor, may I approach the witness and

5    just hand him this?

6         THE COURT:   Sure.

7         MR. TOTH:   In fact, I'm going to take the other copy

8    here to save some trips if that's okay, Your Honor?

9         THE COURT:   That's fine.

10   BY MR. TOTH:

11   Q.   Mr. Windom, what you have in front of you, I believe it's

12   Plaintiff's 46, if I have the number correct?

13   A.   Yes.

14   Q.   Do you recognize those as your tax returns from 2006 to

15   2010?

16   A.   Yes.

17        MR. TOTH:   May I approach again, Your Honor?

18        THE COURT:   You may.

19        MR. TOTH:   Thank you, Mr Windom.

20        THE COURT:   And you say they've been redacted to remove

21   some information that doesn't concern Mr. Windom?

22        MR. LAMPROS:   Yes, Your Honor.   The things we're

23   suppose to redact, we redacted.

24        MR. TOTH:   And it's Plaintiff's Exhibit 46.   I may have

25   called the wrong number.

1    BY MR. TOTH:

2    Q.   Of course, Mr. Windom, 2006 would have been your first

3    full year at Norfolk Southern, correct?

4    A.   Yes.

5    Q.   And, of course, this tax return also reflects -- and I'm

6    not asking you the number -- but the income of your wife as

7    well.  You filed a joint return?

8    A.   Yes.

9    Q.   And did you have certain business expenses in 2006

10   related to your job?

11   A.   Yes.

12   Q.   Let me show you from the 2006 return schedule A --

13       THE COURT:  Are they all identified as Plaintiff's

14   Exhibit 46?

15       MR. TOTH:  They are, Your Honor.

16       THE COURT:  And isn't this something your expert uses?

17       MR. LAMPROS:  Yes, Your Honor.

18       THE COURT:  Why don't you just tender them?

19       MR. LAMPROS:  I'll be happy to.

20       THE COURT:  All right, then Plaintiff's Exhibit 46 is

21   admitted without objection.  And now we can all look at it.

22   BY MR. TOTH:

23   Q.   Mr. Windom, can you identify on your business deductions

24   work clothes, what portion of the work clothes are business

25   expenses that you're claiming as a deduction on your return

1  versus business expenses -- or versus work clothes of your

2  wife?

3  **A.**   Probably a third.

4  **Q.**   And your wife is a school teacher?

5  **A.**   Yes.

6  **Q.**   And I believe she's in the hall here to testify as well,

7  correct?

8  **A.**   Yes.

9  **Q.**   And so you're identifying work clothes.  Can you describe

10  the work clothes that you're taking as a deduction, sir, or at

11  least listing as a deduction?

12  **A.**   Well, I had to change, you know, I went from working on

13  the inside work to outside work, so I had to -- I had to buy a

14  lot of different clothes for outside purposes.

15  **Q.**   Did you buy clothes similar to what Mr. Boone was wearing

16  when he was in here to testify this morning?

17  **A.**   Maybe similar.

18  **Q.**   And I believe there's some testimony that your shirts you

19  would take to the laundry and have cleaned?

20  **A.**   Well, I was trying to be uniform at first, but then I

21  stopped that.

22  **Q.**   And when we say uniforms, you're not talking about

23  uniforms like people at Riverside Ford would wear or --

24  **A.**   No.  I was buying, you know, shirts with pocket on them

25  and trying to keep them neat.  I was trying --

1    **Q.**    Polo shirts?

2    **A.**    No.  Button-up shirts.

3    **Q.**    Button collar shirts?

4    **A.**    Yes.

5    **Q.**    And professional dues, are those your union dues, sir, or

6    are those some type of dues that belong to your wife, because

7    union dues down here later?

8    **A.**    Yes.  I think that belongs to my wife.

9    **Q.**    And attorney's fees, is that a deduction that you took,

10   sir?

11   **A.**    When we first built the house, we had to have an attorney

12   and we will -- we acquired an attorney and that's what those

13   are.

14   **Q.**    So that's a business expense then from 2006, these

15   attorney's fees?

16   **A.**    Yes.

17   **Q.**    And I guess that could be split between you and your wife

18   since she was living there with you?

19         **THE COURT:**  It's a business expense?

20         **MR. TOTH:**  That's the way it's reflected on the tax

21   return, Your Honor.

22   **BY MR. TOTH:**

23   **Q.**    Required telephone is a business expense.  Is that yours,

24   sir?

25   **A.**    Yes.

1    Q.    And is there a rule you can direct me to at the railroad

2    requires you to have a cell phone?

3    A.    At Norfolk Southern we're always on call so they required

4    -- we're required to have a cell phone.

5    Q.    So you felt like that was an appropriate business

6    expense?

7    A.    Yes.

8    Q.    And jumping down here to the next to the last line of

9    classroom expenses, clearly that's something that belongs to

10   your wife?

11   A.    Yes.

12   Q.    And the cleaning work clothes of 14.80, is that a third

13   yours and two-thirds your wife?

14   A.    Probably a little less.  Probably more -- a lot more of

15   it is hers.

16   Q.    And work shoes, that would be your boots?

17   A.    Yes.

18   Q.    And just the total there is $15,087, correct?

19   A.    Yes.

20   Q.    And I'm going to show you Schedule A of your -- let me

21   see if I can back it out for you, sir.  Schedule A from your

22   2006 return, and I just refer you to line 26 which is titled

23   under the job expenses and certain miscellaneous deductions a

24   total on line 26 of $21,751; is that correct?

25   A.    I guess -- yes, that's correct.

1    **Q.**   Of course, on line 20 we've got business expenses of

2    8182?

3    **A.**   Yes.

4    **Q.**   And your tax preparation fee of 160?

5    **A.**   Yes.

6    **Q.**   And then we've got "see statement," and that's the

7    statement you were just looking at, that's 15,087, and that's

8    on line 22, correct?

9    **A.**   Yes.

10   **Q.**   I'm going to take you now, if I could, to your 2007

11   return.  You had already identified that for me.  I want to

12   refer you on your '07 return to Schedule A where we listed

13   your business expenses and your clothes, work clothes, this

14   year's appear to have gone down from 2006.  Can you tell me

15   what percentage of the -- since it says both what percentage

16   of those business expenses for work clothes are yours?

17   **A.**   Not very many probably.  I'd say maybe a third, I guess.

18   I'm not sure.

19   **Q.**   So 33 percent is your estimate?

20   **A.**   My estimate.

21   **Q.**   And I believe in your deposition you said you retained

22   copies of all your receipts?

23   **A.**   Yes.  My wife, we looked them up when I went home, and

24   she's got every one of them.

25   **Q.**   That show -- if we put them all out there on the table

1   33 percent work clothes you, and 33 percent clothes her?

2   **A.**   Well, she's got a receipt for everything.  I was

3   surprised she had them, but she's got receipt of everything

4   that we're getting ready to discuss.

5   **Q.**   Does Norfolk Southern have a specific dress code that

6   you're required to comply with?

7   **A.**   Yes.

8   **Q.**   That would be, what, steel-toed work boots?

9   **A.**   Yes.

10   **Q.**   Anything else?

11   **A.**   Not wear anything that could get into a machine, get

12   caught into a machine.  You know, different things.  Light

13   clothing in the summer time and heavy clothing in the winter

14   time.

15   **Q.**   But you can wear Levis, Wranglers, Carhartt, whatever you

16   would like?

17   **A.**   Yes.

18   **Q.**   Mr. Boone, I've seen him in overalls.  Is that acceptable

19   attire?

20   **A.**   Yes.

21   **Q.**   And I see you've got attorney's fees of 2243 this year.

22   Do those belong to you?

23   **A.**   Yes.  I told you that we -- I told you in the deposition

24   that we refinanced our home about three, maybe about four

25   times.

1    **Q.**   So the amount you paid in attorney's fees was a business

2    expense or deduction?

3    **A.**   It should -- I assume it was a deduction.

4    **Q.**   And required telephone, your expense, not your wife's?

5    **A.**   Yes, that's mine.

6    **Q.**   And that's associated with the business?

7    **A.**   The work.

8    **Q.**   Business?

9    **A.**   With the work.

10   **Q.**   I'm sorry, you only use that phone for business, right?

11   **A.**   No, I use it for work.

12   **Q.**   Work-related business, I guess I should say?

13   **A.**   Yes.

14   **Q.**   Not personal business?

15   **A.**   No, sir.

16   **Q.**   And you've got your union dues on here as well, correct?

17   **A.**   Yes, yes.

18   **Q.**   And just showing you Schedule A, we're back again to your

19   business expenses on line 21, are 2635 and then those on the

20   statement we just looked at are 9482 on line 23, correct?

21   **A.**   Yes.

22   **Q.**   So you're allowed to take two percent over your adjusted

23   gross income, which totals $10,351 that you took as business

24   expenses, correct?

25          **MR. LAMPROS:**  Your Honor, I object.  He's misleading

1    the witness, and he's misleading the jury.  Two percent of

2    what he's taking is not $10,351.  The two percent is 1901.

3        THE COURT:  I'm not sure you stated that right, but in

4    any event, I mean, I assume you're just trying to ask him

5    what's on the form.

6        MR. TOTH:  Yes, Your Honor.

7        THE COURT:  Not to establish any other point.

8        MR. TOTH:  Well, just trying to establish what business

9    expenses are his which have to come out of the economist

10   information versus --

11       THE COURT:  But you're not asking him a tax opinion

12   about 2 percent of AGI or anything like that?

13       MR. TOTH:  No, I'll ask the economist that who will be

14   here, Your Honor.

15   BY MR. TOTH:

16   Q.    And you also filed a tax return in 2008, correct?

17   A.    Yes.

18   Q.    And did you have deductions that you took in 2008 for

19   business expenses?  Did you business expenses also in 2008?

20   A.    Yes.

21   Q.    And you got work clothes on here.  Tell me how that

22   breaks down.  You say both.  One-third, you, again, versus

23   two-thirds, Ms. Windom?

24   A.    Yes.

25   Q.    And do you know, are these professional dues yours or

1    your wife's?

2    **A.**    Probably my wife's.

3    **Q.**    And the work shoes are yours, of course?

4    **A.**    Yes.

5    **Q.**    And the telephone looks like it's gone up to 1688?

6    **A.**    Yes.

7    **Q.**    And then you've got your union dues?

8    **A.**    Yes.

9    **Q.**    And, of course, the classroom expenses are 420, and I

10    think we talked about PAGE has something to do with books that

11    your wife purchases for the classroom?

12    **A.**    Yeah, well, she cleared it up.  She told me about it,

13    yes.

14    **Q.**    At least in two of these years you relied upon a tax

15    preparer named James King?  Do you recall Mr. King?

16    **A.**    Yes.

17    **Q.**    How long has it been since you've seen Mr. King?

18    **A.**    I hadn't seen him since I think 2009.

19    **Q.**    Did you receive any correspondence from Mr. King in 2009

20    or 2010 about your tax returns?

21    **A.**    No, sir.

22    **Q.**    All right.  More business expenses in 2008, correct?

23    **A.**    Yes.

24    **Q.**    And without anything changed your opinions as to -- it

25    looks like it's pretty much repetitive, and I don't want to

1    waste the jury's time and the Court's time.  Did pretty much

2    everything break down the same way as to what you said

3    previously?

4    **A.**   Yes.

5    **Q.**   And here 2009 Schedule A, line 23, and the return you

6    filed.  Everything here break down essentially the same?

7    **A.**   Pretty much.

8    **Q.**   It looks like attorney's fees have gone down.  And I

9    don't see work clothes on here this year; is that correct?

10   **A.**   I don't -- I think -- you see where that page is at up

11   top?

12   **Q.**   I'm sorry, sir?

13   **A.**   See where that page is up top?  Those two lines are --

14   one of them is -- the page should be on the second line.  I

15   think that was my wife's.

16   **Q.**   Well, I guess my point is you did not take a business

17   expense for work clothes in 2009, correct?

18   **A.**   I don't think I did, no, sir.

19   **Q.**   Were you still buying the same type of work clothes in

20   2009?  You worked the entire calendar year?

21   **A.**   Yes, I did.

22   **Q.**   And just any explanation for the change?

23   **A.**   Maybe we just forgot.  I'm not sure.

24   **Q.**   Would your wife be able to address these questions in

25   more detail about the deductions?

**A.**   She should be, yes.

**Q.**   Was she the one primarily responsible for, you known, keeping track of the receipts and things of that nature?

**A.**   Yes, yes.  She's got all the receipts.

**Q.**   In terms of how you did your taxes in 2010, I understand you only worked -- you only worked part of the year, but would anything have changed in terms of, maybe not the same amount, but you would have the same business expenses, but you only worked eight months of the year?

**A.**   I'm not sure.  I'm not sure.

     **MR. TOTH:**  I think I'm through, Your Honor.  Just let me check.  That's all I have, Your Honor.  If you'll just give me a minute to put a gem clip on these so I don't confuse the record.

     **THE COURT:**  Any redirect?

     **MR. LAMPROS:**  Yes, Your Honor.

     **THE COURT:**  We might need to give Mr. Toth just a minute.

     **MR. LAMPROS:**  He's got 7-D -- C&D.  He had some exhibits.

     **THE COURT:**  And are you suggesting he might want to tender them?  So actually he hasn't tendered anything yet. During your redirect, Mr. Toth, you might want to look at the exhibits you want to tender.  I presume there's no objection since y'all have allowed each other to display them to the

1   jury, but they still need to be tendered.

2          **MR. TOTH:**  Yes, Your Honor.

3          **THE COURT:**  But you can go ahead with your redirect,

4   Mr. Lampros.

5                    **REDIRECT EXAMINATION**

6   **BY MR. LAMPROS:**

7   **Q.**   Let's start with your taxes.  Are you a tax professional

8   or do you rely on someone else to do that for you?

9   **A.**   I rely on someone else to do that.

10  **Q.**   Have you had any accounting courses?

11  **A.**   No, sir.

12  **Q.**   Have you had any tax preparation courses?

13  **A.**   No, sir.

14  **Q.**   Are those attorney's fees that he showed you, are those

15  in any way related to your railroad job?

16  **A.**   No, sir.

17  **Q.**   Did Dr. Slappey specifically tell you to walk on a

18  treadmill, or did he tell you just to walk?

19  **A.**   He told me just to walk.

20  **Q.**   Who made the decision to walk on a treadmill?

21  **A.**   I made the decision.

22  **Q.**   When you're at the gym if you feel discomfort, can you

23  stop, or do you have to keep on going?

24  **A.**   I stop.

25  **Q.**   When you were working at the railroad, you're doing your

1    welding job, if you feel discomfort, can you stop, or do you

2    have to keep going?

3    **A.**   I could stop.

4    **Q.**   Can you stop and go home?

5    **A.**   No, no, I can't go home.

6    **Q.**   Now, Mr. Toth asked you about your application for

7    employment.  Do you remember that yesterday?

8    **A.**   Yes.

9    **Q.**   Yesterday afternoon?

10   **A.**   Yes.

11   **Q.**   And on there you put that you graduated from Fort Payne

12   High School?

13   **A.**   Yes.

14   **Q.**   But you told us yesterday in direct that you got a GED?

15   **A.**   Yes.

16   **Q.**   Why did you put you on there that graduated from Fort

17   Payne High School?

18   **A.**   Well, I was kind of embarrassed.

19   **Q.**   Something else that he asked you about if you were

20   qualified to use equipment.  Now, does the term qualified does

21   that have a special meaning on the railroad?

22   **A.**   Yes.

23   **Q.**   And tell us what that means if you're qualified to use a

24   piece of equipment on the railroad.

25   **A.**   You're authorized, you're capable of operating the

1   equipment.

2   **Q.**   Were you qualified use all this equipment that appears on

3   Defendant's 20 on the railroad, like scissors lift and

4   front-end loader, and things like that?

5   **A.**   No, sir.

6   **Q.**   Now, he also talked about your job and he talked about

7   the pay that you earned at the IBEW?

8   **A.**   Yes.

9   **Q.**   It's shown here, is it 19.25 an hour?

10  **A.**   Yes.

11  **Q.**   And the job that you were applying for paid 15.70 an

12  hour?

13  **A.**   Yes.

14  **Q.**   Why in the world would you apply for a job making $4 an

15  hour less?

16  **A.**   I always heard the railroad was a stable job, that, you

17  know, once you get on, you know, you always have a consistent

18  pay and a consistent job, and by me working at IBEW I worked

19  three months, and I'm laid off, don't know when I'm going back

20  to work.  So I had to kind of weigh my options.

21  **Q.**   And the IBEW would you work 40 hours a week year round?

22  **A.**   No, sir.

23  **Q.**   At the railroad you did?

24  **A.**   Yes.

25  **Q.**   Where did you earn more money, at the railroad or at

1    IBEW?

2    **A.**    The railroad.

3    **Q.**    Mr. Toth spent a lot of time asking you about the

4    distances between various steps.  And I think one distance

5    that he asked you about is the distance between here and this

6    step.  Does the distance between this step and this step vary

7    depending upon what end of the step you're on?

8    **A.**    Yes.  Yes, it's not horizontal.

9    **Q.**    Have you ever gotten a measuring stick out and measured

10   all these distances that Mr. Toth asked you about?

11   **A.**    No, sir.

12   **Q.**    When you get out of the cab of the truck, when you're

13   getting out of the truck, do you first stand up in the

14   floorboard and then step out onto the platform?

15   **A.**    I step out onto the platform.

16   **Q.**    All right.  Let's talk about the Form 22 that you filled

17   out, your report of injury, which is Plaintiff's Exhibit 30.

18   Who helped you fill that out?

19   **A.**    Mr. Tommy Thornhill, the track supervisor.

20   **Q.**    Is he in management?

21   **A.**    Yes.

22   **Q.**    Were you nervous when you filled that form out?

23   **A.**    Yes.

24   **Q.**    Why is that?

25   **A.**    I knew I had a chance of being --

1    **MR. TOTH:**  Objection, Your Honor.  I think we know

2  subject to Court rulings, and I'm upset about this.  Can we

3  discuss this?

4    **THE COURT:**  Yes, we can.

5  *(SIDEBAR)*

6    **MR. TOTH:**  Your Honor, that question, I'm not saying it

7  was intentionally inviting anything.  In fact, I'm saying it

8  wasn't intentionally inviting anything.  But the response we

9  were about to get was that he scared something was going to

10  happen to him, he was going to be disciplined and he might

11  lose his job.  That's essentially what he says in his

12  deposition, he was worried about what may happen to him.  The

13  Court's already ruled that, you know, those issues, that's

14  just for punitive purposes, the Court's ruled that out.  In

15  fact, he consented that he wouldn't make any punitive

16  arguments, but if he elicits testimony that implies that there

17  were ramifications for him reporting a personal injury, we're

18  interjecting punitive arguments into the case that are

19  improper.

20    **MR. LAMPROS:**  Your Honor, it's not punitive arguments.

21  They did, in fact, charge him with a rule violation.  I don't

22  know how he knows what he's going to answer.  I'm not going to

23  get into the termination.  I've instructed him not to get into

24  the termination.  They did, in fact, charge him with a rule

25  violation.  He's entitled to explain his state of mind when he

1    was filling out that form.

2        THE COURT:  What's the rule violation got to do with

3    filling out the form -- I assume that's what he's nervous

4    about.

5        MR. LAMPROS:  That's what he's nervous about and what

6    the consequences of a rule violation are.  You know, the rule

7    violation, the one they charged him was not doing work in a

8    safe manner.

9        THE COURT:  Well, at this point whether or not they did

10   ultimately charge him has got nothing to do with his

11   nervousness at the time he was filling out the form.

