1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF GEORGIA

3                     MACON DIVISION

4             _____

5

6   PAUL WINDOM,    PLAINTIFF,      :
                                    : Case No. 5:10-CV-407(MTT)
7   v.                              :
                                    :      August 2, 2012
8                                   :      Macon, Georgia
    NORFOLK SOUTHERN RAILWAY        :
9   COMPANY,                        :
                 DEFENDANT.         :      Volume IV of IV
10  _____

11
                        CIVIL JURY TRIAL
12
            BEFORE THE HONORABLE MARC T. TREADWELL,
13          UNITED STATES DISTRICT JUDGE, PRESIDING

14  APPEARANCES:

15  FOR THE PLAINTIFF:        PETER ANDREW LAMPROS
                              PATRICK JOSEPH HANNON
16                            COOK, HALL, AND LAMPROS, LLP
                              1230 PEACHTREE ST NE STE 3700
17                            ATLANTA, GA 30309

18  FOR THE DEFENDANT:        MARK EDWARD TOTH
                              AMANDA M. MORRIS
19                            HALL, BLOCH, GARLAND, & MEYER
                              P.O. BOX 5088
20                            MACON, GA 31201

21

22

23  _____

            *SALLY L. GRAY, CCR, RPR, USCR*
24               *P.O. BOX 875*
              *MACON, GA 31202-0875*
25
                   *(478-752-3497)*

1              **INDEX TO PROCEEDINGS**

2                **AUGUST 2, 2012**

3                **VOLUME IV of IV**

4

5   **PRELIMINARY**                        **3**

6   **CLOSING ARGUMENTS**                  **9**

7   **CHARGE OF THE COURT**               **69**

8   **VERDICT**                           **98**

9   **CERTIFICATE OF COURT REPORTER**    **101**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2     **August 2, 2012**

3          THE COURT:  Good morning.

4          MR. TOTH:  Good morning, Your Honor.

5          MR. LAMPROS:  Good morning, Your Honor.

6          THE COURT:  Anything we need to discuss before we bring

7     the jury in?  You may bring did jury in.

8          MR. TOTH:  One quick thing, I'm sorry.  May I be heard,

9     Your Honor?

10         THE COURT:  You may.

11         MR. TOTH:  I just want to remind the Court I don't want

12    to have to interrupt his closing argument, and he conceded

13    he's not making punitive arguments, but in every particular

14    case that I have experienced there's also implied punitive

15    arguments, and I just wanted to remind the Court of our

16    position on punitive arguments.

17         THE COURT:  Well, that's fine.  You know, I don't have

18    to tell y'all that objections during closing arguments should

19    not be made unless absolutely necessary.  If they have to be,

20    they have to be and we'll deal with them.  It seems to me that

21    that's one area that from the defendant's standpoint there's

22    some concern.

23         From the plaintiff's standpoint there may be some concern

24    about the defendant crossing the line with regard to the

25    applicability of the Safety Appliance Act for all the reasons

1    we discussed yesterday, and I'm not going to discuss again.  I

2    will say this, Mr. Toth, on that issue don't suggest that I'm

3    trying to limit you in any way with regard to whether or not

4    what the evidence has shown in this case constitutes a

5    violation of the Safety Appliance Act.  The only way you're

6    going to cross the line that I can see is if you make the

7    argument that because it wasn't on tracks it doesn't apply.

8    Short of that, you know, that's fair game for you.

9         **MR. TOTH:**  Yes, Your Honor.

10        **MR. LAMPROS:**  Your Honor, the only other concern the

11   plaintiff would have would be if they try to get into some

12   kind of implicit assumption of the risk argument or try to

13   distance themselves from their non-delegable duty and try to

14   place that burden on Mr. Windom which would also be an

15   assumption of the risk argument, saying that he knew the way

16   the steps were -- the way the step was and he used it anyway.

17   That's -- it's not his duty to fix the step.

18        **THE COURT:**  That's true, but using the steps knowing

19   that they were in the condition that they were in is relevant

20   to contributory negligence, is it not?

21        **MR. LAMPROS:**  Not under the FELA, Your Honor, and

22   there's case law that says that even if the employee knows the

23   condition of the step and his only other option is not to

24   work, that it is not contributory negligence.  And there's

25   evidence in the record that he informed the railroad of the

1     condition of the steps and they took no action.  So his

2     continued use of the steps after April 16th, the only way that

3     could be relevant is an assumption of the risk argument or in

4     an effort to shift their non-delegable duty to Mr. Windom

5     which they can't do under the law.  And that is as a matter of

6     law, they cannot shift that duty to him.

7           And Mr. Bobbitt on his cross examination danced around

8     that and that said, no, it's the railroad's and Mr. Windom to

9     make sure the truck is in good order, and that's not true and

10    that's not the law.  So that all I'm saying is I don't expect

11    Mr. Toth to do that but that would be the only time and

12    instead of objecting I would simply stand up, Your Honor.

13          **THE COURT:**  Mr. Toth?

14          **MR. TOTH:**  I agree assumption of risk is not an

15    available defense, but I think it's fair game for me to say,

16    you know, you used -- you were assigned this truck, he

17    testified he had used the truck for two, two and a-half years,

18    and this was the first time he had ever slipped on it or the

19    first time he'd ever had a problem with it, and I think it's

20    fair game for me to establish that.

21          **MR. LAMPROS:**  And I don't disagree with that.  I agree

22    with that.  But if he goes and says, if he says, you know, if

23    he slipped, the only reason he slipped was because he

24    continued to use the step even after he knew it was bad.

25          **MR. TOTH:**  But that's the point in contention, whether

1    it's bad or not, Your Honor.  That's a disputed fact.

2        **MR. LAMPROS:**  Well, I know, but if you say Mr Windom

3    contended it was bad and yet he continued to use it, that's

4    crossing over from contributory negligence to assumption of

5    the risk.

6        **THE COURT:**  Well, I think what Mr. Toth said first was

7    more that his continued use is evidence that it wasn't unsafe.

8        **MR. LAMPROS:**  And I understand that, and I agree.

9        **THE COURT:**  That's certainly a fair argument.

10        **MR. LAMPROS:**  I don't agree with that, but I agree that

11    that is a fair argument.

12        **THE COURT:**  It sounds to me like, Mr. Toth, you agree

13    that his use of the step with knowledge of its condition is

14    not an argument available under a contributory negligence

15    defense?

16        **MR. TOTH:**  His use of the step?

17        **THE COURT:**  Notwithstanding his knowledge of the

18    condition because that really is -- Mr. Lampros is saying,

19    that's really assumption of risk and you can't make that

20    argument as a part of a contributory negligence argument.  I'm

21    not saying I agree with that yet, but do you agree with that?

22        **MR. TOTH:**  I don't think I do, Judge.  I think I can

23    argue that, you know, he's the one that thinks -- you know,

24    the issue is whether, first, which step, and if it is the

25    bottom step, that he contends and he felt that it was unsafe

1    and he used it, you know, he'd been up and down and it had

2    never had been unsafe, yet he wants to come in and say it's

3    been unsafe since he made a complaint in April.

4         THE COURT:  Well, that's a different argument, and

5    Mr. Lampros has already agreed that's a fair argument.  The

6    argument that he's talking about is that he was contributory

7    negligence because he used the step knowing it's condition.

8    He says that's the argument you can't make as a part of a

9    contributory negligence argument because it's assumption of

10   the risk.  The argument I hear you making now is his continued

11   use of the step is evidence there was nothing wrong with it,

12   it didn't cause any problems.  And that's fine.  But it's the

13   first argument that Mr. Lampros is concerned about.

14        MR. TOTH:  That I argue he assumed the risk of injury

15   after he reported it -- he reported it and he continued to use

16   it so he assumed the risk.

17        THE COURT:  Well, obviously if you put that last clause

18   if there, there's no doubt about it.  And that might be --

19   that might tell the tale of what that argument really is.

20   But, no, I think the argument that Mr. Lampros doesn't want

21   you to make is he knew the condition of the step, he continued

22   to use it, and therefore he was contributory negligent.

23        MR. LAMPROS:  That's right.

24        THE COURT:  So substitute your last clause with that.

25   You're calling it something else or I'm calling it something

1    else, but Mr. Lampros says it's still assumption of risk.

2         MR. TOTH:  Well, if he stands -- I don't think that is

3    going to come up with what I have planned, Your Honor.

4         MR. LAMPROS:  And I didn't expect it would.  I just

5    want to make sure.

6         MR. TOTH:  I don't even think it would come up,

7    certainly not intentionally.  I understand the law.

8         THE COURT:  Okay.  All right.  Now, we may bring the

9    jury in.

10   (Jury In, 9:10 a.m.)

11        THE COURT:  Good morning, ladies and gentlemen.  The

12   first question that I've begun with the fourth day now or the

13   third day now.  Did anybody have any difficulty with my

14   precautionary instructions overnight?  Good.  As I said

15   yesterday, the lawyers have finished the presentation of the

16   evidence.  I met with the lawyers yesterday afternoon after I

17   let you go home early.  We have worked through the matters

18   that we needed to work through, and we're ready today to begin

19   with closing arguments, which will be followed by my charge of

20   the law to you.

21        Let me say a couple of things about closing arguments,

22   and then I'll turn it over to the lawyers.  The plaintiff's

23   lawyers will argue first.  The defendant's lawyers will then

24   argue and then the plaintiff's lawyers will then have a

25   concluding argument.

1        As I told you at the beginning of the trial, what the

2   lawyers say whether in opening statement or closing arguments

3   is not evidence.  But in closing arguments they have much more

4   latitude than they do in opening statements.  In opening

5   statements they simply tell you what they believe the evidence

6   will be.

7        Now they will argue to you not only what the evidence has

8   been, but what they believe the evidence has proved and what

9   you should conclude, what you should find in your

10  deliberations based on the evidence that you've heard and

11  seen.  All right, Mr. Lampros, are you ready to begin?

12       **MR. LAMPROS:**  Yes, Your Honor.  There is one little

13  preliminary matter that I apologize.  It won't take but five

14  seconds if we could do it on sidebar.

15       **THE COURT:**  Sally, just hang loose for a minute.

16       **MR. LAMPROS:**  Yeah, I don't think we even need it on

17  the record.

18  *(PAUSE)*

19       **MR. LAMPROS:**  May it please the Court, counsel, ladies

20  and gentlemen.  I appreciate your time and your patience this

21  week.  When we began I told you that we weren't going to come

22  in here and try to convince you that Paul Windom was incapable

23  of working any other job again, and we're not.  We'll get to

24  that in a minute.  But first I want to talk a little bit about

25  the law and the evidence and what we've seen and what it

1   means.

2       The Judge is going to instruct you on the law this

3   morning.  He's going to tell you that Mr Windom has three

4   separate legal claims or three areas of the law in which he

5   brings his claim against Norfolk Southern.  The first is the

6   Federal Employer Act -- the Federal Employers Liability Act,

7   the second is the Safety Appliance Act, and the third is a

8   violence of federal regulations.

9       What is the Federal Employers Liability Act?  We call it

10  the FELA, because it's easier to say.  The FELA is the law

11  that Congress passed for the benefit of railroad workers who

12  were injured on the job.  When a railroad worker is injured on

13  the job, he has to sue his employer under the FELA.  In order

14  to recover for that job injury, he's got to prove that his

15  employer was negligent and he has to prove that by a

16  preponderance of the evidence, and that that negligence played

17  a role in bringing about the injury.

18      And the Judge is going to instruct you on the law, and

19  it's simply that, what does it mean to bring about to cause

20  the injury?  And he will tell you that negligence is the legal

21  cause of damage if it played any part no matter how small in

22  bringing about or actually causing the injury or damage.

23      That's what the law is.  That is what our burden is, to

24  show you by a preponderance of the evidence, and the Judge

25  told you what a preponderance is, if the scales tip ever so

1    slightly, if we show you that something that the railroad did

2    or failed to do caused, or played any part, no matter how

3    small in bringing about or actually causing the injury or

4    damage to Mr. Windom, then your verdict should be for the

5    plaintiff.

6        What is negligence?  Negligence is simply the railroad

7    doing something it shouldn't have done or failing to do

8    something it should have done.  What was the negligence in

9    this case?  It was the railroad's failure to keep the steps on

10   that truck in good and safe condition, in particular the step

11   that Mr Windom said that he slipped off of.  And we've seen

12   the pictures of -- go to Plaintiff's 17.

13       We've seen pictures of it, and you've heard the testimony

14   about it.  And they trotted in several witnesses, and they've

15   all said there's nothing wrong with that bent step.  It's

16   perfectly safe.  But look at it and apply your common sense.

17       If you look at this picture, right here, Defendant's 7-B

18   you can see that it's sloping downward and also it's not

19   level; it not parallel.  I get parallel and perpendicular

20   confused sometimes.  It's not parallel to the step above it,

21   and it's also not level.  So just apply your good common

22   sense.  Does that look like a safe step?  Does that look like

23   a step or a piece of equipment that the railroad should have

24   had something done about?

25       And how long had it been that way?  Well, Mr. Boone told

1    you it had been that way as long as he could remember, two

2    years.  Mr. Windom told you it had been that way two years.

3    Now, he's going to come up here and they're saying that nobody

4    ever got hurt before.  Well, the fact that nobody ever got

5    hurt before is not proof that it wasn't negligence.

6         That's like a driver who speeds down the road on a

7    regular basis, when he finally gets in an accident because of

8    his speeding and say, it wasn't my fault, I drive 95 miles an

9    hour all the time, and I've never been in a wreck before.

10   Just because they got away with it for a long time doesn't

11   mean it wasn't negligence.

12        Now, what's the documented date by their documents that

13   we knew they had notice that the steps were bad?  This will be

14   in evidence.  It is in evidence, and it'll go back to the jury

15   room with you.  And these are the Norfolk Southern's own

16   records.  These are their own documents about this truck.

17        And if you look on page four, it's got the notes about

18   what's going on.  And it says 4/16/2010, 3:04 P.M., driver

19   Paul Windom, gas tank dented, steps need replacing.  4/20,

20   four days later:  Right side tank is dented, left right and

21   rear steps are bent.  It goes into the shop.  What do they do?

22   They change the wiper blades, they change the oil, the filler,

23   the bumper, the air filter element, but they don't -- and they

24   fix one step.  One step.

25        Now, when Mr. Smith testified about that, Mr. Toth came

1   back up on redirect and said, well, right here it says you

2   fixed a step, maybe all we need to do is add an S to that.  So

3   he wants to add an S to the document that they produced to

4   change the evidence in the case.

5       Did the step get repair?  No.  Did the step get replaced?

6   No.  And keeping that step in that condition after they've

7   been told and after they knew is negligence.  And they can't

8   blame Paul for it.  The Judge is going to instruct you on the

9   law.

10      The railroad has a continuing duty.  It is railroad's

11  duty.  It's not Mr Windom's duty to fix that truck.  He

12  doesn't own it.  He did what he was supposed to do, tell them

13  about it, and they did nothing to fix it.  And if that

14  negligence by the railroad played any part, no matter how

15  small in bringing about Mr. Windom's injury, then your verdict

16  should be for Mr. Windom.

17      The second aspect of the law is the Safety Appliance Act.

18  What is the Safety Appliance Act?  It's another law that

19  Congress passed for the protection of railroad workers.  It

20  requires the railroad to keep its equipment in good working

21  order for the safety of its workers.