12       MR. LAMPROS:  Right.  All his testimony is going to be

13   is that he was worried he would be charged.  I think he

14   started -- and we can look at transcript.  The way I heard his

15   answer was he knew that there was a chance that he could be

16   charged with a rule violation and he could be disciplined.

17       MR. TOTH:  This is just his back door effort to

18   litigate wrongful discharge.

19       THE COURT:  No, no.  I mean, he's not talking about

20   whether or not he was charged or whether or not he was

21   discharged.  You've raised the issue of the inconsistency

22   between his testimony and what you say is the inconsistency --

23   I assume you'll say -- an inconsistency between his testimony

24   and what's on that form, and he's entitled to explain why he

25   put what he did on the form.  He can't talk about what

1    happened or didn't happen subsequently.

2         MR. LAMPROS:  Okay.

3         MR. TOTH:  Are you going to allow him to say that he

4    was concerned that he might be disciplined?

5         THE COURT:  Well, what I understand him to say is he

6    was concerned that he might be charged with a rule violation.

7    In fact, as I understand what you're saying he should have

8    been.  That's your contention is he violated the three points

9    of contact.

10        MR. TOTH:  And he's appealed the discipline.

11        THE COURT:  We're not getting into what happened.  All

12   this involves is his simply of mind.  He's trying to explain

13   why he said what he said in response to the point you've made

14   about what he said in that form.

15        MR. TOTH:  If he wants to say he's nervous because a

16   management official is sitting there with him, and he was

17   concerned and nervous when he'd never filled one of these

18   reports out, I think that's fair, but to sit there and imply --

19        THE COURT:  But that's not apparently the truth.  The

20   true is he was worried he might be charged.  It sounds to me

21   like you'd say that he's got good reason to be worried.  You

22   don't have to take that position, but this is a completely

23   different issue that we talked about with regard to his

24   discipline.  There is simply what was going through his head

25   and what he contends is an explanation for why he did what he

1    did.  I'll allow that.

2    *(BENCH CONFERENCE CONCLUDED)*

3         **THE COURT:**  All right, ladies and gentlemen, since

4    we've interrupted things already, why don't we go ahead and

5    take our mid-morning break.  We'll take about 15 minutes and

6    we will remain seated while you go to the jury room.

7    *(Jury Excused, 10:20 a.m.)*

8    *(RECONVENED; ALL PARTIES PRESENT)*

9         **THE COURT:**  You may be seated, and let's bring the jury

10   in.  Mr. Lampros, you may continue.

11   **BY MR. LAMPROS:**

12   **Q.**   Mr Windom, before the break I asked you if you were

13   nervous when you filled out Plaintiff's Exhibit 30, which is

14   Norfolk Southern Form 22?

15   **A.**   Yes, I was.

16   **Q.**   And why were you nervous?

17   **A.**   I knew that I would get in trouble.

18   **Q.**   Mr Windom, is there any doubt in your mind which step you

19   slipped from on August 6, 2010?

20   **A.**   No, there's no doubt.

21   **Q.**   And which step is that?

22   **A.**   That was the middle step.

23   **Q.**   Point it out.

24   **A.**   That one right there.  That one right there.

25   **Q.**   Do you wear a knee brace today?

1    **A.**   Yes.  Yes, sir.

2    **Q.**   Do you wear it every day?

3    **A.**   Yes, sir.

4    **Q.**   Do you think you could go back and do the job as a track

5    welder safely given the condition of your knee?

6    **A.**   I don't -- I wouldn't think I could.

7          **MR. LAMPROS:**  That's all I have.

8          **MR. TOTH:**  Nothing else, Your Honor.

9          **THE COURT:**  All right, Mr. Windom you may step down.

10   Mr. Lampros, you may call your next witness.

11         **MR. LAMPROS:**  I call Tom Birmingham for cross

12   examination, Your Honor.

13         **COURTROOM DEPUTY:**  Do you solemnly swear that the

14   testimony you are about to give in this case shall be the truth,

15   the whole truth, and nothing but the truth, so help you God?

16         **THE WITNESS:**  I do.

17         **COURTROOM DEPUTY:**  Please state and spell your name for

18   the record.

19         **THE WITNESS:**  Thomas James Birmingham.  Birmingham is

20   B-I-R-M-I-N-G-H-A-M.

21                    **THOMAS JAMES BIRMINGHAM**

22      **Witness, having first been duly sworn, testified on**

23                      **CROSS EXAMINATION**

24   BY MR. LAMPROS:

25   **Q.**   Mr. Birmingham, good morning.

1    **A.**   Good morning.

2    **Q.**   I'm Andrew Lampros.  We've met before.  You are an

3    employee of Norfolk Southern?

4    **A.**   Yes, sir.

5    **Q.**   You're a manager, right?

6    **A.**   Yes, sir.

7    **Q.**   And tell the jury how long you've been with the company?

8    **A.**   I've been with the railroad 36 years and Norfolk Southern

9    since 1999.

10   **Q.**   And Norfolk Southern's headquarters are in Norfolk,

11   Virginia, right?

12   **A.**   Yes, sir.

13   **Q.**   And they also have some offices up in Atlanta, right?

14   **A.**   Yes, sir.

15   **Q.**   And one department that Norfolk Southern has is the

16   vocational rehabilitation department, correct?

17   **A.**   I don't know if that's a department.

18   **Q.**   But they do have an area called vocational

19   rehabilitation, right?

20   **A.**   Yes, sir.

21   **Q.**   And tell us what the vocational rehabilitation department

22   or division, or whatever you would call it, what it does?

23   **A.**   Hmm, to the best of my understanding it is to assist

24   employees who are unable to work their regular job to find

25   another job.

**Q.**   And they assist in finding other jobs in the company or outside the company?

**A.**   I believe it to be both.

**Q.**   And they assist them with retraining, right?

**A.**   I think that's part of it.

**Q.**   And they will send an employee back to school, correct?

**A.**   I believe so, yes, sir.

**Q.**   And you've worked in the past with the vocational -- let's just call it a department for our purposes today. You've worked in the past with the vocational rehabilitation department, haven't you?

**A.**   I don't work there with them, no, sir.

**Q.**   That's all I have.

        **THE COURT:**  Any direct examination?

        **MR. TOTH:**  None, Your Honor.

        **THE COURT:**  May Mr. Birmingham be excused?

        **MR. LAMPROS:**  Yes, Your Honor.

        **THE COURT:**  All right, thank you, Mr. Birmingham.  You are excused.  Mr. Lampros?

        **MR. LAMPROS:**  Yes.  We like to play the video deposition of Dr. Joseph Slappey.

        **THE COURT:**  Ladies and gentlemen, you are about to hear the testimony of Dr. Slappey.  You've heard his name mentioned before.  He is testifying by deposition.  A videotaped deposition.  He was -- you'll hear an oath was administered to

1   him.  You should consider his testimony just as you would

2   consider any witness who comes into court and testifies from

3   the witness stand.  About how long is the deposition?

4       **MR. LAMPROS:**  Approximately an hour.

5   *(Videotape of Dr. Joseph Slappey Played in Open Court)*

6       **THE COURT:**  Let me mention one thing about the

7   videotape deposition, ladies and gentlemen.  You might have

8   noted some skips in the video a couple of times.  In the past

9   I've had some jurors who wondered what is going on there and

10  maybe if there's anything improper going on.  No, the

11  videotape is edited to deal with objections and other issues.

12  Any video -- or any editing of the videotape is done under the

13  Court's supervision.  So don't draw any conclusions from the

14  fact that there may be a skip or appear to be a skip in the

15  video.  It's all been presented to you with the assistance of

16  lawyers and based on rulings by the Court.  All right.  It's

17  12:15.  It's obviously time to take a lunch break.  Please be

18  back in the jury room by 12:30.  We'll remain seated while you

19  go to the jury room.

20  *(Jury excused)*

21      **THE COURT:**  All right, what's up this afternoon,

22  Mr. Lampros?

23      **MR. LAMPROS:**  Your Honor, we have experts and Mrs.

24  Windom.  Moving along.

25      **THE COURT:**  All right.  We'll be in recess until 1:20.

1    *(RECONVENED; ALL PARTIES PRESENT)*

2         **THE COURT:**  All right.  Anything before we bring the

3    jury in?

4         **MR. LAMPROS:**  Just a couple of housekeeping matters,

5    Your Honor.  We have two experts we're getting ready to call.

6    Is there any reason why Dr. Thompson needs to sit outside?

7    He's the economist?

8         **THE COURT:**  Well, the general rule is that the rule

9    does not apply to experts.

10        **MR. TOTH:**  I don't think he based any of his opinions

11   though on what the vocational rehabilitation expert is going

12   to add.

13        **THE COURT:**  That would make it even less necessary for

14   him to be sequestered.  I mean, I don't know.

15        **MR. LAMPROS:**  I don't know that he wants to come in.  I

16   was just going to give him that option instead of sitting in

17   the hallway.  The other thing is the defendant has a number of

18   exhibits that need to get tendered in, and then I have

19   Plaintiff's 11 and 15 that I'd like to go ahead and tender as

20   well.

21        **THE COURT:**  Have they been identified?

22        **MR. LAMPROS:**  They're initial disclosures and

23   supplemental initial disclosures.

24        **THE COURT:**  What's the relevancy at this point?

25        **MR. TOTH:**  Well, I'm not going to publish it to the

1    jury; I just want to get them into evidence.

2          THE COURT:  Well -- no, I guess they're not on the

3    record.  You just want to make a record of them --

4          MR. LAMPROS:  Yes.

5          THE COURT:  -- but they don't need to be trial

6    exhibits.

7          MR. LAMPROS:  Not yet.  But there will come a point.  I

8    anticipate there'll come a point where I'll need them.

9          THE COURT:  Well, in that event we can admit them into

10   evidence.  But --

11         MR. LAMPROS:  Okay.

12         THE COURT:  Why don't we wait until that point, if it

13   arises?

14         MR. LAMPROS:  Okay.  I think that's it for housekeeping.

15   Their exhibits to be tendered.

16         THE COURT:  All right.  And as far as the defendant's

17   exhibits they really need to be tendered in the presence of

18   the jury.  So at some point, Mr. Toth, just be ready to do

19   that.  I don't think there's an issue as to any that you

20   identified so far.

21         MR. LAMPROS:  And I'm tendering my copy -- you used my

22   copy of the tax returns, but we'll tender them as a

23   plaintiff's exhibit.

24         THE COURT:  Yeah, well, that's the way we handled it.

25   It was tendered as Plaintiff's Exhibit 46.

1    MR. LAMPROS:  And I'll go ahead and do that when they

2  come back in.

3    THE COURT:  I think -- it's been done.

4    MR. LAMPROS:  Has it been done?

5    THE COURT:  Yeah.  We did not change the number on

6  that.  Are we ready for the jury?  Bring them in.

7  (Jury In, 1:35 p.m.)

8    THE COURT:  All right, Mr. Lampros, you may proceed.

9    MR. HANNON:  Your Honor, the plaintiff calls Dr. Benson

10  Hecker.

11    COURTROOM DEPUTY:  Do you solemnly swear that the

12  testimony you are about to give in this case shall be the truth,

13  the whole truth, and nothing but the truth, so help you God?

14    THE WITNESS:  I do.

15    COURTROOM DEPUTY:  Thank you.  Will you please state

16  and spell your name for the record.

17    THE WITNESS:  My name is Benson Hecker.  B-E-N-S-O-N.

18  H-E-C-K-E-R.

19                       **BENSON HECKER**

20      **Witness, having first been duly sworn, testified on**

21                     **DIRECT EXAMINATION**

22  **BY MR. HANNON:**

23  **Q.**   Good afternoon, Dr. Hecker.

24  **A.**   Good afternoon.

25  **Q.**   Doctor, what do you do for a living?

1   **A.**   I'm a vocational expert, vocational rehabilitation

2   expert.

3   **Q.**   Will you briefly tell the jury your educational

4   background, please?

5   **A.**   Educationally, I left high school in the senior year,

6   1951, and joined the Navy, and then received my GED while in

7   the Navy.  And then after the service I had a bachelor's

8   degree from Springfield College in Massachusetts in recreation

9   and youth leadership.  I have a master's degree from Michigan

10  State University in rehabilitation counseling, a doctorate in

11  rehabilitation counseling in psychology, University of

12  Maryland 1972, and post-doctoral studies, University of

13  Florida in life care planning -- life care planning, 1996.

14  **Q.**   Doctor, could you give us just a brief description of

15  what the field of voluntary rehabilitation is?

16  **A.**   Vocational rehabilitation is a study -- a field of study

17  and practice where you work with people who have physical and

18  or emotional problems.  You do testing, counseling, job

19  placement, testifying in situations in various courts as part

20  of the process.

21  **Q.**   Doctor, what is briefly your work experience in the field

22  of vocational rehabilitation?

23  **A.**   What I'll try to do is give you the most relevant as

24  relates to the profession.

25  **Q.**   Please.

**A.**   I worked at a home for juvenile delinquents for two years as a house parent, director of physical education in a mental institution, a counselor for the neighborhood youth corps for summer programs for placing innocent youths in jobs in Michigan and Washington, DC.  Director of rehabilitation at the Athens Retardation Center.  Assistant professor in rehabilitation counseling, University of Georgia.  And I've been self employed for approximately 40, 45 years doing what I do.

**Q.**   And as a part of your self employment now do you do any work for any governmental agencies?

**A.**   Yes, sir.

**Q.**   Which agency?

**A.**   I'm on the list of vocational experts for the Social Security Administration.  What we do is we testify in a proceeding as to whether a person is able to perform work or doesn't have the ability to perform work given age, education, vocational background, skills.  We have to be able to read medical records, be sitting on hearings, and we also respond to hypothetical questions from the judge and from the claimant's attorney giving those same factors.

**Q.**   Essentially you're serving as an expert in social security proceedings?

**A.**   Yes, sir.

**Q.**   How long have you been serving as an expert in Social

1    Security Administrative proceedings?

2    **A.**   I'm going on my 41st year.

3    **Q.**   And when you do that type of work, who pays your fee?

4    **A.**   The government.

5    **Q.**   Can you tell me, give me any approximation of how many

6    times you've served as an expert?

7    **A.**   A very rough guesstimate, over 10,000 cases.

8    **Q.**   Is -- how does the work you are retained by the

9    government to do in social security cases compare to the work

10   you've been asked by us to do in this case?

11   **A.**   Basically it's the same.  Instead of sitting in on a

12   hearing, I did an interview.  So that's basically the same.  I

13   formulated an opinion the same way I would formulate an

14   opinion in those types of cases.

15   **Q.**   Well, Doctor, in order to formulate that opinion did you

16   review any documents in this case?

17   **A.**   Yes, sir.

18   **Q.**   Well, tell me, please, what documents you reviewed in

19   order to form your opinion?

20   **A.**   Medical records reviewed was South Georgia Medical

21   Center, Valdosta, Georgia, 8/11/10.  Dr. Mann, 8/19/10 through

22   8/25/10.  Valdosta Orthopedic Associates, 8/13/10 through

23   9/9/10.  Southeast Orthopedics, 9/7/10.  Orthopedic

24   Rehabilitation and Surgery Centers, 10/7/10.  Forsyth Street

25   Ambulatory Surgery Center, 10/20/10.  And Rehabilitation

1    Physicians of Georgia, 5/10/11.

2    **Q.**   In addition to reviewing those medical records and

3    documents you mentioned you had the opportunity to interview

4    Mr Windom?

5    **A.**   I did.

6    **Q.**   When did that interview occur?

7    **A.**   Sir?

8    **Q.**   When did that interview occur?

9    **A.**   Okay.  The interview, the in-person interview was

10   November 19, 2011.  There was a follow-up telephone

11   conversation with him subsequent to that period of time.

12   **Q.**   During that interview, did he give you any information

13   regarding his educational background?

14   **A.**   He did, sir.

15   **Q.**   Can you tell me just generally what information he

16   relayed on you and that you relied on?

17   **A.**   Let me get -- I don't want to shuffle too much.  With

18   regard to education, Mr. Windom completed his high school

19   education in 1989, and he received an associate degree in

20   industrial maintenance from Ben Hill-Irwin Technical College,

21   in 1993 through 1995.  And from Middle Georgia Technical,

22   2000, he also obtained his commercial driver's license, the

23   CDL.

24   **Q.**   And that's the extent of his formal education?

25   **A.**   Yes, sir.

**Q.**   Did he give you any information regarding his -- excuse
me, his work history?

**A.**   Yes, sir.

**Q.**   What information is that?

**A.**   His work history is as follows.  Norfolk Southern, from
1/2005 through 8/5/2010, active as a track repairman whose
duties involved operating machinery, labor type activities,
welding, walking on uneven ballasts, being exposed to various
weather conditions with paid benefits including $22.80 per
hour, plus time and a-half pay for overtime, with two weeks
vacation, 11 or 12 holidays, and per diem expenses.  He also
performed work as an electrician through the union as a
journeyman, the IBEW, was $18.25 per hour.  Tacompsa Products
as a maintenance person for six years.

**Q.**   Okay.  In addition to talking with him about what his
work history was, did Mr. Windom also give you any information
regarding any functional or physical difficulties that he was
having?

**A.**   What I try to do with all my people is I do what we call
a systems approach.  I start from the head and work down to
find out what problems they're having in various areas and
then see how that correlates with the medical records.  With
regard to Mr Windom, he noted with regard to his head that his
senses were intact.  In other words, he was able to see, hear,
and talk well.  He was able to demonstrate a full range of

1    motion of his head, and headaches were described as occurring

2    normally.  In other words, no problems with his head.  No

3    problems were noted also with his shoulders.  Demonstrated a

4    full range of motion in his hands and arms, as well as his

5    chest, stomach, and hips.  So basically from the waist up or a

6    little bit below the waist up, no problems were defined by Mr.

7    Windom.

8    Q.    How about from the waist down, what did he relay to you?

9    A.    With regard to his lower extremities, on the right side

10   Mr. Windom described increasing fatigue and pain.  And using a

11   pain scale, and we use a pain scale from one to ten, with one

12   as being very -- none or very mild, increasing to ten as

13   severe.  Mr. Windom stated that his pain with limited

14   activities ranged from three to four slash ten, which was mild

15   to moderate or very basically little pain.  He did say,

16   however, that activities increase his pain to five, six levels

17   or moderate levels.  On the left side, Mr Windom reported

18   having surgery on October 20th, 2010.  Pain was described as

19   six to ten or moderate with limited activities.  Let me

20   explain what limited activities means.  Limited activities is

21   the ability to sit and stand at your own convenience.  No

22   significant amounts of turning, twisting, lifting, carrying,

23   or putting a lot of stress on that lower extremity.  So with

24   limited activities he had pain which was described as

25   moderate.

**Q.**   Now, did he describe to you how he was in any way coping or dealing with this pain?

**A.**   Well, let me just further state that if he increased his pain -- his activities, which involve the activities I've described, such as stooping, squatting, balancing, turning, twisting, climbing, exposure to cold weather, his pain would increase to 7-8 levels, or moderately severe.

**Q.**   Okay.  So activity increased his pain, and then what did he describe, if anything, regarding coping mechanisms or how he would deal with that?

**A.**   He stated that in order to help his pain he's required to stop activities, change positions, take medication, elevate several hours daily, and use a spa.

**Q.**   And with regard to the various movements you just alluded to, stooping, squatting, balancing, et cetera, did you ask him question regarding his ability to do those types of activities?