22      It prohibits the railroad from using equipment -- if

23  you'll go to page 16, please, of the charges.  And the Judge

24  is going to instruct you on the law, and he's going to tell

25  you that the Safety Appliance Act applies to this welding

1    truck even when it's not on the railroad tracks.

2        So when it's parked there at the Pilot Station, the

3    Safety Appliance Act applies.  And he's going to tell you, the

4    Judge is going to instruct you that the Safety Appliance Act

5    requires that a railroad carrier may use or allow to be used

6    on any of its railroad lines a vehicle only if it's equipped

7    with secure sill steps.

8        Now, they've had witnesses come in here and say oh, yeah,

9    it was secure, it was secure.  It was attached by those

10   cables.  Well, secure I submit to you means not just attached

11   but it's got to provide secure footing.  It's got to be safe,

12   and if you look at that picture it's going -- and apply your

13   common sense, it doesn't look like it's going to supply secure

14   footing.

15       The other aspect of it -- look at page -- no, we're still

16   on page 16, I'm sorry.  The step is bent down and it slopes.

17   That's not a secure step.  And keep in mined that Mr. Bobbitt

18   testified, and I believe Mr. Thornhill testified that there's

19   no sill step on that truck.  But that's a requirement under

20   law.

21       What they want to do is try to confuse the issues by

22   saying, wait, that's not a sill step.  There's no sill step on

23   this truck.  Well, the law requires that truck to have a sill

24   step, and it requires that sill step to be in safe and

25   suitable condition.  That's the regulation.

1       Well, what is a federal regulation?  Well, we know

2   there's tons of federal regulations.  This one applies again

3   to the vehicle when it was at the Pilot Station, and the Judge

4   is going to instruct you on that.  And there will be two

5   things for y'all to decide with regard to whether the railroad

6   violation that regulation.

7       Number one, how high up was that truck?  For the

8   regulation to apply, the bed of the truck, the bottom of it

9   has to be, when it's operated on the rail, it has to be at

10  least 24 inches over the top of the rail.  Now, that seems a

11  little confusing.  But Mr. Toth spent an awful lot of time

12  talking about how when it gets on the rail, it gets jacked up.

13      And you can look at the pictures yourself of the truck

14  and tell that when it's on highway mode, the bottom of that

15  truck is pretty high as it was.  Put up 17 again -- or 7.  7

16  is fine.  And we're talking about this area right here.

17      The first thing y'all need to decide is:  Do you think

18  that was 24 inches above the rail when it operated on the

19  rail?  If it does then -- if it was, when it was operated on

20  the highway, did -- let's go back to 16, please -- did that

21  motorcar -- and that's what it is.  It's called a motorcar

22  under the regulation -- was it equipped with safe and suitable

23  steps or footboards?

24      And that's the question.  And if it wasn't equipped with

25  safe and suitable sill steps -- and under this regulation it

doesn't use the term secure.  Safe and suitable.  Were those
steps on that truck safe and suitable?  And if they weren't,
then that's a violation of the regulation.  And if that
violation, again, played any part even in the slightest in
bringing about the injury, then your verdict should be for Mr.
Windom.

Now, Mr. Toth is going to argue inevitably that the bent
step played no role in this injury.  Let's explore that a
little bit and let's talk about what happened on the day of
the incident.

Let's review what happened when Mr. Windom's boss, Tommy
Thornhill saw Paul limping in Cordele.  He gets out of his
truck, he gets Paul, they go into the office, and they sit
down in Mr. Thornhill's office.  And he starts pulling out
forms and asking Paul what happened.  And he also -- and
you've got to keep in mind now, Mr. Thornhill is Paul's boss.
He has power over him.

And he also gets on the phone immediately and calls the
big boss, Mr. Bobbitt.  The boss of bosses.  And tells him,
Mr. Bobbitt, Paul Windom is reporting an injury.  What does
Mr. Bobbitt do?  Well, let me talk to Paul.  Tell me what
happened.  Paul tells him what happened.  Tell me again.  Paul
tells him again.  Tell me again.  He tells him again.

Mr. Bobbitt admitted he asked Paul three different times
to tell him what happened.  Because he didn't like what he was

1     hearing.  And here's Paul, a laborer, a welder, talking to a

2     man with 31 years at that time of management experience, the

3     man who's got the ultimate power over Paul.

4          What did Mr. Bobbitt say about how Paul was when he was

5     talking to him?  He said Paul was confused.  Mr. Bobbitt

6     admitted that.  So he asked him to explain it time and time

7     again.  How did Paul describe how he felt when he's sitting in

8     there with Mr. Thornhill and Mr. Bobbitt?  He said he was

9     nervous and scared.

10         Mr. Thornhill fills out the form.  He goes so far to even

11    start filling out the portion of the form that has the

12    employee describe the incident.  All the while they're on the

13    phone with Mr. Bobbitt.  The inquisition is underway.

14         Mr. Thornhill goes out that day, he said, and took

15    pictures of that truck.  Now ask yourself this.  The pictures

16    he took -- and you'll see them, they're in evidence -- on the

17    day of the event he does everything he can to keep that bent

18    step out of the pictures because he didn't want anyone to know

19    that truck had a bent step.

20         And all he had to do was say, Mr. Windom, come out here

21    and let's take a picture and I want you to stand there and

22    point to me and tell me which step you're saying you slipped

23    off of.  That's all he had to do.

24         He could have said, Paul, when you say middle step, what

25    step are you referring to?  I want to make sure we're clear

1    about this.  Because, as they said, one purpose is to make

2    sure that they can address these problems so they don't happen

3    again.  Which step did you slip off?  I want to be absolutely

4    sure we're clear on this.  Mr. Thornhill didn't do that.  From

5    the nervous, confused employee he got the answer he wanted and

6    he ran with it.

7         Now, Mr. Bobbitt testified that he didn't think that the

8    incident happened the way that Paul described it.  But he

9    never asked Paul to clarify.  Mr. Thornhill never asked Paul

10   to clarify.  They just went with what they wanted to go with.

11        And let's talk a little bit about the credibility of the

12   railroad witnesses.  What do they blame Paul for doing?  They

13   blame him for violating the three points of contact -- D-2,

14   please -- rule.  And they also blame him for violating another

15   rule, which is Defendant's 2, and it's also in evidence under

16   ours as well.  Failure of employee to maintain three points of

17   contact while dismounting.  That's one thing they blamed him

18   for.

19        The second thing they blamed him for:  Employee working

20   in an unsafe manner unnecessarily attempting to hurriedly

21   leave the cab of the vehicle.  Prevention:  Employees must

22   maintain three points of contact while mounting or dismounting

23   equipment.  Employees must perform duties in a manner that

24   will not cause injury to self and others.  Well, that second

25   one is pretty self-explanatory and just as a catch-all.

1       But Mr. Thornhill sat right there and he and I went over

2   step by step this description that Mr. Bobbitt and

3   Mr. Thornhill gave of what they said Paul said.  And if you

4   remember that, we went step by step, and I kind of moved

5   around, and I said, okay, he's got his hand here and he's got

6   his hand here, and he's got his leg here.  And I asked

7   Mr. Thornhill, now, through that scenario we just went through

8   that are the railroad's own words, tell me when Mr. Windom

9   lost three points of contact.

10      And what was his answer?  Well, at first he didn't have

11  any answer.  He sat there and looked at me, and it wasn't with

12  warmth and affection.  And then he said:  When he slipped.  So

13  I asked again:  Before he slipped when did he not have three

14  points of contact that caused him to slip?  And again:  When

15  he fell.

16      And that's what Mr. Thornhill said.  This whole scenario

17  gives you good idea of what was happening with Mr. Thornhill

18  and Mr. Bobbitt and Mr. Windom.  They're doing everything they

19  can to shift the blame from the railroad to Mr. Windom,

20  including getting right up there and not telling the truth.

21  And when they get caught with it, they don't have anything to

22  say.

23      Now, you would think -- now, Mr. Bobbitt has been sitting

24  here the whole trial, and he saw Mr. Thornhill testify, and he

25  heard his answer to that question.  So what does Mr. Bobbitt

do when he gets on there?  He changes the three point of contact rule.  He says, oh, no, it requires that you use a secure handhold, not just have three points of contact.  I asked somebody, who knows that rule -- who instructs you -- I asked one of the workers yesterday afternoon -- and we'll talk about them in a minute.

I ask one of the workers yesterday afternoon:  Does Mr. Thornhill go over that rule with you every day?  Yes. Mr. Thornhill would know as well as anyone on the railroad if that rule was violated?  Yes.

Did Mr. Thornhill during his 20 or 30 minutes that he was up there or on either my cross examination or Mr. Toth's direct examination say anything about the three point of contact rule requiring a secure handhold?  No.  Mr. Bobbitt did after he heard Mr. Thornhill's testimony and saw how he testified.

I asked him:  Where is it in the rule work?  It's not written anywhere.  That's a written instruction that his supervisor, Mr. Thornhill, gave him.  Well, why didn't Mr. Thornhill mentioned it during his testimony?  Because it doesn't exist.  You can't believe what they tell you.

Now, how else do we know that their credibility is less than certain?  If you look at this -- and remember the questions we asked:  What is the purpose of this write-up?  It is to make sure that similar incidents don't happened in the

1   future.  Well, then, if you believe that they say this

2   write-up should say somewhere in here:  Prevention:  Employees

3   must maintain three points of contact while mounting or

4   dismounting equipment using secure handholds.  It doesn't say

5   that.

6       Now, what else do we know that calls into question their

7   credibility?  Mr. Bobbitt -- and if you look at the truck,

8   there's been talk about platform steps, top steps, middle

9   steps, fuel tank steps, bottom steps, sill steps, hi-rail

10  steps.  We've had I don't know how many different terms for

11  steps.

12      And this step right -- the area right here, they want to

13  call it the top step.  Other folks have called it the platform

14  step.  And I was able to get a copy of Mr. Bobbitt's

15  testimony, and what does Mr. Bobbitt say about the platform?

16      And the question was:  Now, this right here is the

17  platform?  Well, you can call it that.  That's what I called

18  it.  Question:  That's what you called it?  Yes.  And you're

19  the one who came up with that term?  Yes.

20      And why did he come up with the term platform?  Because

21  it has to be called -- it has to be called and considered a

22  top step for their theory to work.  Because if you look at it,

23  if this is the platform, and this is a step and this is a

24  step, then the truck only has two steps, and that's what it

25  has is two steps.

1    And there's is no middle in two, and they know that.  So

2    what do they do?  They stop calling it a platform, and

3    Mr. Bobbitt, says, no, I'm the only guy who calls it a

4    platform.  It's really a top step.  Everybody else refers to

5    it as the top step.

6        Now, they brought in those guys yesterday to testify

7    against Paul.  And let's talk about their credibility a little

8    bit.  They all still work for the railroad.  They all still

9    answer to Mr. Thornhill.  They all still answer to whoever

10   Mr. Thornhill's boss is.  It's not Mr. Bobbitt anymore.

11       You know, they went to the trouble to bring Mr. Bobbitt

12   down here from Roanoke, Virginia for the week.  And all of

13   them had met with Mr. Thornhill or -- there's only two.  They

14   had met with Mr. Thornhill and the railroad's lawyers.

15       I believe it was Mr. Floyd did not want y'all to know

16   that.  When I asked Mr. Floyd:  When's the last time you saw

17   Mr. Thornhill -- or when Mr. Toth asked him, when did we meet

18   on this case, he said a few days ago.  That's what he said on

19   direct.  When I asked him on cross, when was the last time you

20   saw Mr. Thornhill, he said yesterday.  Where?  Here in Macon.

21   Where?  Here in Macon.  Where in Macon?  And he hesitated, and

22   he looked at Mr. Bobbitt and he looked at Mr. Toth, and he

23   said at the lawyer's office.

24       So they were all in there yesterday -- or day before

25   yesterday, the day before they testified, going over what

their testimony was going to be and what they should say.  And

that pretty's clear because if you recall their testimony it

was almost all the same, almost word for word the same.  And

all the sudden they've got people coming in here to testify

and saying on Monday morning Paul stands up in front of all of

us and says, I fell, it was all my fault.

Now, Mr. Smith's testimony, we've talked about that.

We've touched on that.  He's saying it's DOT compliant.  But

the DOT regulations aren't what we're here about.  We're here

about Federal Railway Administration Regulations, and whether

that truck complied with those regulations.  And that's the

law under which Mr. Windom is entitled to recover.

And, again, look at that exhibit, which is Norfolk

Southern's own, and think, okay, did they replace those steps,

did they repair them?  And the answer is no.  And he also

brought in some cables.  I think they're in evidence.

And those are the cables that they want you to believe

that make a secure attachment for that step.  What did Mr.

Smith say about it?  Once it gets bent, it's not getting

unbent unless they bring it in and get it fixed.  Can brute

force bend it back?  No.

Now, they say Paul said middle step.  Everybody else says

middle step.  Everybody on the railroad says this is the

middle step of that truck.  But Paul explained to you and

explained to them why he called the middle step the middle

1   step, and they never asked him, up until this litigation

2   began, they never asked him one time to clarify that.

3       Did he use the same terminology as everybody else?  No.

4   Does that make -- has he ever varied from what step he said he

5   slipped off of?  No.  He got down from the truck, and

6   Mr. Boone told you how he got down from the truck.  I also

7   have his testimony.  He says he got down taking in two steps,

8   you know, that he'd get on the platform and go to the fuel

9   tank step, and then to the ground.  Two steps.  What did --

10  and then he also said everybody on the railroad has their own

11  way of doing things.  And that's true.  That's true.

12      Now, let's talk a little bit about damages.  We'll come

13  back and visit liability again at the end, but I want to talk

14  a little about damages.  Dr. Slappey.  Dr. Slappey is a board

15  certified orthopedic surgeon who operated on Mr. Windom.

16      And Mr. Windom had been to a couple of doctors, a few

17  doctors before that.  Who's the first doctor they took him to?

18  Their doctor in Valdosta because they can drive 50 miles and

19  get him in to see a doctor quicker by driving 50 miles to

20  Valdosta than they can by going two miles on Wednesday

21  afternoon.  Did you call over there and see how busy that ER

22  was?  No.  We just know that Valdosta is a better place to go.

23      And what did Mr. Windom say?  First they tried to take

24  him to a doctor down there.  The doctor wasn't there, so then

25  they went to the emergency room.  So if he says -- Mr. Toth I

1    expect is going to get up here and say he went to doctor to

2    doctor to doctor until he found one that he liked or one that

3    would operate on him.

4         The long and short of it is Dr. Slappey looked at what

5    the other doctors had done and said he's got a tear in his

6    meniscus.  I'm going to fix it.  Mr. Windom is entitled to go

7    to whatever doctor he feel comfortable with.  One doctor

8    disappeared on him.

9         But, anyway, Mr. Toth has done everything he can to

10   minimize that injury, and I'm not going to sit here and tell

11   you that Mr. Windom has lost a leg or is paralyzed or anything

12   like that.  He didn't.  It was a torn meniscus.  But it is not

13   an insignificant injury when it comes to his ability to labor

14   at the job he had.