**A.**   These are where we get into his ability to function.  He stated that he was able to sit for approximately one hour comfortably.  He stated that standing and walking he's able to do that comfortably for about 30 to 35 minutes.  Now, there is a concept that we use, and the word is comfortably.  In other words, a person may be able to sit, stand, or walk longer, but comfortably means that you're not experiencing pain to the point that it becomes distracting.  Now, lifting and carrying,

1   he was able to lift and carry a gallon of milk, groceries and

2   15 to 20 pounds comfortably.  He stated that stooping,

3   squatting, balancing, climbing steps, turning, twisting, these

4   types of activities were possible, but they had to be

5   performed carefully and with pain while performing them.

6   **Q.**   Okay.

7   **A.**   He stated in terms of sleeping that he was able to sleep

8   three to four hour in shifts because of his pain and states

9   that he often sleeps on the floor to help his symptoms.

10   **Q.**   Did you discuss with him whether or not he was taking any

11   medication?

12   **A.**   As far as medications he stated that he was taking

13   Naprosyn, an antiinflammatory, a pain medication, he's had

14   injections, he's using braces, and physical therapy.

15   **Q.**   And did you speak with him specifically about what

16   activities in his daily life he was able to perform or not

17   perform?

18   **A.**   Yes, sir.

19   **Q.**   What did he tell you?

20   **A.**   He stated that he was able to drive.  He was able to

21   shop.  He was able to attend church, perform light household

22   activity or chores and socialize.  He also stated that he does

23   not cut grass, participate in sports or perform any vehicle or

24   house maintenance, in other words, the heavier types of

25   activities.

**Q.**   Dr. Hecker, do you need any additional information other than what you just outlined for the jury in order to render your vocational rehabilitation opinion in this case?

**A.**   No, sir.

**Q.**   And tell me what opinion you've reached as a result of the information we just heard?

**A.**   My opinion is really divided into three parts.  The first part is when I consider his age, education, vocational background and transferable skills, he would have been classified as a good employment prospect.  Without any physical and or emotional problems, he would have been a good employment prospect with a fairly wide range of jobs for which he would have been able to compete.  However, most probably would have maintained his work for the railroad because of the higher salaries he was able to earn and benefits as a result of that employment.

**Q.**   Just to be sure I understand you, this first part of your three part is if he hadn't been injured at all?  Do I understand you correctly?

**A.**   Yes, sir.

**Q.**   Okay.  And essentially he was a good prospect, but he had a great job to begin with?

**A.**   He had a job that was paying extraordinarily well.

**Q.**   Okay.  Tell me then what is the second part of your, I guess, three-part opinion?

**A.**   The second part of my opinion is as follows.  Again, we use age, education, vocational background, and skills, and when I consider his impairments, limitations, and continuing pain, it was my opinion that Mr. Windom was unable to perform any substantial gainful work activity which exists in significant numbers in open competition with others, period.

**Q.**   Okay.  Now, that second part that you just outlined, explain to the jury the rationale that underlies the opinion that you just read, that he cannot perform substantial gainful work activities that exist in significant numbers?

**A.**   Mr. Windom sustained a work-related injury to his left lower extremity with treatment involving evaluations, surgery, pain medication, antiinflammatory agents, physical therapy, braces and other conservative measures, period.  Despite all of these treatments he was still limited in his ability to sit, stand, walk, climb, turn, twist, stoop, squat, and balance.  Additionally, he still experiences chronic moderately severe pain which required him to stop activities, change positions, take medications, elevate and lower -- and elevate his lower extremities for several hours per day.

**Q.**   Dr. Hecker, and let me ask you this, if you would look -- we talked about work, what work would require specifically light and or sedentary work.  What basic functions would he be required to maintain at that level of work?

**A.**   I think we have to look at work, any kind of work

1  requires what we call basic work activities:  Physical

2  activity, mental activities.  Any work at light and/or

3  sedentary levels would require sitting, standing, walking,

4  paying attention, concentration, or maintaining tasks for

5  prolonged periods of time.  Work would involve using his upper

6  and or lower extremities rapidly, repetitively, continuously

7  for using tools or for operating machinery in order to meet

8  production quotas.  He would also be required to effectively

9  get along with significant others, such as co-workers,

10  supervisors, the general public, be able to deal effectively

11  with normal work stresses when meeting production quotas.  And

12  he would also have to be able to maintain work station and or

13  attendance regularly.

14  **Q.**   Okay.

15  **A.**   Now --

16  **Q.**   Well, given those requirements you've just outlined and

17  Mr. Windom's impairments, in your opinion is he employable?

18  **A.**   No, sir.

19  **Q.**   And why not?

20  **A.**   Given the limitations that I've identified, he's not able

21  to perform the basic work activities on a regularly sustained

22  basis which would be required in a work environment.

23  **Q.**   Dr. Hecker, I'd like to then ask you some questions about

24  the third part or the last part of your opinion.  I guess just

25  begin by briefly telling me what that last part of your

1    opinion is?

2    **A.**   The last part is making an assumption that Mr. Windom is

3    able to control his pain, is able to maintain an eight hour a

4    day, five-day a week workplace environment on a sustained

5    basis.   I think that the basic assumption that we're making

6    here is if he had no impairments, no limitations, or he was

7    able to control them to the point that he could perform those

8    that there would be work that he could perform.   And I would

9    hope that that's where he would be because that's the hope of

10   rehabilitation people is to try to get people back to work so

11   that they can perform some type of activity which would be

12   gainful and meaningful.

13   **Q.**   Okay.  But if you -- I would ask you to assume for the

14   sake of rendering this opinion that that is some day true,

15   what is your opinion on his employment prospects given that

16   optimistic scenario?

17   **A.**   We look at light and sedentary work for Mr Windom.   Now,

18   perhaps I can define those two terms.

19   **Q.**   Please, sir.

20   **A.**   Sedentary work, utilizing the Dictionary of Occupational

21   Titles from the Department of Labor -- which is a very basic

22   document that all rehabilitation people use.   The government

23   uses it in their social security hearings -- sedentary work is

24   defined as the ability to sit at least six of eight hours a

25   day.   Lifting requirements are ten pounds occasionally, unless

1    more frequently, such as ledgers, dockets, books, things like

2    that.  Light work using the same documents is defined as the

3    ability to lift 20 pounds on an occasional basis, ten pounds

4    frequently, stand and/or walk at least six of eight hours a

5    day.  Those are the two definitions that I utilized in looking

6    at work for Mr. Windom because of the problems he was having.

7    **Q.**   So given those definitions -- and I want you to then

8    assume that he's able to control his pain or that he becomes

9    able to control his pain and able to perform work activity on

10    a sustained basis, what is his vocational outlook at that

11    point?

12    **A.**   Looking at light and/or sedentary work, manufacturing

13    durable and nondurable goods, counter sales and retail, such

14    as an automobile parts place is an example or rental.  Light

15    delivery.  Unarmed security.  Entry level clerical work.

16    Hotel-motel clerk, but small.  And cashier work, and those are

17    just families of jobs.

18    **Q.**   Well, what do those type of jobs pay?

19    **A.**   Those jobs range in pay from $8 to $11 per hour.

20    **Q.**   And are they typically full time or part time?

21    **A.**   Typically the full-time work would be manufacturing, the

22    factory work.  The other types of jobs are generally part-time

23    jobs about 32 hours a week, and the reason that they do part

24    time is so that the employer doesn't pay benefits, hospital,

25    medical, dental, and other kinds of benefits that one would

1    normally expect in a full-time job.

2    **Q.**   Doctor, did you do any research regarding the

3    unemployment rates in the area where Mr Windom lives?

4    **A.**   Yes, sir.

5    **Q.**   What did you find?

6    **A.**   When we begin -- all right.  When I initially wrote this

7    report the national average for unemployment for all people

8    was 9.0.  As of June 12th -- I mean, June 2012 the

9    unemployment rate nationally is 8.2.  For the State of Georgia

10   initially 10.2; currently 8.9.  For Wilcox County, the county

11   where Mr. Windom lives, it was initially 14.0 and currently 11.5.

12   **Q.**   Doctor, assuming that he is able to return and compete

13   for light or -- and or sedentary work, what are some of the

14   difficulties he might face given his situation?

15   **A.**   I think the most obvious ones are the high unemployment

16   rates that we have.  So the difficulty would be finding a job,

17   number one.  Number two, he also has to be able to compete

18   with people who have no impairments for those same jobs.  So

19   the probability of finding those jobs or obtaining and

20   maintaining those jobs is greatly reduced.

21   **Q.**   So in summary -- well, let me ask you this, can you

22   summarize your three-part opinion for us?

23   **A.**   Yes, sir.  Very, very briefly.  Under item A, assuming no

24   impairments, no limitations, prior to any impairments, he

25   would have been a good employment prospect, but most probably

1    would have stayed with the railroad because of the higher

2    salary levels and benefits --

3         **MR. TOTH:**  Objection, Your Honor.  I don't think it's

4    proper for this witness to speculate in this particular area.

5    He can certainly offer expert opinions as to what his

6    employment prospects or possibilities are, but to predict and

7    speculate as to the future of Mr. Windom is far too

8    speculative for this witness.

9         **THE COURT:**  Well, one, he testified to that 20 minutes

10   ago without objection.  And, two, I don't think he's saying

11   what you're saying.  He's simply saying he'd likely stay where

12   he was if he wasn't hurt.  Is that correct, Doctor?

13        **THE WITNESS:**  Yes, sir.  Yes, Your Honor.

14        **THE COURT:**  Okay.

15        **MR. TOTH:**  Thank you, Your Honor.

16   **BY MR. HANNON:**

17   **Q.**   Doctor, if you would please, summarize the last two parts

18   of your opinion again, please, sir.

19   **A.**   Under B, given impairments or limitations, continuing

20   pain and need for elevation, need for further treatment, he is

21   not employable at present.  And number three, which is the

22   area I would hope he would be, would be if we assume that he

23   can control his pain, control the need for elevation, and

24   maintain an eight-hour a day, five-day a week, 50 week a year

25   work schedule.  I've identified job salary levels for you.

1   **Q.**   And what is that salary level?

2   **A.**   Salary 8 to 10 dollars -- eight to 11 an hour.

3   **Q.**   Thank you, Doctor.

4         **THE COURT:**  Cross examination?

5         **MR. TOTH:**  Yes, Your Honor.

6                      **CROSS EXAMINATION**

7   BY MR. TOTH:

8   **Q.**   Good afternoon, Dr. Hecker.

9   **A.**   Mr. Toth, how are you doing?

10  **Q.**   Good.

11  **A.**   Good to see you again.

12  **Q.**   Good to see you, sir.  The jury's probably now figured

13  out I've taken your deposition and have some idea of what your

14  report is, and I want to ask you --

15  **A.**   Will you do me just one favor, please.

16  **Q.**   Yes, sir.  Yes, I'm sorry, is that better?

17  **A.**   I can't turn these up any higher, but it's okay.  It's

18  okay -- thank you.  Oh, good.  Thank you.

19  **Q.**   I'll do my best --

20  **A.**   No, that's fine.

21  **Q.**   -- just give me a hand signal if you need that, sir.

22        **MR. TOTH:**  Ms. Hatcher, is this screen on?  Thank you,

23  ma'am.

24  BY MR. TOTH:

25  **Q.**   I don't want to skip around here a little bit, but I just

1    want to make sure that I heard what I believe you said to the

2    jury that it's your opinion that Mr. Windom is unable to

3    perform any substantial gainful employment on page 11 of your

4    report unless something changes for the better?

5    A.   Yes, sir.

6    Q.   And just so we're clear, this opinion that you've reached

7    was based upon your review of all the medical records that you

8    identified by provider name, correct?

9    A.   Yes, sir.

10   Q.   And your opinion is also based upon your interview of

11   him, correct?

12   A.   Yes, sir.

13   Q.   And if I recall this correctly, you drove from

14   Greenville, South Carolina to a hotel in Atlanta where this --

15   Mr Windom's law firm is located and sat down with him and then

16   I believe thereafter another person to conduct interviews

17   during that visit?

18   A.   Yes.  It was a conference room, yes, sir.

19   Q.   And the travel time you charge is $300 per hour?

20   A.   Yes, sir.

21   Q.   And how long does it take you to get to Atlanta?

22   A.   About two and a half hours.

23   Q.   And I believe since you were seeing two people that day,

24   if I remember this correctly --

25   A.   Yes, sir.

**Q.**   -- you cut Lampros somewhat of a break and split the fee
in terms of what you charge?

**A.**   Yes, sir.  I didn't want to bill twice.

**Q.**   You weren't going to charge two different clients for
traveling, correct?

**A.**   Absolutely.  Same way for the hotel, it was divided in
half.

**Q.**   And I believe that in your file you have an invoice for
the first charge that you provided for your -- for your
interview part of your report and that's, let's see, $1,637?

**A.**   That may be correct.

**Q.**   Is it in your file, sir?

**A.**   I don't have my bill in front of me.

**Q.**   Well, what did you bring with you today, sir?

**A.**   I -- I brought my report.

**Q.**   I'm sorry, sir?

**A.**   My report.

**Q.**   Okay.

**A.**   My handwritten notes.

**Q.**   Yes, sir.

**A.**   I'm sorry, I -- I do have the bill.

**Q.**   And did I state it correctly?

**A.**   Yes, sir, $1,637.

**Q.**   Is that it?

**A.**   I'm sorry.  That's just blank paper.  I have some

1   research material that I brought with me that I also used.

2   **Q.**   Did you use that to form your opinions?

3   **A.**   The research -- this is current -- I didn't use, however,

4   this is indicative of prior research which has been done which

5   helped me formulate my opinion.

6   **Q.**   Well, maybe moving along, did you rely upon that research

7   in rendering any of your opinions today?

8   **A.**   Through -- the answer has to be yes, because through the

9   years the research that's here is consistent with what I have

10  been trained to do, to listen to, through continuing

11  education, through classes, through various arenas.  So, yes,

12  it is consistent.

13  **Q.**   Okay.  And I'm just trying to get a handle on, first,

14  what you're charging today.  When I came up to take your

15  deposition, and I think I spent about two and a half hours,

16  you charge me $900, correct?

17  **A.**   You were closer to three.

18  **Q.**   $300 an hour?

19  **A.**   No, you were closer to three hours.

20  **Q.**   Okay.  And you charged me $900?

21  **A.**   Yes, sir.

22  **Q.**   And you didn't charge me any more than what you charged

23  Mr. Lampros, did you?

24  **A.**   No, sir.

25  **Q.**   Did you come down last night?

1    **A.**    Yes, sir.

2    **Q.**    And you charged for your travel time?

3    **A.**    Yes, sir.

4    **Q.**    Do you plan on going back today?

5    **A.**    I hope so.

6    **Q.**    So how many additional hours are you going to have in

7    this case at $300 an hour?

8    **A.**    About eight, maybe ten.

9    **Q.**    So on the high end we can make this another $3,000?

10   **A.**    Yes, sir.

11   **Q.**    So for your testimony today something less than $5,000,

12   not counting what I paid you?

13   **A.**    My testimony?  No, my time, not my testimony.

14   **Q.**    I'm sorry, your time to provide testimony?

15   **A.**    Yes, sir.

16   **Q.**    And isn't it true, Doctor, this is the first time you've

17   ever testified live in court in Georgia against a railroad

18   defendant, correct?

19   **A.**    No, sir.

20   **Q.**    You've testified in Georgia before a jury -- let me start

21   the question over.  Have you testified live in trial on behalf

22   of a defendant in Georgia?

23   **A.**    Never on behalf of the defendant because I've never been

24   called by the defendant.

25   **Q.**    And if I understand from your deposition testimony, about

1   95 percent of the testimony you do is on behalf of plaintiffs,

2   correct?

3   **A.**   For my private work, yes, sir.

4   **Q.**   Excuse me?

5   **A.**   For my private work, yes, sir.

6   **Q.**   And would it be fair to say that you went through your

7   educational background to offer this jury support for the

8   opinions that you reached, and I think you discussed at least

9   in part that people with a vocational rehabilitation

10  background will often try to help people get back to the work

11  force, correct?

12  **A.**   That's part and parcel of their job, yes, sir.

13  **Q.**   And what have you done for Mr. Windom to help him find a

14  job?

15  **A.**   I was not asked to provide the services.  I was asked to

16  provide an evaluation.

17  **Q.**   Would it be fair to say you haven't helped anybody get

18  back to work in the last four or five years?

19  **A.**   No, sir.  I've not been asked to -- at least not for,

20  hey, I've tried -- see, I've got another part of my practice

21  which is a very small part of my practice, and that is people

22  come to me, they ask me for advice with regard to schooling,

23  with regard to work, who they can contact to try to get work.

24  That, I do.  But I don't list that as part of pay.  That's a

25  -- I guess you'd call it my pro bono.

**Q.**   And I believe you've mentioned you've done that two or three times in the last four or five years, got involved in a pro bono case?

**A.**   Yes, sir.

**Q.**   So fair to say, Doctor, primarily you're in the litigation consulting business at this point of your career?

**A.**   I'm in the rehabilitation field, litigation is part and parcel of my work.  It may involve a lot of it.  But that's part of it, the other work I do.

**Q.**   Did you read Mr. Windom's first or second deposition in this case at any point in time?

**A.**   No, sir.

**Q.**   You relied completely upon your interview of him, correct?

**A.**   Yes, sir.

**Q.**   And you mentioned several times about all the pain that he discussed during the interview.  You don't give them any tests as a vocational rehabilitation expert to determine whether or not you feel like he's being forthright and honest with you, you're taking his word for it, correct?

**A.**   I have to take his word for it, but his pain and the treatment that he's received for his pain is consistent.  And in terms of what he presented to me you might use the term forthright.  Everything that he presented to me did not show any signs of malingering, trying to avoid an issue.  He was

1   very pleasant and very forthcoming in what he expressed.

2   **Q.**   Does pleasant equal honesty to you, sir?

3   **A.**   Sir?

4   **Q.**   Does pleasant equal honesty?

5   **A.**   I'm not sure -- I can't hear.

6   **Q.**   I'm sorry, Doctor, I'm doing the best I can --

7   **A.**   It's all right.

8   **Q.**   -- without trying to bother the jury here.  Does pleasant

9   equal honesty?

10   **A.**   Does pleasant do what?

11   **Q.**   Equal honesty, forthrightness in your mind?

12   **A.**   He was a pleasant person as he presented himself to me.

13   He was forthright as he presented what he said to me and what

14   he said to me coincided with the medical records.  The medical

15   records did not identify any problems with his upper

16   extremities, chest, stomach, back, hips.  He didn't say he had

17   any of those.  So the correlation between what he said to me

18   and what he presented -- what was presented in the records was

19   consistent.

20   **Q.**   So you are looking at those medical records to see if

21   they support what he's telling you about his pain levels,

22   correct?

23   **A.**   Pain levels and receipt of medication, receipt of

24   treatment, yes.

25   **Q.**   And those medical records assist you in reaching your

1    opinions as to how you reached your ultimate three opinions in

2    the case as you broke them down, correct?

3    **A.**    The medical records, as well as what he is indicating.

4    **Q.**    Now, his wife was there.  You didn't interview her, did

5    you?

6    **A.**    No, sir.

7    **Q.**    Is that not your practice?

8    **A.**    Not really.

9    **Q.**    At times you do interview spouses to get their opinions

10   on things?

11   **A.**    If the plaintiff or the claimant or the client, however

12   you want to call it, is not able to effectively communicate

13   with me, and the person has brought -- has brought that person

14   to the interview, I will then interview that person.  But in

15   this particular case, I noted that his -- he was able to

16   speak, hear, and think effectively, so there was no need to

17   interview somebody else.