15        Now, Mr. Toth called it and tried to get Dr. Slappey to

16   call it a partial tear.  What did Dr. Slappey say?  Well, it's

17   a little bit like pregnancy.  You can't have a partial tear.

18   Either it's torn or it's not.

19        Mr. Toth tries to emphasize 60 to 70 percent of his

20   meniscus is still there, and that's true.  But that means 30

21   to 40 percent of it is gone, over a third.  Dr. Slappey said

22   early onset arthritis is a strong policy due to this injury

23   and the surgery he had to perform.

24        Mr. Toth accused Mr. Windom of malingering.  What did Dr.

25   Slappey say?  Dr. Slappey, who's seen him a number of times

1   and treated him, he said, no, I didn't think he was

2   malingering.  Dr. Slappey, do you think he was truthful to you

3   about his complaints of pain?  Yes.  What did Dr. Slappey do

4   for him?  He gave him injections in his knee.  He gave

5   prescription medications.  Dr. Slappey would not take Mr.

6   Windom into this office and stick a needle into his knee and

7   shoot medicine in there unless he believes his complaints and

8   thought it was necessary.

9       Now -- and Mr. Windom told you, Paul told you, he's still

10  going to a doctor, and he's still today having injections.

11  And that doctor wouldn't be providing that medical treatment

12  if it wasn't necessary.  They'd just give him an aspirin or a

13  sugar pill and tell him to go home.

14      Now, the railroad could have had Paul seen by a doctor

15  for this litigation.  They could have had a doctor review the

16  records and come in here and testify, but they didn't.  And

17  you know why.  Because any doctor that he hired would have to

18  say that continued pain -- while most patients do recover from

19  a torn meniscus, there are some patients who have continued

20  pain.

21      And Paul didn't say it was a chronic, constant,

22  overwhelming, I can't get out of bed pain.  He says it bothers

23  me from time to time.  It keeps me from doing the physical

24  activities that I need to do to do my job.  Mr. Bobbitt or Mr.

25  Thornhill, one, I can't remember, I believe it was Mr.

1    Thornhill said no.  If he can't do these tasks, he can't do

2    this job.

3        What else does Mr. Toth do to try to minimize Mr.

4    Windom's injuries?  He talks about Herschel Walker when he

5    played college football at the University of Georgia.  He

6    tries to compare Mr. Windom, as a 40-year old man, to one of

7    the greatest college athletes who's ever played the game.  I

8    don't think that's a fair comparison.

9        Now, the other doctors who Paul saw, if any of those

10   doctors had anything bad to say about Paul or his injury or

11   the cause of his injury, the railroad would have had them -- a

12   deposition or they'd have had them here, and he'd have seen

13   that doctor just like he saw Dr. Slappey.  But you didn't.

14       Dr. Hecker.  Dr. Hecker testified about employability,

15   and he said it's going to be tough for Paul to find a job,

16   that people who are injured have a tougher time finding a job.

17   He talked about employment rates.  He says that eventually his

18   hope is that Paul can get back to work in a job that pays 8 to

19   $11 an hour.

20       Paul wants to get back to work too.  But I think we're

21   all in agreement that when he goes back to work, he's not

22   going to be working in a job that paid him what the railroad

23   paid him and that provided him the benefits that the railroad

24   provided him.  And we'll talk about that later.  You know, if

25   you can remember in my opening, I said we're going to ask you

1  just to make him whole, to put in a position he would have

2  been.

3       Dr. Hecker said, you know, I want to be careful with him

4  in any job placement because I don't want him to go back into

5  a job and risk reinjury or have a shortened work life.  When

6  he goes back to work, I want to be able -- want to make sure

7  it's in a job that he can continue to work until retirement.

8       Now, what has the railroad done to help Paul get another

9  job?  Have they offered him an office job that he could do?

10  No.  Have they offered him another job that doesn't require

11  the walking, standing, all the tasks that we talked about,

12  lifting, carrying 70 pounds?  No.  Have they offered to help

13  him with retraining?  No.  Did they offer to let him

14  participate in their vocational rehabilitation program that

15  Mr. Birmingham told you about?  No.

16       Finally, Dr. Thompson.  And Dr. Thompson came in here and

17  did a whole lot of math and a lot of it is boring, and it's

18  hard to understand.  But he took the numbers from the tax

19  returns and from the railroad earnings and said -- he averaged

20  them out, and he said, this is what Mr. Windom on average made

21  per year.  And that number is 58,000 and some change.

22  $58,700, something like that.  Did Mr. Toth or the railroad

23  dispute that number?  No.

24       Dr. Thompson also said these are the benefits that the

25  railroad provides Mr. Windom.  And he got that directly off

their sheet.  Did the railroad dispute that number?  No.  He applies his math to it, comes up with his number, and brings it back.

What did the railroad dispute?  They nitpicked over cell phone bills and dry cleaning bills and clothing.  And that's the only thing they disputed.  So if you want to give them the benefit of the doubt on that, go right ahead.  Because in the whole scheme of things, the cell phone bills, the dry cleaning bills, his other un-reimbursed business expenses, in the whole scheme of things compared to the money that he was earning working at the railroad aren't that significant.

The other thing that Mr. Toth wants to emphasize is that it's a big number, and he doesn't want to talk about bringing it back to present value.  That's a big number too.  But he said three million dollars, that's a big number, and it is a big number.

But Dr. Thompson told you how he got to it, and he told you why that's not a true number.  He had to bring it back to present value.  But the numbers are what the numbers are, and those numbers are based upon what the railroad admits Paul made.

And if they really disagreed with what Dr. Thompson had to say, they'd have had their own economist to come in here and do his own calculations and say these are what the numbers ought to be.  But they didn't do that.

1    So, I'm going to sit down for a while but Mr. Toth is

2    going to come up here and I'm sure he's going to say middle

3    step, middle step, middle step, middle step.  When he's done

4    I'll come back and talk about a few other things with, and

5    then we'll wrap up.  I appreciate your time and your patience.

6        **THE COURT:**  Mr. Toth?

7        **MR. TOTH:**  May it please the Court, counsel, ladies and

8    gentlemen of the jury.  It's been a long time coming, and I

9    know it's been a long week for you, and we appreciate you

10   being here to settle this dispute for us.  I know a lot of you

11   have come from a long way and you've got a long way to go

12   home.  And this my chance finally to tell you what I believe

13   the evidence has shown.

14       And unfortunately I won't get back up under our rules of

15   procedure and have the opportunity to address what he says

16   when he gets his last 25 minutes probably.  But I have an

17   hour, and I hope not to use that.

18       I hope we can cut to the chase and get to what's really

19   important and not talk about Mr Windom's first five years at

20   the railroad, but talk about August 6th because that's really

21   when this all started, August 6th of 2010 and what happened on

22   that particular day and what was the step that he reported on

23   August 6th that caused him to slip.

24       Now, Mr. Lampros has to make you believe and convince you

25   that it's the bottom step.  The only one that testified in

1    this case that has called -- and I'll have this put up, one of

2    the exhibits, 7-C, Ms. Morris.  The only person throughout

3    this trial that has called -- right down here, Ms. Morris, if

4    you'll mark that for me, please -- is Mr. Windom.  He calls

5    that the middle step, and for the life of me from the time

6    that this case was filed I have been trying to figure out how

7    that could be the middle step, what kind of spin he was going

8    to put on it to make that the middle step.  Because everybody

9    that testified in this case with the exception of Mr. Windom

10   and his lawyers -- look at this with common sense.

11        I mean, how many steps do you see?  I mean, everybody

12   that got on the stand was asked to just -- if you were coming

13   out, what would you do?  You'd come down here.  That's your

14   first step.  That's step one right there.  The platform step.

15   The platform that you stand on.  It's a step.  Then down here,

16   that's the middle step or the step inset in the fuel tank.

17   And then the bottom step.  Nowhere in his Form 22 report that

18   you're going to have in evidence with you do you hear anything

19   about bottom step, suspended step, hi-rail step, or what I

20   like to refer to, the step closest to the ground.

21        In contrary to what Mr. Lampros would have you believe,

22   Mr. Thornhill got up here and testified that they walked up

23   there and he said, which step did you slip from?  And he said

24   the middle fuel tank step.  The fuel tank step.  And now I

25   thought it interesting that when Mr. Windom testified and I

asked him countless times about dimensions, dimensions,
dimensions, and he said I'm just not good at numbers, I'm just
not good at numbers.  But what did he say in response to
Mr. Lampros's question about how far away were they from the
truck when Mr. Thornhill asked him about which step it was -
15 yards.

So he could get his measurements when it's convenient for
his case, but he can't get the measurements right when we try
to find out why in the world he would possibly be using the
bottom step when he's getting out of the truck at the Pilot
Gas Station.

There was a lot of testimony about the distance -- and
I'll just clear it off there -- from the bottom step -- again
he calls it the middle step.  We acknowledge that -- to the
ground.  We heard 3 or 4 inches, 5 or 6 inches.  He's
six-foot-one.  He testified eventually that the middle step
that I call -- what I call the middle step is 18 to 20 inches
from the ground.

He called in one of his good friends that he used to work
with as his helper.  He drove the truck, and Mr. Boone,
Mr. Boone was his helper.  He said he's six-three and a-half
and whenever he got out of the truck he never used that bottom
step.  He didn't do that.  And he said, I got long legs, I'm
six-three and a-half.

Well, Matt Coleman, another member of Mr. Windom's union,

1    somebody he worked with all the time, he said he was five-nine

2    and he never used that step.  I mean, it's common sense that

3    you would not use that step unless you were on the hi-rail.

4          The purpose of that step is when the truck is elevated to

5    use that step to assist you if you need it to get down when

6    you're in a condition where maybe you have a railroad line and

7    the ballast slope falls out.

8          And he's got to give you this explanation that the bottom

9    step is really the middle step, and why?  Because that's what

10   he wrote up on August 6th of 2010.  That's what he told

11   Mr. Thornhill which step was involved.  That's what he told

12   Mr. Bobbitt on the phone.

13         And if you recall Mr. Bobbitt -- and you're going to get

14   a charge from the jury about judging people's credibility.

15   And if this man can't pass the credibility test, I don't know

16   who can.  And he drove down here from Roanoke because he felt

17   strongly enough about what he knew about this case that he

18   wanted 12 people to hear exactly about what this gentleman

19   told him on the telephone.

20         And he did so at great inconvenience, but it was

21   important for him.  He's the only one that could tell his side

22   of the conversation and what their conversation was.  Mr.

23   Thornhill admittedly only heard what Mr. Windom was telling

24   him on the phone.

25         And what he tell him?  And you heard it -- you heard it

from Mr. Bobbitt.  It was Friday, I got in a hurry, I didn't maintain three points of contact, I slipped on that middle step and went down and landed awkwardly.  And he followed it up with additional questions because the first version didn't make sense.

    And when you get that Form 22 back there, I would just suggest to you -- you can do whatever you want with this evidence when you're in the jury room, but I can tell you what we've done trying to make some sense out of this story about this middle step -- I'm sorry, ladies and gentlemen -- trying to make some kind of sense how this can be the middle step.  I mean, it's just common sense it's the bottom step.

    But that's the sales pitch he's got to make to have a chance of any recovery in this case.  And I'd submit to you this is a lawyer-driven case if there ever has been one.  Because if -- everybody agreed on what the middle step was and which step caused the fall on August 16 -- on August 6th and then again on Monday.  Everybody knew what it was.  Nobody disagreed about it.

    But in September when we get a letter from a lawyer, all of a sudden that middle step becomes something different.  And their middle step -- and I'm going to mark it on here again -- this is their middle step.  Nobody from the railroad tried to tell you, none of our witnesses tried to tell you that it did not have a bend in it.  But every one of them told you it was

1    secure and it was safe.

2        Ladies and gentlemen, I think you just have to see

3    through what it is, and the best way to see through what it is

4    is to carefully read this Form 22, have somebody -- I can't

5    direct you to do this, I can only suggest that you do this.

6        But have somebody sit down in a chair like you're driving

7    and have somebody hold a photo up and show it to the rest of

8    you, and then have somebody read that Form 22 and use somebody

9    if you're willing to that's six-one, six foot, and have them

10   try to recreate exactly what he says he did.

11       And I know this is somewhat hard to read and I know it's

12   been talked about a lot, but I really want you when you're

13   deliberating upon this evidence to try to figure out in your

14   mind if you think this is possible.  We all agree the first

15   sentence that's on here, on Defendant's Exhibit 1, was written

16   by Mr. Thornhill who completed the top.

17       But here's his story.  Understanding that Mr. Windom

18   testified that he was aware of the obligation to maintain

19   three points of contact when mounting and dismounting

20   equipment from day one at the railroad -- I mean, he doesn't

21   dispute that.  He knew he was supposed to do that.  And here's

22   how he writes it up.  And when I read this to you off his Form

23   22, keep in mind you're not going to hear anything about left

24   hand or right hand.

25       And I think when I read this to you you'll know why Mr.

1    Bobbitt told you he thought he had gone down face forward when

2    they were on the phone, yet the more he talked to him and the

3    second time and then the third time, the story then becomes,

4    you know, what you see in the investigation report about him

5    actually holding the grab iron.

6        Every NS that you heard from in this case said they used

7    the grab iron.  The grab iron is right up here.  That's your

8    secure handhold.  But here he is just -- again, I had one hand

9    on the handle of the door, okay.  He doesn't say which hand.

10   I had the other hand on the seat.

11       So we've got a contact here.  I think he described it as

12   the very back part of the seat.  Not what you sit on, I guess

13   the back part and the door over here.  I had one hand on the

14   handle of the door and the other on the seat of the truck, I

15   placed my left foot on the middle step.

16       So at nowhere does he say he's on the platform step.  He

17   writes it up as -- and we don't if he's coming down forward or

18   backwards.  He eventually told Mr. Bobbitt he was going down

19   backwards like he's supposed to with handholds.

20       But give some consideration to this because I really

21   believe this is what happened.  He comes down forward, hits

22   that step, and goes down.  But he knows that's a violation of

23   the rule, of maintaining three points of contact because he

24   would not have three points of contact going down forward.

25       But he tells Mr. Bobbitt, he gives his explanation, and

1    you can go and demonstrate that explanation too, and I -- but

2    keep in mind when he says middle step, that on the back here,

3    that's one handhold, that's one handhold, and he says I go to

4    the middle step.

5        Well, everybody in the courtroom except the people

6    sitting at that table representing Mr. Windom say this is the

7    middle step.  So if he told the truth on his Form 22 he's

8    going from here, his feet right here, all the way down here,

9    I'd submit that's impossible.  So think about it.

10       And I want to -- and think about all the people that came

11   in here that told you, and I made a list of them, about what

12   is the middle step, what constitutes the middle step.  We had

13   Mr. Boone.  He certainly identified that as the middle step.

14   We had Matt Coleman, five-foot-nine who identified the step in

15   the fuel tank as the middle step.  We had Trae Floyd, he

16   identified it.  And he was nervous.  He told you he was

17   nervous.  He had never testified in court.  He'd never been

18   cross examined before.

19       And I think all of those witnesses -- if you remember, I

20   asked them, did I do anything or did Ms. Morris do anything to

21   influence you in any manner, all of them said no.  But the

22   only way this story can work is if you somehow believe that

23   can be the middle step.