18   **Q.**    And, of course, in the capacity you work as a vocational

19   rehabilitation expert offering testimony here, I believe you

20   said in South Carolina, Georgia, maybe Florida one time, are

21   you often provided with a functional capacity examination by a

22   physician?

23   **A.**    Yes, sir.

24   **Q.**    And you had one in this particular case too that you

25   referred to in your report, don't you?

**A.**    Yes, sir.

**Q.**    Well, tell the jury about what those limitations are from the functional capacity report that was done by Dr. Howard, a rehabilitation physician in Atlanta?  I believe I'd refer you to page six of your report --

**A.**    All right.  The --

**Q.**    Before you get started -- let me show this to Mr. Lampros -- I show you Defendant's Exhibit 22, which I represent to you is your report.  And just so we can all be on the same page here, let me -- is it on Ms. Hatcher?  Okay.  If you would tell the jury the information you received from the functional capacity examination?

**A.**    The orthopedic -- I'm sorry, the Rehabilitation Physician of Georgia, 5/10/11, notes that he was complaining of left knee joint pain and that he underwent surgery.  And that he was reporting left knee pain which adversely affects his weight bearing, standing.  Standing pain score was five to 10, which is moderate.  And it had adversely affected his walking, exercising, prolonged standing, sexual activity increased his pain, and that he had continuing pain with weight bearing aggravated by bending, interfering with his gait, and he was using a cane on the right side.  And they gave you a diagnosis.  With regard to the functional capacity assessment they stated that he could sit for eight hours a day, stand and walk four hours a day, each, climb frequently, lift 50 pounds,

1    carrying 30 -- 35 to 50 pounds, pushing and pulling up to 75

2    pounds, bending constantly, frequently, constantly squatting,

3    twisting frequently and upper extremity use was unrestricted.

4    That's the functional capacity assessment.

5    **Q.**   And, Doctor, if I understand this correctly in terms of

6    category, that is moderate, moderate plus.  What does that

7    mean to you if you were trying to apply it to the Department

8    of Labor job classifications that you discussed earlier?

9    **A.**   First of all, there is no definition in the Department of

10   Labor with regard to -- I'm sorry, what was -- moderate to

11   moderate plus.  The definitions that they use are light,

12   sedentary, medium, heavy, and very heavy.  Those are the

13   definitions.  So, the definition that they give here of

14   moderate to moderate plus is not a definition.

15   **Q.**   Would it be most similar to medium of the classifications

16   in the Department of Labor Dictionary and Occupational Titles?

17   **A.**   We could use and make that assumption if we want to.

18   **Q.**   Well, let go through this.  You are very familiar with

19   the medium job classification?

20   **A.**   Yes, sir.

21   **Q.**   For a Department of Labor job title?

22   **A.**   Yes, sir.

23   **Q.**   What do they provide in terms of a medium job

24   classification in terms of sitting?

25   **A.**   Sitting?

1   **Q.**   Yes.

2   **A.**   Sitting if you use medium, you have to use light and

3   sedentary also as part of that definition.

4   **Q.**   I understand.

5   **A.**   So sitting then has to be for at least six to eight hours

6   a day.

7   **Q.**   Okay.  Here we have eight hours per day out of an

8   eight-hour day.  That is a little different there.  I got you.

9   On the next one?

10   **A.**   Yes, sir.

11   **Q.**   What would the medium level provide in terms of number of

12   hours a day a person can stand?

13   **A.**   Standing, according to the definition, standing and/or

14   walking is six of eight hours a day.

15   **Q.**   So this one provides for a little less in terms of the

16   standing then, correct?

17   **A.**   Yes, sir, that's correct.

18   **Q.**   And what does the medium Department of Labor dictionary

19   standard provide for walking out of eight-hour day?

20   **A.**   As I said, standing and/or walking six of eight hours a

21   day.

22   **Q.**   I'm sorry, what about climbing at medium --

23   **A.**   They don't identify climbing, but let me just state that

24   when we begin to look at medium work activity, medium work

25   activity may involve stooping, squatting bending, lifting,

1  carrying, turning twisting and balancing.  That's the physical

2  activities involved for medium work.

3  Q.  Okay.  Does medium work under the Department of Labor

4  guidelines allow a person to lift up to 50 pounds?

5  A.  I'm sorry?

6  Q.  Does the medium level job classification for the

7  Department of Labor allow a person to lift up to 50 pounds?

8  A.  Up to 50 pounds occasionally, which means one-third of

9  the day.

10  Q.  Okay.  And does the medium level job classification allow

11  that person to carry up to 35 to 50 pounds?

12  A.  That's within that framework, yes, sir.

13  Q.  And does the medium level job classification allow a

14  person to push and pull up to 75 pounds?  Not lift, but push

15  and pull?

16  A.  That would be most probable.

17  Q.  And does the medium level job classification allow

18  bending frequently and constantly?

19  A.  As I said, the bending, stooping, squatting, all of those

20  activities that I identified, would have to be done either

21  frequently for that kind of activity.

22  Q.  And the medium level job classification provide for

23  squatting frequently?

24  A.  Yes, sir.

25  Q.  Twisting frequently?

1   A.   Yes, sir.

2   Q.   And does the medium level job classification allow

3   unrestricted use of the upper extremity?

4   A.   Well, if he has unrestricted use of his upper extremities

5   the term sedentary, light, medium, heavy, and very heavy is

6   really a nonentity.

7   Q.   And if I understand your direct examination questions

8   presented to you by Mr. Hannon that, in fact, you didn't know

9   from your review of the records or your interview of him any

10  problems with his upper extremities?

11  A.   Well, when I interviewed him he didn't identify any

12  problems and I've already stated that.

13  Q.   So if I understand you correctly, despite this functional

14  capacity examination file that was in your file, that you

15  certainly looked at or had the opportunity to look at that

16  comes up with a moderate-moderate plus functional ability, it

17  contains many of the same type of limitations or definitions

18  of a medium level job classification for the Department of

19  Labor.  And I know we're splitting hairs here a little bit.  I

20  just want to see how much we can agree on.

21  A.   All right.  I think now what you have to look at --

22  Q.   Can we agree on that, Doctor?

23  A.   I would agree on that.

24  Q.   Okay.

25  A.   That's what that says.  I have to agree.  But I think you

1    have to go further than just a one-time functional capacity

2    assessment.  A functional capacity assessment is provided for

3    a very limited time frame in very controlled environment.  And

4    they try, after an hour of examination, to extrapolate what he

5    can do for that short time frame into eight hours a day, five

6    days a week regularly, and that's not possible.  That's like

7    saying if I could run a four-minute mile in a controlled

8    environment, then I ought to be able to go outside and run an

9    eight-minute mile -- two miles -- a 12-minute 3 miles, which

10   is not possible.  The point that I'm trying to make is in a

11   controlled environment he may be able to do that, but it's

12   difficult to extrapolate that on a regular and continuing

13   basis.

14   **Q.**   So if I in putting these -- this together right in my

15   head, although you're looking -- you'll take the truth, the

16   examination, for that period of time, but you're concerned

17   about him being able to have that capacity ten years in the

18   future to do those activities?

19   **A.**   Not in the ten year -- yes, sir.  Okay.  And then we have

20   to go one step further.  My opinion as a rehabilitationist is

21   not to see how much the person can do maximally.  As a

22   rehabilitation person we have to see what he can do over the

23   long haul which is comfortable which would not allow him to be

24   hurt again.  It would allow him to maintain a satisfactory

25   work environment.  So, you place him in an environment which

1    would allow him to sit or stand at his own convenience.  We

2    allow him to perform work which would be lighter lifting.

3    That protects his life work expectancy.  And I've been

4    involved in too many social security hearings where people who

5    have had surgical procedures have gone back to the kind of

6    work they were doing and have been reinjured.  And I don't

7    want to get involved in that kind of a situation with Mr

8    Windom.

9    Q.   And I asked you in your deposition if you could identify

10   any of those people, and you said no, correct?

11   A.   And the reason I -- and I thought about that afterwards,

12   and I can't -- even if I knew, I couldn't tell you because

13   that's protected information.

14   Q.   Well, and likewise you couldn't tell me how many people

15   went back to work at what the functional capacity exam said

16   they do on that slice of time and work that to a full age of

17   60, 63, 65.  You can't tell me that either?

18   A.   I can't tell you that because those are the people we

19   don't see.

20   Q.   What we don't get the benefit of, you say you want to put

21   him in the most conservative job you can as in sedentary or

22   light duty to maximize his opportunity, but you're speculating

23   that's the best thing for him because you can't say within a

24   reason degree of your professional certainty as a vocational

25   rehabilitation expert that more people will not make it to

1    their full retirement age, returning to the medium level, for

2    example, as opposed to those that are placed in a light duty?

3    A.   My concern --

4    Q.   If you can just answer the question first?

5    A.   I'm sorry.

6    Q.   You can't answer that, can you?

7    A.   I can't tell you the exact numbers, but I can tell you my

8    concerns.  I deal with people through social security through

9    my practice, people who have been injured, people who have had

10   multiple surgical procedures.  People who attempted to go back

11   to work, and that's fine.  I think that bodes well for their

12   motivation.  But then I also see them on the rebound after

13   they have been reinjured having the same complaints prior to

14   their initial treatment, and I don't really want to get into

15   that situation.  I want to protect.  It's kind of like --

16   Q.   You don't want to take a chance is what you're telling

17   this jury?

18   A.   Sir?

19   Q.   You don't want to take a chance?

20   A.   I don't want to take a chance on them getting hurt.

21   Q.   Okay.  One of the questions I also asked you was whether

22   or not you did anything to identify what jobs were available

23   in the Wilcox County area.  Do you recall those questions?

24   A.   I don't remember that exact question but I did look up

25   the unemployment rate for Wilcox.

1  Q.   I understand.  And did you review your deposition that I

2  took in this case prior to your testimony today?

3  A.   I believe I did.

4  Q.   When did you do that?  Last night?

5  A.   No.  As a matter of fact, the weekend.

6  Q.   And you charged for that time as well?

7  A.   No, sir.  I tell you, in terms of a bill, I haven't

8  really identified a bill yet.  I've not come up with any

9  invoice or anything.

10  Q.   Well, you're not here out of the goodness of your heart?

11  A.   Well, I'm here like you, I get paid for my time.

12  Q.   Exactly.  And you mentioned some pro bono cases you took,

13  but with the exception of a few pro bono cases, four or five

14  years ago, that's the only work that you doing where you don't

15  get paid, correct?

16  A.   Of course.  I work; I get paid.  You work; you get paid.

17  Q.   I asked you if you looked at the newspaper in Tifton,

18  Georgia or Albany, Georgia or Cordele, Georgia or Macon as I

19  recall.  Do you remember if you looked at any newspaper

20  classified advertisements to see what may be available for Mr

21  Windom?

22  A.   I have not looked at any newspapers or any job openings.

23  What I have given you with regard to jobs are jobs which exist

24  in those areas that you've described.

25  Q.   Well, if Mr Windom -- if you were as a vocational

1    rehabilitation expert or someone with your PhD, your

2    doctorate, your background, if he hired you -- if he hired you

3    to try to help him find a job, what would you do to try to

4    help him find a job?  Would you go to the classified

5    advertisements in the newspapers?

6    **A.**    I'd go to the Department of Labor.  Would be one, it

7    would be the first place.

8    **Q.**    What about the newspaper?

9    **A.**    Newspapers.  Newspapers are a good source, but they

10   really don't tell the whole picture because they may identify

11   a job, but they really don't identify how many people apply

12   for those jobs.  So as an example, they may say we have an

13   opening as a maintenance person.  How many people would be in

14   competition or competing for those jobs?  We don't know.  So--

15   but that may be a source just to identify jobs.

16   **Q.**    And I recall you saying that you would not want anyone

17   with the injury that Mr Windom has traveling or commuting more

18   than an hour to work each day; that's correct?

19   **A.**    Everything that I -- that we talk about professionally

20   within my professional organizations -- I'm sorry if I'm

21   whispering -- whistling.  Everything that we talk about in our

22   organizations, you use a standard, and the standard is one

23   hour traveling distance from home is really the maximum.  So

24   when we begin to look at Macon, some of the other major

25   metropolitan areas, they're more than hour from his home in

1    Abbeville.

2    **Q.**   I believe you identified as major metropolitan areas from

3    your expertise, background, those communities that would have

4    more than a hundred thousand people?

5    **A.**   Yes, sir.

6    **Q.**   And do you have the ability to identify those communities

7    within a hundred miles of Wilcox County where this gentleman

8    resides, Mr Windom?

9    **A.**   A hundred miles?

10   **Q.**   Yes, I believe that's what you said.

11   **A.**   Well, first of all, a hundred miles would make traveling

12   distance two hours, at least.  So to have me look for jobs for

13   two hours away, even in Macon, which is an hour and a half, is

14   really just a waste of my time.

15   **Q.**   And I think we agreed that with your testimony you often

16   commute five, six, seven, eight hours to provide your opinions

17   at various trials throughout the southeast, correct?

18   **A.**   Yes, sir.  Yes, sir.

19   **Q.**   And isn't it true, Dr. Hecker, that in the last three

20   years you as a vocational rehabilitation expert or background

21   in this vocational rehabilitation, I believe you agreed with

22   me or you commented you had seen an increase in the number of

23   people who have had to move to find employment and relocate

24   their families?

25   **A.**    Yes, sir.  But I think we also have to look at Mr Windom.

1   That's a number of folks is very general.  You have to look at

2   Mr Windom.  His wife is a teacher.  She has 17 years in the

3   community.  He also has -- let me just make sure.  He has

4   family, two brothers, nieces.  So he has a history of being in

5   and ties within his community.  To make his wife get up and

6   move to another community is really not realistic.  To make

7   him leave a small town to go into a large city is really not

8   realistic.

9   **Q.**   But it's done by people all the time, isn't it, if you've

10   got -- it's done by people all the time, isn't it?

11   **A.**   It's done by people all the time, but we have to narrow

12   people to Mr. Windom and bring it to him.

13   **Q.**   It may not be preferred, but people do it all the time,

14   don't they, sir?

15   **A.**   It may not be.  I have to agree with you.  It's done all

16   the time.  In Mr. Windom's case, which what I'm dealing with

17   is what have to look at.

18   **Q.**   And we talk at length about the Department of Labor job

19   classifications, and I think you've educated me they're

20   actually 12,300.  Have I got that right here in my notes?

21   **A.**   The Dictionary of Occupational Titles identifies 12,300

22   jobs.

23   **Q.**   And you agree with me by taking the most conservative

24   approach, and I believe the term you used is to protect his

25   work life future by putting him in a job that is sedentary,

1    you're eliminating thousands of jobs that could be available

2    to him in the medium category, which is what the FCE in your

3    file indicated he was capable of performing or performing at

4    least, understanding during that window of time in that

5    controlled environment, that it was done by a physician,

6    correct?

7    A.   I'm eliminating medium, heavy, and very heavy jobs.

8    Q.   So you agree with me?

9    A.   Yes, sir.  I thought I just said I did.

10   Q.   And would you be eliminating as much as 75 percent of the

11   12,300 jobs that are out there per the department of

12   occupational job classifications?

13   A.   If they exist at medium, heavy, and very heavy, yes, sir.

14   Q.   Is 75 percent too high a number, Doctor?

15   A.   Sir?

16   Q.   Is 75 percent too high a number?

17   A.   It may be little bit high.

18   Q.   What would you put that number at, sir?

19   A.   About 60.

20   Q.   Now, when you're providing your opinions to this jury

21   about what you feel like he's capable of going back to do, in

22   your interview you certainly talked to him about what he had

23   done before which bring him certain skills that, you know,

24   that maybe this gentleman back here may not have.  You've got

25   to talk to him and find out what his life work experiences

1    are, correct?

2    **A.**   Yes, sir, that's correct.

3    **Q.**   And were you provided with a copy of the employment

4    application that he gave to Norfolk Southern that contained

5    his educational background and his employment history?

6    **A.**   I was not provided with that document.  I was provided

7    with an educational history that he provided.

8         **MR. TOTH:**  Your Honor, before I publish this, I'd like

9    to go ahead and move Defendant's Exhibit 20, which was

10   discussed at length by Mr Windom in his deposition, identified

11   by Mr Windom.

12        **THE COURT:**  I think it was even published then.  Any

13   objection?

14        **MR. HAMMON:**  No, Your Honor.

15        **THE COURT:**  It's admitted without objection.  What's

16   the number on that again?

17        **MR. TOTH:**  Defendant's Exhibit 20, Your Honor.

18   BY MR. TOTH:

19   **Q.**   Dr. Hecker, can you see the top portion of that?

20   **A.**   Yes, sir.

21   **Q.**   And I would just represent to you this was the employment

22   application that was submitted by --

23        **MR.  HANNON:**  A redaction issue, Your Honor.

24        **THE COURT:**  I assume you're covering up personal

25   information not relevant to any issue in this case, right, for

1    the jury's benefit probably relating to his wife?

2         **MR. HANNON:**   In compliance with the local rules for

3    redacting social security numbers, Your Honor.

4         **THE COURT:**   Right.   Ladies and gentlemen, we do have

5    rules these days requiring some personal information such as

6    social security numbers be covered up so that they don't get

7    out there where they can be misused.   So what they're doing

8    now is what we expect the lawyers to do.

9    **BY MR. TOTH:**

10   **Q.**   Okay.   May I just direct you to what we've marked as

11   Defendant's Exhibit 20 and under personal history, can you

12   identify that as at least Paul T. Windom who you previously

13   interviewed and you're here about today?

14   **A.**   That's Paul T. Windom, yes, sir.

15   **Q.**   And do you agree with me where it says "referred to this

16   company by the newspaper?"

17   **A.**   Yes, sir.

18   **Q.**   And if I can refer you there to position desired is track

19   laborer, and then there's an indication:   Information about

20   your interests, skills, and abilities:   And then -- parens

21   typing, shorthand, computer hardware, software, tools,

22   machinery, and equipment you can operate.   Are you able to

23   identify certain skills that Mr Windom brought with him to the

24   railroad in 2005?

25   **A.**   Where were you reading, please?

1   **Q.**   I can point --

2   **A.**   Thank you.

3   **Q.**   Right here, sir.

4   **A.**   Okay.  It's really difficult -- some of it's difficult to

5   read.  So perhaps you can read it for me.  Oh, is it forklift?

6        **THE COURT:**  Yes.

7   **BY THE WITNESS:**

8   **A.**   The next word I can't see.

9   **Q.**   Would be scissors lift?

10  **A.**   Scissors lift, okay.

11  **Q.**   I'm not sure of the next one.  Front-end loader?

12  **A.**   Front-end loader.  Bulldozer.

13  **Q.**   Bulldozer?

14  **A.**   Right.  Cherry picker.  Sure.

15  **Q.**   Backhoe, potentially?

16  **A.**   Yes, sir.

17  **Q.**   Bridge machine?

18  **A.**   All right.

19  **Q.**   And educational background, is that consistent with what

20  you put in your report?

21  **A.**   I believe so.  We have high school, Middle Georgia --

22  yes -- Technical College, yes.

23  **Q.**   Do you have anything in there about Pearson Tech?

24  **A.**   About what, please?

25  **Q.**   It would be page six of your report under education.  Do

1    you have anything in there about under college and university

2    that says Pearson Tech?

3    **A.**    No, he didn't identify that.  He didn't indicate that he

4    attended that.  Just what I had in my report.

5    **Q.**    And just taking you now to page two about his employment

6    history, and if you can just refer back to your report where

7    you identified what he was earning when he was working with

8    the International Brotherhood of Electrical Workers?

9    **A.**    Yes.  18.25 an hour.  And it said, over here I believe,

10   starting salary 18.50.