24       I found it interesting when plaintiff was putting up his

25   evidence, and I'm going to put up Plaintiff's Exhibit 20,

1    plaintiff testified that he took this step himself -- of

2    course, he was still seeking medical treatment, he wasn't at

3    work.  He testifies that he took this picture in January or

4    February of 2011.  So five, six months, he couldn't give me an

5    exact date, but five to six months.

6        And we had any number of people that were shown this

7    photograph and asked what they thought about the condition of

8    -- you know, if you want to believe them, the bottom step, per

9    his definition.  You know, I call it the bottom step, the

10   hi-rail step, the step closest to the ground.

11       If you look at that picture taken in January or

12   February 2011 -- and I understand Mr. Windom testified that

13   that picture is a fair and accurate representation of what it

14   looked like on August 6th.  But at no point in time during the

15   trial of this case did Mr. Lampros or Mr. Windom take any

16   issues with the photographs and the date they were taken by

17   Mr. Thornhill.

18       And when you get back there, you can compare it.  And in

19   the event you think this is somehow the step that he slipped

20   from, despite what the Form 22 says about the middle step and

21   despite everybody else calling that the middle step, if you

22   think that's the case, what did everybody say about the step

23   beside Mr. Windom?  That it was secure and it was safe.  Was

24   it perfectly horizontal?  Nobody tried to make that argument

25   because it's not.  It's not in those photographs.  But it was

1   safe and it was convenient and certainly it was secure.

2       You heard the gentleman here today -- yesterday,

3   Mr. Jimmy Smith from Smith Auto and Diesel, and he came up

4   here.  He didn't want to be here.  But he came up here and he

5   brought cable with him.  And remember what he said about that

6   cable?  Five-eights of an inch thick and 80,000 pounds per

7   square inch was the strength.

8       Now, if Norfolk Southern is not using the right type

9   cable to secure that step -- I mean, 80,000 pounds per square

10  inch -- they all indicated it was secure.  But why he wants

11  you to believe it's that step is -- and you'll get the Judge's

12  jury charges.

13      But if you somehow believe that the step closest to the

14  ground played a role in this and that was the step and you

15  think that's it and you believe it was not secure -- and I

16  would submit to you, ladies and gentlemen, there's no evidence

17  of that -- or you concluded it was not conveniently located or

18  safe, then that eliminates any consideration by you of his

19  contributory negligence for his admitted -- his admitted

20  failure to maintain three points of contact.

21      And you got a choice on this as to who you want to

22  believe.  You can believe Mr. Windom who is going to ask you

23  for thousands and thousands of dollars I expect when he gets

24  back up here or you can believe the people that were at that

25  meeting who heard him say when they discuss in the morning

1    close calls.

2         Close calls.  That something -- did anybody have a close

3    call last week that we need to make everybody else aware of so

4    nobody has a similar close call.  And it was at that time that

5    Mr. Windom said in the presence of his union brothers, yes, I

6    had a close call, I was getting out of the welding truck, I

7    didn't maintain my three points of contact and I slipped on

8    that middle step.

9         And we already know from what he told Mr. Bobbitt and Mr.

10   Thornhill on Friday, that middle step is in the fuel tank.

11   And I just don't see how you can reach any other conclusion

12   from looking at those photographs as to what the middle step

13   is.

14        And I know what Mr. Lampros, his explanation is, and why

15   he spent so much time talking about this area up here -- let

16   me see if I can get you a better picture, ladies and

17   gentlemen.  And let me back up.  This is -- again, Mr. Lampros

18   doesn't want you to believe the platform constitutes a step.

19        So the pictures that he's put in front of you, you know,

20   the difference in his and mine besides what you see down here

21   is the door is closed.  And when the door is closed, you don't

22   have the ability to see a good view of what these steps look

23   like on August 6th, 2010 when the pictures were taken, not

24   January or February of 2011.

25        I mean, this shows you -- I'm going to see if I can bring

1    it out some for you.  Why would this not be a step?  It's got

2    this little raised indentions there for traction.  That's your

3    step.  And remember Mr. Windom's cross examination, we went

4    over this and over this about me asking him don't you have to

5    step down there?  That's step one.  Constantly he would say,

6    no, that's not a step down.  You know, and -- I mean, look,

7    when you get the pictures back there, you don't need a tape

8    measure to know that there is -- you have to step down to that

9    platform step.

10        And, finally, after Judge Treadwell got frustrated with

11   us, you made your point, Mr. Toth, and he's made his point,

12   essentially I had to move on.  I appreciated the Court's

13   ruling on that.  But he could not admit this was a step

14   because why? He wants you to just look at this.  He wants you

15   to look and say, well, there's only two steps, considered the

16   ground a step.  The ground is the ground.  It is not a step.

17   That's how he's trying to make that the middle step.

18        So when you hear his arguments on this, you know, you

19   heard it from me first, that's what his argument is going to

20   be, that that's the middle step, that's why he put it in the

21   Form 22 as the middle step because just look, there's a step,

22   there's a step, what's in the middle?  Don't be persuaded by

23   the self-serving arguments that he's going to make on that

24   point.

25        And when I say lawyer-driven case, he talked about I

1   didn't bring any experts in here.  I don't need any experts in

2   this case.  I think you can figure this out without experts.

3   Dr. Slappey, you heard at length from him about what his

4   injury was.  And he even admitted at some point in time he

5   just got frustrated and recommended he see somebody else.

6       Mr. Lampros just got up here and said, well, we're not

7   contending he's in pain every day.  It's a -- you know, it's

8   on again, off again, worse some days than others.  Well, every

9   time he goes to see Dr. Slappey he says he's in pain, and Dr.

10  Slappey puts that in his notes.  But when Dr. Slappey

11  testified -- and I know video depositions are tough -- tough

12  on the lawyers to sit there and listen to.  I know they're

13  tough on you.

14      But remember some of the things that Dr. Slappey said,

15  that most people get back to work -- most people that have

16  this type surgical procedure, which is the partial medial

17  meniscectomy repair, and, again, 60 to 70 percent of that

18  meniscus remains -- most of them get back to heavy labor and

19  recreational activities in three to six weeks.

20      And he testified that the only thing that he can find

21  that, you know, supports him not going back to heavy labor is

22  his subjective complaints of pain.  And what do doctors do?

23  They take X-rays.  Three times after the surgery he took

24  X-rays trying to figure out what was going on.  Each time he

25  said, no acute findings.  And he admits he's frustrated, and

1    he recommended that he get an FCE, which was eventually done

2    and talked about by Dr. Hecker, and he had no explanation for

3    these continued complaints of pain.

4         I think Mr. Lampros asked Dr. Slappey a question, is

5    there any tool or diagnostic device that you can use to, you

6    know, to test if a person truly is in pain, and, of course,

7    the doctor said, no, there is no such device, and he said he

8    had no reason to suspect that he wasn't telling the truth.

9         But he also said in response to my questions about

10   malingering -- which means a person is misrepresenting truly

11   their symptoms or misrepresenting their symptoms for secondary

12   gain purposes as in financial gain as in a verdict for money.

13   What's Dr. Slappey say?  Well, I didn't think he was, I didn't

14   think he was lying to me, but I've been fooled before.

15        So keep that in mind in your deliberations.  Because how

16   many doctors did he go to before he finally got to Dr.

17   Slappey.  I think we went through a list of about five

18   different doctors before he finally has this surgery.  And he

19   eventually got a second opinion from Hughston Clinic, but we

20   don't hear from that doctor.  They didn't go over there and

21   take his deposition.

22        So you can assume from that whatever you want to.  If he

23   had something to help the case, I would argue they would have

24   taken his deposition.  The person that did the functional

25   capacity examination up in Atlanta.  They didn't go do his

1    deposition either.  And when he's sitting here saying, well,
2    the railroad's lawyer didn't do any of this, when you hear the
3    charges, the Judge charges you the law, and he's going to tell
4    you, I don't have to disprove his case.

5    He carries the burden to a preponderance of the evidence
6    to convince you that we were negligent in this case and our
7    negligence caused him this injury to his knee.  That's his
8    burden.  I don't think he's carried it in this case.

9    What is readily apparent from Mr. Windom's own admissions
10   is that he did not maintain three points of contact and he
11   slipped.  And he wasn't out on the hi-rail, out in rough
12   conditions or terrain or anything like that.  He was in a flat
13   concrete parking lot.  So there were no contributing factors
14   that would have, you know, played any role in the slip.

15   And what I think -- if you're convinced like me that the
16   middle step is truly the middle step, what evidence did you
17   hear from the plaintiff about anything wrong?  What do you see
18   wrong in here?  Not a thing.  He doesn't identify one thing.

19   So if you believe it's the middle step that he slipped
20   from, that's the sole proximate cause of his injury is his own
21   negligence, and then you must find for the defendant and award
22   zero damages.  And he's challenged me on you've heard nothing
23   from me on damages.

24   Well, I don't think he's entitled to any.  I think he
25   caused his own injury.  Mr. Bobbitt told you he admitted he

1    got in a hurry, it was Friday, he got in a hurry, and he

2    didn't maintain three points of contact.  He told

3    Mr. Thornhill that, and then he said the same thing in the

4    safety meeting in front of co-workers.

5        So you're going to have to believe the witnesses that

6    came in here and said and quoted him as saying that he did not

7    maintain three points of contact and he slipped and went down

8    off this middle step, that I'm convinced I know which one it

9    is, you're going to have to believe all of them are lying to

10   you.

11       You're going to have to test the credibility of people.

12   And in your jury charges the Judge is going to give you, you

13   know, some ideas about things that allow you to call into, you

14   know, the credibility, you know, of whether or not the witness

15   is telling you the truth or not telling you the truth.

16       And, you know, one of these that you get is:  Did the

17   witness seem to have a good memory?  And I submit to you that

18   Mr Windom's memory is very good on some things and not so good

19   on other things.  If it's something good for his case, he can

20   remember it.  But if it's something that's not so good for his

21   case, he can't recall.

22       And when I say this is a lawyer-driven case, what I'm

23   telling you is this whole theory of liability developed about

24   it was the slip occurred on the bottom step, that was

25   developed after he went to lawyers.  That wasn't the step on

August 6th.  That came around after the fact.  And where does it leave us?  It leaves us with expert witnesses, Dr. Hecker, I think he admitted five to six grand he's making off this case for his work in this case, that's if everything went well and he could -- you know, only had I guess 10 more hours of billable time at 300 bucks an hour.

And, you know, I guess there's a saying, you get what you pay for?  Well, five or $6,000 gets you an opinion from Dr. Hecker.  I'm just reading from his report, "as a result it is my opinion that Mr. Windom is unable to perform any gainful work."  41 years whole old and unable to perform any gainful work.

Now, Tommy Thornhill testified.  He's got 10 months left before retires at age 60.  And he'll deserve his retirement.  But what Mr. Windom is asking you to do is give him a verdict that retires him today, and although -- and the Judge is going to tell you too, he's got a duty to mitigate his damages, and that means if he can't -- if his doctors are telling him you can't do heavy labor, go find something that you can do to replace those lost earnings.

Well, what type evidence did we hear on that?  Well, first, you got to decide when he could have gone back to some type work.  Dr. Slappey testified within three months of the surgery he could have gone back and done at least some type light duty work.  The FCE, and that's a functional capacity

1   exam.  That's kind of an abbreviation lawyers use, doctors use

2   all the time.  But, you know, it's kind of self-explanatory,

3   it's an examination to determine your functional capacities,

4   and Dr. Hecker said he relied upon that.  And if you would

5   just put that up for me, Ms. Morris, it's page six of the

6   report.

7           MR. LAMPROS:  Your Honor, that's not in evidence.

8           THE COURT:  Yeah, that was not introduced into

9   evidence.

10          MR. TOTH:  Well, I'll tell you what my recollection was

11  that Dr. Hecker testified to in regard to his functional

12  capacities.  He concludes that he can work what he calls is a

13  moderate or moderate plus job.

14      And then you recall Dr. Hecker and I went back and forth

15  for a while where he said that's not a job category of the

16  Department of Labor, and then we eventually agreed that that

17  would be very close to the medium level that he does recognize

18  as a job classification because he told us we had sedentary,

19  light duty, medium, heavy, and very heavy.

20      And as you may recall 75 percent of the jobs listed --

21  well, let me back up.  Remember him talking about the

22  Dictionary of Occupation Classifications?  He said there were

23  12,300 of them, and 75 percent of those jobs listed fall in

24  the medium category.

25      In the function capacity examination done by Dr. Howard

1    in Atlanta, who you didn't get the benefit of hearing, but Dr.

2    Hecker said he relied upon his report, indicated, and this was

3    in February of 2011, that he could do this moderate, moderate

4    plus, which Dr. Hecker agreed would be a medium job which is

5    sitting for eight hours a day out of eight hours, standing for

6    four hours out of an eight-hour day, walking four hours out of

7    an eight hour day, climbing frequently, lifting up to 50

8    pounds, carrying it up to 35 to 50 pounds, pushing and pulling

9    up to 75 pounds, bending frequently and constantly squatting

10   frequently, twisting frequently, and no limits at all as to

11   his upper extremities.  That's what Dr. Howard said in

12   February of '011.

13        Now, that would include in my mind a lot of different

14   jobs that he could have gone back to in February of '011, and

15   now we're in August of 2012, and he's done nothing to go back

16   and earn any money.  Nothing.  And the Judge is going to tell

17   you, he's got a duty to mitigate his damages.

18        What have you done to try to find a job?  Well, he went

19   to the Department of Labor.  Okay.  Nothing happened there.  I

20   said, did you save any of the applications that you filled out

21   online looking for work?  No, I didn't.  Have you prepared a

22   resume?  No.  Well, that's kind of where people start when

23   you're looking for a job is to put together a resume and he

24   hasn't even done that.

25        And, once again, he wants you to retire him today with

1   your verdict, yet he's got a duty to mitigate those damages.

2       And in terms of the evidence of -- that exists that he

3   could go out and be earning some money, when he came to the

4   railroad he was making 19.25 an hour, and his job when he

5   testified that when the event occurred on August 6 of 2010 he

6   was making 22.80 an hour.  I think you heard that from Dr.

7   Thompson and also Mr. Windom himself.

8       And Mr. Windom is somewhat of a unique railroad employee,

9   where someone like Tommy Thornhill and Mr. Bobbitt are pretty

10  much career railroad men, Mr. Windom had any number of other

11  jobs before he actually started this job with the railroad.

12  And you're going to have -- I think you'll have with you his

13  employment application.

14      And I don't want to go over all this again because you've

15  heard it already, but just remind yourself when you're

16  thinking about the jobs that he could go back to work per this

17  functional capacity examination -- and remember what Dr.

18  Hecker said, 75 percent of the jobs are in the medium level

19  classification which he qualifies for.

20      Look at his employment application.  He made good grades

21  in high school.  And he's got a wealth of prior work

22  experience before he came to the railroad.  I think that's

23  important when you consider to the extent you felt like you

24  had to award damages in this case you'd have to mitigate them.