11   **Q.**    And that does nothing to really change any opinions you

12   have in this case, does it?

13   **A.**    No.

14   **Q.**    Does your report mention a Irby Construction and what his

15   skills were there, sir?

16   **A.**    It doesn't -- let me just see.  No, it doesn't -- let me

17   just -- no, sir.  Construction work.

18   **Q.**    Okay.  And his duties there were brown bucket truck?

19   **A.**    He was a machine operator.

20   **Q.**    And did you ask Mr Windom what kind of grades he made in

21   high school?

22   **A.**    I believe he made if I remember correctly, I think about

23   a 3.2.

24   **Q.**    And I believe you indicated that that type of grade point

25   average in high school would put him at a competitive edge of

1    other people with an equal education level that maybe didn't

2    do so well grade-wise in high school?

3    **A.**    I think that that would put him in a good position, but I

4    think we have to also understand how a 3.2 may differ from

5    school to school.  So while that may look good on paper, a 3.2

6    from a small school may not mean the same as it would, let's

7    say, in Atlanta or some other larger city.  But it is a good

8    grade point average according to that high school.

9    **Q.**    Were you aware he had a commercial driver's license?

10   **A.**    I believe I stated that in my report.

11   **Q.**    I'm sorry, I didn't mean to make you restate yourself.

12   And does that also give him a competitive edge in pursuing

13   jobs if he elected to do so in the medium level job

14   classification?

15   **A.**    He was machine operator.  Various types of machines.  So

16   he had the ability to operate machines.  Now, machines are

17   performed if we look at driving, for example, a truck driver.

18   According to the DOT is medium.  DOT Dictionary of

19   Occupational Titles is medium, low semi-skilled.  He operated

20   heavy equipment for the railroad.  Medium again.  Low

21   semi-skilled.  So we would add the capacity to operate

22   machinery.  No argument.  That doesn't give him a competitive

23   edge at light and sedentary levels.

24   **Q.**    That's because in your vocational opinion you're only

25   willing to consider light and sedentary jobs for him, correct?

**A.**   Yes, sir.  For the reasons stated.

**Q.**   And I may have gotten confused.  You're not excluding Mr. Windom from jobs driving a tractor trailer or something over the road.  You talked about he was a machine operator.

**A.**   I'm excluding that.

**Q.**   Okay.  I want to be clear, I'm sorry.  And we discussed whether or not you felt like he could be a maintenance supervisor or a hotel clerk based upon some of his prior work experiences that you were made aware of, and it was your opinion you didn't not think he could do that, correct?

**A.**   That's correct, if --

**Q.**   That's medium level?

**A.**   Well, it's not only medium, and at times it may even be heavy when you're changing out motors, when you're changing out air conditioning units, you're doing much more than medium work.  And, in addition, you're also doing a significant amount of physical functioning that he has difficulty with.

**Q.**   Doctor, would you agree with me that someone 41 years of age -- Doctor, would you agree with me that someone 41 years of age who has the exact same skills as someone who is 61 years of age has a competitive advantage in seeking jobs within whatever the physical limitations are that have been imposed upon him?  That may be right.  I'm just saying, do you feel like with your expertise they would have a competitive advantage of age?

**A.**   You're only using it based on age?

**Q.**   Yes.

**A.**   Certainly a person 41 years old with the same skills as a person 61 years old would have a competitive advantage.

**Q.**   And, Doctor, none of the opinions that you've offered here today take into account the fact that Mr Windom might get better, do they, sir?

**A.**   I would hope that he would get better.

**Q.**   But do your opinions take that into account today, sir?

**A.**   My opinions do not take into account whether he gets better, and they don't take into account the fact that he may get worse.

**Q.**   Well, if he got worse the only thing that does is, what, eliminate the sedentary and light jobs that you feel like he may be able to work if he can control his pain levels and find something in the sedentary or light duty job position after -- after he becomes pain free or controls his pain?

**A.**   I would hope he would become pain free.  I would hope that he would be able to maintain work on a regular continuing basis.  That is what we all hope for.

**Q.**   But just so I'm clear, when you leave here today and drive back to South Carolina, your professional opinion to this jury as of today Mr Windom is not qualified to work any particular job from a vocational standpoint, that's your opinion?

1   **A.**   Given -- given his present condition.  But I would hope

2   and I would like to see him get better so that he could

3   perform work.

4   **Q.**   That's all I have right now, Doctor.  Thank you for your

5   time today.

6   **A.**   Thank you, sir.

7   **Q.**   And have a safe trip back.

8           **THE COURT:**  Redirect?

9                    **REDIRECT EXAMINATION**

10  **BY MR. HANNON:**

11  **Q.**   Dr. Hecker, you were shown, this is Defendant's 20, it's

12  been previously admitted, and asked a question about Pearson

13  Tech there at the bottom.  And I believe it indicates it's a

14  fibra optics course.  Let me ask you this, would him taking a

15  fibra optics course for two or three weeks and receiving some

16  sort of a certificate some years ago, we know it would have to

17  be at least before 2004, would that change your opinions in

18  any way today?

19  **A.**   No, sir.

20  **Q.**   How about the knowledge that at some point from 1994

21  looks like -- I'll display that -- at some point from 1997 to

22  '99 he had a construction job?  Would that in any way change

23  your opinion?

24  **A.**   No, sir.

25  **Q.**   And why not?

**A.**   Well, again, the construction jobs, when you, again,

identify construction work, the operation of machinery is

called at least medium.  The labor function of a construction

laborer is called heavy and very heavy unskilled.  So it

wouldn't change my opinion.

**Q.**   Okay.  In discussing the functional capacity exam -- let

me ask you this, the functional capacity exam that you

discussed with him, is that actually in your report?

**A.**   It is.  It's on page five of my report.

**Q.**   Okay.  And in that functional capacity exam they use the

term frequently, does that have specific meaning for people in

your vocation?

**A.**   Yes, sir.

**Q.**   What is that?

**A.**   We use the terms constant, which means greater than

66 percent of the time; frequent, from one-third to two-thirds

of the time; and occasional, up to one-third of the time.

**Q.**   How about the term constantly?

**A.**   Constant is the -- is greater than 66 percent.

**Q.**   Doctor, I'm going to show you what was shown to you a

little bit earlier.  This is -- is this, in fact, a page from

your report?

**A.**   It's at page five of my report.

**Q.**   And it quotes from the functional capacity exam?

**A.**   Yes, sir.

**Q.**   And in rendering the opinions, the three opinions you

gave earlier today, did you consider this functional capacity

exam?

**A.**   Absolutely.

**Q.**   And you see it uses the term moderate to moderate plus.

What meaning that does that have in the Department of Labor's

-- or is that defined by the Department of Labor?

**A.**   It's not defined by the Department of Labor.  We had to

make the translation to medium work.  But moderate and

moderate plus is not defined in the Department of Labor.

**Q.**   And, in fact, it's not a term you use, is it?

**A.**   No, sir.

**Q.**   But when you consider this report, your opinion as I

understand it is that if he is able to control his pain he may

be able to return to light and sedentary work; is that right?

**A.**   That's correct.

**Q.**   Explain for the jury why -- explain for the jury then

again why you believe he is not able to do medium work?

**A.**   Well, I hope I'm not repeating myself.  One, we begin to

look at medium work as identified the lifting of 50 pounds

occasionally -- yeah, 50 pounds occasionally, 25 pounds

frequently, standing and walking at least six of eight hours a

day with significant amounts of bending, stooping, all the

physical functions, in my opinion those are limited by his

presentation by the medical records.  So in my opinion from a

1   vocational standpoint it's better to put those medium on the

2   side and let him function effectively at a light and sedentary

3   job.

4   **Q.**   Understanding that, if for some reason he had -- was

5   placed in a medium job, would he be able to work safely?

6         **MR. TOTH:**   Objection to the form of safely, Your Honor.

7   I don't know how we can define that term.   That is a very

8   broad term, and I think it's somewhat leading as well,

9   suggestive of an answer.

10         **THE COURT:**   Well, it's not leading.   It might be vague.

11   But I think the witness will have to tell us if he can answer

12   that question.

13   **BY THE WITNESS:**

14   **A.**   Thank you, Your Honor.   As far as safely is concerned, if

15   he has to perform those types of activities on a regular basis

16   in my opinion that would not be classified as, quote, safety

17   or safely.   He should be eliminated from being in a position

18   to perform those activities.

19   **Q.**   Well, let me ask it this way:   What are the risks he

20   faces if he does?

21   **A.**   Risks certainly are reinjury and the need for more

22   medical treatment, increasing pain.   Those would be the risks.

23   And, again, I don't want to be involved in a situation which

24   places him in that area.

25   **Q.**   You had discussions with Mr. Toth -- you spoke with Mr.

1    Toth about getting better or -- let me ask you this.  Your

2    opinion C, or the third opinion that you outlined for the jury

3    earlier, does that -- if not assuming he gets better, does

4    that make some assumptions -- optimistic assumptions?

5    **A.**   That's an optimistic assumption at where I hope he would

6    be.

7    **Q.**   And what assumptions are those that you base your third

8    opinion on, as opinion C?

9    **A.**   The assumptions are that he controls his pain, that he is

10   doesn't have to elevate, that he doesn't require more

11   treatment, that he's placed in a situation where he is not

12   involved in activities which would present the opportunity or

13   the high probability for reinjury.

14   **Q.**   And that's light and/or sedentary?

15   **A.**   Yes.

16   **Q.**   Thank you, Doctor.

17             **THE COURT:**  All right, may -

18             **MR. TOTH:**  Just one follow up, Your Honor?

19             **THE COURT:**  Okay.

20                         **RECROSS EXAMINATION**

21   **BY MR. TOTH:**

22   **Q.**   Just so I'm sure, you just told counsel that you did not

23   want to be involved in getting him hurt.  You're not making

24   any decisions or recommendations to Mr. Windom about where he

25   should go back to work and what type of job classification,

1   you're just consulting for purposes of the litigation, not

2   trying to get him back to work in a particular classification,

3   correct?

4   **A.**   In essence what I'm telling him -- that's not correct.

5   What I'm telling him is to look for work when he's able to at

6   light and sedentary levels.  That's what I'm telling him.

7   **Q.**   Are you telling him or are you telling the jury?

8   **A.**   I'm sorry?

9   **Q.**   Are you telling him or are you telling the jury?

10  **A.**   Whoever.  The jury.

11  **Q.**   That's all I have.

12       **THE COURT:**  All right.  May the witness be excused?

13       **MR. HANNON:**  Yes, Your Honor.

14       **THE COURT:**  Dr. Hecker, you are excused.  Thank you.

15       **THE WITNESS:**  Thank you, Your Honor.

16       **THE COURT:**  We will take our afternoon break.  It'll be

17  about 15 minutes.  We'll remain seated while the jury goes to

18  the jury room.

19  *(Jury Excused; 3:12 p.m.)*

20       **THE COURT:**  All right, we'll be in recess for

21  15 minutes.

22  *(RECONVENED; ALL PARTIES PRESENT)*

23       **THE COURT:**  I gather you've got your economist next?

24       **MR. LAMPROS:**  Yes, Your Honor, Dr. Thompson.

25       **MR. TOTH:**  Your Honor, I just talked to Mr. Lampros

1    about going ahead and tendering the ones that we've discussed

2    and agreed upon, perhaps we can do that at this point if

3    that's all right with Your Honor.

4         **THE COURT:**  All right.  Well, let's bring the jury in.

5         **MR. TOTH:**  I'm sorry, yes.

6    *(Jury In, 3:35 p.m.)*

7         **THE COURT:**  All right.  Mr. Toth, you have some

8    exhibits to tender?

9         **MR. TOTH:**  Yes, Your Honor.  Defendant's Exhibit 1.

10        **THE COURT:**  Which is?

11        **MR. TOTH:**  The Form 22 personal injury report.  The

12   redacted -- Defendant's Exhibit 20, the redacted personal

13   information on the employment application.  Defendant's

14   Exhibit 9, getting on and off equipment.

15        **THE COURT:**  What was nine?

16        **MR. TOTH:**  I'm sorry.  Bulletin number five.

17        **THE COURT:**  Okay.  That's right.

18        **MR. TOTH:**  Defendant's Exhibit 7, 7-B, and 7-C.

19        **THE COURT:**  And those were the photographs?

20        **MR. TOTH:**  Yes, Your Honor.

21        **THE COURT:**  And there's no objection to those exhibits?

22        **MR. LAMPROS:**  None, Your Honor.

23        **THE COURT:**  Then they are admitted without objection.

24   All right, Mr. Lampros, you may call your next witness.

25        **MR. LAMPROS:**  Your Honor, the plaintiff calls Dr.

1    Richard Thompson.

2         **COURTROOM DEPUTY:**  Do you solemnly swear that the

3    testimony you are about to give in this case shall be the truth,

4    the whole truth, and nothing but the truth, so help you God?

5         **THE WITNESS:**  I do.

6         **COURTROOM DEPUTY:**  Please state and spell your name for

7    the record.

8         **THE WITNESS:**  G. Richard Thompson, T-H-O-M-P-S-O-N.

9                        **RICHARD THOMPSON**

10      **Witness, having first been duly sworn, testified on**

11                      **DIRECT EXAMINATION**

12   **BY MR. LAMPROS:**

13   **Q.**   Dr. Thompson, good afternoon.

14   **A.**   Good afternoon.

15   **Q.**   You've introduced yourself to the jury.  Would you please

16   tell us your occupation?

17   **A.**   I'm a professor emeritus of economics at Clemson

18   University in South Carolina.

19   **Q.**   And if you could please, give us a brief description of

20   your educational background?

21   **A.**   I have an undergraduate degree in economics from the

22   University of South Florida in Tampa which I received in 1966.

23   I have a PhD in economics from the University of Virginia

24   which I received in 1972.

25   **Q.**   And briefly describe for us your experience as a

1    professor?

2    **A.**    I started teaching in what is now -- a assistant

3    professor of economics in what is now the University of

4    Central Florida in Orlando.  I was assistant professor there

5    until 1974.  I left there and went to the University of South

6    Alabama in Mobile, Alabama as associate professor of

7    economics.  I had a visiting scholar program at Arizona State

8    University in, I believe, 1978.  I came back to South Alabama

9    as a professor of economics and later director of graduate

10   studies for the university.  I left there in 1982 and came to

11   Clemson University as assistant and then associate dean of the

12   college of business and professor of economics.  I was in the

13   administration up until 1993 when I left the administration

14   and went back on the facility full time as a professor of

15   economics.  I technically retired in 2006.  That's where the

16   professor emeritus comes from.  I continued teaching until

17   last semester.  I haven't decided whether I'm teaching next

18   semester yet or not.

19   **Q.**    Have you written or published any books or articles in

20   economics?

21   **A.**    I've published 30 something articles and monographs on

22   various topics in economics.

23   **Q.**    Have you written any articles pertaining to the type of

24   testimony you're here to give today?

25   **A.**    I have.  I've written articles relative to the type of

1    testimony that economists -- or the type of reports that

2    economists write and ultimately the testimony that they give.

3    Most of those have appeared in legal publications of one type

4    or the other.

5    Q.   Before today have you ever testified in federal court

6    before?

7    A.   I have.

8    Q.   What were you asked to do in this case?

9    A.   In this case I was asked to look at Mr. Windom's earnings

10   that he earned prior to the incident, to calculate what his

11   earning capacity or his ability to earn was, and then to

12   project that out until his expected retirement date.  Once you

13   project that earnings out, of course, you can simply add it

14   all up and come up with what economists refer to as lifetime

15   earnings.  That's the earnings he would earn in his lifetime.

16   And in a sense it's not very meaningful because it's earnings

17   that you earn some time in the future.  It is not earnings

18   that you have now.  So what you have to do is say, okay, what

19   is that equivalent to the earnings you would have now.  In

20   other words, how much would it take in order to replicate

21   those earnings over the rest of his life, and we call that

22   reducing it to present value.  The interim step in there, of

23   course, is you take taxes out, federal and state taxes that he

24   would have pay on his earnings in the future, and also to take

25   out the un-reimbursed business employee expenses that he would

have paid had he continued working.  Once we do that, we have

one final number left over which is economists refer to as the

net present value of future earnings.  And that's simply an

amount of money that you could take today, invest it at the

best rate you could get, and withdraw amounts each year equal

to the amount that you would have earned that year, and at the

end of the date that he would be expected to retire, there

would be nothing left.

I was also asked to make the same type of calculations

for his -- the cost of the fringe benefits that the railroad

provided him.  Railroads, as you might know, have very good

fringe benefits both in health and welfare and in pension

funds.  They have -- you can sort of break them down into

health and welfare benefits and pension benefits.  And I took

those from, you know, the railroad that he worked for and

projected those out over that same period of time.  You don't

take taxes out of that, of course.  You simply reduce it to

present value.  And we have a number that would say, all

right, this is the amount that you have to have today in order

to invest it to withdraw amounts equal to what they would have

paid for his fringe benefits up until his retirement date.

Q.   Are you here to tell the jury what Mr. Windom's lost

wages are?

A.   I'm sorry, sir?

Q.   Are you here to tell the jury what Mr Windom's lost wages

1   are?

2   **A.**   No, I'm not.  I don't make any decision whether they're

3   lost or not.  I'm simply here to say this is what he would

4   have earned had he continued working.

5   **Q.**   And we are paying you, our law firm is; correct?

6   **A.**   Yes, sir, I hope so.

7   **Q.**   And we pay you for your report and for your time?

8   **A.**   That's correct.

9   **Q.**   And we pay for your time to come down here and testify

10  today?

11  **A.**   That's correct.

12  **Q.**   And just tell briefly how much we paid for your time to

13  provide the report and the work you've done so far?

14  **A.**   I think I charged for the number of hours I put in on the

15  report, I think I charged a total of $750, if I recall

16  correctly which was paid, and that's for time that I spent

17  writing the report.  I charge $900 a day for testimony, and,

18  of course, the expense of getting here.

19  **Q.**   Now, we've talked about or you talked briefly about what

20  you did, and have you calculated the net present value of Mr.

21  Windom's railroad earnings?

22  **A.**   Of his earnings.  Yes, sir.

23  **Q.**   What information did you use to make your calculations?

24  **A.**   First of all, I took what he was actually earning at the

25  time that he was injured, and basically I took his earnings

1   for the year -- years 2007, 2008, and 2009.  The reason I did

2   that was that one of things that we know happens is that most

3   of our earnings are not constant.  As a matter of fact, I

4   don't know anybody's earnings who are always constant and

5   continue this perfect increase.  And so that the thing to do

6   is say, okay, let's find out if we can get some sort of

7   average, and the average we want to get is an average of

8   earnings, say, for three years or five years, or how many

9   years we have available, and denominate those earnings in the

10  last year.  In other words, if I take his 2007 earnings, I

11  want to say what is that equivalent to in 2009 and -- just by

12  the consumer price index.  And then once I have those three

13  years of earnings all in 2009 -- you add them together and

14  divide by three.  And in doing that I came up with $58,727

15  which would be the wages -- his earnings as of 2009.

16  **Q.**   His average earnings based on 2007, 2008, and 2009 is

17  $58,727; is that right?

18  **A.**   Right.  And he actually I believe as I recall from his

19  tax return he made more than that one of the years but he made

20  less than that one of the years too, so the average comes out

21  to $58,000.

22  **Q.**   I'm a little confused as to what you did with the

23  earnings in 2007 to bring them to 2009.