25      And what did Dr. Hecker say?  Even though the functional

1   capacity examination was done by a medical doctor who

2   indicated what he was capable of doing, what his physical

3   abilities were, he indicates he should only go back to a light

4   and sedentary type job because he said -- you remember his

5   explanation, he got a little off point I thought -- well, I

6   don't want to put him back to work, that's a window of time

7   that he was able to do those job tasks, and that's no

8   guarantee that 10 years in the future he'll be able to do

9   those job tasks and per his experience in this field, if he

10  puts him back to work in a medium level job that increased his

11  chance at reinjury of this -- what I would classify, and I

12  think almost everybody classifies as a minor knee surgery.

13      Let's not forget, it was a partial tear of the meniscus.

14  It was a 35 minute surgical procedure.  I've been talking

15  longer than that surgery took.  He went -- he started at -- he

16  left Abbeville at six and he was home at 10, and yet he's

17  still not back to work doing anything.

18      But what are some of the things he's able to do?  Well,

19  he can certainly go to the gym.  And his explanation was that

20  Dr. Slappey -- and this is very important -- Dr. Slappey told

21  him that he needed to exercise, and so he said that's why he

22  started going to the gym, and he indicated I think that he

23  goes three times a week, and I think Mrs. Windom confirmed

24  that he goes three times a week.  And he said he walks on a

25  treadmill a 2.9 to 3 miles per hour for 30 to 35 minutes.  So

1    he's able to do that.

2         And I guess in my mind that indicates to me there's some

3    type job out there that he could do, and that's what the

4    doctors said in terms of physical capacities.  He's in the

5    medium level job classification right now.  And, of course,

6    Dr. Slappey, when he's asked about whether or not -- and this

7    question came from Mr. Lampros.  It didn't come from me.

8         Doctor, is -- you know, I think the question was phrased

9    -- would it be good for Mr. Windom as part of his

10   rehabilitation to get, you know, to walk on a treadmill for

11   exercise to rehab that knee?

12        Well, of course, Mr. Lampros knew that I knew he had been

13   going to the gym, so he asked this question of Dr. Slappey,

14   expecting Dr. Slappey is going to say, yeah, that's a good

15   idea, and what did Dr. Slappey say to Mr. Lampros and you the

16   jury?  No, I would not recommend that to him.  He's saying

17   he's got an unstable knee and he's in pain and he has no

18   control?  No.

19        So Mr. Windom has lied to you about that.  Dr. Slappey

20   didn't tell him to get on a treadmill.  Dr. Slappey may have

21   told him to do the prescribed exercises that he had given him,

22   but he certainly didn't tell him to get on a treadmill.  In

23   fact, he said it would be a bad idea.  And that may be -- if

24   we believe he's still in pain, that may be why he is still in

25   pain.  So, anyway, remember Dr. Slappey's testimony very

1  carefully and remember what his testimony was about how

2  quickly most people get back to work after something like this

3  -- this type surgery.

4      Dr. Thompson, the economist.  He certainly testified at

5  length, and I'd the opportunity to take his deposition.  So

6  when I got up here in opening statement I told you what his

7  numbers were going to be, because I had his report that had

8  been given to me and I had taken his deposition, and he and I

9  got into a big argument over whether or not he had properly

10 prepared his report.

11     There's a methodology you have to use.  You take his

12 income that he was making, which he took three years' worth

13 and averaged it out and then adjusted it for inflation and

14 came up with this roughly 58 -- well, let's call it $59,000

15 number that he had been making.

16     Well, he then, of course, acknowledges that everybody has

17 to pay taxes.  Some people pay higher percentages than others,

18 and he indicates he was only paying, I think it was, five

19 percent federal taxes and four percent state tax, so nine

20 percent taxes is it.

21     Well, one of the reasons he may only be paying nine

22 percent on those taxes is all these business deductions.  And

23 I thought, just paying attention to you ladies and gentlemen,

24 everybody seemed to take interest at some of these deductions

25 that appeared.  Household clothes, split down the middle is

1    what Dr. Thompson did after he did it wrong to start with.  If

2    you remember Dr. Thompson's report, he testified initially he

3    only reduced it by two percent and he stuck firm to that in

4    his deposition that he was right and I was wrong.

5         Well, he gets up here on direct and what's he do, he

6    says, well, I've talked to some of my colleagues and I think I

7    calculated it improperly or maybe -- you know, he had some

8    little explanation for it.  So instead of it -- because you've

9    got to reduce to a net number.  You got to reduce taxes and

10   business expenses.  So he only reduce two percent to start

11   with.

12        Well, as it turns out he should he have reduced close to

13   13 percent.  And when you're talking about, you know, 13

14   percent is a big difference than two percent.  But up until I

15   brought this to his attention we would have had the wrong

16   number.  It'd have been a completely flawed report.

17        And his report is based on all these assumptions.  I

18   mean, he can't promise us anything.  He's an economist.  He's

19   taking numbers and making projections.  And then, you know,

20   the original number that I told you about in opening statement

21   was $1,485,105, and what's that number come down to once he

22   does it right?

23        It's reduced by $181,000.  And Dr. Thompson just says,

24   eh, that's insignificant.  Those were his exact word,

25   insignificant.  And I'm sitting here thinking, I don't know

1    about the members of the jury but $181,000 is significant to

2    Mark.  That's a bunch of money.  And that was a big mistake,

3    yet he called it insignificant.

4        And yet still he wouldn't go in and assign all of the

5    business expenses to Mr. Windom.  He tried to go through and

6    allocate out, you know, the business expenses to Ms. Windom,

7    the business expenses to Mr. Windom.  And he said, and he

8    obviously hadn't read Mr. Windom's deposition, he said the

9    phone expense he allocated to Ms. Windom.  Yet the phone

10   expense Mr. Windom had testified to belonged to him.

11       Once again, it's another error.  And their explanation

12   is, well, you know -- and he wants to argue with me, and we're

13   talking 11, 12 dollars difference.  Well, it's not so much 11,

14   $12, I don't quibble with that much.  $181,000, I do.  But

15   when you start seeing errors in these reports from these

16   people that make their living providing testimony across the

17   country -- remember his testimony?  He's testified or given a

18   deposition since 2007 in, I believe it was a 187 different

19   cases.

20       You all saw how comfortable he was in here.  This a like

21   his living room.  I mean, he can sit on that witness chair and

22   spin those numbers out.  Yet Mr. Lampros wants you -- you

23   know, has told you, I'm not trying to argue he can't do

24   something at some point in time.  But he didn't offer -- he

25   didn't ask his witness to consider, let's say, he can go back

1    to work making $40,000, what would that do to your economic

2    analysis?  He didn't ask him that question.

3        I asked him a hypothetical about if he could go to work

4    at Home Depot in the electrician's department because he

5    worked for the, you know, the Brotherhood of Electrical

6    workers all these years.  He was a journeyman apprentice

7    electrician.

8        And I said, just assume he could make that amount of

9    money.  Well, he laughed at me.  Home Depot?  I said, yes,

10   Home Depot.  And what did he say?  Well, if he can make that

11   much money at Home Depot, then, you know, those numbers would

12   wash out.  So, you know, my suggestion is just consider the

13   fact he can go get a job making that $58,000 number if you

14   feel like there's some way we have liability in this case.

15   That's his duty on mitigation.

16       But I want to finish talking to you a little bit about

17   the gym.  He's not just walking on the treadmill.  And my

18   time's almost up.  He's not just walking on the treadmill.

19   He's lifting weights.  He told you that.  He's doing dumb

20   bells and he's doing military press and he's doing ab work.

21   He can do all that.  And he drives 25 minutes to get there, 25

22   minutes to get back, three days a week.  He can do all that,

23   but he can't -- yet he's in pain, he says, but he can still go

24   do all that.

25       Now, the Judge will tell you what the law is, but the

important thing I really want you to focus on -- and you'll

have -- you'll get questions in the form of a verdict, and

you're going to get asked whether we were negligent in any

manner.

That's your first question.  And I submit to you that

answer is no.  And the same answer to two.  Three, you would

only answer if you answered yes to question two.  And that's

where you determine who's more at fault, Mr. Windom or the

railroad.  But that takes you first finding the railroad did

something negligent to cause him an injury.

And then he's got to prove by a preponderance of the

evidence that negligence was the cause of an injury to him.

But the most important ones, and I think from Mr. Windom's

testimony he's admitted regardless of whether you want to

believe him on which step it is or is not, that he didn't

maintained three points of contact and he slipped and twisted

his knee.

But on four and five, that's where they're talking about

the Safety Appliance Act that requires that bottom step, which

he calls the middle step now, to be secure.  And that Jimmy

Smith, I think if he didn't convince you that that type cable

can secure a step and it may bend, but it's secure, and it's

still safe even in a bent condition.  That's what everybody

said.

And nowhere on the Form 22 that he filed out in his own

handwriting on the day it happened did he say anything about the bottom step.  He's talking about the middle step that became a bottom step after he had some lawyers help him.  But if you say yes to four or five, you eliminate completely his responsibility for the event, for the accident.

So if you say yes and yes to four and five, what you put on three, the question above it, means nothing.  That's why you have to answer these questions no.  I mean the railroad gave this man a good job.  They trained him, they taught him how to get on and off that equipment.  What did he tell you?  He'd had this truck for over two years and he had never had a problem getting down until this particular day.

And I say it's lawyer-driven because we've got very-well paid experts that are in here to try to throw a big number on the blackboard for you to talk about, and we've got this story that's changed completely from August 6th -- as to the time it happened on August 6th.  And, you know, compare my pictures, and please, reenact it and see if you feel like when you read that Form 22 that it could have happened like he says it does.

I'd submit to you, ladies and gentlemen, it could not have.  I mean, I think from the first time those photographs got put up there I saw people leaning in looking, trying to sort out how that could be the middle step.  And that's just common sense, and I don't need to pay some expert to come in here to tell you that.  I'm relying upon your common sense,

1     and I'd ask that you find for the defendant in this case and

2     the way you do that is to check no to all those boxes and not

3     be persuaded by these created arguments in fantasy land about

4     how that can become -- how the bottom step, the sill step, the

5     step closest to the ground, can become the middle step.  It

6     just doesn't sell.

7          Thank you again for all of your time and your attention.

8     I know several of you have taken a lot of notes, and I hope

9     when you go back there and deliberate upon this and see if you

10    can figure out how it could happen like he says it does on the

11    Form 22.  Nobody -- Tommy Thornhill didn't have his hand over

12    his hand writing that for him.

13         And evaluate the credibility of the witnesses.  Mr.

14    Windom is the one here asking you for a bunch of money.  Mr.

15    Thornhill came down from Roanoke to tell you what he was told

16    on August the 6th of 2010.  Thank you, ladies and gentlemen.

17         **THE COURT:**  Ladies and gentlemen, Mr. Lampros spoke for

18    about 35 minutes in his opening argument, and I will allow him

19    as much time as Mr. Toth took, total.  I don't know if he'll

20    use that much time, but let me see if I can get a sense from

21    you.  Do you want to take a break now, or finish the closing

22    arguments and then take a break?  Anybody feels strongly you

23    need to go right now, raise your hand.  All right,

24    Mr. Lampros.

25         **MR. LAMPROS:**  Thank you, Your Honor.  I'm going to

1    stand over here for this part because I'm going to try and use

2    this a little bit.  We're almost done.  In just a few minutes

3    y'all will go back in your jury room and you'll have two jobs

4    to do.  The first job is to answer those questions the Judge

5    is going to ask you.  The other job is going to be to explain

6    to the other jurors why you feel the way that you do.  So in

7    the next few minutes I'm just going to kind of sum up here and

8    give you some things to talk about.

9         If you look at the railroad, the form that they had,

10   Plaintiff's 30, and I think it's their Defendant's 1, they say

11   from day one we know that there's no way this incident

12   happened the way Paul described it.  Did they ever go back and

13   asked Paul to clarify?  Did they ever say, what do you mean by

14   middle step?  How is it possible that you step directly out of

15   the truck onto any of those steps, even the one we normally

16   call the middle step?

17        What do they call it in their own forms?  They call it

18   the middle step of the gas tank.  And then they call it the

19   middle step of the fuel tank.  What did Mr. Bobbitt call --

20   and let's use their picture.  What did Mr. Bobbitt say?

21   Mr. Bobbitt said, no, the only person who calls that a

22   platform is me.  Nobody else calls it a platform.  Well,

23   nobody except for Mr. Boone, Mr. Windom, the other guys who

24   came up here.

25        And Mr. Toth made a big deal out of Mr. Coleman coming in

1    here and standing five-foot-nine, whatever he -- however tall

2    he was.  Just remember Mr. Coleman with Mr. Floyd spent

3    Tuesday afternoon in Mr. Toth's office.  And he said -- I

4    asked him.  I asked:  Did me or Ms. Morris do anything to

5    influence your testimony, and they both said no.

6        Well, they weren't the only ones there.  Mr. Bobbitt was

7    there.  Mr. Thornhill was there, the boss.  And I would

8    suggest that there may have been some other railroad officials

9    there too, and they're all getting together to talk about how

10   they're going to testify.

11       Why would Mr. Windom put what he put on this Form 22?

12   And there's only one explanation.  He was nervous, he was

13   confused, and he was scared.  And that's the long and short of

14   it.  And he knew there could be some consequences, I think he

15   testified to that.

16       And Ms. Morris asked Mr. Bobbitt -- they want you to

17   think that everyone on the railroad calls this step on hi-rail

18   vehicles the middle step.  Everyone on railroad.  That's what

19   they all said.  Everybody says this is the middle step,

20   everybody says this is the middle step.

21       Well, Ms. Morris asked Mr. Bobbitt about the different

22   kinds of hi-rail vehicles they have.  They have Suburbans,

23   they have dump trucks, they trucks bigger than this one, and

24   they have trucks smaller than this.  Why didn't they show you

25   pictures of those trucks to show, look, they all have the same

1    configuration?

2         Look, everybody will say that that step right there is

3    the middle step regardless of the vehicle.  Because as Mr.

4    Boone told you, it depends on the person.  They all have

5    different terminology for what they're talking about.

6    Mr. Boone, do you know how Mr. Windom got on or off the truck?

7    No, sir, I don't.  That was what Mr. Boone said.

8         Now, they asked these witnesses what everybody else on

9    the railroad says it was.  Did you ever hear them ask:  What

10   have you heard Mr. Windom refer to this step as?  What have

11   you heard Mr. Windom refer to this step as?  No.  They never

12   asked anyone.  They sure had them come in and testify, I heard

13   Mr. Windom say on Monday morning it's all my fault.

14        You know, these guys -- talking about memories --

15   Mr. Floyd, I believe it was, he had a clear recollection of

16   Mr. Windom in his confession on Monday morning.  But when I

17   asked him what did you do on that Friday, the day of the

18   event, he sure couldn't remember that.  He said, well, I don't

19   know, I don't know.  The truth of the matter was he was

20   patrolling with Mr. Thornhill and he also saw Mr. Windom hurt

21   and he also saw which step Mr. Windom pointed to, and they

22   weren't going to have him come up there and testify about

23   that.  He sure was hazy.  They got down that confession but

24   they couldn't get the other part, could they?

25        And I want to talk about -- I'm going to switch gears

1    here a little bit.

2         Do you recall during the two and a-half hours over two

3    days that Mr. Toth cross examined Mr. Windom, there was one

4    part where he said, are you sure you weren't limping earlier

5    in the day?  And Mr. Windom said no.  Now you work with a

6    contractor that day, didn't you, moving steps?  Yes.  And you

7    worked with a man named Alex Warner moving steps, didn't you?