24  **A.**   Well, if you earn something in 2007, you say, well, how

25  much would you have to have in 2009 to buy the same amount of

1    goods you could buy in 2007.  And we're all familiar with the

2    concept of inflation.  Fortunately, one of the fortune aspects

3    of the situation of our economy today, we have very low rates

4    of inflation.  And matter of fact, inflation for 2009 was

5    actually negative, was negative four-tenths of one percent.

6    So you take the earnings in 2007 and increase them in 2008 by

7    the inflation rate in 2008, and then you decrease them to the

8    2009, and you have the equivalent earnings in 2009.  Do the

9    same thing for 2008 and then take the 2009, and you just get

10   an average.

11   Q.   So you didn't just add them together and divide them by

12   three?

13   A.   You added the final numbers together and divided by

14   three.

15   Q.   But not the -- you didn't take his tax returns numbers,

16   add those three together and divide them by three?

17   A.   No.  Obviously, if you want to take an extreme example

18   and go back, say, 20 years.  You know, 20 years, he may have

19   been earning like $10,000.  What would that be equivalent

20   today?  That's what you want to get and divide it.

21   Q.   And you just did that on a shorter period?

22   A.   I just did it for three years.  You could do it for five

23   years.

24   Q.   Did you also calculate the value of the fringe benefits

25   he would have received at Norfolk Southern?

1    **A.**    I calculate the value that he received based on the

2    information that I believe was provided by your office in

3    terms of what the --

4    **Q.**    I've put up on the --

5    **A.**    We have it right there.  That was provided to me by your

6    office which shows in 2009, based on his earnings in 2009, I

7    couldn't calculate what would they would have paid for him in

8    terms of fringe benefits.

9    **Q.**    Is this the sheet?

10   **A.**    That is the sheet.  This is the sheet over here.  The

11   first section up here is the railroad retirement benefits

12   which include tier one and tier two benefits.  For those not

13   familiar with it, tier one benefits are the same as what most

14   of us get in social security.  Railroad workers aren't under

15   the social security program.  They get tier one benefits which

16   is calculated identically to what the social security benefits

17   are.  The tier two benefits are basically the pension fund,

18   and the pension fund, the railroad paid 12.1 percent, up to

19   $79,000 -- $79,200 in income so they paid 12.1 percent on his

20   $58,000.  The bottom part down here -- the unemployment

21   insurance wasn't counted in.  The bottom, the health and

22   welfare, shows that they paid $13,346.52 for his medical,

23   life, accidental death, disability, occupational disability

24   insurance.  They did a similar number, slightly smaller, of

25   course, for his major medical.  Again, smaller for dental

1    insurance and smaller for vision insurance.  If you add all

2    those together, it comes to a total of $15,554.80 they were

3    paying per year for his fringe benefits.

4    **Q.**   Are you talking about for the health and welfare or for

5    the --

6    **A.**   I'm sorry, that's for the health and welfare.  That's

7    just health and welfare, not the tiers one or two.  And if you

8    add everything together, they were paying a total basically of

9    $2,343.25 a month for his fringe benefits.

10   **Q.**   I'm sorry, Doctor, can you give us that number again?

11   **A.**   $2,343.25.

12   **Q.**   A month?

13   **A.**   Per month for his fringe benefits.  I believe that comes

14   to, if my math is correct, which I did very quickly, $28,119

15   per year.

16   **Q.**   Are those the baseline figures that you used?

17   **A.**   They are.

18   **Q.**   Doctor, I want you to assume that Paul Windom was born on

19   May 12, 1971, injured in the incident that occurred on

20   August 6, 2010 while working as a track welder for Norfolk

21   Southern and he last worked at that job on August 10, 2010,

22   and except for the injuries would have been expected to work

23   until he had 30 years of service when he was retirement

24   eligible.  I also want you to assume that his seniority date

25   was January 10, 2005, and he was retirement eligible

1    January 10, 2035.  Based upon that information along with the

2    average annual wage you've calculated for Mr. Windom, do you

3    have a reasonable degree -- do you have an opinion to a

4    reasonable degree of economic certainty as to what Mr Windom

5    would have earned had he been able to continue working in his

6    chosen occupation until retirement eligible?

7    **A.**    Yes, sir, I do.

8    **Q.**    And what is the future value of all his earnings?

9    **A.**    If we take his earnings and project it forward -- and

10   I'll come back in a minute to how we did that -- and project

11   it forward and add it all up, just simply add it up, it gives

12   us $3,021,781.

13   **Q.**    That seems like a big number.

14   **A.**    That's a big number.

15   **Q.**    How did you get that?

16   **A.**    We know that historically earnings for everybody in

17   society have increased.  You know, certainly there are times

18   when they increase less than other times.  If we go back to

19   the long period of time in the U.S. economy, taking into

20   account of all the periods of inflation where the wages

21   increased pretty rapidly to periods of like we're doing right

22   now when wages are not increasing pretty rapidly, and we

23   simply find out what the growth rate is from 1960 through --

24   to 1910, which is what I did, and the growth rate is

25   5.25 percent for that period of time per year for that period

of time.  Now, the growth rate and earnings of anybody whether
it be a railroad worker, a college professor, or attorney is
generally comprised of two elements, productivity, the
worker's productivity which sometimes we call the real growth
rate in earnings, or to be technical, the marginal efficiency
of capital, which doesn't mean much to anybody.  But it's
simply that real portion of productivity.  And that averages
probably two to -- two and three-quarters to three percent
most of the time.  And that -- and productivity increases are
caused by several things.  It's caused by increasing our
capital, our computer systems.  Our computer systems have
increased productively significantly, so we've become more
productive because of that.  We've become more productive
because of our training, our experience.  We become more
productive because of our education, the courses we take.  All
of those create this productivity that come back and rewards
us with higher wage rates.  So that's part of that 5.24
percent -- 5.25 percent.  The other part of it is the price
index.  You know, wages are affected by inflation.  Inflation
affects wages.  Now, you don't get the full benefit of
inflation, but you get a good chunk of the inflation.  And so
if you look at the -- you know, you don't want to work for
wages that stay the same or decrease if prices of stuff you're
buying goes up.  And so we -- and employers know that, and the
demand for labor goes up instead of the wages.  So, anyway,

1    those two things comprise that long-term growth rate in

2    earnings; inflation and productivity.

3    **Q.**   The growth rate you apply was what?

4    **A.**   5.25 percent.  Now --

5    **Q.**   Would you take 58,727 -- that's the baseline for 2009 --

6    and then for 2010 multiply 58,727 times -- increase it by 5.25

7    percent?

8    **A.**   Correct.

9    **Q.**   And you just did that for every year?

10   **A.**   And did that for every year up until his retirement date

11   that we talk about earlier.  And that gives you some pretty

12   big numbers.  You know, one of the most powerful formulas we

13   have in the world is compound interest, and that's basically

14   all it is, is compound interest.

15   **Q.**   Now, we know and the Judge has told earlier and we've

16   talked about it already present value.  Did you reduce this

17   number to present value?

18   **A.**   I did.  I didn't reduce that number.  Actually I took

19   taxes out.  And I went back on his tax returns for 2007, '8

20   and '9, and he paid a effective tax rate -- that means that's

21   the tax he paid on every dollar.  Most of us are used to

22   talking about marginal tax rates where you don't pay anything

23   on the first few dollars and you pay big taxes on the last

24   few.  If you just take your tax and divide it by your income,

25   you've got a tax on every dollar.  So the tax that he paid on

1    every dollar for those three years was 9.84 percent.

2    **Q.**   Did that include federal and state?

3    **A.**   That's federal and state.  Federal tax was 6.32 percent

4    and the Georgia state tax was 3.52 percent.

5    **Q.**   That 9.84 percent for taxes.  Okay.

6    **A.**   9.84, is that correct -- yeah.

7    **Q.**   My handwriting is not the best.

8    **A.**   I'm sorry about that.

9    **Q.**   I'm kind of at a disadvantage here.

10   **A.**   And that's a pretty low tax rate, but that's actually

11   what he paid.

12   **Q.**   And where did you get that information from?

13   **A.**   Directly from his tax return.

14   **Q.**   And what else did you deduce -- deduct from the --

15   **A.**   Well, I didn't deduct anything at that point.  I simply

16   said, all right, let's reduce that $3,021,781.00, let's reduce

17   it by his taxes, which would give us after-tax earnings, which

18   sometimes we refer to that as take-home pay, and his after-tax

19   earnings would be $2,724,438.00.

20   **Q.**   So that's the 3,021,781 minus 9.84 percent and it gives

21   us 2,724,438?

22   **A.**   That's correct.

23   **Q.**   Do you make any other deductions?

24   **A.**   No.  At that point I said -- and think about it, that

25   we're talking here about end numbers of a long stream of

1    things that I added together.  So the next question we have is

2    go back to the extreme of $2,724,438 and that would give us

3    after-tax earnings for each of those years up until 2035, and

4    there'd be big numbers at the end too.  So we have to ask the

5    next question is, how much do you have to have today in order

6    to invest it in a safe, secure investment in order to be able

7    to invest it and withdraw amounts that will give us those

8    amounts that will sum up to 2,724,438.  It's called reducing

9    it to present value.  The investment rate we use has to be one

10   that's safe and secure because we're not trying to create an

11   investment portfolio.  We're trying to replicate income.  So

12   we want to choose a safe, secure investment.  The investment

13   rate I used is the long-term rate on short-term treasury

14   securities.  That would be the same period -- and actually

15   that's the same period of time that I took the grow rate and

16   earnings.  Now, there's a reason for that.  I said earlier

17   that the growth rate and earnings was comprised of two

18   factors; productivity and inflation.  Bond rates are comprised

19   of the real yield on capital, which is productivity and

20   capital plus inflation.  So if you're going to take a growth

21   rate to some period of time, you have to take the discount

22   rate from that same period of time or you're just not going to

23   get an answer that makes any sense.  I used a long-term period

24   of time going from 1960 to 2010.  You could pick a different

25   period of time as long as you get a period of time that all

1    the little variables will even out, that you don't get

2    disruptions in the economy.  But you could take 1970 and 2010.

3    Even maybe ten years, I'd have to look at it, to make sure

4    there are no -- nothing happened in the economy that's

5    unusual, then it doesn't really matter.  Those two rates will

6    move together.  So that would give me -- if I do that, that

7    would give me a present value.

8    Q.    Is that also the discount rate?

9    A.    That's what we refer as a discount rate.

10   Q.    And what rate did you use?

11   A.    I use 5.24 percent, which interestingly enough is almost

12   the same as the growth.  They're almost a wash.

13   Q.    Okay.

14   A.    That would then give us present value of earnings of

15   1,304,071 --

16   Q.    One million --

17   A.    There you go.  I had it -- can't read and write it here.

18   $1,304,071.

19   Q.    Did you also deduct expenses related to his employment

20   with the railroad?

21   A.    I did.  We had some controversy about that issue early

22   on, which we'll probably talk about later.  But going back and

23   going through his tax returns and subtracting exactly what he

24   claimed that he paid for un-reimbursed business employee

25   expenses, it comes to 12.9 percent of his income.  I

1    subtracted that out, and that wound up giving us the

2    $1,304,071.

3    Q.   So over a 25-year period, how much is that on average per

4    year?

5    A.   On average per year.

6    Q.   If you took --

7    A.   I don't think I calculated an average per year.

8    Q.   Do you have a calculator?

9    A.   No.  Well, you can't do that because each year is going

10   to be different.

11   Q.   I understand.  What I'm saying is he had 25 years left to

12   work, right?

13   A.   Right.

14   Q.   And we took that 1,304,000 and divided that by 25, that

15   would be approximately $50,000 a year?

16   A.   Something like that.  Actually it'd be 58 thousand minus

17   taxes the first year and so forth on.  It'd be more each year.

18   Q.   I understand.  Now, let's talk about the fringe benefits.

19   A.   I did the same thing with the fringe benefits.  The

20   $2,343.25 per month that they were paying on his behalf.  If

21   you look -- if you go back and look at actually the growth

22   rate and fringe benefits that's paid by the railroad they're

23   pretty high, but we don't have a long period of time for that.

24   And so I said, let's just use rather than something that may

25   be arbitrarily higher than -- and give you a bigger number

1    than we should, let's just use the growth rate and earnings

2    that we did to calculate his earnings.  And so I did, and if

3    you do that, take that $2,343.25 per month and increase it at

4    5.24 percent a year, it's going to wind up with $1,295,094.

5    **Q.**   So you used a 5.24 percent growth rate?

6    **A.**   5.25.  The same as I did for earnings.

7    **Q.**   And if you look at the -- what they actually paid, is

8    that consistent with it?

9    **A.**   Right.  If you calculate what that actual growth rate was

10   -- I thought one sheet we had it on there -- but it's higher

11   than five percent.

12   **Q.**   And then did you also just bring that back to present

13   value as --

14   **A.**   I did.  I reduced that -- I then reduced that to present

15   value and didn't reduce it for taxes because that was benefits

16   not earnings, and that would give you $660,106.00 is what it

17   would cost them in present value to replicate his fringe

18   benefits.

19   **Q.**   So you're talking about figures that go out from August

20   11 of 2010, all the way until?

21   **A.**   2035.

22   **Q.**   January 10th of 2035?

23   **A.**   Correct.

24   **Q.**   How many years is that?

25   **A.**   I believe that's a little over 24.

**Q.**   January 10, 2035.  Doctor, let's talk about the fringe benefits a little bit more.  Why are the tier one, right here, tier one and tier 2, does he also have to make contributions to tier one and tier two?

**A.**   I'm not that familiar with it.  I don't think so.

**Q.**   Why -- let's assume -- I want you so assume that he does also make contributions?

**A.**   He makes contributions to his pension.  I don't know if their tier one or two, just pension contributions.  I don't know how the railroad does that.

**Q.**   Well, why would you count the railroad's contributions as a benefit but not count his contributions as a cost to him?

**A.**   Because both what the railroad is putting in and what he's putting in goes to create his pension he's going to get when he gets 30 years in and at least the age 60.  So it's not a tax to him.  He gets it back.  What it's doing is the railroad is investing it for him.

**Q.**   Now, is there any way to figure out if he were -- if Mr. Windom or any other railroad for that matter would get dollar for dollar out of the tier one and tier two that they put in?

**A.**   Absolutely not.  And the rest of us aren't dollar for dollar getting out what we put in social security either.  You know, we're not going to be able to figure that out.  He can't figure that out either.

**Q.**   All right.  Let's sum up here.  The net present value of

1    Mr. Windom's railroad earnings had he continued to work are

2    $1,304,071; is that right?

3    **A.**    Yes, sir.

4    **Q.**    After taxes and after expenses?

5    **A.**    After -- yeah, after the un-reimbursed business employee

6    expenses.

7    **Q.**    And the net present value of 24 years worth of fringe

8    benefits is $660,106?

9    **A.**    Correct.

10   **Q.**    Is that right?  24 years of fringe and wages the net

11   present value of those added together is what?

12   **A.**    If we add those two together it should sum to a total of

13   $1,964,177.

14   **Q.**    And if we add together the 2000 -- your average of 58,727

15   and the 28,119, that's wages?

16   **A.**    You can't really do that because the 58,000 is before

17   taxes and the 28,000 is not taxed.

18   **Q.**    Okay.

19   **A.**    So -- and we're getting net present value in terms of

20   after tax.

21   **Q.**    Doctor, have you fully expressed all of the opinions you

22   have in this case in terms of what the net present value of

23   what Mr. Windom's wages and benefits would have been?

24   **A.**    I have.

25   **Q.**    And have you done it in a manner that any other economist

1    in the country would find acceptable?

2    **A.**    I certainly hope so.

3    **Q.**    And is your methodology accepted by economists

4    nationwide?

5    **A.**    It has.

6    **Q.**    That's all I have for now.  I appreciate your time.

7                 **THE COURT:**  Mr. Toth?

8              **MR. TOTH:**  Yes, Your Honor.

9                         **CROSS EXAMINATION**

10   BY MR. TOTH:

11   **Q.**    Good afternoon, Dr. Thompson.

12   **A.**    Good afternoon.

13   **Q.**    As you made reference to, we are going to get into some

14   things we discussed before.  You recall our deposition here

15   not too long ago up in, I guess, Anderson, South Carolina?

16   **A.**    I guess that was Anderson.  I was thinking it was --

17   yeah, that's correct.

18   **Q.**    And I'm going to skip around here a little bit because

19   you were throwing a lot of numbers.  I'm not so good at them,

20   but I think you can educate me and maybe I can help educate

21   the jury on some of the things that you've talked about that

22   I'd also want them to consider based upon these opinions that

23   you're offering -- that ballpark, what, $2 million from your

24   economic analysis from lost earnings and lost fringe benefits?

25   **A.**    Correct.  Actually they weren't lost.  That's what he

1    would be expected to earn and that's what they'd be expected

2    to pay.  I can't say they're lost.

3    **Q.**   And that's just one of the assumptions you're making is

4    that he's never going to work another day anywhere in regard

5    to --

6    **A.**   Oh, absolutely not.  I just got through explaining that.

7    All I'm doing is calculating what he could have earned from

8    the railroad had he continued working.  I haven't said

9    anything about what he can or can't do outside of that.

10   **Q.**   And, of course, Mr. Lampros hasn't asked you to make any

11   calculations before you came today about reduce your number by

12   him returning to work in a different job capacity?

13   **A.**   That's correct.

14   **Q.**   And you're not here to offer this jury any opinion about

15   what this man's medical condition is or what type of labor he

16   may be able to return to in the future?

17   **A.**   Absolutely not.  I don't have any expertise in that at

18   all.

19   **Q.**   I believe you told me you look at the numbers and the

20   numbers are the numbers or something to that effect?

21   **A.**   Pretty much.

22   **Q.**   I know you've got in your file the tax returns, and you

23   referred to basing your opinions -- even though you got '06

24   and the 2010 return, you just focused on '07, '08, and '09?

25   **A.**   That's correct.  The '010 was not a full year one way or

1  the other.

2  **Q.**   And can you tell the jury before you adjusted for

3  inflation what the average of those three years would be?

4  **A.**   I have no idea.  That's a meaningless number.

5  **Q.**   Well, Doctor, I don't understand how it's meaningless if

6  you take those -- if you take his earnings for '07, '08, '09,

7  add them together and divide by three and then adjust for

8  inflation; is that correct?

9  **A.**   No.  That would not make any sense.  It's sort of like

10  saying let's go back 20 years when he was making $10,000 and

11  add them up and say, oh, well, he was only earning $30,000.

12  **Q.**   Well, what was he making in 2007?  I'm sure they gave you

13  a W-2?

14  **A.**   I can look it up.  In 2007 he was making $46,039 -- I'm

15  sorry, he -- no, that's correct.  That was the railroad

16  earnings, $46,039.

17  **Q.**   $46,039?

18  **A.**   Correct.

19  **Q.**   And I'll go ahead and acknowledge to everybody my

20  handwriting is worse than Mr. Lampros's, so I'll do my best.

21  Can you give me what he was making in 2008 per his W-2?

22  **A.**   Well, my shelf here is so small I dropped all my papers.

23  Let me sort them out really quick.  Okay, 2008.  In 2008, he

24  was earning $58,276.

25  **Q.**   Okay.  In 2009?

**A.**   $70,973.

**Q.**   And did you adjust for inflation each year, or did you add those three numbers together, and then make -- divided by --

**A.**   No, you adjust the 2007 to 2009.  If you add them together, you'd be adjusting the 2007 and --

**Q.**   I just want to make sure --

**A.**   -- all to a different -- the wrong numbers -- the wrong time period.

**Q.**   I just want to make sure I understood.  Each year was adjusted?

**A.**   That's correct.

**Q.**   And that's what gave you the number of close to 59,000? Is it 58,727?

**A.**   That's correct. It was obviously higher than one year and lower than another year.

**Q.**   And I believe your explanation for not using the additional tax returns that you had, 2006, it was significantly lower and 2010 was significantly higher, and you thought it would just be an offset?