8    Yes.  And what are you going to do when he comes in here and

9    says he saw you limping?  Well, where is Mr. Warner?  He

10   changed horses in midstream, you know.  They want you -- they

11   kind of want to hint around that it didn't happen there, but

12   then they realize that ain't going to work.

13        I want to talk to you about what preponderance of the

14   evidence means, and if you find by a preponderance of the

15   evidence that the condition of this step, the condition of

16   step, regardless of what anybody calls it, if you find the

17   condition of that step right there caused or contributed to

18   cause or played any part in bringing about Mr. Windom's injury

19   or damages that under the law, the law that we all talked

20   about before we started, the law the Judge is going to charge

21   you on and the law that you held your hand up and swore that

22   you would uphold, under your law your verdict needs to be for

23   Mr. Windom, if it played any part.

24        And if you find in any way that that step right there is

25   not safe, then you need to find under the law that that

1   violated the Safety Appliance Act.  Okay.

2       And if you find that this portion of the truck is more

3   than 24 inches and you also find that that step is not safe,

4   then you need to find a regulatory violation.  Those are

5   questions the Judge is going to have you answer.

6       Now, we have never said that he can't work.  He can.  He

7   wants to work.  Mr. Toth said, well, he can go to the gym

8   three times a week.  Going to the gym three times a week to

9   help control his diabetes is one thing he said he had to do

10  and trying to get stronger is not the same as working 40 hours

11  a week in jobs like Mr. Windom has worked his entire career.

12  If he's feeling discomfort in the gym he can stop and go home.

13  If he's feeling discomfort at work, he can't necessarily stop

14  and go home.

15      When Dr. Slappey said Mr. Windom could go back to work at

16  light duty, that he thought he could do some light duty job,

17  well, what did the railroad say?  Did they say, come on, Mr.

18  Windom, let's put you to work at this light duty job.  No,

19  they didn't do that.  See you, Mr. Windom, we're not going to

20  help you.  There's nothing we can do for you.

21      The issue with regard to his damages is not just what

22  he's capable of doing.  We admit that he's got some

23  capabilities.  And Mr. Toth is trying to confuse the issue and

24  say he's not gone back to work, he's not gone back to work.

25  Well, he's not gone back to work because he hasn't been able

1    to find anything that he can do within his limitations.  He

2    will go back to work eventually.  We all know that.

3         Now, finally I want to talk a little bit before I move

4    into what we're going to ask you for, I want to talk to you a

5    little bit about Dr. Thompson.  And Mr. Toth said he

6    complained to Dr. Thompson about the way he had done things by

7    un-reimbursed business expenses.

8         So what does Dr. Thompson do?  Dr. Thompson does it the

9    way Mr. Toth wants it done.  And he's still says, oh, he got

10   it wrong, he got it wrong, he got it wrong.  He's still

11   finding fault with him.

12        The un-reimbursed business expenses that you're supposed

13   to deduct have to be related to the railroad and that's the

14   long and short of it.  Some of them are, and some of them

15   aren't, and that's the long and short of it.  But what did Dr.

16   Thompson say, what did Mr. Windom say?  Somebody took our

17   calculator -- may I borrow that.  What did Mr. Floyd say?

18        While we're on that topic, I want you to look, he was

19   talking about all those jobs he worked before and what jobs he

20   can do now.  And if you look at this employment application,

21   it tells you what job you're applying for, truck track

22   laborer, expected earnings $15.70 an hour.  That's the job

23   that he is applying for with Norfolk Southern, the job he

24   wants to get.  You turn back here, and it says what job do you

25   have now?  IBEW.  Most recent salary, 19.25.

1    Ladies and gentlemen, there's no reason on God's green

2    earth that anybody would give up a job paying $19.25 to take a

3    job that paid $15.70 unless it was a better job that's going

4    to pay you on a more regular basis.  But let's take Dr.

5    Hecker, what he said 8 to $11.  Let's give him the benefit of

6    the doubt.  Let's say Mr. Windom can get a job making $15 an

7    hour, okay.  What did Mr. Floyd say?  What is really the

8    undisputed testimony about what people in Mr Windom's job

9    category at the railroad?  $22.80 something cents an hour.

10    Now, I'm going to try and do this as quick as I can and

11    as close as I can.  That's about two-thirds.  If you assume

12    Mr. Windom can get a job earning $15 an hour, that's about

13    two-thirds of what he would have earned had he continued to

14    work at the railroad.

15    So what I suggest is an appropriate number, to make him

16    whole, he's not asking for anything that he wouldn't have been

17    entitled to.  He's not asking for anything that he would not

18    have earned had he not continued to work the railroad.  If you

19    award him one-third of his railroad earnings as lost wages.

20    Just one-third.  We're not ask you to retire him.  We're

21    asking you to compensate him for what he would have earned had

22    he continued working in that job.

23    And he talked about the functional capacity exam,

24    50 pound lifting restriction.  Mr. Thornhill and Mr. Bobbitt.

25    Can he do that job if he can only lift 50 pounds?  No, sir.

He had a good job and he earned a good living, so I suggest that if you take $15 an hour and assume -- which is higher than what Dr. Hecker said -- and assume that it's going to grow at the same rate as the railroad wages, that one-third would be a sufficient recovery.

And let's do the same -- there's no dispute about the benefits. The benefits at the railroad equaled I think something around $28,000 a year, $2300 plus or minus a month. Those are good benefits and jobs with benefits like that are hard to find. But again, assume he can get a job that's going to give him benefits equal to two-thirds. So award him one-third of the benefits as -- to make him whole.

And if you'll notice when you get the verdict form, it's going to talk about past lost wages, and I'm not talking about that. I could have come in here and said, look, he hasn't been able to work for two years because of this injury, and so you should give him the $116,000 for his lost wages. I'm not asking you to do that.

What Dr. Thompson gave you is how much would he have earned at the railroad from August 11, 2010, which is the last day he worked there, until January 5, 2035, the first day he would have been eligible for his retirement. That's what he told you he would have earned during that time period.

What I'm saying is from August 11, 2010, until January 5, of 2035, let's assume he could have found a job during that

1   entire time period where he earned $15 an hour.  Okay.  So

2   those two years since then I want you to assume he's been

3   working a job earning $15 an hour and been receiving benefits

4   at two-thirds the rate.  All we're asking you to do is to put

5   in the position he would have been in.

6        Now, the Judge is going to instruct you there are other

7   elements of damages.  There's pain and suffering, intangibles.

8   You saw Ms. Windom testify as to the effect it's had on his

9   life and what it's done for him, and she cried and Paul cried.

10       So there's other damages, pain and suffering and that

11  sort of thing.  It's a hurt knee.  We're not disputing that.

12  We're not telling you that it's an amputated limb.  It's a

13  hurt knee that causes him pain from time to time.  I suggest

14  an appropriate award for pain and suffering of $50,000.  You

15  know, it's caused him some problems before, and it's going to

16  cause him some problems in the future.  It's not going to --

17  it's nothing that's killing him, but it does keep him from

18  going back to that job.

19       And, ladies and gentlemen, those are reasonable

20  suggestions in terms of what will make him whole and they take

21  into account what Mr. Toth wants you to believe is, which is,

22  he can work some job.  These numbers take that into account

23  because Dr. Thompson talked about August 11, 2010 to

24  January 5, 2035.  $15 an hour for that same period.  Assumed

25  that he worked a job where he earned $15 an hour in that same

1    time period.

2         Ladies and gentlemen, this has been a much longer week

3    than I ever thought, but we're done and I appreciate your

4    time, and if there's anything that I have done that you have

5    found distasteful or has offended you, I apologize, and you

6    are welcome to call me up after this trial is over and tell me

7    about it.  But hold that against me.  Do not hold that against

8    Paul.

9         Because this case is not about me as much as Mr. Toth

10   wants to make it about me and Mr. Hannon.  It's not about us.

11   It's about Paul, and it's about what happened to him August 6,

12   2010 and what effect that has had on his life.  And if you

13   think that that step played any role in bringing about his

14   injury or any of his damages, then the law says you need to

15   find for Mr. Windom.  I appreciate you your time.

16        **THE COURT:**  Ladies and gentlemen, my charge will

17   probably take about 15 minutes, I don't know for certain.  I

18   think it's appropriate to take a quick break now, probably

19   about a ten-minute break, and then we'll come back in and do

20   the charge and then begin your deliberations.  You still don't

21   have the entire case.  You're missing the charge.  So don't

22   start talking about it yet.  We'll remained seated while you

23   go to the jury room.

24   *(Jury Excused)*

25        **THE COURT:**  We'll be in recess for ten minutes.

1    *(RECONVENED; ALL PARTIES PRESENT, 11:18 a.m.)*

2         **THE COURT:**  All right, you may bring the jury in.

3         Ladies and gentlemen, it is now time for me to instruct

4    you on the law that you must apply as you resolve the facts

5    and issues of the case.  The significance of this part of the

6    trial is illustrated by the fact that our court security

7    officer is locking the doors to the courtroom so that there

8    will be no interruptions during my charge.

9         You have in your seats and now in your hands a copy of

10   the charge, and you'll be able to take that back with you to

11   the jury room as you begin your deliberations.  I would

12   suggest that you listen carefully -- well, I would require

13   that you listen carefully to me as I give the charge.  Don't

14   try and read ahead.  You can follow along if you want, but

15   don't try and read ahead.  Again, you will have that written

16   copy of the charge with you when you go back to the jury room.

17        You have heard the evidence in this case and it now

18   becomes my duty to explain to you the rules of law which you

19   must follow and apply in reaching a decision.  After I have

20   completed these instruction, you will go to the jury room and

21   begin your deliberations.

22        In deciding the case you must follow and apply all of the

23   law as I explain it to you whether you agree with that law or

24   not.  You must not let your decision be influenced in any way

25   by sympathy or by prejudice for or against anyone involved in

1    the case.

2        The fact that a corporation is involved as a party must

3    not affect your decision in any way.  A corporation and all

4    other persons stand equal before the law and must be dealt

5    with as equals in a court of justice.

6        When a corporation is involved, of course, it may act

7    only through people as its employees.  And in general a

8    corporation is responsible under the law for any of the acts

9    and statements of its employees that are made within the scope

10   of their duties as employees of the company.

11       In your deliberations you should consider only the

12   evidence, that is, the testimony of the witnesses and the

13   exhibits I have admitted in the record.  But as you consider

14   the evidence, both direct and circumstantial, you may make

15   deductions and reach conclusions which reason and common sense

16   lead you to make.

17       Direct evidence is the testimony of one who asserts

18   actual knowledge of a fact, such as an eye witness.

19   Circumstantial evidence is proof of a chain of facts and

20   circumstances tending to prove or disprove any fact in

21   dispute.

22       The law makes no distinction between the weight you may

23   give to either direct or circumstantial evidence.  Remember

24   that anything the lawyers say is not evidence in the case.

25   And except for my instructions to you on the law you should

1  disregard anything I may have said during the trial in

2  arriving at your decision concerning the facts.  It is your

3  own recollection and interpretation of the evidence that

4  controls.

5      Now, in saying you must consider all of the evidence, I

6  don't mean that you have to accept all of the evidence as true

7  or accurate.  You should decide whether you believe what each

8  witness had to say and how important that testimony was.

9      In making that decision you may believe or disbelieve any

10 witness in whole or in part.  Also the number of witnesses

11 testifying concerning any particular dispute is not

12 controlling.

13     In deciding whether you believe or do not believe any

14 witness I suggest that you ask yourself a few questions.  Did

15 the witness impress you as one who was telling the truth?  Did

16 the witness have any particular reason not to tell the truth?

17 Did the witness have a personal interest in the outcome of the

18 case?  Did the witness seem to have a good memory?

19     Did the witness have the opportunity and ability to

20 observe accurately the things he or she testified about?  Did

21 the witness appear to understand the questions clearly and

22 answer them directly?  Did the witness's testimony differ from

23 other testimony or other evidence?

24     During the trial of this case certain testimony has been

25 presented to you by way of deposition consisting of sworn

recorded answers to questions asked of the witness in advance of the trial by the attorneys for the parties to the case.

The testimony of a witness who for some reason cannot be present to testify from the witness stand may be presented in writing or in video as you heard under oath.  Such testimony is entitled to the same consideration and is to be judged as to credibility and weighed and otherwise considered by the jury insofar as possible in the same way as if the witness had been present and had testified from the witness stand.

You should also ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact or whether there was evidence that at some other time the witness said or did something or failed to say or do something which was different from the testimony the witness gave you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it because people naturally tend to forget some things or remember other things inaccurately.

So, if a witness has made a misstatement you need to consider whether that misstatement was simply an innocent lapse of memory or an intentional falsehood and the significance of that may depend on whether it has to do with an important fact or only with an unimportant detail.

1      When knowledge of a technical subject matter might be

2  helpful to the jury, a person having special training or

3  experience in that technical field is permitted to state an

4  opinion concerning those technical matters.  Merely because

5  such a witness has expressed an opinion, however, does not

6  mean that you must accept that opinion.  The same as with any

7  other witness, it is up to you whether to rely upon it.

8      When a witness has been or will be paid for reviewing and

9  testifying concerning the evidence, you may consider the

10  possibility of bias and should view with caution the testimony

11  of such a witness where court testimony is given with

12  regularity and represents a significant portion of the

13  witness's income.

14      In this case each party asserting a claim or a defense

15  has the responsibility to prove each essential part of the

16  claim or defense by a preponderance of the evidence.  I'm

17  referring, of course, to the burden of proof that we've talked

18  about during the course of the trial.  This is sometimes

19  called the burden of proof or the burden of persuasion.

20      A preponderance of the evidence simply means an amount of

21  evidence that is enough to persuade you that a claim or

22  contention is more likely true than not true.  I gave you the

23  illustration of scales to illustrate that.  It's simply more

24  likely true than not true.

25      When more than one claim is involved and when more than

1   one defense is asserted you should consider each claim and

2   each defense separately, but in deciding whether any fact has

3   been proved by a preponderance of the evidence, you may

4   consider the testimony of all the witnesses, regardless of who

5   may have called them, and all the exhibits received in

6   evidence, regardless of who may have produced them.

7         If the proof fails to establish any essential part of a

8   claim or contention by a preponderance of the evidence, you

9   should find against the party making that claim or contention.

10  And as I give you further charges, I will tell you who has the

11  burden of proof with regard to particular issues.

12        In this case the plaintiff's claims are asserted under

13  the Federal Employers Liability Act, sometimes called F-E-L-A

14  or FELA.  Under the act every common carrier by railroad while

15  engaged in interstate commerce is liable in damages to any of

16  its employees who are injured as a result of the railroad's

17  negligence.

18        The plaintiff claims that the defendant violated the

19  Federal Employers Liability Act.  Specifically the plaintiff

20  contends as follows.  First, that the defendant was negligent,

21  and second, that the defendant violated the Safety Appliance

22  Act.  I'll talk more in a moment about the Safety Appliance

23  Act, but now I'm going to talk about the negligence claim.

24        To prevail on the negligence claim, the plaintiff must

25  prove each of the following facts by a preponderance of the

evidence.