**A.**   I don't think I had 2006.

**Q.**   So you do not have 2006 in your file?

**A.**   I don't.  Unless it's attached to something here.  I don't have 2006.

      **MR. TOTH:**  Your Honor, may I approach and show him Plaintiff's Exhibit 46 which includes 2006?

1    **THE COURT:**  You may.

2    **BY THE WITNESS:**

3    **A.**    Okay.

4    **Q.**    Could you just give us the number there, sir, in 2006?

5    **A.**    $37,784.06.

6    **Q.**    Thank you.

7    **A.**    You have to bring that up now four years, not just --

8    **Q.**    Yes, sir.

9    **A.**    Okay.

10   **Q.**    And it's my understanding that the first thing you do is

11   you essentially add a growth rate to this, correct?

12   **A.**    The first thing that I did was -- well, the first thing I

13   did was determine, you know, what the ending date would be if

14   he retired based on his seniority date.  That would be the

15   first thing I did.  And the second thing I did was determine

16   the earning capacity which we talked about.  And then using

17   the growth rate earnings, I then projected it out to that

18   ending date.

19   **Q.**    And you took him out to about, what, age 63, sir?

20   **A.**    It was about that.  It was year -- August of 2035, I

21   believe that would 63 or 64.  I'd have to do the math real

22   quick.  It would be when he had 30 years in, 30 years from the

23   seniority date, plus, he would be over the age of 60.

24   **Q.**    And I appreciate your point about when you add growth

25   rate it's really like compounding interest.  Do you agree with

1    me using your annualized figure of 58,727, which is part of

2    the calculations that you made in this case, kind of where you

3    start, if you project that out to I think you said 2034 or

4    2035 --

5    **A.**    Right.

6    **Q.**    -- would the annual income at that point be in excess of

7    $200,000?

8    **A.**    It would probably be close to that.  It would be -- that

9    would be four times what his earnings was.  If we could -- you

10   know, I assume we can put that into perspective a little bit.

11   If you take, say, the minimum wage right now, which is $7.25

12   an hour, it has increased -- and this is a tough one to

13   believe since in inception, which was 25 cents, it's increased

14   right at five percent, a little less than five percent.  And

15   the minimal wage hasn't increased in a straight line like

16   we're doing here.  It increase like this.  But you get the

17   same effect, you'd increase in a straight line, that would be

18   a 30 times increase in the minimum wage.  If you look at what

19   college professors made when I started and what the starting

20   salary is now, that's 15 times increase.  We're only talking a

21   four or five times increase here.  So if you put it in terms

22   of what's going on out there in the economy, that's not a big

23   deal.

24   **Q.**    But the effect of it is for this calculation to be

25   accurate we've got to continue the historical trend that

1    you've looked back I think until 1960 and average it all out

2    to come up with this 5.25 percent raise every year until 2035?

3    **A.**    Correct.

4    **Q.**    And then you came up with the seven figure number that I

5    told the jury they would expect to hear in this case, but you

6    also have to take taxes on that because we all pay taxes?

7    **A.**    Right.  And I did, I took taxes out.

8    **Q.**    And you indicated that, what, federal taxes he paid were

9    around five percent?

10   **A.**    6.32 percent, I believe is what he paid.  I pay more than

11   that.

12   **Q.**    And state taxes?

13   **A.**    State taxes were 3.52.  Federal taxes was 6.32, state

14   was 3.52.

15   **Q.**    And these -- this seven figure number you're putting in

16   front of the jury for it to be accurate it's got to consider

17   that his taxes are not going to increase?

18   **A.**    Yes and no.  We can put that in perspective too.  Go back

19   to 1965 and look at what a person earning $20,000 --

20   **Q.**    Can you answer the question first?

21   **A.**    I said yes.  I agree with you.

22   **Q.**    All right, I'm sorry.

23   **A.**    And go back to 1965 and look at a person earning $20,000

24   was paying.  They were paying close to 30 percent tax.  Today

25   they get a tax credit.  So -- and we increase that, the person

1    earning, say, $20,000.  So if we keep his earnings constant,

2    the tax rate should stay constant.

3    **Q.**   But that's once again another assumption you're making?

4    **A.**   But it's historically based.  It is an assumption, sure,

5    but it's a historically based assumption that we got the data

6    for that.

7    **Q.**   And in all fairness, if you're going to acknowledge it's

8    an assumption we'll grow at 5.25 percent or, you know, his

9    salary would, you're also reducing it to present day by almost

10   the identical number just --

11   **A.**   Sure.  It's a wash.

12   **Q.**   And I believe your explanation to the jury was you're

13   trying to reduce a number to pay him out in today's dollars

14   what he would have earned if he had continued until, I guess,

15   you said 2035?

16   **A.**   Yeah, 2035.  And a more correct way to say that is pay

17   him a sum that he could invest it at whatever that safe secure

18   interest rate is, the bond yield on short term treasury

19   securities, and he could withdraw amounts equal -- each year

20   equal to what he would have supposedly earned that year and at

21   the end of -- in August of 2035 he would have nothing left.

22   **Q.**   And obviously the big number that's on the board that, I

23   guess, it gets just about cut in half, is that -- to the

24   extent you play the lottery here and you're asked if you could

25   take a cash option, would you -- is that like taking a cash

1    option, getting your money now as opposed to later, you're

2    going to get less money?

3    **A.**   I don't think I followed the logic of your explanation

4    there.  I don't recommend playing the lottery.

5        **MR. TOTH:**  Your Honor, may we approach before I begin

6    this next line of questioning?

7        **THE COURT:**  You may.

8    *(AT SIDEBAR)*

9        **MR. TOTH:**  Judge, I'd like to explore with him, in his

10   deposition he acknowledged he had gone on his wife's insurance

11   and the railroad is paying roughly $1200 a month, and, you

12   know, we can't say that that insurance benefit has been

13   replaced with equal deductibles or equal benefits or HMOs or

14   PPOs, but it is something he has been able to replace at a

15   cost that he said in deposition was about $300 a month.  He

16   has a duty to mitigate his damages, and this would be one item

17   of damages, and we would like to be able to ask the doctor,

18   Dr. Thompson, if that would affect his lost fringe benefit

19   calculation since the roughly $2500 a month or whatever it is

20   he said the railroad pays per month, the largest part of that

21   is the premium the railroad would pay for his health

22   insurance.

23       **THE COURT:**  Is this same issue --

24       **MR. LAMPROS:**  It's the same issue that Your Honor has

25   already ruled on.  If they're not identical policies, I don't

1    see how it can -- plus, it's a collateral source.

2        **THE COURT:**  Well, I will say that the collateral source

3    analysis or analogy breaks down a little bit -- obviously if

4    he had gone back to work, he would have -- you'd be able to

5    prove -- the defendant would be able to prove and you'd

6    probably prove yourself what he's making, and if it were less,

7    then that would be relevant to the issue of damages.  And

8    that's not a collateral source.  What the railroad is saying,

9    I guess, is that him being able to get other insurance is more

10   or less the same thing.  He hasn't gone back to work, but he's

11   got something that reduces that loss.

12       **MR. LAMPROS:**  Right.  There's no evidence in the record

13   that you're comparing -- make a comparable loss replacement,

14   and that would be incumbent upon the defendant to product that

15   evidence, and it's their burden of proof on this affirmative

16   defense.  And in any event, Your Honor, notwithstanding all of

17   that, the 403 implications, it's just too prejudicial to say

18   -- unless they have no qualms with me getting up in closing

19   and saying the railroad is trying to shift its obligation to

20   the taxpayers of Wilcox County.

21       **MR. TOTH:**  That would be punitive, Judge, if you're

22   talking about a 403 argument.

23       **MR. LAMPROS:**  Well, that's what they're doing.

24       **THE COURT:**  Well -- and I don't fully buy my own

25   analogy about -- it's like he were going back to work, and I

1    didn't mean to suggest that was my analogy.  I think makes

2    your argument -- you know, he has still lost under the

3    plaintiff's theory that fringe benefit.  The fact that he was

4    fortunate enough to have a spouse who worked and provided him

5    and he could go on her insurance doesn't change the fact that

6    he has lost that.  I also agree that we don't know the extent

7    to which we're comparing apples to apples.  So, no, I'm not

8    going to change my ruling on it.

9        **MR. TOTH:**  And just so we don't have to come back up

10   here again, that would be inappropriate for cross examination

11   to try make apples apples when Ms. Windom is on the stand?

12       **THE COURT:**  No, because that's only part of the reason.

13   And I would be very surprised the extent to which anybody

14   could get into the details of their healthcare plan.  We don't

15   have any evidence of the railroad plan.  No, we're not going

16   to go down that road.

17       **MR. TOTH:**  All right, thank you.

18   *(BENCH CONFERENCE CONCLUDED)*

19   **BY MR. TOTH:**

20   **Q.**   I apologize for making you and the jury wait.

21   **A.**   Quite all right.

22   **Q.**   You and I can agree, Dr. Thompson, that an economist like

23   yourself, the methodology that you employed requires you in

24   offering opinions to juries like we have here to reduce the

25   projected -- your analysis requires you to reduce the taxes,

1    reduce to present day, and also reduce any business expenses

2    that he may have incurred, correct?  To get a true net-net

3    number?

4    **A.**   Sure.  And that's what I did.

5    **Q.**   And you didn't do that the first time though, did you,

6    Doctor --

7    **A.**   No, and there is --

8    **Q.**   -- when I took your deposition?

9    **A.**   No, I'm sorry, I --

10   **Q.**   Well, let me rephrase the question.  You did reduce for

11   business expenses, but you only reduced the business expenses

12   by -- let me see if I can put it in front of you here.

13   **A.**   Two percent.

14   **Q.**   I'm going to show you here on --

15   **A.**   Sure.  It was two percent.

16   **Q.**   And just so the jury can see the table that you came up

17   with, you only reduced it by two percent, correct?

18   **A.**   That's correct.  I just said that.

19   **Q.**   All right, I just --

20   **A.**   And several times.

21   **Q.**   Well, I understand --

22   **A.**   Can I explain why we did that that way?

23   **Q.**   Well, let me just finish my cross examination if I can,

24   if you have a an explanation, then I'm sure --

25   **A.**   Sure.

1        **MR. LAMPROS:**  Your Honor, I think he should be able to

2    explain his answer now.

3        **THE COURT:**  Well, that's typically the way it goes.

4    He's answered the question.  Now, if you have an explanation,

5    you can give it.

6    **BY MR. TOTH:**

7    **Q.**   Dr. Thompson?

8    **A.**   Okay.  There's two reasons.  One is that there is some

9    controversy about how we should handle un-reimbursed business

10   employee expenses and there's also a controversy, not only

11   with me as an economist but with the IRS.  Basically there are

12   two groups of un-reimbursed employee business expenses.  There

13   are the ones that supposedly have a receipt, not necessarily

14   but they're receiptable.  There is the other set of business

15   employee expenses that are not receiptable.  One would be

16   things like union dues where you get a thing saying you paid

17   union dues, you buy tools, you buy clothes, you buy work

18   boots.  Those are things that you could theoretically get a

19   receipt on.  The other things that you can are like mileage,

20   that you're going somewhere to and from the job.  Meals you

21   eat while you're traveling.  Other things and I can't think of

22   one right off the top of my head, but there are things like

23   that.  Well, those are two categories.  Well, the IRS says and

24   one of their publications has it wrong, they have corrected

25   since then.  One of them says they're going to cap it at 2

percent.  What they meant were they're capping those

non-receiptables that is not a cap, but you have to have

business employee expenses in excess of 2 percent of your

earnings before you can deduct anything.  Why they do that, I

could come up with a theory on it, but it doesn't make a lot

of sense they did that.  So what I did initially because it's

in two separates places in the tax return, I didn't look in

the second place.  That's the receiptable ones.  Had I look in

the receiptable it wouldn't have been 2 percent and I

apologize for not looking thee.  If you take the

non-receiptable and you calculate those as a percentage of

their earnings, it's 1.999, as close to percent to 2 percent

as you can get which because of the cap made it sound

reasonable.  Revisiting it with other economists and with you

in a deposition, I -- let's look at it further.  And if you're

going to make these calculations correctly, I'm always willing

to take advice and learning, if you're going to make them --

you've got to deduct what he actually spent.  Now, that's what

we did.  The other problem with this is if we deduct the total

-- for instance, to give you an example, I'm a college

professor.  I can deduct my books as un-reimbursed business

employee expenses.  Well, I like to read.  Well, suppose that

I buy books that don't necessarily help me teaching but I like

to read?  I can actually deduct those.  But should I be

allowed to?  And the answer the probably not, but you can

1   still do it.

2   Q.   But you can only reimburse in excess of 2 percent of your

3   adjusted gross income?

4   A.   Sure.  You have to have un-reimbursed expenses and that

5   means that what you're actually taking off your taxes is the

6   net difference between your total un-reimbursed business

7   employee expenses and 2 percent of your income.  So you don't

8   get to take the full 100 percent.

9   Q.   And the same exhibit, are these the type business

10  expenses that you're used to seeing for a railroad employee?

11  A.   Some of them, yes.  But his wife also had -- spouse also

12  had un-reimbursed business expenses.  There's a separate page

13  in there for her too.  And I tried to be as conservative,

14  which would be biasing it I guess in your favor rather than

15  his favor.  We know the union dues was his.  We know the

16  classroom expenses was hers.  We know that the work shoes were

17  his.  We know the work clothes were both, so I split that in

18  two.

19  Q.   So, again, your calculations to be accurate dividing the

20  clothes 50/50, would be accurate, correct?

21  A.   That's correct.  And we're going to have a conversation

22  here probably about $10 or $12, right, on 1.9 million.

23  Q.   We're going to have a conversation until Judge Treadwell

24  tells me I can't ask you any more questions.

25  A.   Sure.

**Q.**   Telephone, is that a typical expense you see?

**A.**   I don't know what it is, so I don't know.  I'm assuming that he as working for the railroad did not have the telephone expenses.  They were obviously his wife's.  I don't know that for a fact.

**Q.**   Well, was that an expense you assigned to him as a business expense to him?

**A.**   No, I assigned that to her.

**Q.**   The phone is to her?

**A.**   Yes.  The answer to that is still yes.

**Q.**   So if it his then, whether it's $12 or $1200, it's -- you know it would be wrong if she comes in here and testifies that the telephone is a business expense of his?

**A.**   Absolutely.  And then we should adjust it from 12.9 percent to 13 percent.

**Q.**   Well, and in all honesty here the first report you gave me has been substantially changed, wouldn't you agree?  Because of the changed methodology that you employed after I ask you extensively about these business expenses?

**A.**   Yeah.  And did you calculate what the different -- the change was?  You say substantially.

**Q.**   Well, I'll put this down here.  This was the --

**A.**   Substantially --

**Q.**   -- number that came --

        **THE COURT:**  Whoa, you've got to talk one at a time.

**BY THE WITNESS:**

**A.**    If I could finish it, sir, the substantially is it went from 1,478,274 to 1,304,071 and adding the fringe benefits brings it back up to 1.9 million.

**Q.**    So what's the difference in the numbers?

**A.**    Well, I don't see a big difference.  There's obviously a difference there, but it's not a substantial difference that it's going to make a lot of difference.

**Q.**    So 480 thousand dollar -- excuse me, $180,000 isn't substantial?

**A.**    Sure, and that's --

**Q.**    -- to you, sir?

**A.**    Sure, and that's a lot of business employee expenses too you might look at too.

**Q.**    And I assume if you did this on the 2007 return, you tried to go back and do it as well on the 2008?

**A.**    I did.

**Q.**    And did you employ a similar methodology in attempting to sort out whose --

**A.**    I did.

**Q.**    -- business expenses --

**A.**    I tried to be conservative as I could.

**Q.**    -- were whose?

**A.**    To make the number bigger.

**Q.**    I'm sorry, sir?

1    **A.**    To make the number -- the number of the cost of the

2    business employee expenses bigger so if I erred, I erred not

3    on his side but the other side.

4    **Q.**    But that's not correct if the telephone belongs to him?

5    **A.**    I'm a $1,000 off, you're absolutely right.

6    **Q.**    In the 2008 business expenses that is on the Windom

7    return, did you split the clothes down the middle again?

8    **A.**    Could you move this over so I could see the date on it?

9    **Q.**    I'm sorry.  Is that what you wanted me to do, Dr.

10   Thompson?

11   **A.**    You moved it the wrong way.

12   **Q.**    I'm sorry.

13   **A.**    Wasn't that exactly the same one you had?

14   **Q.**    I thought we had 2007, but I'll check it real quick to

15   see if it's the same number.  It was 2007, I'd represent is

16   2750.  So, very close.

17   **A.**    I'll take your word for it.

18   **Q.**    There's --

19   **A.**    We're still not --

20   **Q.**    -- 2007?

21   **A.**    That's fine.  We're still a couple thousand dollars off

22   here, so that's fine.

23   **Q.**    So the clothes were -- I'm sorry if I'm repeating myself,

24   the clothes were split again?

25   **A.**    Absolutely.

1    Q.   And professional dues were hers, but the telephone was

2    once again, hers as well in the amount of, I guess, 1395, if

3    I'm looking at it right?

4    A.   Absolutely.

5    Q.   Is that correct?

6    A.   That's correct.

7    Q.   In 2009 the --

8    A.   If you want me to, I can tell you the ones I used.  I

9    used the work shoes, the union dues, and the tools were his.

10   Q.   What about the attorney's fees?

11   A.   I didn't -- I didn't use them for him.  I don't know what

12   they were.

13   Q.   Did you consider them a business expense?

14   A.   I don't know what they were.

15   Q.   Sir?

16   A.   I don't know what they were.

17   Q.   But on the tax return they showed up as a business

18   expense and a deduction to him, correct?

19   A.   $325, that's correct.

20   Q.   And I'll show you the 2006 return, the business expenses

21   here, would you agree that on the itemized business expense

22   deductions in 2006 this seems to be the largest amount of

23   business expenses in comparison to '07, '08, and '09?

24   A.   It would certainly appear to be, you're right.

25   Q.   And I know, Doctor, that since we're in federal court

1    you're required to give me a list of cases that you've

2    testified in, and you've been kind enough to do that from

3    January 1st of 2007 to the present.  And I've got 187 cases

4    that you've given a deposition in or testified live, does that

5    sound about right?

6    **A.**    It sounds about right.  I have an updated copy if you'd

7    like it.

8    **Q.**    No, Your Honor -- no, Dr. Thompson, I'm fine.  Are

9    business -- in doing your economic analysis are business

10   expenses something you routinely reduce when you're required

11   to get to a net figure as part of your methodology?

12   **A.**    That's correct.  However, to save you some time here,

13   most people don't have any.

14   **Q.**    And if they have some it has to exceed 2 percent of their

15   adjusted gross income?

16   **A.**    That's correct, and most people don't have any.

17   **Q.**    And I belive you've told me that you've seen tax returns

18   of railroad employees that have no business expenses listed?

19   **A.**    Absolutely.

20   **Q.**    And I've seen your report that you've given me that I

21   guess we can now deem at least table one, amended by the

22   number that -- I don't know if you said insignificant but

23   $180,000 difference now?

24   **A.**    That's correct.  That's just the earnings now, not the

25   fringe benefits, $1,304,07.

**Q.**   And I'm just curious because before you walked into court today and made those comments on direction examination that your opinions had changed, when did you revise your calculations?