First, that at the time of plaintiff's injury the plaintiff was an employee of the defendant and performing duties in course of that employment.  Second, that the defendant was at such time a common carrier by railroad engaged in interstate commerce.  Third, that the defendant was negligent as claimed by the plaintiff, and, fourth, such negligence was a legal cause of damage sustained by the plaintiff.

In the verdict form that you have, which I'll go over with you in a moment, you will be asked to answer a series of questions about these issues.  Now, in this case the parties have agreed that the first two requirements have been satisfied.  They've stipulated to that.

Accordingly, the issues for you to consider involve the third and fourth items, that is, whether the defendant or any of its employees other than the plaintiff was negligent, and if so, whether such negligence was a legal cause of any damages sustained by the plaintiff.

Under the Federal Employers Liability Act it is the continuing duty of the defendant to use reasonable care under the circumstances in furnishing the plaintiff with a reasonably safe place to work.  This does not mean that the defendant is a guarantor of the plaintiff's safety, and the mere fact that an accident has happened standing alone does

not require the conclusion that the accident was caused by anyone's negligence.

The extent of the defendant's duty is to exercise reasonable care under the circumstances to see that the place in which the work is to be performed is reasonable safety.

Negligence, I'll define for you, is the failure to use reasonable care. Reasonable care is that degree of care that a reasonably careful person would use under like circumstances. Negligence may consists either in doing something that a reasonably careful person would not do under like circumstances or in failing to do something that a reasonably careful person would do under like circumstances.

For purposes of this action, negligence is a legal cause of damage if it played in any part, no matter how small, in bringing about or actually causing the injury or damage.

So, if you should find from the evidence in the case that any negligence of the defendant contributed in any way toward any injury or damage suffered by the plaintiff, you may find that such injury or damage was legally caused by the defendant's negligence.

You are also instructed that negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence played any part, no matter how small, in

1    causing such damage.

2        If a preponderance of the evidence does not support the

3    plaintiff's claim that the defendant was negligent, then your

4    verdict should be for the defendant on that claim.  If,

5    however, a preponderance of the evidence does support the

6    plaintiff's claim, negligence claim, you will then consider

7    the defense raised by the defendant.

8        The defendant contends that the plaintiff was also

9    negligent and that such negligence was a legal cause of the

10   plaintiff's own injury.  The defendant contends that the sole

11   cause of any injury suffered by the plaintiff was his failure

12   to exercise ordinary care for his own safety.

13       This is a defensive claim and the burden of proving this

14   defense by a preponderance of the evidence is upon the

15   defendant who must establish, first, that the plaintiff was

16   also negligent, and, second, that such negligence was a legal

17   cause of the plaintiff's own damage.

18       The law requires you to compare any negligence you find

19   on the part of both parties.  So if you find in favor of the

20   defendant on this defense of contributory negligence, that

21   will not prevent recovery by the plaintiff.  It will only

22   reduce the amount of the plaintiff's recovery on the

23   negligence claim.

24       In other words, if you find that this accident was due

25   partly to the fault of the plaintiff and that the plaintiff's

own negligence was, for example, and it's only an example,

50 percent responsible for plaintiff's own damage, then you

would fill in that percentage as your finding on the special

verdict form that I'm going to explain to you in a moment.

Such a finding would not prevent the plaintiff from

recovering.  The Court -- and I stress that.  The Court will

merely reduce the plaintiff's total damages by the percentage

that you insert.  Again, by using the number 50 percent as an

example, I do not mean to suggest to you any specific figure

at all.

If you find that the plaintiff was negligent with regard

to this defense of contributory negligence, you might add --

you might find 1 percent or 99 percent.  That's up to you.

The plaintiff also claims that his injury was caused by

the defendant's violation of the Federal Safety Appliance Act.

Because the welding truck can be used on railroad lines, the

Safety Appliance Act applies to the truck even when it's not

on railroad tracks.  However, whether that vehicle was in

violation of the Safety Appliance Act or its regulations is

for you to decide.

I charge you that the Safety Appliance Act requires that

a railroad carrier may use or allow to be used on any of its

railroad lines a vehicle only if it is equipped with secure

sill steps.

I further charge you that the Safety Appliance Act

regulations provide that each track motorcar shall be equipped
with safe and suitable sill steps or footboards conveniently
located and securely fastened to a car when the bed or deck of
the track motorcar more than 24 inches above the top of the
rail.

In order to prevail on this claim the plaintiff must
establish by a preponderance of the evidence that the
defendant violated one or both of these provisions and that
the violation or violations was a legal cause of damages
sustained by the plaintiff.

The defendant denies the plaintiff's claims that it
violated the Safety Appliance Act or its regulations and
contends that in any event the plaintiff was the sole cause of
his injury.  For purposes of this claim a violation of a
statute or regulation is a legal cause of injury if it plays
any part, no matter how small, in bringing about or actually
causing the injury.

So, if you should find from the evidence that a violation
by the defendant contributed in any way toward an injury
suffered by the plaintiff, then the plaintiff's injury was
legally caused by the violation.

A violation may be a legal cause of the injury even
though it operates in combination with the act of another,
some natural cause, or some other cause.  However, if the
plaintiff was sole cause of his injury then any violation of

1    the Safety Appliance Act or its regulations would not be the

2    legal cause of that injury.

3         If a preponderance of the evidence does not support the

4    plaintiff's claim that a violation of the Safety Appliance Act

5    or its regulation by the defendant legally caused his injury,

6    then your verdict will be for the defendant on the Safety

7    Appliance Act claims.

8         If, however, a preponderance of the evidence does support

9    the plaintiff's claim, you will proceed to consider damages.

10        If you find for the plaintiff whether on the negligence

11   claim or on the alleged Safety Appliance Act claims, you will

12   then consider the issue of the plaintiff's damages.  In

13   considering the issue of the plaintiff's damages, you are

14   instructed that you should assess the amount you find to be

15   justified by a preponderance of the evidence as full, just,

16   and reasonable compensation for all of the plaintiff's

17   damages, no more and no less.

18        Compensatory damages are not allowed as a punishment and

19   must not be imposed or increased to penalize the defendant.

20   Also, compensatory damages must not be based on speculation or

21   guesswork because it is only actual damages that are

22   recoverable.

23        On the other hand, compensatory damages are not

24   restricted to actual loss of time or money.  They cover both

25   the mental and physical aspects of injury, tangible and

intangible.  Thus, no evidence of the value of such intangible things as physical and emotional pain and mental anguish has been or need be introduced.

In that respect it is not value you are trying to determine, but an amount that will fairly compensate the plaintiff for those claims of damages.  There is no exact standard to be applied, and any such award should be fair and just in the light of the evidence.

You should consider the following elements of damage to the extent you find them proved by a preponderance of the evidence and no others.  First, net wages and benefits to the date of trial.  Second, net wages and benefits in future reduced to present value.  Third, physical and emotional pain and mental anguish.

The plaintiff's damages can include any aggravation of existing disease or physical defect or activation of any latent condition resulting from such injury.

If you find that there was such an aggravation, you should determine if you can what portion of the plaintiff's condition resulted from the aggravation and make allowance in your verdict only for the aggravation.

However, if you cannot make that determination or if it cannot be said that the condition would have existed apart from the injury, you should consider and make allowance in your verdict for the entire condition.

1    You are instructed that any person who claims damages as

2  a result of an alleged wrongful act on the part of another has

3  a duty under the law to mitigate those damages.  That is, to

4  take advantage of any reasonable opportunity that may have

5  existed under the circumstances to reduce or minimize the loss

6  or damage.

7    This is a defensive claim and the burden of proving that

8  defense by a preponderance of the evidence is upon the

9  defendant who much establish that the plaintiff within the

10  limitations of any disability sustained failed to seek out or

11  take advantage of a business or employment opportunity that

12  was reasonably available under all the circumstances shown by

13  the evidence.

14    If you find that, then you should reduce the amount of

15  the plaintiff's damages by the amount that could have been

16  reasonably realized if the plaintiff had taken advantage of

17  that opportunity.

18    If a preponderance of the evidence shows that the

19  plaintiff has been permanently injured, you may consider the

20  plaintiff's life expectancy.  In that regard you may consider

21  evidence of the plaintiff's own health, age, occupation, and

22  physical condition before and after the injury in determining

23  the probable length of the plaintiff's life.

24    When considering life expectancy in determining future

25  damages you should bear in mind, of course, the distinction

1    between entire life expectancy and work life expectancy.  And

2    those elements of damages related to future income should be

3    measured only by the plaintiff's remaining work life

4    expectancy.

5         Under the law any award made to the plaintiff in this

6    case for past or future lost earnings is not subject to

7    federal or state income tax.  Therefore, in computing the

8    amount of any damages that you may find the plaintiff is

9    entitled to recover for lost earnings, the plaintiff is

10   entitled to recover only the net after-tax income, less

11   business expenses.

12        In other words, the plaintiff is entitled to recover only

13   take-home pay that you find the plaintiff has lost in the past

14   or will lose in the future.

15        If you should find that the plaintiff has proved a loss

16   of future earnings, any amount you award for that loss must be

17   reduced to present value.  This must be done in order to take

18   into account the fact that the award will be paid now and the

19   plaintiff will have the use of that money now and in the near

20   future even though the total loss will not be sustained until

21   later in the future.

22        In order to make a reasonable adjustment for the presence

23   use of money representing a lump sum payment of anticipated

24   future loss, you must apply what is called a below-market

25   discount rate.

1      In making that calculation you should first determine the

2  net after-tax income the plaintiff would have received during

3  the remainder of the plaintiff's working life including any

4  increases the plaintiff would have received as a result of any

5  factors other than inflation.

6      This future income stream must then be discounted or

7  reduced by applying a below-market discount rate which

8  represents the estimate market interest rate the award could

9  be expected to earn over the period of the loss adjusted for

10  the effect of any income tax on the interest so earned and

11  then reduced by the estimated rate of future price inflation.

12      You have heard the testimony of an economist concerning

13  this calculation and his opinion concerning the appropriate

14  below-market discount rate, and while you are not bound by

15  that opinion, you may rely upon it as an aid in resolving this

16  issue.

17      Now, of course, the fact that I've given you instructions

18  concerning the issue of plaintiff's damages should not be

19  interpreted in any way as an indication that I believe the

20  plaintiff should or should not prevail in this case.

21      Any verdict that you reach must, of course, be unanimous,

22  which means, of course, that you all have to agree.  Your

23  deliberations will be secret.  You will never have to explain

24  your verdict to anyone.  And we'll talk more about that after

25  the trial.

1     It is your duty as jurors to discuss the case with each

2 other in an effort to reach agreement if you can do so.  Each

3 of you must decide the case for yourself, but only after full

4 consideration of the evidence with the other members of the

5 jury.

6     While you are discussing the case do not hesitate to

7 reexamine your own opinion and change your mind if you become

8 convinced that you were wrong, but do not give up your honest

9 beliefs solely because the others think differently or merely

10 to get the case over with.

11     Remember that in a very real way, you are judges, judges

12 of the facts.  Your only interest is to seek the truth from

13 the evidence in the case.

14     When you go to the jury room the first thing you need to

15 do is to select a foreperson.  The foreperson will preside

16 over your deliberations and will speak on your behalf when

17 it's necessary to communicate with the Court.  And I'll talk a

18 little bit about that in just a minute.

19     But, first, we're passing out the verdict form.  We've

20 made a copy for each of you.  Of course, you'll have the

21 original with you.  And let's go over that.  It's titled

22 Special Interrogatories to the Jury, interrogatories being

23 simply a word that lawyers like to use for some reason.  It's

24 basically questions.  You've got six questions that you have

25 to answer.

1    The first question concerns the negligence claim:  Do you

2    find by a preponderance of the evidence that the defendant was

3    negligent in the manner claimed by the plaintiff and that such

4    negligence was a legal cause of damage to the plaintiff?

5    Note that that incorporates, that question, the two

6    things the plaintiff has to prove:  Negligence and legal

7    cause.  Your answer is yes or no.  If you answer no, you'll

8    proceed the question four, and we'll go over that in a moment.

9    If you answer yes, you simply proceed to question two.

10   Question two:  Do you find from a preponderance of the

11   evidence that the plaintiff was also negligent in the manner

12   claimed by the defendant and that such negligence was a legal

13   cause of the plaintiff's own damages?

14   This, of course, contains the elements of the plaintiff

15   -- or, pardon me, the defendant's claim that the plaintiff was

16   negligent and the two elements of that, negligence by the

17   plaintiff that was a legal cause of the plaintiff's injury.

18   You answer yes or no.

19   If you answer yes to question two, you'll see in question

20   three you're asked this question:  What proportion or

21   percentage of the plaintiff's damage do you find from a

22   preponderance of the evidence to have been legally caused by

23   the negligence of the respective parties?

24   You'll recall the charge that I gave you on this.  If you

25   do find some negligence on the part of the plaintiff in

1    accordance with my instructions you would assign the

2    appropriate percentage to each of the parties here in your

3    response to question three.  And as the note says, the

4    percentages should add up to 100 percent.

5        Question four concerns one of the plaintiff's Safety

6    Appliance Act claims:  Do you find from a preponderance of the

7    evidence -- that's the introductory clause, remember -- that

8    the defendant violated the Safety Appliance Act and that such

9    violation was a legal cause of damage?

10        Again, it's got both elements that the plaintiff must

11   prove to prevail on that claim:  A violation and legal cause.

12   You will answer yes or no depending upon your findings.

13        Question five does the same thing for the Safety

14   Appliance Act regulations that I mentioned in the instructions

15   I've just given you, and if the plaintiff has proven that

16   claim by a preponderance of the evidence, you would answer

17   yes.  If the plaintiff has not proved that claim, you would

18   answer no, again, in accordance with the instructions I've

19   given you.

20        The final question you get to if you have answered yes to

21   questions one, four, or five -- and/or five.  If you have

22   answered yes to questions one, four, and/or five, that means

23   you have reached the issue of damages and you will be asked in

24   question six:  What sum of money do you find from a

25   preponderance of the evidence to be the total amount of the

1    plaintiff's damages?  And you simply put whatever your

2    findings are on each of the three elements of damages that I

3    have instructed you on.

4         Your foreperson, after you have answered all the

5    questions, will sign in the appropriate place, and the

6    remaining 11 will all sign the verdict.

7         All right.  In just an a moment you will retire to the

8    jury room.  We will bring the original verdict form back,

9    along with the exhibits.  When you have reached a verdict,

10   again, make sure that the verdict form has been properly

11   executed, let the court security officer know, and we'll bring

12   you back in to the courtroom to deliver your verdict to the

13   Court.

14        If you should need to communicate with me at any time

15   during your deliberations, do so in writing.  Write what your

16   question or point is, and the court security officer will

17   bring that to me, and I will decide how to address it.

18        Now, that concerns questions you might have about the

19   substance of what we're doing here.  If you have a questions

20   about when can we go to lunch or something like that, just

21   pass that out through the court security officer and we'll

22   deal with that.

23        And why don't we deal with it right now.  When you go

24   back, just decide if you want to break for lunch first, if you

25   want to deliberate for a while.  It's up to you.  Simply let

1    us know that you wish to go to lunch.  And we won't bring you

2    back in courtroom for that.  But let the court security

3    officer know, and he'll let me know.  I would suggest, you

4    know, try and hold your lunch to an hour or less at this point.