**A.**   In the last couple of days.

**Q.**   And did you do that as the request of counsel?

**A.**   I did.

**Q.**   Did you do any research in the tax code to determine if you were right or wrong as to the methodology you employed the first time?

**A.**   I did.

**Q.**   And did you determine that I was, in fact, correct?

**A.**   Not completely because we've still got the cap there that we're not sure about.

**Q.**   Yes, sir.  And on your report that -- which is Defendant's Exhibit 21, on page eight, is this the formula that you used to reach your calculations?

**A.**   That is correct.  There is a -- something that should have been added there, but this will give you almost exactly the same answer.

**Q.**   What's missing?

**A.**   I revised the formula, and I should have brought a copy with me.  If you want to use that, it'll give you the same formula.

**Q.**   And I want to ask you a hypothetical if I can.  And let

me preface it by just confirming you don't know anything about

Mr. Windom's history of employment before he came to work at

Norfolk Southern; you just know him to be on August 6th of

2010, you were reported he had injury when working for Norfolk

Southern and you got his tax returns and W-2s?

**A.** Pretty much it.

**Q.** And you don't know where he worked before?

**A.** I do not.

**Q.** I want you to assume that he could get a job at Home

Depot as their manager of the electronic section making the

annualized income, I think the figure of $58,723.03, that he

could go to work and that would be his income.

**A.** For Home Depot?

**Q.** For Home Depot. I did -- this is a hypothetical. I want

you to assume he can get a job managing the electric

department, and I'll just represent to you he was a -- had

substantial experience as an electrician?

**A.** Sure.

**Q.** And to the hypothetical is if he can make -- go to work

-- this injury there will have its two-year anniversary date

on August 6th. So he starts August 7th at Home Depot with a

starting salary of $58,723.03 and every year he gets a 5.25

percent increase and his tax rates don't change, would it

impact your calculations as to what he would have earned in, I

guess, I think you said 2034, 2035?

**A.**   No.   It wouldn't impact what I did at all.   You're doing something entirely different, which is fine.   You can do something entirely different, but it doesn't change what I did.   What I changed -- what I did, and I'll repeat it again, is I replicated what his income would be had he continued working for the railroad.

**Q.**   And all I'm asking you to do is replicate what his earnings would be if he was making that same amount of money at Home Depot.

**A.**   Sure, you could do that.   I'm quite confident you can do it.

**Q.**   But let's assume he can't make $58,000 -- excuse me, annualized earnings at Home Depot of 58,723, that he can only make $40,000 annually.   Do you have the ability to tell the jury today what the difference in his -- what he would have earned if he'd have stayed at the railroad as opposed to going to work at Home Depot at 40 grand a year?

**A.**   I couldn't tell exactly, no.   I'm sure, like I say, you have a computer, you could make the calculation pretty simple.

**Q.**   And if you assume the same tax rates, then you could reduce by percentage, could you -- could you not?

**A.**   I'm sorry?

**Q.**   Well, you would have to assume that at $40,000 he'd be subject to the same tax rates that he would at 59,000.

**A.**   I would assume that it would be subject a lower tax rate.

1    I don't know why we would assume the opposite.

2    Q.    Well, in fact, his tax rates would be lower if he was

3    making less money; is that correct?

4    A.    I would think.

5    Q.    And you talked about his fringe benefits and you talked

6    about tier one and tier two.  Do you recall that on direct

7    examination?

8    A.    Sure.

9    Q.    And every dollar that the railroad contributes to tier

10   one and tier two benefits, whatever that total may be, when I

11   believe you were assuming retirement at age -- or when he had

12   30 years of service in which would have been like age 63, you

13   can't sit here and tell the jury that every dollar the

14   railroad paid in on his behalf that he would receive out

15   during his retirement?

16   A.    Certainly not.  And I was asked that question on direct

17   and I said exactly the same thing.  You can't tell that.  You

18   can't tell it for social security, you can't tell it for

19   Georgia State Retirement System.  It's impossible to tell.

20   It's depending on how they do in the market.

21   Q.    It's like an actuarial table --

22   A.    Sure.

23   Q.    -- you have to consider, correct?

24   A.    Sure.  Now, what the railroad retirement board can do,

25   what they have done in the past, is calculate what his

1    retirement would be based on the fact that he's getting these

2    earnings now and that's what his past earnings would have been

3    say if he worked 30 years in the past.  Now, how they do that,

4    I don't know.  I'm not privy to their calculations, but I've

5    seen them make those calculations which then you could take

6    what his -- and I've used those calculations as been given to

7    me by attorneys before -- you can take those calculations and

8    then project them out to 2035 and see if that's the same, and

9    actually the two or three times that I've been provided those

10   calculations it comes out more.  I don't know why.

11   Q.   But I guess there's three options.  Whatever the railroad

12   contributes, he might take every nickel of that out in

13   retirement and more, or he could take the same dollar amount

14   out if it worked that way, or he could get less, correct?

15   A.   Absolutely.  And that's true of just about every

16   retirement system I'm aware of.

17   Q.   But for purposes of your projection, you're looking at

18   everything they contribute in and give the jury a calculation

19   that he's going to take every dollar out?

20   A.   Sure.  We're taking the average.

21        MR. TOTH:  One second, Your Honor.  Thank you, Dr.

22   Thompson.

23           THE WITNESS:  Thank you, sir.

24           THE COURT:  Any redirect?

25           MR. LAMPROS:  Briefly, Your Honor.

1          **REDIRECT EXAMINATION**

2    **BY MR. LAMPROS:**

3    **Q.**    Are the tier one and tier two amounts that the railroad

4    pays that's shown on that sheet that we went over earlier, are

5    those paid on his behalf for his benefit by the railroad?

6    **A.**    That is correct.

7    **Q.**    I want you to assume, Doctor, that that phone is his --

8    is an un-reimbursed business expense, the phone charges, okay?

9    **A.**    I'm sorry, assume what?

10   **Q.**    Assume that the phone charges that were shown on the --

11   *(Pause)*

12   **Q.**    If you assume that the phone charges --

13   **A.**    That's probably some -- I don't know what it is.

14   **Q.**    That's tools, attorney's fees, union dues, required

15   telephone.

16   **A.**    The required one on the other was like a thousand and

17   something dollars.  I don't know what they were.

18   **Q.**    How much would that increase -- how much larger would

19   your deduction be?  That's kind of a strange way to ask that

20   question because I'm asking you how much --

21   **A.**    It would go from 12.9 percent to about 13.5 percent,

22   somewhere in there.

23   **Q.**    And --

24   **A.**    Assuming half of those were his.

25   **Q.**    I want to you assume all of them.

1    **A.**    Maybe 14 percent.

2    **Q.**    Okay.  So the 1,304,000 number, what would it go to?

3    **A.**    It would decrease an additional one and a half, two

4    percent, max.

5    **Q.**    So it would go down to maybe 1.28?

6    **A.**    Somewhere in there.

7    **Q.**    And $30,000 of a 1,300,000, while $30,000 is a lot of

8    money, it's not a significant number when you compare it to

9    1.3 million?

10   **A.**    Probably not.  I consider $30,000 a lot of money, but I'm

11   a college professor.

12   **Q.**    Tell us how you -- and I agree it is a lot of money.

13   Tell us how you went through the calculation of how you

14   determined about taxes?

15   **A.**    The 12.9 percent?

16   **Q.**    No, the 9.84 percent.

17   **A.**    That's the actual average rate he paid for the years

18   2007, '8, and '9.

19   **Q.**    And did you take the amount that he paid and divide it by --

20   **A.**    His income.

21   **Q.**    -- his total income?

22   **A.**    Correct.  That's the amount he paid on every dollar he

23   earned.

24   **Q.**    And Mr. Toth asked you on cross about some changes you

25   had made from the time you gave your deposition.  Those

1   additional expenses that you deducted, does that make the net

2   present value of plaintiff's railroad earnings more or less?

3   **A.**   Less than what we had in the previous report, that's

4   correct.

5   **Q.**   So by making those deductions, you're presenting a

6   smaller number to the jury?

7   **A.**   I am.

8   **Q.**   That's all I have.

9         **THE COURT:**   All right, may Dr. Thompson be excused?

10   You are excused, Dr. Thompson.

11         **MR. LAMPROS:**   He's excused.

12         **THE WITNESS:**   Thank you sir.

13         **THE COURT:**   All right, ladies and gentlemen, it's close

14   enough to 5 that we're going to stop for the day.  I'll tell

15   you again, you probably have it memorized by now, but be

16   diligent, be careful, and do not allow yourselves to be

17   exposed to any information about the case.  Don't try and do

18   any independent research.  Don't get into any discussions

19   about the substance of what we're doing here with friends or

20   families.  Again, you have to base your decision on what you

21   hear here in the courtroom.  All right, we'll remain seated

22   while you go to the courtroom.  Be back in the morning about

23   the same time, a few minutes before 9 o'clock.

24   *(Jury Excused, 4:52 p.m.)*

25         **THE COURT:**   Let me talk for just a moment about this

1    step.  I didn't appreciate until I heard some of the testimony

2    here because I couldn't tell from the pictures that y'all were

3    showing me at the pretrial conference, and nobody made the

4    point.  The step in question was attached at either end with

5    metal cables.  We've heard that so far, right?  And I assume

6    it's the cable that we're generally familiar with.  It's semi

7    rigid.  It's not pliable like a rope -- like a length of rope,

8    but there's some -- can be some give to it.  Is that right?

9    Generally speaking, is that right?

10        **MR. LAMPROS:**  Are you asking me?

11        **THE COURT:**  Yes.

12        **MR. LAMPROS:**  Based upon Mr Windom's testimony I think

13   he said it would give a little bit.

14        **THE COURT:**  And then according to what I could see in

15   the pictures, at some point, after August 6, 2010, those

16   cables were replaced with what I would call probably, I know

17   it's not the technical correct term, but hard rubber brackets?

18        **MR. LAMPROS:**  I would agree.  They appear to be rigid

19   rubber.

20        **THE COURT:**  Does anybody anticipate we're going to hear

21   any evidence about that?  The replacement?

22        **MR. TOTH:**  Well, Your Honor, that was the subject of

23   Your Honor's ruling that unless we opened the door.  There was

24   a 407 exclusion on that per Your Honor's ruling that unless

25   somebody opened the door which would be, you know, on it that

1    that evidence would not come in.  And to address some of Your

2    Honor's concerns, and were good points why I was asking

3    certain questions about distances, you know, the measurements

4    that I made would have depicted the truck in the revised

5    condition.  So in the -- in terms of the step.  I mean, so you

6    know, it would have, you know, I can't open the door on that,

7    and that's why I asked those questions, Your Honor, and I told

8    you in explanation on it, I'm not trying to waste the Court's

9    time.

10        MR. LAMPROS:  I may be confused here, Your Honor, but

11   my recollection is that there was a 407 motion made.  They

12   actually the argument that it wasn't a subsequent remedial

13   measure, and I thought the ruling was before I presented it or

14   used it to cross examine or used it in examination of a

15   witness I was to approach and we were to discuss it.

16        THE COURT:  Well, it was based upon Rule 407 and

17   subsequent remedial measures.  But I understand things a

18   little differently now than I did then, even though the

19   picture -- well, let me ask you this first, Mr. Lampros.  Your

20   point of the picture, which is a subsequent remedial measure,

21   but you're offering it simply to show what you contend is the

22   correct state of the step, which is, it's level?

23        MR. LAMPROS:  Yes.  I would not get into the rigid

24   rubber versus the cable configuration at all, Your Honor, and

25   even with the 407 exclusion there are three exceptions that a

1   witness can open at any time.

2        **THE COURT:**  That's really not what I'm interested in.

3        **MR. LAMPROS:**  I understand.

4        **THE COURT:**  Although I do have more concern about that

5   picture than I did.  Now, here's what I was assuming, and I'm

6   a little surprised that nobody spent more time on this

7   subject.  I was assuming that as you look at the picture not

8   knowing anything more than I did at the time, that the step

9   was detached and somebody fixed it by attaching it back.  But

10  now I understand that it was not detached; in fact, it was

11  secured in both ends, and then subsequently it was secured in

12  a different manner.

13       **MR. LAMPROS:**  It was bent and jammed in.

14       **MR. TOTH:**  The plaintiff himself testified it was

15  secure.  That was on cross examination.  That's why I didn't

16  pursue it any further.  It was secure, but it was bent.

17       **THE COURT:**  Is there going to be any testimony that

18  either of you anticipate about why --

19       **MR. TOTH:**  Your Honor --

20       **THE COURT:**  Pardon?

21       **MR. TOTH:**  I'm sorry, Your Honor.

22       **THE COURT:**  Well, let me finish, Mr. Toth, unless you

23  think there's something you've got to tell me right now.

24       **MR. TOTH:**  No, sir.  I just didn't want something put

25  up about --

1        **THE COURT:**  In front of whom?

2        **MR. TOTH:**  Mr. Lampros just put a picture up.  I

3    thought we were listening to Your Honor.

4        **THE COURT:**  Well, I was hoping y'all were, but maybe

5    between the two of you nobody is.

6        **MR. TOTH:**  I'm sorry, Your Honor.

7        **MR. LAMPROS:**  I just thought it might be helpful for

8    our discussion.

9        **THE COURT:**  Are we going to hear testimony about why

10    these -- this step is attached the way it is whether it's with

11    semi-rigid cables or semi-rigid rubber?

12        **MR. LAMPROS:**  Mr. Toth?

13        **MR. TOTH:**  I can anticipate some of that coming in,

14    Your Honor.  Not that it's not secure.  And not to get us off

15    track, but the photograph he put up was the one he testified,

16    the plaintiff, that he took some time in January or February.

17    The photographs I've shown, Your Honor, were taken August 6th

18    will be the testimony on that.  So we're looking at photos he

19    -- and I understand what the Court's ruling was, if he says

20    it's a fair and accurate representation which he did, they're

21    in.

22        **THE COURT:**  Well, what I understand now, though, is

23    that these steps given the way they're attached can look

24    different from day to day based on whether or not they've been

25    banged around or they hit something while they were on the

1    track or on the road.  But now let me be sure I understand,

2    Mr. Lampros, the theory of the plaintiff with regard to why

3    this step does not satisfy the SAA, the statute is that it's

4    not secure?

5           MR. LAMPROS:  It's got to be safe and secure, Your

6    Honor.

7           THE COURT:  Well --

8           MR. LAMPROS:  And I would have to pull the -- let me

9    pull my --

10          THE COURT:  I think the statutory language itself

11   refers to secure sill steps.  The regulation refers to, I

12   believe, safe and suitable steps or footboards?  Safe and

13   suitable?

14          MR. LAMPROS:  I'm getting there, Your Honor.

15          THE COURT:  That's what I see.  The statute says

16   secure, and the regulation says safe and suitable.  Is what I

17   view to be the operative language in each.

18          MR. LAMPROS:  Equipped with safe and suitable is what

19   the regulation say.

20          THE COURT:  All right.

21          MR. LAMPROS:  Conveniently located and securely fasted.

22          THE COURT:  Okay.  Well --

23          MR. LAMPROS:  And, Your Honor, also there is some

24   overlap between the regulation and the statute.

25          THE COURT:  What do you mean?

1    **MR. LAMPROS:**  A regulatory violation in addition to

2    being negligence per se under Section 33, it could also be a

3    Safety Appliance Act violation.

4        **THE COURT:**  Well, we talked about this a little bit in

5    our telephone conference last week.  I mean, you've got the

6    statute and then you've got specifically the regulations in

7    part whatever enacted pursuant to the Safety Appliance Act

8    and --

9        **MR. LAMPROS:**  The effect is the same.

10       **THE COURT:**  And we decided that.  We are in agreement

11   on that assuming their applicability.  But the statutory

12   provision that we're looking at simply says secure.  The

13   regulations have language that I understand you say is broader

14   than that, but the statute itself simply says secure.

15       **MR. LAMPROS:**  Your Honor, I would agree with that, with

16   you that that portion of the statute does say secure simply.

17       **THE COURT:**  But that's the only portion of the statute

18   that applicable to us here.  Where is the picture that you

19   were intending to use to show how it should look, not as a

20   subsequent remedial measure, but just simply to show how it

21   should look?

22       **MR. TOTH:**  Your Honor, while he's getting that, too,

23   the charge that Mr. Lampros submitted on 231.25 makes

24   reference to "suitable sill steps and clipboards conveniently

25   located and securely fastened to a track motorcar when it's

1    more than 24 inches on top of the rail."

2         THE COURT:  You're not going to make that argument

3    again, are you, Mr. Toth?

4         MR. TOTH:  Well, to the extent we're going to -- to the

5    extent Your Honor was going to eliminate the Safety Appliance

6    Act case.

7         THE COURT:  Well, I haven't made any decisions.

8         MR. TOTH:  I know you haven't.

9         THE COURT:  But one decision I'm not going to revisit

10   if the sill step was in violation of the act or regulation and

11   consequently as a matter of law unsafe.  It doesn't make any

12   difference to me for the reasons I've ruled whether or not it

13   was unsafe while on tarmac or unsafe while on the railroad.

14   The fact of the matter is if it's required the fact that it's

15   done or not done in a correct manner is subject to causing the

16   same injury whether or not it happened at the Pilot or whether

17   or not it happened on the railroad track.  So we're not going

18   to revisit that issue.

19        MR. TOTH:  Yes, Your Honor.

20        MR. LAMPROS:  That's the picture, Your Honor.  It's

21   Plaintiff's 22.

22        THE COURT:  Yeah, see, that's -- now that I understand

23   -- I'll just let you know today and y'all can ponder this

24   overnight, but I've got real problems with that picture now.

25   It shows a totally different means of attachment, not just

1   that it's perpendicular or level, however you want to say it,

2   but that they've now attached it in a different way.  If I had

3   to guess, I'd say they use those hard rubber brackets because

4   they don't act like the cables where they get deformed one way

5   and they stay deformed.  That's my guess.  I don't know.  And

6   it's probably not necessary for me to know, but that's

7   logical.

8        MR. LAMPROS:  I can work around it.

9        THE COURT:  But, you know, if your point is simply that

10   it's supposed to be level, I don't know that you need a

11   picture to do that anyway.

12        MR. LAMPROS:  I think I can work around that, Your

13   Honor.

14        THE COURT:  Okay.  Other than alerting you to that

15   issue, is there anything else we need to cover this afternoon?

16        MR. TOTH:  I believe Your Honor's rule is we leave our

17   exhibits that are tendered?

18        THE COURT:  Yes, that's the safe rule.

19        MR. LAMPROS:  We've been leaving them on the podium,

20   but I decided --

21        MR. TOTH:  My office probably --

22        THE COURT:  Yeah, if they've been tendered, they need

23   to be left with me or left with the clerk.  Otherwise they

24   show up missing, and I know you don't want it to be your

25   fault.  All right, if nothing else then, we will --

1        MR. LAMPROS:  I've got to give you 46.

2        THE COURT:  Pardon?

3        MR. LAMPROS:  I was just --

4        THE COURT:  Okay.  We'll reconvene at 9 o'clock in the

5    morning.

6        MR. TOTH:  Thank you, Your Honor.

7            *(JURY TRIAL ADJOURNED JULY 31, 2012)*

8        _____

9

10       *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
     *TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE*
11   *ABOVE-ENTITLED MATTER THIS 5th DAY OF NOVEMBER, 2012.*

12       *s/SALLY L. GRAY, USCR,*
     *U.S. DISTRICT COURT-MIDDLE DISTRICT OF GEORGIA*
13   *E-mail: Sally_Gray@gamd.uscourts.gov*

14

15

16

17

18

19

20

21

22

23

24

25