5        While you're at lunch or while you're on any break,

6    though, you're not in your deliberations because you're not

7    all going to be together.  You only deliberate, you only talk

8    about this case when the 12 of you are in the jury room.

9        All right.  You may now retire to the jury room, and we

10   will be bringing to you shortly, immediately, the verdict form

11   and the exhibits.

12   *(Jury Excused, 11:52 a.m.)*

13       **THE COURT:**  All right, I'll let you make your formal

14   exceptions to the charge in just a moment, but anything I need

15   to do to correct anything I did wrong in the delivery of the

16   charge that was submitted that anybody contends I need to

17   bring them back in and correct that?

18       **MR. LAMPROS:**  Nothing from the plaintiff, Your Honor.

19       **THE COURT:**  Defendant?

20       **MS. MORRIS:**  I'm just concerned, Your Honor, that one

21   of our changes did not get made to the charges which I can

22   address as a formal exception also whenever we get there.  But

23   on page 14 under the contributory negligence charge there's

24   the use of the word plaintiff sole cause of injury, any

25   injuries suffered by the plaintiff was his failure to exercise

1    ordinary care for his own safety.  But in the definition of

2    negligence the word reasonable care was used, and yesterday I

3    mentioned that we preferred ordinary care and we thought

4    ordinary care was the proper term to use there in the

5    definition of negligence, but that at any rate it should be

6    consistent for both the plaintiff and the defendant, and I do

7    not believe that change was made on page 14 for the

8    contributory negligence charge.

9        **THE COURT:**  Where exactly do you say that should have

10   been made?

11       **MS. MORRIS:**  On the first full paragraph on page 14,

12   the second sentence.

13       **THE COURT:**  Yes.

14       **MS. MORRIS:**  That instead of failure to exercise

15   ordinary care, it should be plaintiff failed to exercise

16   reasonable care for his own safety.  In order to keep the

17   definition for negligence consistent for both the plaintiff

18   and the defendant.

19       **MR. LAMPROS:**  Your Honor, the charges don't define

20   defendant's negligence and plaintiff's negligence.  The

21   charges simply define negligence, and it's the pattern charge.

22       **THE COURT:**  Well, Ms. Morris, are you requesting they

23   be brought back in here and instructed?

24       **MS. MORRIS:**  No, Your Honor, I just want to put it on

25   the record and make sure that's it's preserved.

1      **THE COURT:**  I'll bring them back in if that's what you

2   want.

3      **MS. MORRIS:**  Yes, Your Honor.

4      **MR. LAMPROS:**  Your Honor, are you going to recharge the

5   entire charge?

6      **THE COURT:**  I am.  Is that still what you want?

7      **MS. MORRIS:**  I'll just withdraw, Your Honor.  We'll

8   just leave it as is.  I just want to make sure it's on the

9   record.

10      **THE COURT:**  Well, it's on the record that you don't

11   want me to bring them back in.

12      **MR. TOTH:**  We understand.

13      **MS. MORRIS:**  We understand.

14      **THE COURT:**  Okay.  Anything else?  All right.  Now, Mr.

15   Lampros, let me have your exception to the charge.

16      **MR. LAMPROS:**  The plaintiff has no exceptions to the

17   charge, Your Honor.

18      **THE COURT:**  Ms. Morris or Mr. Toth?

19      **MS. MORRIS:**  Yes, Your Honor.  I'm not sure what order

20   the Court would prefer me do this in.  Since the charges are

21   not numbered, I was just going to try to go by topic if that's

22   okay and reference to the page numbers.

23      **THE COURT:**  Well, probably by subject matter would be

24   the best way.

25      **MS. MORRIS:**  Yes, Your Honor.  Okay.  The first

1    exception, of course, the Court is well aware of the

2    defendant's position with respect to the Safety Appliance Act

3    and the regulation under the Safety Appliance Act, but I want

4    to put our formal exception to those charges that were given.

5        Defendant's position is that the jury should not be

6    charged at all on the Safety Appliance Act or any regulations

7    promulgated under the Safety Appliance Act.  We would

8    incorporate all of our prior arguments on that issue in the

9    partial motion for summary judgment, our motion in limine,

10   arguments at the pretrial conference, the conference calls

11   that the Court held with the parties, our motion for judgment

12   that was made yesterday, and the arguments in the charge

13   conference yesterday.

14       All of the evidence in this case shows that welding truck

15   was at the Pilot Gas Station, Vienna, Georgia at the time this

16   incident.  Defendant's position, of course, is that the Safety

17   Appliance Act does not apply in such a situation when the

18   welding truck was not on the railroad lines at the time of the

19   incident.

20       Therefore because defendant believes the Safety Appliance

21   Act does not apply, the jury should not be charged on that,

22   and because the statute would not be applicable, any

23   regulatory scheme promulgated under that would also not be

24   applicable, including the charge given on the regulation about

25   the track motorcar being equipped with safe and suitable sill

1    steps or footboards, conveniently located and securely

2    fastened to a car in the bed or deck of the track motorcar is

3    more than 24 inches above the ground.  Defendant takes formal

4    exception to giving the charge on that regulation.

5         **THE COURT:**  Anything else?

6         **MS. MORRIS:**  Yes, Your Honor, I want to make sure the

7    Court knew I was moving on to the next topic.  Defendant would

8    take exception to the Court's failure to give the jury a

9    charge on the tier one and tier two taxes.  Defendant made a

10   motion in limine on this issue with the economist, Dr.

11   Thompson's failure to use the proper methodology in

12   calculating the lost benefits as part of those lost earnings.

13        There's obviously a disagreement over the methodology

14   that an economic should use in an FELA case to calculate that,

15   and defendant believes it's err to not instruct the jury on

16   the proper way to calculate lost earnings and deduct the tier

17   one and tier two contributions, the taxes.

18        We would also except to the Court's failure to give a

19   complete instruction on mitigation.  Defendant submitted

20   additional mitigation instructions other than the charge given

21   on mitigation by the Court.

22        We believe a more complete instruction on the law for

23   mitigation and the plaintiff's duty to mitigate his damages

24   would include defendant's request to charge 28, which

25   specifically references an employee suing under the FELA, and

that it is the employee's -- that where the employee chooses to not return to gainful employment, that's not a proximate result of the defendant's conduct.  That charge more clearly defines the plaintiff's duty and that the jury cannot assign those damages to the defendant.

Also defendant requested in charge 29 on mitigation of damages that also further provides a complete definition of the plaintiff's duty or his burden and duty to mitigate, that he cannot wait passively for employment or opportunities to fall in his lap.

I believe the evidence would support these two charges. The plaintiff had elicited testimony about the defendant's voc-rehab department and the defendant's failure to do anything to help the plaintiff get back to work, but these charges clearly define that the plaintiff cannot wait passively for anyone, including the defendant to put him back -- to get him back to work.  Those two charges would clarify that it's the plaintiff's responsibility to find employment.

The next exception would be on the impeachment charge. As stated yesterday during the charge conference, I believe that's not a complete statement of what the jury should do if they find that a witness was successfully impeached.

In addition, defendant would further except to the charge defining legal cause and the language "no matter how small." We believe the correct standard for legal cause and the

1  correct definition would be whether any negligence of

2  defendant caused in whole or in part an injury to the

3  plaintiff.

4      And, again, on the issue with a difference between the

5  standard for negligence as applied to the plaintiff and then

6  as applied to the defendant, as I just explained before we

7  officially began the exceptions, ordinary care was used for

8  the plaintiff on page 14, and then for defendant on page 12

9  reasonable care was used.

10     And it's the defendant's position that the standard

11 should be the same as applied to the plaintiff and as applied

12 to the defendant for both negligence and contributory

13 negligence those should be the same.  It's the same burden of

14 proof and that should be clear to the jury, and we would take

15 exception to that not being the same application to both

16 parties.  That's all, Your Honor.

17     **THE COURT:**  Okay.  The jury has gone to lunch, so watch

18 out for them if you leave the courthouse.  We'll be in recess

19 until we hear from the jury.

20 *(RECONVENED; ALL PARTIES PRESENT)*

21     **THE COURT:**  We have a request from at least one juror.

22 I thought it would be better to discuss it with the lawyers.

23 She would like it, as she put it, notebooks apparently to help

24 her explain some things that she wants to explain.  Not the

25 contents of the notebooks, but just presumably to use the

1    notebooks as steps or whatever.  I can't think of any reason

2    not to comply with that.  If we were, I mean, I would want to

3    be conscious of what's in the notebooks.  We've probably still

4    got some Martindale-Hubbells around here which might be a good

5    thing to use that for.  I don't know they're used for anything

6    else anymore.  Not the Georgia edition, but, you know, some

7    other state so they wouldn't be looking up lawyers or anything

8    like that.  Mr. Lampros, what do you think?

9         **MR. LAMPROS:**  You mean like textbooks?

10        **THE COURT:**  Well, you know, the Martindale-Hubbell book?

11        **MR. LAMPROS:**  Yeah.

12        **THE COURT:**  Yeah, again, it's not for purposes of the

13   content.  It's -- all I know is she wants them to use

14   something like that to demonstrate.

15        **MR. LAMPROS:**  I'm okay with it.

16        **THE COURT:**  Mr. Toth?

17        **MR. TOTH:**  One minute, Your Honor.  Are they asking for

18   a tape measure, Your Honor, or is it just --

19        **THE COURT:**  No.

20        **MR. TOTH:**  I'm curious, but I guess the only way we see

21   what's behind door number one back there is to let that happen.

22        **THE COURT:**  And I don't know this, but I suspect it

23   might in large part be prompted by your suggestion to them in

24   your closing that they do some demonstrations.  Who knows, but

25   I don't see any harm in it and since there's no objection

1    we'll get them their books.  But it will be, hopefully it will

2    be -- I wouldn't even want to give them a case book because

3    who knows what they'd look in there and think they found.  But

4    I don't see any harm in a Martindale-Hubbell from some other

5    state.

6          MR. LAMPROS:  And it's probably old anyway.

7          THE COURT:  Yeah, yeah.  So we'll do that then.  We are

8    recessed until we hear from them again.

9    *(RECONVENED; ALL PARTIES PRESENT)*

10         THE COURT:  I understand we have verdict, so let's

11   bring the jury in.

12   *(Jury In, 4:00 p.m.)*

13         THE COURT:  Ladies and gentlemen, I understand you have

14   verdict?

15         JUROR:  Yes, we do, Your Honor.

16         THE COURT:  Are you the foreman, sir?

17         JUROR:  Yes.

18         THE COURT:  Tell me your name again?

19         FOREMAN:  Marvin Whiteside.

20         THE COURT:  Is the verdict unanimous?

21         FOREMAN:  The verdict is unanimous.

22         THE COURT:  Virtually?

23         FOREMAN:  It's unanimous.  It's all signed.

24         THE COURT:  Okay.  Would you hand it to Mr. Payne,

25   please.  The verdict does appear to be -- it is in order with

the exception that it hasn't been dated.  So, Mr. Whiteside,
that's easy enough to fix.  Mr. Payne?  On the very last page
you'll see there's a place for the date, and the date today is
the 2nd.  And, Ms. Hatcher, you may publish the verdict.

**COURTROOM DEPUTY:**  In the United States District Court
for the Middle District of Georgia, Macon Division, Paul
Windom versus Norfolk Southern Railway Company, civil action
number 5:10-CV-407:

Do you find from a preponderance of the evidence that the
defendant was negligent in the manner claimed by the plaintiff
and that such negligence was a legal cause of damage to the
plaintiff?  Yes.

Number two:  That the plaintiff was also negligent in the
manner claimed by the defendant and that such negligence was a
legal cause of the plaintiff's own damage.  Yes.

Number three:  If you answered yes to question two, what
proportion or percentage of the plaintiff's damage do you find
from a preponderance of the evidence to have legally caused --
to have been legally caused by the negligence of the
respective parties?  The defendant, 10 percent.  The
plaintiff, 90 percent.

Number four:  That the defendant violated the Safety
Appliance Act and that such violation was a legal cause of
damage to the plaintiff.  They checked the box, no.

Number five:  That the defendant violated the Safety

1   Appliance Act regulation and that such violation was a legal

2   cause of damage to the plaintiff.  They checked the box, no.

3       Number six:  If you answered yes to questions one, four,

4   and/or five, what sum of money do you find from a

5   preponderance of the evidence to be the total amount of the

6   plaintiff's damages without adjustment by application of any

7   percentages you may have given in answer to question three.

8       (A)  Net lost wages and benefits to the date of trial:

9   $100,000.

10      (B)  Net lost wages and benefits in the future reduced to

11  present value:  $100,000.

12      Physical and emotional pain and mental anguish:  Zero.

13      It is signed by the foreperson and concurred by the 11

14  remaining jurors.

15      **THE COURT:**  Mr. Lampros, any exceptions to the form of

16  the verdict?

17      **MR. LAMPROS:**  None, Your Honor.

18      **THE COURT:**  Mr. Toth?

19      **MR. TOTH:**  None, Your Honor.

20      **THE COURT:**  Anything further we need to do with this

21  jury?

22      **MR. LAMPROS:**  Not that I can think of, Your Honor.

23      **MR. TOTH:**  None by the defendant.

24      **THE COURT:**  All right, ladies and gentlemen, that does

25  complete your service as jurors for this term of court.  You

1   may now retire to the jury room.  Ms. Hatcher will come back

2   there and speak to you.  We're going to need to keep you just

3   a little bit longer but not too much longer.  We'll remained

4   seated while you return to the jury room.

5   *(Jury Excused)*

6        **THE COURT:**  All right.  I assume that what this

7   means -- let me see if you agree -- that a judgment will be

8   entered in favor of the plaintiff for $20,000.

9        **MR. LAMPROS:**  I agree, Your Honor.

10        **THE COURT:**  Mr. Toth?

11        **MR. TOTH:**  I agree, Your Honor.

12        **THE COURT:**  Who's going to prepare that judgment?

13        **MR. LAMPROS:**  I can prepare it, Your Honor.

14        **THE COURT:**  We typically do, but why don't you do that,

15   Mr. Lampros, it's a little bit different.  All right, anything

16   further?

17        **MR. LAMPROS:**  Are we permitted to speak to the jurors?

18        **THE COURT:**  Yes.  In fact, I'm going to go back and

19   talk to them for just a few moments.  I tend to do that.  I

20   learned that from Judge Fitzpatrick.  I will tell them that

21   they can, they don't have to.  I'll tell them the lawyers

22   won't badger them, but that they may well contact them and

23   whether or not they speak to the lawyers is up to them.

24   Anything else?

25        **MR. LAMPROS:**  That's all for us.

1       THE COURT:  All right.  Mr. Toth?

2       MR. TOTH:  No, thank you, Your Honor.

3       THE COURT:  This matter is adjourned.

4       *(CIVIL JURY TRIAL CONCLUDED AUGUST 2, 2012)*

5   _____

6       *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
    *TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE*
7   *ABOVE-ENTITLED MATTER THIS 5th DAY OF NOVEMBER, 2012.*

8       *s/SALLY L. GRAY, USCR,*
    *U.S. DISTRICT COURT-MIDDLE DISTRICT OF GEORGIA*
9   *E-mail: Sally_Gray@gamd.uscourts.gov*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25